UNITED STATES DISTRICT COURT : EASTERN DISTRICT OF VIRGINIA

PATRICIA A. DAVIS, PAUL R. DAVIS JR ESTATE, PAUL R DAVIS SR. ESTATE , RUTH E. DAVIS ESTATE, PAUL R. DAVIS ET AL.

**Additional evidence filed for DAVIS ESTATE, PAUL R. DAVIS ET AL.**
**120 Kidd Blvd**

120 Kidd Blvd

Norfolk VA 23502 Date: June, 21, 2024

Case No.:

COMMONWEALTH OF VIRGINIA

202 N 9th St, RICHMOND, VA 23219

V.

COMMISSIONER OF HIGHWAYS

VIRGINIA DEPT OF TRANSPORTATION

1401 E. BROAD ST.

RICHMOND VA 23219

V.

BROCK FARMS REALTY INC.

303 34TH ST.

VIRGINIA BEACH VA 23451

V.

CITY OF NORFOLK

810 UNION ST.

NORFOLK VA 23510

UNITED STATES DISTRICT COURT : EASTERN DISTRICT OF VIRGINIA

HAMPTON ROADS TRANSPORTATION ACCOUNTABILITY COMMISSION

723 WOODLAKE DR.

CHESAPEAKE, VA 23320

Evidence PAGE

1. Article 1-2
2. Letter of Liability City Assessor 3-5
3. Letter of Liability City Tax Attorney 6
4. City GIS MAP 7
5. Cover up bid to fix GIS once we tell them about fraud 8
6. Sign at 330 Peace Haven Dr 9
7. Info Brock Farms INC 10-13
8. Original 1957 Deed 14 15
9. Mill Creek USGS name change 16
10. Risk & Reward Survey 17-54
11. Black Masks 55
12. Programmatic Agreement 56-70
13. CE Categorical Exculsionary Document 71-95
14. Initial Financial Plan 96-106
15. Checks to Brock Farms Realty 107-108
16. Title Search 109-111
17. Deed agreement of the .016 contract 112-114
18. Deed of correction 115-117
19. Title search info118-123
20. Appraisals and turn downs deprived financial expectations 124-176
21. US HWY 1964 Project Plans 177-214
22. VDOT 2016 Project Plans 215-231

THOUGHT LEADERSHIP

Alerts

Published: June 27, 2019

# Property Owners May Now Bring Takings Claims Directly to Federal Court

**Services**

Construction & Design

Construction Litigation

Public Law

**Industry**

Real Estate, Development & Construction

**Professionals**

**Katharine D. David**

Houston: 713.525.6258

kate.david@huschblackwell.com

**Jeffery T. Nobles**

Houston: 713.525.6239

jeff.nobles@huschblackwell.com

**Mike Stafford**

Houston: 713.525.6259

**Key Point**

- Property owners may now bring a regulatory takings or inverse condemnation claim in federal court without first exhausting state court remedies, overruling *Williamson County*.

On June 21, 2019, the U.S. Supreme Court ruled that property owners who have had their property taken by state or local governments without compensation may file a Fifth Amendment takings claim in federal court without first having to exhaust remedies in state court. The decision, *Knick v Township of Scott, Pennsylvania*, No. 17-647, overruled *Williamson County Regional Planning Commission v Hamilton Bank of Johnson City*, 473 U.S. 172, an oft-criticized precedent that required takings claims to first be heard in state court.

Under the Fifth and Fourteenth Amendments to the U.S. Constitution, a property owner has a "takings" claim against the government when government action (such as a regulation) goes too far in restricting the owner's use. *Williamson County* created two procedural prerequisites to bringing a takings claims in federal court: (1) the "final decision" requirement, holding that the government had to have made a final decision on what uses were allowed to the owner under the government regulation; and (2) the owner must have been denied compensation by the government, and sued the government in state court first (the "state litigation" requirement).

The Catch-22 was that, under other Supreme Court precedent, if a landowner lost in state court, the owner's claim was barred in federal court. It is this Catch-22 that the Supreme Court addressed, and resolved, in *Knick*.

© 2022 Husch Blackwell LLP. All rights reserved

Knick owned 90 acres of rural residential land with a small burial site. She was fined by the Township of Scott, Pennsylvania, for allegedly violating a township ordinance that all cemeteries must be kept open to the public during the day. Knick claimed that the regulation deprived her of the full use of her property without compensation and sued in federal court under the Fifth and Fourteenth Amendments—without previously obtaining a final determination on compensation from a state court. Relying on *Williamson County*, the Third Circuit Court of Appeals found that Knick's federal claim was barred because Knick had not been finally denied compensation by a state court.

The Supreme Court reversed and overruled *Williamson County*'s state litigation requirement. The court held that because a takings claim under the Fifth and Fourteenth Amendments is a constitutional claim, 42 U.S.C. § 1983 provides a federal cause of action in federal court, without the need to exhaust state remedies: "A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it."

**What this means to you**

*Knick* significantly changes the landscape for property owners who wish to sue the government for takings or inverse condemnation claims. Those claims may now be brought in federal court without the owner having previously litigated the issue in state court. Those property owners are also entitled to bring a § 1983 claim for the taking in state court if they choose (although such claims would likely be subject to removal by municipal or state defendants). For developers and property owners who claim that strict development regulations or zoning rules have the effect of "taking" their property, those parties now have access to the federal courts.

From the perspective of a government entity, Knick does not create new causes of action or additional liability, but it does expose the government to proceedings in federal court rather than state court. And *Williamson County*'s "final decision" requirement is still good law. Claims brought before the government entity has made a final determination of what uses will still be permissible are not ripe.

**Contact us**

If you have questions about this update or how it might affect your business, contact Kate David, Jeff Nobles, Heidi Rasmussen, Mike Stafford, Ben Stephens or your Husch Blackwell attorney.

© 2022 Husch Blackwell LLP. All rights reserved



THE CITY OF
NORFOLK

OFFICE OF THE REAL ESTATE ASSESSOR
810 Union Street, Room 402
Norfolk, Virginia 23510
(757) 664-4732

February 4, 2019

Paul R and Patricia A Davis
120 Kidd Boulevard
Norfolk, VA 23502

RE: 120 Kidd Boulevard

Dear Mr. and Mrs. Davis,

A question was raised by your son regarding the rear boundaries of your lot located on the east side of Kidd Boulevard adjacent to Newtown Creek. Our research has confirmed that, by certain deeds of correction recorded around 1956, many of these lots have property lines that extend beyond those depicted on the original subdivision plat entitled "Subdivision of Part of McGinnis Tract, River Forest Shores". The property lines for the affected lots actually extend to the western shoreline of Newtown Creek. These deeds of correction were evidently overlooked by city employees at the time. As a result, even though certain property owners on the east side of Kidd Boulevard owned the property, they were not assessed for the land within the extended area.

Our office authorized a re-delineation of the parcel boundaries for the affected properties. Your property at 120 Kidd Boulevard is affected; however, because the additional land area (approximately 17,593 square feet) adds little additional utility to the use of your property, any <u>land</u> value change due to the extension of the parcel boundaries should be less than $5,000. I have enclosed "before and after" maps of the affected parcels which should illustrate the changes.

The effective date of the parcel boundary extension is 7/1/2019.

This office is completing its work for the 2019 reassessment of real estate. Assessment notices will be mailed in mid-March 2019. Your 2019 assessment for 120 Kidd Boulevard has not been finalized, which is the reason I cannot be more specific at this point about the value of land. The overall value (land and buildings) of your property might experience a change in value due to market conditions external to the issue of parcel boundaries.

Please feel free to contact this office if you have questions or concerns in this matter.

Sincerely,

William A (Pete) Rodda, CAE, RES
Real Estate Assessor



Before Changes
Legend
Property Parcels
Home Address
100 KIDD BOULEVARD
104 KIDD BOULEVARD
108 KIDD BOULEVARD
112 KIDD BOULEVARD
116 KIDD BOULEVARD
120 KIDD BOULEVARD
124 KIDD BOULEVARD
128 KIDD BOULEVARD
132 KIDD BOULEVARD
136 KIDD BOULEVARD
140 KIDD BOULEVARD
144 KIDD BOULEVARD
148 KIDD BOULEVARD
5968 SELLGER DRIVE
5972 SELLGER DRIVE
200 EAST MCGINNIS CIRCLE
204 EAST MCGINNIS CIRCLE
330 PEACE HAVEN DRIVE
EDISON AVENUE
0 0.0150.03 0.06 0.09 0.12
Miles
N

After Changes
Legend
Property Parcels
Home Address
100 KIDD BOULEVARD
104 KIDD BOULEVARD
108 KIDD BOULEVARD
112 KIDD BOULEVARD
116 KIDD BOULEVARD
120 KIDD BOULEVARD
124 KIDD BOULEVARD
128 KIDD BOULEVARD
132 KIDD BOULEVARD
136 KIDD BOULEVARD
140 KIDD BOULEVARD
144 KIDD BOULEVARD
148 KIDD BOULEVARD
5968 SELLGER DRIVE
5972 SELLGER DRIVE
330 PEACE HAVEN DRIVE
0 0.0150.03 0.06 0.09 0.12
Miles
N

Mr. Byler (Gary),

Thanks for your quick response.

I have just completed a thorough review and I would like an opportunity to sit down with you to share it and explain it to you.

Basically said, Mr. Davis is correct in that he does own the property behind his platted lot (all the way to the middle of the creek).

However, he is incorrect in his statement that the City has made a claim to or taken any of his property.

Please let me know when you might have some time soon for me to review this matter with you.

If it is convenient, we can meet in my office here at City Hall.

I look forward to hearing from you.

Thanks,


Alex H. Pincus
Assistant City Attorney
810 Union Street, Suite 900
Norfolk, VA  23510
E-Mail Address: alex.pincus@norfolk.gov
Phone: 757-664-4529  Direct: 757-664-4213
Fax: 757-664-4201



Not secure | norfolkair.norfolk.gov/norfolkair/Forms/Map.aspx

SEARCH

Overlays None

Real Estate - Residential Property - Vacant Land

Property Detail

| | |
|---|---|
| Account Number | 05212612 |
| GPIN | 1457616938 |
| Parent Account | |
| Owner Name | Brock Farms Realty Inc |
| Property Address | 330 Peace Haven Dr |
| Neighborhood | 252100 |
| Property Use | Vacant Land |
| Plate | 1244 |
| Mailing Address | 453 Pleasant Point Dr Norfolk VA 23502-5703 |
| Legal Description | 6 Ac M/L Brock Prop |
| Parcel Approximate Area (Sq Ft) | 1179700 |
| Parcel Approximate Acreage | 27.0822 |
| House Plate Number | 305 |

Sales / Assessment History

Schools

Municipal Services

Planning

Public Safety

Civic

Code Enforcement Cases

Building Permits

Building Plan Review

Legend

info

+ fade -

+ zoom -

Type here to search

Manag | City of Norfolk | Attachment-H | RFP-7016-City- | RFP-7304-0-20 | RFP-7304-0-20

gov/Bids.aspx?CatID=18&txtSort=Status&showAllBids=on&Status=

THE CITY OF FOLK

Government Business Residents

Bid No. IFB 7066-0-2019/AP

This serves as written notice of the City of Norfolk's rescission of the notice of intent to award dated February 12, 2019.

Closes: 2/20/2019

RFQ 7099-0-2018/AM Carpet Replacement Nauticus

Bid No. RFQ 7099-0-2018/AM

The City of Norfolk is seeking a responsive and responsible vendor to provide Carpet Replacement (Nauticus) according to the terms, conditions, and specifications of...[Read on]

Status: Closed
Closes: 3/13/2019

Cover up MAP Fraud

IRFP 6710-0-2019/DT GIS Property Record Web Application

Bid No. IRFP 6710 GIS Property Record

The purpose of this RFP is to obtain a web-based solution that will replace all functionality of the current custom-built Norfolk AIR web application and provide... [Read on]

Status: Closed
Closes: 3/5/2019

RFQ 7153-0-2019/AM Milk for Norfolk Juvenile Detention Center

Bid No. RFQ 7153-0-2019/AM

The City of Norfolk is seeking a responsible vendor to provide Milk to Norfolk Juvenile Detention Milk to the Norfolk Juvenile Detention Center (" NJDC " ) to the [Read on]

Status: Closed
Closes: 3/1/2019

Services REPOST

Status: Closed

CITY OF NORFOLK PUBLIC UTILITIES EASEMENT
ENTRY NOT AUTHORIZED
BY THE CITY OF NORFOLK UTILITIES IS PROHIBITED
FOR EMERGENCIES AND QUESTIONS
CALL: 757 823-100

)5212612 BROCK FARMS REALTY INC 330 PEACE HAVEN DR 5

Tax ID P161244 05212612 Printed 09/26/2018 Card No. 1 o

BROCK FARMS REALTY INC
453 PLEASANT POINT DR
NORFOLK, VA 23502-5703
6 AC M/L BROCK PROP

Neighborhood Number
252100
Neighborhood Name
Pleasant Point
TAXING DISTRICT INFORMATION

| | |
|---|---|
| Jurisdiction Name | NORFOLK |
| Area | 001 |
| Section & Plat | 1244 |
| Routing Number | 1457616938 |
| Census Tract | 6902 |

Site Description
Topography
Level
Public Utilities

Street or Road

Neighborhood
Static
Zoning:
SF-4
SF-6, SF-T
Legal Acres:
27.0822

**Transfer of Ownership**

| Owner | Consideration | Transfer Date | Deed Book/Page | Deed Type |
|---|---|---|---|---|
| | 0 | 01/31/1997 | SUBD | 0 |

**Valuation Record**

| Assessment Year | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|
| Reason for Change | | Reassess | Reassess | Reassess | Reassess | Reassess | Reassess | Reassess |
| 0 | L | 291600 | 291600 | 291600 | 291600 | 291600 | 291600 | 291600 |
| | I | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | T | 291600 | 291600 | 291600 | 291600 | 291600 | 291600 | 291600 |

**Land Size**

| Land Type | Rating, Soil ID - or - Actual Frontage | Acreage - or - Effective Frontage | Square Feet - or - Effective Depth | Influence Factor |
|---|---|---|---|---|
| Homesite Homesite | 15 | 27.0822 | | 1 -5% 4 -5% |







THE PLATTING OR DEDICATION OF THE FOLLOWING DESCRIBED LAND, "SUBDIVISION OF PLEASANT POINT PHASE 1 – SECTION 2", IS WITH THE FREE CONSENT AND IN ACCORDANCE WITH THE DESIRE OF THE UNDERSIGNED OWNER, PROPRIETORS AND TRUSTEES, IF ANY.

BROCK FARMS REALTY, INC.

Jan 7, 1997 — DATE
Doris B. Brock President — DORIS B. BROCK, PRESIDENT

STATE OF VIRGINIA

CITY OF Virginia Beach, TO-WIT:

I, Barbara Sandwitch, A NOTARY PUBLIC IN AND FOR THE CITY AND STATE AFORESAID, DO HEREBY CERTIFY THAT Doris B. Brock WHOSE NAME IS SIGNED TO THE FOREGOING WRITING, BEARING DATE OF THE 7th DAY OF January, 1997 HAS ACKNOWLEDGED THE SAME BEFORE ME IN MY CITY AND STATE AFORESAID.

GIVEN UNDER MY HAND THIS 7th DAY OF January, 1997.

MY COMMISSION EXPIRES: 10-31-99

Barbara Sandwitch — NOTARY PUBLIC

LOCATION MAP
NOT TO SCALE

I, RUSSELL C. SANDERSON, DO HEREBY CERTIFY THAT THIS PLAT WAS MADE BY ME AT THE DIRECTION OF THE OWNERS, AND IS ENTIRELY WITHIN THE BOUNDARIES OF THE LAND COVERED BY DEED DULY RECORDED IN THE CLERK'S OFFICE OF THE CITY OF NORFOLK, VIRGINIA, AND THAT STEEL PINS ARE IN PLACE AT POINTS MARKED THUS "•" AND THEIR LOCATIONS ARE CORRECTLY SHOWN.

SOURCE OF TITLE AND LAST PLACE OF RECORD:
D.B 1442, PG. 577
CLERK'S OFFICE OF THE CIRCUIT COURT
OF THE CITY OF NORFOLK, VIRGINIA.

COMMONWEALTH OF VIRGINIA
12-24-96
RUSSELL C. SANDERSON
No. 002017
LAND SURVEYOR

| TRAVERSE FROM POINT 'A' TO POINT 'B' UPPER LIMITS OF CBPA WETLANDS | |
|---|---|
| BEARING | DISTANCE |
| N16°35'41"E | 62.96' |
| N18°40'09"E | 20.83' |
| N87°52'16"E | 11.75' |
| N18°00'11"E | 3.00' |
| N42°56'58"W | 19.06' |
| N03°45'07"E | 28.36' |
| N02°11'33"E | 26.57' |
| N02°53'14"W | 17.08' |
| N20°12'19"E | 36.72' |
| N41°16'24"E | 25.06' |
| N26°22'18"E | 48.48' |
| N28°26'19"E | 37.73' |
| N17°26'10"E | 42.74' |
| N13°58'22"E | 27.84' |
| N33°35'29"E | 28.89' |
| N26°45'37"E | 23.09' |
| N54°44'06"E | 27.23' |
| N29°44'48"E | 32.91' |
| N89°51'42"E | 17.82' |
| N41°55'46"E | 84.90' |
| N41°30'27"E | 38.86' |
| N49°05'29"E | 23.08' |
| N45°36'08"E | 37.36' |
| N39°27'45"E | 24.04' |
| N25°33'08"E | 31.29' |
| N06°26'48"W | 40.49' |
| N37°09'44"W | 15.19' |
| N04°44'42"W | 16.63' |
| S85°33'21"W | 14.74' |
| N08°05'39"E | 43.51' |
| N17°00'47"W | 16.75' |
| N21°00'13"E | 32.96' |
| N19°28'06"E | 2.88' |

NOTES:

1.) "o" IRON PIN SET
"•" IRON PIN OR PIPE FOUND

2.) THIS PROPERTY IS CURRENTLY ZONED R-5

3.) THE PROPERTY SHOWN HEREON APPEARS TO BE LOCATED IN ZONES "A4", "B" AND "C" (BY SCALED MAP LOCATION AND GRAPHIC PLOTTING ONLY) THE APPROXIMATE LOCATION OF THE FLOOD BOUNDARIES AS SHOWN ON THE H.U.D. FLOOD HAZARD MAP FOR THE CITY OF CHESAPEAKE, VIRGINIA COMMUNITY-PANEL No. 510104 0004D ARE DEPICTED HEREON.
EFF. DATE: AUGUST 1, 1979
REV. DATE: APRIL 17, 1984
BASE FLOOD ELEVATION FOR ZONE "A4": 8.5

4.) THE TOTAL AREA ENCOMPASSED BY THIS SUBDIVISION IS 353,108 SQ. FT. OR 8.106 ACRES.

5.) UPPER LIMITS OF THE CBPA WETLANDS AS DETERMINED BY WOLFE ENVIRONMENTAL AND ENGINEERING CONSULTANTS IN MARCH 1996 AND AS APPROVED BY THE BUREAU OF ENVIRONMENTAL AFFAIRS.

6.) BMP SIZE AND CONFIGURATIONS ARE CONCEPTUAL AND FINAL DESIGN IS SUBJECT TO SITE PLAN REVIEW AND APPROVAL BY THE CITY OF NORFOLK PRIOR TO CONSTRUCTION.

7.) A LANDSCAPE PLAN SHALL BE PROVIDED AT THE TIME OF SITE PLAN REVIEW AND APPROVAL FOR EACH LOT, FOR THE PURPOSES OF MITIGATION AS PER THE CBPA SECTION OF CITY OF NORFOLK ZONING ORDINANCE.

THE UNDERSIGNED CERTIFY THAT THIS SUBDIVISION AS IT APPEARS ON THIS PLAT CONFORMS TO THE APPLICABLE REGULATIONS RELATING TO THE SUBDIVISION OF LAND AND IS ACCORDINGLY APPROVED.

BY SUCH APPROVAL, THE UNDERSIGNED DO NOT CERTIFY TO THE CORRECTNESS OF THE BOUNDARY, STREETS AND OTHER LINES ON SAID PLAT.

APPROVED: Leonard M. Newcomb — DEPARTMENT OF CITY PLANNING, NORFOLK, VA — DATE: 1/27/97

APPROVED: Susan D. Hamilton — DEPARTMENT OF UTILITIES, NORFOLK, VA — DATE: 1/30/97

APPROVED: [signature] — DEPARTMENT OF PUBLIC WORKS, NORFOLK, VA — DATE: 1/31/97

SUBDIVISION OF
# PLEASANT POINT
PHASE 1 – SECTION 2
NORFOLK — VIRGINIA

HOGGARD/EURE ASSOCIATES, P.C.
Surveyors/Planners/Engineers
Portsmouth, Virginia 23703

| | |
|---|---|
| DRAWN BY: | SPR |
| COMP. BY: | RCS |
| CHECKED BY: | RCS |
| SCALE: | NONE |
| DATE: | DECEMBER 24, 1996 |
| REV.: | |
| SHEET NO. | 1 OF 2 |

1283\50PLAT.DWG

PROJECT No. 1283-96

1275-97 50/114 & 115 1-31-97 2:30pm

| CURVE | RADIUS | DELTA | ARC | TANGENT | CHORD BEARING | CHORD |
|---|---|---|---|---|---|---|
| 1 | 750.00' | 10°56'45" | 143.28' | 71.86' | S 24°58'23" W | 143.06' |
| 2 | 450.00' | 23°41'45" | 186.11' | 94.40' | S 18°35'53" W | 184.78' |

geonames.usgs.gov/apex/f?p=GNISPQ:3:::NO::P3_FID:1480013

USGS science for a changing world

Query Result FAQs

## Feature Detail Report for: Nosehs Creek

ID: 1480013
Name: Nosehs Creek
Class: Stream (Definitions)
Citation: Number used by USGS - Used in the Chesapeake, VA area project, c1989.
Entry Date: 13-Sep-1996
*Elevation: -3/-1

*Elevations in feet/meters from the National Elevation Dataset

### Counties

| Sequence | County | Code | State | Code | Country |
|---|---|---|---|---|---|
| 1 | Norfolk (city) | 710 | Virginia | 51 | US |

### Linear Feature (Stream, Valley, Arroyo) Mouth

| Sequence | Latitude(DEC) | Longitude(DEC) | Latitude(DMS) | Longitude(DMS) | Map Name |
|---|---|---|---|---|---|
| 1 | 36.8295924 | -76.2016039 | 364947N | 0761206W | Kempsville |

**Mapping Services**

- GNIS in ESRI Map
- USGS The National Map
- HomeTownLocator
- ACME Mapper 2.0
- Microsoft Virtual Earth
- Find the Watershed

**Important Links**

- GNIS Home
- U.S. Board on Geographic Names
- Mapping Information

Search for anything

11:22 AM
11/27/2020

BOOK 501 PAGE 396

WILLIAM R. PEFLEY, ET UX
TO ( B. & S.
PAUL R. DAVIS, ET UX TAX $19.95 4974

THIS DEED, Made this 24th day of June, 1957, between WILLIAM R. PEFLEY and DOROTHY E. PEFLEY, his wife, parties of the first part, and PAUL R. DAVIS and RUTH E. DAVIS, husband and wife, parties of the second part.

WITNESSETH: That for and in consideration of the sum of Ten Dollars ($10.00) cash in hand paid and other good and valuable considerations, the receipt whereof is hereby acknowledged, the said parties of the first part do hereby grant and convey, with general warranty, unto the said parties of the second part, as tenants by the entireties with the right of survivorship as at common law, the following property, to-wit:

All that certain lot, piece or parcel of land and all of the property and riparian and other rights in and to the property extending beyond Lot 3 unto the center of Mill Creek, as described in the deed of Benjamin T. Backus et ux, to the McGinnis Industrial Center, Incorporated, dated May 20th, 1949, and recorded in the Clerk's Office of the Circuit Court of Princess Anne County, Virginia, in Deed Book 263, at page 459, situated in the County of Princess Anne, Virginia, Kempsville Magisterial District, known and numbered as LOT THREE (3), in BLOCK A of Section I, as shown on the plat of "Subdivision of part of McGinnis Tract, River Forrest Shores, Princess Anne County, Virginia", made by Philip B. Freeman, C.E., dated June, 1952, which plat is duly of record in the aforesaid Clerk's Office in Map Book 32, at page 6, reference to which is hereby made for a more particular description of the said property.

It being the same property conveyed to the said William R. Pefley by deed of Hugo E. Seliger and A. Edna Seliger, dated June 26, 1956, and duly recorded in said Clerk's Office in Deed Book 419, at page 490.

This conveyance is made subject to the conditions, restrictions, easements and reservations of record, if any, affecting the aforesaid property and constituting constructive notice.

The said parties of the first part covenant that they have the right to convey the said property to the grantees; that the said grantees shall have quiet and peaceable possession of said property, free from all encumbrances; that they, the said parties of the first part, have done no act to encumber the said property; and that they, the said parties of the first part, will execute such further assurances of the said property as may be requisite.

Witness the following signatures and seals:

William R. Pefley (SEAL)
William R. Pefley

Dorothy E. Pefley (SEAL)
Dorothy E. Pefley

STATE OF VIRGINIA

CITY OF NORFOLK, to-wit:

I, John B. James, a Notary Public in and for the City and State aforesaid, whose notarial commission expires on the 20th day of September, 1960, do hereby certify that William R. Pefley and Dorothy E. Pefley, whose names are signed to the writing above bearing date on the 24th day of June, 1957, have acknowledged the same before me in my City and State aforesaid.

Given under my hand this 24th day of June, 1957u.

John B. James
Notary Public

VIRGINIA: In the Clerk's Office of the Circuit Court of Princess Anne County, on the 24th day of June 1957 at 9:40 A.M., this Deed was received and upon the certificate of acknowledgment thereto annexed, admitted to record.

TESTE: JOHN V. FENTRESS, Clerk
By Mary E. Cooper D. C.

John B. James, atty.
Board of Trade Building
Norfolk 10, Va.
7/1/57



geonames.usgs.gov/apex/f?p=GNISPQ:3:::NO::P3_FID:1480013

USGS
science for a changing world

Query | Result | FAQs

## Feature Detail Report for: Nosehs Creek

ID: **1480013**
Name: **Nosehs Creek**
Class: **Stream** (Definitions)
Citation: **Number used by USGS - Used in the Chesapeake, VA area project, c1989.**
Entry Date: **13-Sep-1996**
*Elevation: **-3/-1**

*Elevations in feet/meters from the National Elevation Dataset

## Counties

| Sequence | County | Code | State | Code | Country |
|---|---|---|---|---|---|
| 1 | Norfolk (city) | 710 | Virginia | 51 | US |

## Linear Feature (Stream, Valley, Arroyo) Mouth

| Sequence | Latitude(DEC) | Longitude(DEC) | Latitude(DMS) | Longitude(DMS) | Map Name |
|---|---|---|---|---|---|
| 1 | 36.8295924 | -76.2016039 | 364947N | 0761206W | Kempsville |

**Mapping Services**

- GNIS in ESRI Map
- USGS The National Map
- HomeTownLocator
- ACME Mapper 2.0
- Microsoft Virtual Earth
- Find the Watershed

**Important Links**

- GNIS Home
- U.S. Board on Geographic Names
- Mapping Information

Search for anything

11:22 AM
11/27/2020

# I-64/264 Interchange Project

## Summary Risk Workshop Report

December 9, 2014

# TABLE OF CONTENTS

Executive Summary .......... 1

Risk Workshop .......... 3

*The November 17, 2014, Risk Workshop .......... 3*

*Development of the Project Risk Register .......... 4*

Risks .......... 6

Conclusion and Next Steps .......... 9

Exhibit 1: Participant List .......... 11

Exhibit 2: Project Risk Register .......... 12

Exhibit 3A: Risk Impact Chart (Summary Level by Impact Score) .......... 33

Exhibit 3B: Risk Impact Chart (Sequential Based on Risk Number) .......... 35

## Executive Summary

The Virginia Department of Transportation ("VDOT") conducted a one-day, facilitated risk workshop for the I-64/264 Interchange Project on Monday, November 17, 2014. The workshop was held at the Hampton Roads District offices in Suffolk, Virginia. Michael Loulakis (President, Capital Project Strategies, LLC) facilitated the workshop, which was attended by 28 individuals from VDOT, Hampton Roads Transportation Accountability Commission ("HRTAC"), the Federal Highway Administration ("FHWA"), and Project consultants.

Workshop attendees were organized into four groups that generally corresponded to their Project responsibilities: (1) design and environmental; (2) construction and operations; (3) right-of-way ("ROW"), utilities, and public relations; and (4) programmatic. Project risks were organized into the following categories:

- Design (Roadway, Bridge, and Structures)
- Drainage
- ROW and Utilities
- Environmental
- Geotechnical
- Construction
- Stakeholder Coordination
- Public Relations
- Programmatic

As set forth in the Project Risk Register (attached as Exhibit 2), the workshop participants identified a total of forty-five (45) individual risks, based on the assumption that the Project would be delivered through a design-bid-build process. Participants were asked to rank each risk through the following criteria, with the "Probability" category reflecting the likelihood that the risk would materialize:

| | Rank | | |
|---|---|---|---|
| | 1 | 2 | 3 |
| **Probability** | Low | Medium | High |
| **Cost Impact** | < $1 mm | $1 mm to < $10 mm | > $10 mm |
| **Schedule Impact** | < 1 month | 1 month - 6 months | > 6 months |

Participants found the following six (6) Project risks to be the most significant:

- Ramp D-7
- Potential need to acquire additional property
- ROW and utilities
- Maintenance of Traffic ("MOT") and sequencing of construction ("SOC")
- Aggressive schedule to meet June 2017 advertisement date
- Project's fixed budget

Of the above risks, the most significant was considered to be the aggressive schedule to meet the June 2017 advertisement date.

Each of the above risks has a high level of complexity and the potential, if not resolved or mitigated, to have a major impact on the Project's cost and/or schedule (i.e., both the pre-advertisement schedule and the post-award schedule).  Importantly, several risks are highly dependent upon and influenced by other risks, with the most notable being: (a) the aggressive schedule to meet the advertisement date; and (b) the Project's fixed budget. These two risks were perceived to impact resource allocation, quality of work, post-award risk of change orders, and a variety of other issues.

This Summary Report elaborates upon the approach taken for conducting the workshop and the workshop results.  It also identifies key next steps resulting from the workshop.

## Risk Workshop

### *Risk Analysis Generally*

A risk is any uncertain event that, if it happens, can potentially interfere with successful delivery of a project. While all projects have exposure to risks, some may have more challenging risks than others as a result of a variety of factors (e.g., project technical complexity, the status of funding/financing, and stakeholder acceptance). Risk analysis and risk management generally involve the process of anticipating what risks the project faces, mitigating them to the extent reasonably possible, and having a plan to react to them if/when they occur. Risk management is undertaken throughout the project lifecycle in order to track identified risks, measure the performance of mitigation, identify new risks as they arise, maintain adequate contingency, and capture lessons learned.

The central tool for tracking the above is a risk register created at the very early stages of project development. The risk register is then updated with new and/or closed out risks as the project progresses. The initial assessment of the risks identified in the risk register is qualitative and subsequently updated with quantified values as the project progresses and more project data becomes available.

Importantly, the identification of an uncertainty as a "risk" is not intended to convey that a process is flawed, that somebody should be blamed for doing something wrong, or that someone is not doing his/her job. Rather, it is a management tool that forces project personnel and leadership to think proactively about what could happen – good or bad – that might affect the project and to plan accordingly.

### *The November 17, 2014, Risk Workshop*

Consistent with the reasons stated above, VDOT Hampton Roads District conducted a one-day, facilitated risk workshop for the Project on Monday, November 17, 2014. The workshop was held at VDOT's Hampton Roads District Offices in Suffolk, Virginia, and its purpose was to identify and prioritize the risks associated with the Project.

Twenty-eight (28) individuals participated in the workshop. The participants included employees from VDOT Central Office, VDOT Hampton Road District Office, VDOT Alternative Project Delivery Office, HRTAC, FHWA, and Project consultants. Michael Loulakis, of Capital Project Strategies, LLC, facilitated the workshop. The participant list is attached as Exhibit 1.

The workshop opened with introductory remarks from Mark Velasquez, the Project's project manager, and an introductory presentation of the Project by Bill Mackey (Kimley-Horn), one of the Project consultants. Mr. Loulakis then facilitated the workshop dividing the participants into four teams of five to seven people at separate tables. Tables were organized into groups that generally corresponded to Project responsibilities: (1) design and environmental; (2) construction and operations; (3) right-of-way ("ROW"), utilities, and public relations; and (4) programmatic. Each team was given a large flip-chart to

record and capture key discussion points during the team modules. Participants were given the following framework to assign impact and priority:

| | Rank | | |
|---|---|---|---|
| | 1 | 2 | 3 |
| **Probability** | Low | Medium | High |
| **Cost Impact** | < $1 mm | $1 mm to < $10 mm | > $10 mm |
| **Schedule Impact** | < 1 month | 1 month - 6 months | > 6 months |

Each team separately identified what it considered to be key project risks, based on the assumption that the project would be delivered under a design-bid-build process. After several hours of table discussion, the facilitator brought all the teams together for a large group discussion, in which the teams went around the room and shared their findings. After lunch, the facilitator asked each team to identify its top five (5) project risks – regardless of whether these risks were in their specific areas of expertise. The facilitator captured these risks on flipcharts, and then asked each person to identify, from his/her own perspective, the top two (2) risks. The following risks were identified by the participants:

- Aggressive schedule to meet June 2017 advertisement date
- Potential need to acquire additional property
- ROW and utilities
- Project's fixed budget
- Maintenance of Traffic ("MOT") and sequencing of construction ("SOC")

The first risk (aggressive schedule) received the overwhelming majority of votes as the project's biggest risk, followed by the potential need to acquire additional property. The three remaining risks all were considered approximately equal.

After this exercise, the teams then reconvened to assign, for the specific risks they developed on their flipcharts, the impact of these risks based on the prioritization method addressed above. Each team was also asked to identify mitigation strategies for the highest risks.[1]

### *Development of the Project Risk Register*

The facilitator developed a Project Risk Register (attached as Exhibit 2) that compiled and organized the risks identified during the workshop and documented in the flipcharts developed over the course of the session. The Risk Impact Chart (Summary Level by Impact Score) attached as Exhibit 3A contains a

[1] There was some limited discussion during the workshop about whether design-build or CM/GC (i.e., at-risk construction management that involves early contractor involvement) would help mitigate major project risks. Because the intent of the workshop was not to examine the applicability of other delivery systems, these discussions were not complete enough to draw conclusions as to their viability. This is something that is addressed in the Conclusions and Next Steps portion of the Summary Report.

summary of the risks from the Project Risk Register in descending order of impact, with the impact score being calculated as the sum of: (a) degree of importance multiplied by cost impact; plus (b) degree of importance multiplied by schedule impact.  The highest impact score under this formula is 18 (3*3 + 3*3) and is denoted in red.  The "yellow category" is all the impact scores of 8 or less.  The "orange category" is everything in between.  Items that scored a "3" in any category are blue.  The purpose of this is to give a quick synopsis of what are considered to be the top risks to be addressed and monitored over time.  The Risk Impact Chart (Sequential Based on Risk Number) attached as Exhibit 3B contains the same information as in Exhibit 3A, but has a brief description of the risk and is listed by Risk Number, in descending order.

## Risks

During the workshop, the following forty-five (45) items were identified as risks, and were generally grouped into the categories of: (a) Design (Roadway, Bridge, and Structures); (b) Drainage; (c) ROW and Utilities; (d) Environmental; (e) Geotechnical; (f) Construction; (h) Stakeholder Coordination; (i) Public Relations; and (j) Programmatic.

Table 1: Risk Summary

| Category | Risks |
|---|---|
| Design (Roadway, Bridge & Structures) | • Ramp D-7<br>• South of Curlew Drive<br>• Greenwich Overpass<br>• Pavement design<br>• Cross-slope of existing mainline<br>• Accuracy of survey information<br>• Designing and specifying the ITS |
| Drainage | • SWM design may be impacted by new regulations<br>• Culvert at I-64 and Curlew Drive |
| ROW and Utilities | • Potential need to acquire additional property<br>• Obtaining approval for Type III Certification<br>• Ability to manage ROW and utility relocation process within times required by current project schedule<br>• Quality of plan sheets<br>• Effect of weather on ability of private utility companies to perform relocations<br>• Dominion Virginia Power<br>• Private utility company relocations generally<br>• Challenges with specific properties |
| Environmental | • Requirement for an Environmental Assessment ("EA")<br>• Wetland Re-Delineations<br>• Ramp D-7 permitting |
| Geotechnical | • Overall soil quality<br>• Deep foundations<br>• Geotechnical conditions south of Curlew Drive |

**Construction**

- Maintenance of Traffic and Sequence of Construction
- Construction access
- Existing infrastructure assets
- Night work
- Maintaining existing ITS during construction
- Coordination with City of Norfolk and City of Virginia Beach's traffic operations
- Setting beams over traffic

**Stakeholder Coordination**

- Witchduck Phase 2 coordination
- Interface with localities and public agencies
- Interface with private utilities
- Future interchange improvements
- HRT coordination

**Public Relations**

- Public perception and support
- Specific acquisitions required for the project
- Adjacent land users

**Programmatic**

- Aggressive schedule to meet June 2017 advertisement date
- Resource availability given other projects
- Construction cost estimate
- Construction market and inflation
- Fixed budget
- Using a single construction contract
- Federal oversight

Each of the above-referenced risks is discussed in the Risk Consequence and Workshop Notes section of the Project Risk Register. Of these risks, the following were considered to be the most likely to occur and to have the greatest impact on cost and schedule, as evident from their scores on the Risk Impact Chart (Exhibit 3B). These risks were also independently considered as the most significant project risks during group discussions.[2]

[2] The Ramp D-7 risk was identified by the participants during the workshop as a "Top 5" risk, although it was not chosen by anyone as a "Top 1 or 2" risk.

### *Ramp D-7 (Risk 1.01)*

Ramp D-7 is one of the most complicated elements of the project. The design of the ramp would require the relocation of a stream and impacts to adjacent wetlands. The small area in which to work complicates the constructability of the ramp. There are also socio/economic impacts associated with this ramp, as it is located in an area with lower income properties.

### *Need to acquire additional property (Risk 3.01)*

A number of factors could result in the need to acquire additional property, including: (a) design changes and refinement; (b) stormwater management ("SWM") and drainage requirements; and (c) permit requirements. If this occurs, VDOT will need to go through the public involvement process (i.e., have another public hearing to explain what new properties need to be taken). This process will take several months, and compounds the other risks described in the ROW and utility risk category. There is also a major cost and schedule exposure in actually acquiring the additional property. Additional takes or relocations will likely require an Environmental Assessment to be done, which would create a substantial cost and schedule impact.

### *ROW and Utilities (Risks 3.02 and 3.03)*

In addition to Risk 3.01, two other significant ROW and utility risks were identified. Risk 3.02 addresses the issue of obtaining approval for a Type III Certification (i.e., ongoing ROW acquisition and utility relocations after advertisement). Although this certification is rarely approved, the current schedule is based on getting this approval. Even with this certification, there are some major resource challenges for the ROW division. If the Type III certification is not given, it will likely delay the advertisement date unless the mitigation strategies addressed in this overall category are implemented.

Risk 3.03 addresses VDOT's ability to manage the ROW and utility relocation process within the times required by the current project schedule. This risk category is a function of not only: (a) what is needed to support the current property acquisition/relocation plan; but also (b) new takings and utility relocations that will be required as the design advances. Major internal resource constraints were identified. There is also a concern as to whether support from external resources will meaningfully reduce this risk given the magnitude of this project and the time constraints with the currently scheduled advertisement date, which is considered very aggressive. Failing to solve the resource issue will create the potential for delays to the advertisement date. It will also create the potential for less than high quality work.

### *Maintenance of Traffic ("MOT") and Sequencing of Construction ("SOC") (Risk 6.01)*

The breadth of the Project creates major challenges with both MOT and SOC. Among the issues to be addressed will be length of work zones and extent/duration of shoulder closures (which could increase both peak and off-peak congestion). Each of these will impact construction durations and productivity

(i.e., cost to the contractor), safety, and public relations. The accelerated schedule creates a risk that the MOT/SOC plans will be rushed.

### *Aggressive schedule to meet June 2017 advertisement date (Risk 9.01)*

This is considered the biggest risk on the project, as it influences every major element of the project (e.g., ROW acquisition and utility relocation and design development and decisions).

### *Fixed budget (Risk 9.05)*

It is expected that a budget will be fixed for this project before the start of ROW acquisition and contract advertisement. There are risks that this budget will be exceeded because, among other things: (a) ROW acquisition may cost more than expected; (b) construction prices will be higher than expected because of the project's inherent risks (e.g., MOT and lower competition); and (c) the project contingency in the budget may be lower than appropriate because of pressures faced by management to meet the fixed budget number.

## Conclusion and Next Steps

The discussions held were insightful and productive, and identified numerous key risks that should be addressed by the project management team as the Project moves forward. The two programmatic risks identified above (i.e., aggressive schedule and fixed budget) should be carefully assessed by project leadership to determine if there is any flexibility in these requirements. Because many of the other project risks are caused (or exacerbated) by these two risks: (a) mitigation strategies for these two risks should be in harmony with the mitigation strategies for other major project risks, and (b) project leadership should recognize that these two risks create the need for mitigation strategies for the other major project risks.

From the facilitator's perspective, there would be a benefit in having, at a later point in time, a more robust risk workshop that will provide a quantitative risk analysis for the project. This will be particularly helpful in developing project cost contingencies, as increasing the contingency was considered to be a risk mitigation strategy for several major project risks.

Finally, the facilitator was asked to provide an assessment as to whether this project would benefit if the delivery process was converted from design-bid-build to design-build. The answer to this question is complex, as it considers a variety of factors that were not addressed during the workshop. However, based on the status of the project and the risks identified in the workshop, it appears that the use of design-build would likely create more challenges than it would solve.

On the positive side, the use of design-build would likely mitigate Risk 9.01 (aggressive schedule to meet the June 2017 advertisement date). It could possibly mitigate some of Risk 6.01 (MOT and SOC), as there

can be a benefit in having the design-build contractor develop an effective MOT/SOC plan. However, VDOT will confront three specific risks if it decides to convert to design-build at this point in the process:

- The design has already advanced far beyond what would be reasonably associated with an effective design-build procurement. Simply stated, the proper use of design-build envisions that the design will primarily be done by the design-builder, not that the design-builder will be finishing the virtually complete design of the owner. Public owners who try to convert design-bid-build documents to design-build documents face many challenges, including the likelihood for major change orders resulting from conflicts in their bidding documents. Moreover, some designers may decide that the project is too risky to participate – they would face potential liability to the contractor as the designer-of-record for ambiguous design documents, yet obtain lower fees because the design would have been largely performed by VDOT.

- The risks associated with ROW (Risks 3.01, 3.02, and 3.03) would not likely be mitigated by the use of design-build. ROW acquisition for the alignment remains a core VDOT responsibility. While there can be some risk sharing mechanisms in terms of how timing of ROW will be handled under design-build, the risk of obtaining ROW ultimately remains with VDOT. The failure of VDOT to timely obtain ROW under a design-build process will likely create a major potential for cost and schedule overruns, as construction is now affected by ROW acquisition. This is not the case in design-bid-build.

- Using design-build will likely exacerbate the risks associated with the acquisition of additional property (Risk 3.01). While responding to an Environmental Assessment will be challenging under design-bid-build, VDOT will still be in control of the process. This appears to be far more complicated under design-build, where construction will likely have started, and VDOT will face the prospects of suspension of work, major changes in sequencing, or terminating the contract for convenience.

As a final consideration, design-build, by its very nature, shifts more discretion and control to the design-build contractor over elements of the project. This may impact other risks identified in the workshop (e.g., public relations).

The above assessment is not intended to state that design-build cannot work on this project given its current status. However, if it is something that project leadership wishes to consider further, it is recommended that a specific discussion take place with VDOT's Alternative Project Delivery Office and others that fully vets the pluses and minuses of its use.

## Exhibit 1: Participant List

| Hampton Roads District | |
|---|---|
| Mark Velasquez | Project Management Office |
| Bruce Duvall | Project Management Office |
| Salvija Hofheimer | Project Management Office |
| Pete Reilly | Assistant District Administrator |
| Chris Eggleston | Structure & Bridge |
| Mohamed Ali | Structure & Bridge |
| Drew Scott | Hydrology & Drainage |
| Danny Williams | Survey |
| John Deusebio | Materials |
| Jenny Salyers | Environmental |
| Randy Friedland | Right of Way |
| Mike Robinson | Right of Way |
| Mike Wilder | Utilities |
| Tim Haynam | Traffic Engineering |
| Mike Johnson | Construction |
| Vasilios Andreou | Construction |
| Bud Morgan | Construction |
| Laurie Simmons | Public Affairs |
| Tony Gibson | HRTAC Funding Liaison |

| Central Office | |
|---|---|
| Joseph Clarke | VDOT Alternative Project Delivery Office |
| Rick Worssam | Location & Design |
| Josh Kozlowski | Noise Studies |

| Various | |
|---|---|
| Jose Granado | FHWA |
| Semme Yilma | FHWA |
| Bill Mackey | Consultant Designer (UPC 17630) |
| Stephen Holland | Consultant Designer (UPC 17630) |
| Burt Matteson | Consultant Designer (UPC 57048) |
| Michael Loulakis | Workshop Facilitator (Capital Project Strategies, LLC) |

## Exhibit 2:  Project Risk Register

# I-64/264 INTERCHANGE PROJECT
# NOVEMBER 17, 2014, RISK ASSESSMENT WORKSHOP

## PROJECT RISK REGISTER

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 1.01 | Design (Roadway, Bridge, and Structures) | Ramp D-7 | 3 | 3 | 3 | This is one of the most complicated elements of the project. The design of the ramp would require the relocation of a stream and impacts to adjacent wetlands. The small area in which to work complicates the constructability of the ramp. There are also socio/economic impacts associated with this ramp, as it is located in an area with lower income properties. | This element of the project has been, and continues to be, thoroughly vetted and addressed by the project team. Among the mitigation strategies are:<br><br>(a) Possible relocation of the impacted stream may increase the need for additional property acquisition;<br><br>(b) Build-in maintenance paving of existing surface streets into the construction contract; and<br><br>(c) Identify during design stockpile/set-up locations and any additional easement requirements. |

Explanation of Ratings:

- Probability: 3 = high 2 = medium 1 = low
- Cost Impact: 3 = $10mm or more 2 = $1mm to less than $10 mm 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more 2 = 1 month to less than 6 months 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 1.02 | Design (Roadway, Bridge, and Structures) | South of Curlew Drive | 2 | 2 | 2 | The issue of whether to use a bridge or a retaining wall with fill has yet to be decided, although it is currently designed with a retaining wall. There is a question of whether there is enough quality fill material available regionally to make this cost effective. Poor soil conditions (Risk 5.01) will have an impact on the design, particularly if the retaining wall option is used.<br><br>The retaining wall design is complicated by limited space, poor soil, and availability of adequate quality fill material. While the bridge is likely easier to build, it has cost and constructability issues because of its length, deep foundations and overall complexity (in part due to the need for the short retaining wall that will be a component of the longitudinal bridge abutment/joint).<br><br>Because this area is located adjacent to an elementary school in a low income neighborhood, there may be some disruptions to the school that could create public relations risks. There will also likely be some MOT and logistical challenges. It is currently anticipated that fill would be placed from the interstate. However, other materials may be brought in from the adjacent school grounds and/or Curlew Drive. | Mitigation strategies include: (a) cost-re-evaluation under current market conditions for fill vs. retaining wall; and (b) account for higher unit cost of fill material. |

Explanation of Ratings:

- Degree of Importance: 3 = high; 2 = medium; 1 = low
- Cost Impact: 3 = $10mm or more; 2 = $1 mm to less than $10 mm; 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more; 2 = 1 month to less than 6 months; 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 1.03 | Design (Roadway, Bridge, and Structures) | Greenwich Overpass | 3 | 2 | 1 | There are currently differing opinions on the placement of the Greenwich Overpass in the Sequence of Construction ("SOC"). VDOT ROW & Utilities believes that this should be constructed first due to its ease of construction, lack of utility relocation, minimal amount of ROW acquisition. The consultant designer believes this may create issues with Maintenance of Traffic ("MOT") during construction. The MOT/SOC is currently under discussion. | The placement of the Greenwich Overpass in the SOC could be combined with the phase of construction that widens the mainline. This would alleviate any MOT concerns, as the mainline I-264 lanes could be constructed concurrently. The approaches for the overpass could also be constructed first, which would limit the MOT issues from the construction of the pier. There is also a possibility, given the project's funding constraints, to remove the Greenwich Overpass entirely from the design. This would require confirmation through traffic analysis to ensure that the Witchduck Road Interchange would function adequately. |
| 1.04 | Design (Roadway, Bridge, and Structures) | Pavement design | 1 | 1 | 1 | Traffic forecasts have not been updated to reflect the current advertisement date, which may impact the project's pavement design. | Traffic forecasts and pavement design parameters should be updated based on the current project schedule. |

Explanation of Ratings:
- Degree of Importance:    3 = high            2 = medium                      1 = low
- Cost Impact:             3 = $10mm or more   2 = $1 mm to less than $10 mm   1 = less than $1 mm
- Schedule Impact:         3 = 6 months or more 2 = 1 month to less than 6 months 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 1.05 | Design (Roadway, Bridge, and Structures) | Cross-slope of existing mainline | 1 | 3 | 3 | The current scope of the project involves adding two additional outside lanes, with no improvements being made to the inside (mainline) lanes. This risk addresses the potential that FHWA may require modifications to the adjacent mainline lanes to address potential slope issues, which would then potentially require that cross-slope modifications be made to all existing eastbound lanes to conform to the latest AASHTO standards. If this risk were to materialize, it could jeopardize the project's viability. | VDOT would address this risk by seeking a Design Exception. |
| 1.06 | Design (Roadway, Bridge, and Structures) | Accuracy of survey information | 3 | 1 | 1 | The project's surveys were done long ago. There is a concern that they are outdated and may contain inaccuracies. The risk of inaccuracies is enhanced because the original surveys were done by different surveyors, and there is a risk that these surveys were not accurately integrated. | The survey is currently being updated throughout the project, with the surveyors focusing on areas where there are known changes. |
| 1.07 | Design (Roadway, Bridge, and Structures) | Designing and specifying the ITS | 3 | 1 | 1 | The aggressive schedule may impact the ability to effectively design the ITS and eliminate the risk of vaporware (i.e., creating a specification that may not exist by the time the contractor is ready to procure and install the ITS late in the construction period). This creates the potential for a change order if products are no longer available or not fully supported by the market. | A contingency can be added to the budget to address this risk. |

Explanation of Ratings:

- Degree of Importance: 3 = high; 2 = medium; 1 = low
- Cost Impact: 3 = $10mm or more; 2 = $1 mm to less than $10 mm; 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more; 2 = 1 month to less than 6 months; 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 2.01 | Drainage | SWM design may be impacted by new regulations | 1 | 2 | 3 | It is expected that this Project will be "grandfathered" under the performance-based SWM regulations. If this is not the case, and the design is subject to the new runoff reduction SWM regulations, it will require additional design efforts, affecting the budget and schedule. It will also likely require additional construction and property acquisition, compounding the challenges already faced in this area as describe in the ROW and Utility Risk Category. | Speeding the project's development will mitigate this risk by going to construction prior to the July 1, 2019 deadline for grandfathered projects. Additional mitigation strategies are included in the ROW and Utility Risk Category. |
| 2.02 | Drainage | Culvert at I-64 and Curlew Drive | 3 | 2 | 2 | Five drainage options have been prepared for the culvert at I-64 and Curlew Drive, which all cross under the existing HRT light rail system, creating logistical and design complications. Of these options, some are also located near the existing I-64 bridge abutments, which will further add to constructability complications. Some options would require additional ROW and relocations, putting the current environmental document in jeopardy. Some options are located down Curlew Drive, impacting MOT and existing utilities. | Because all options have impact to HRT, the goal is to minimize the impacts. Several alternative culvert designs are being considered to address this risk. Bridge and drainage designs need to be coordinated and finalized. Coordination with HRT and the City of Norfolk will help mitigate this risk. |

Explanation of Ratings:

- Degree of Importance: 3 = high; 2 = medium; 1 = low
- Cost Impact: 3 = $10mm or more; 2 = $1 mm to less than $10 mm; 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more; 2 = 1 month to less than 6 months; 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 3.01 | ROW and Utilities | Potential need to acquire additional property | 3 | 3 | 3 | A number of factors could result in the need to acquire additional property, including: (a) design changes and refinement; (b) SWM and drainage requirements; and (c) permit requirements. If this occurs, VDOT will need to go through the public involvement process (i.e., have another public hearing to explain what new properties need to be taken). This process will take several months, and compounds the other risks described in this category. There is also a major cost and schedule exposure in actually acquiring the additional property. Additional takes or relocations will likely require an Environmental Assessment to be done, which would create a substantial cost and schedule impact. | Mitigation techniques are addressed throughout this Risk Register, including: (a) making a policy decision that the current property acquisition plan will not be changed and to design around them; (b) designing the project to minimize the total number of new takes and relocations needed; and (c) acquiring those properties with relocations first during the ROW phase to avoid any additional tenant relocations. |

Explanation of Ratings:
- Degree of Importance:  3 = high  2 = medium  1 = low
- Cost Impact:  3 = $10mm or more  2 = $1 mm to less than $10 mm  1 = less than $1 mm
- Schedule Impact:  3 = 6 months or more  2 = 1 month to less than 6 months  1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 3.02 | ROW and Utilities | Obtaining approval for a Type III Certification | 3 | 2 | 3 | A Type III Certification (i.e., ongoing ROW acquisition and utility relocations after advertisement) is rarely approved. The current schedule is based on getting this approval, which already creates some major resource challenges for the ROW division. If the Type III certification is not given, it will likely delay the advertisement date unless the mitigation strategies addressed in this overall category are implemented. | Mitigating the risk of not obtaining Type III Certification is dependent upon having regular and informed meetings with the Project's executives and ensuring that they understand the consequences of this action. The likelihood of approval is enhanced if there is: (a) a clear, realistic and well-conceived ROW acquisition plan in place; and (b) a well-defined construction sequence limiting the contractor's operations to those areas cleared of ROW and utility relocations. If Type III Certification is not approved, then a mitigation strategy is to delay the advertisement date. If this does not occur, then mitigation would include the items addressed below in this category. |

Explanation of Ratings:
- Degree of Importance:     3 = high              2 = medium                                1 = low
- Cost Impact:              3 = $10mm or more     2 = $1 mm to less than $10 mm             1 = less than $1 mm
- Schedule Impact:          3 = 6 months or more  2 = 1 month to less than 6 months         1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 3.03 | ROW and Utilities | Ability to manage the ROW and utility relocation process within the times required by the current project schedule | 3 | 2 | 3 | This risk category is a function of not only: (a) what is needed to support the current property acquisition/relocation plan; but also (b) new takings and utility relocations that will be required as the design advances. Major internal resource constraints were identified. There is also a concern as to whether support from external resources will meaningfully reduce this risk given the magnitude of this project and the time constraints with the currently scheduled advertisement date, which is considered very aggressive. Failing to solve the resource issue will create the potential for delays to the advertisement date. It will also create the potential for less than high quality work. | Ways to mitigate this risk include: (a) prioritizing this Project internally in relation to the needs of other projects; (b) aggressively bringing on external resources; (c) using a phased ROW acquisition and construction process (which is currently the plan), to prioritize what is needed as of the advertisement date (on the assumption that a Type III Certification process will be approved); and (d) eliminating the potential for relocations by acquiring full-take properties quickly, which would mitigate some of the risk of having to relocate new tenants that move into the property. |
| 3.04 | ROW and Utilities | Quality of plan sheets | 2 | 1 | 2 | The accelerated speed of the Project creates the potential for inaccurate plan sheets and survey information. A particular concern was expressed over the time period between the release of the plan sheets and the notice to proceed (NTP) with ROW acquisition, which is very compressed. Inaccuracies will likely result in re-work and delays to the ROW acquisition process. | The root cause of this risk relates to the need for an accurate survey and plan sheets that support the project schedule. These risks are addressed elsewhere in this Risk Register. The risk could also be mitigated by delaying the NTP for ROW acquisition to conform to what is needed for quality supporting information. |

Explanation of Ratings:

- Degree of Importance: 3 = high; 2 = medium; 1 = low
- Cost Impact: 3 = $10mm or more; 2 = $1 mm to less than $10 mm; 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more; 2 = 1 month to less than 6 months; 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 3.05 | ROW and Utilities | The effect of weather on the ability of private utility companies to perform their relocations | 2 | 1 | 3 | Utility relocations will be delayed by the need for the private utility companies to be responsive to severe weather conditions that affect their customers around the country, thereby delaying the advertisement date (and potentially the contractor if a Type III Certification is approved). | Find ways to incentivize the utility companies. Determine whether the utility companies will allow others (e.g., the construction contractor) to perform this work under their direction and supervision. |
| 3.06 | ROW and Utilities | Dominion Virginia Power (DVP) | 2 | 1 | 3 | DVP is separately identified as a project risk given the major relocations associated with its facilities. Overall weather risk is discussed in Risk 3.05. | Develop a focused action plan that addresses how to best address the issues associated with DVP. |
| 3.07 | ROW and Utilities | Private utility company relocations generally | 2 | 1 | 2 | There is a risk of unknown utilities as the design progresses, and as construction begins. Because it is difficult for VDOT to influence the speed by which private utilities perform the relocations, their utility relocations may not support the aggressive schedule for advertisement. | The mitigation strategy is similar to that in Risk 3.05. |
| 3.08 | ROW and Utilities | Challenges with specific properties | 3 | 2 | 2 | Properties that were identified as being specific challenges included: (a) First Baptist Church of Norfolk; (b) Altmeyer Funeral Home; and (c) the business park. | VDOT has already engaged these stakeholders to better understand their concerns, address their needs, and make them part of the process. This engagement should continue throughout the project's development. |

Explanation of Ratings:

- Degree of Importance: 3 = high; 2 = medium; 1 = low
- Cost Impact: 3 = $10mm or more; 2 = $1 mm to less than $10 mm; 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more; 2 = 1 month to less than 6 months; 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 4.01 | Environmental | Requirement for an Environmental Assessment (EA) | 1 | 3 | 3 | The current NEPA document is a Categorical Exclusion (CE). However, any additional tenant relocation will create property, there is a risk that the CE will no longer be valid and that an EA will be required. | This risk can be mitigated by minimizing or avoiding any new tenant relocations. The mitigation for this is discussed in Risk No. 3.01. |
| 4.02 | Environmental | Wetland Re-Delineations | 3 | 2 | 2 | The original wetlands delineation was performed in 2005 during a drought, and there are questions as to its accuracy. Re-delineation may result in changes to the design and the need for additional mitigation. This creates a specific risk to Ramp D-7, as discussed in Risk 4.03. | VDOT is currently evaluating this issue and re-delineations are being considered. |
| 4.03 | Environmental | Ramp D-7 permitting | 3 | 1 | 3 | Among the other risks with this element of the Project is the risk of permitting. The current design requires the relocation of a stream and addressing wetlands. Virginia DEQ is focused on minimizing impact to the wetlands, and the Army Corps of Engineers is focused on minimizing stream relocation. They have competing interests. Virginia Marine Resource Council (VMRC) has a concern about how the project may be affecting organisms, which are potentially influenced by wetlands and stream relocation. | To address the multi-agency permitting associated with this work, VDOT has had, and should continue to have, frequent meetings with each agency to integrate design solutions that address their competing needs. |

Explanation of Ratings:

- Degree of Importance: 3 = high; 2 = medium; 1 = low
- Cost Impact: 3 = $10mm or more; 2 = $1 mm to less than $10 mm; 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more; 2 = 1 month to less than 6 months; 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 5.01 | Geotechnical | Overall soil quality | 3 | 2 | 1 | The project's soil is considered to be of poor quality, with a mixture of organic clays and high PH levels. This creates compaction and drainage issues impacting design and construction. The corrosive qualities will also impact material selection. | Mitigation strategies include: (a) identifying the soil quality and corrosivity factors, (b) determining design adjustments (including material constraints); and (c) clearly noting the issues and constraints in the contract documents. |
| 5.02 | Geotechnical | Deep foundations | 3 | 2 | 1 | The design's deep foundations will likely be impacted by the poor soil conditions. This is a subset of Risk 5.01, but separately discussed as a project risk. | Same mitigation strategy as that for Risk 5.01. |
| 5.03 | Geotechnical | Geotechnical conditions south of Curlew Drive | 3 | 2 | 2 | The design of the I-64 widening south of Curlew Drive will be influenced by the poor soil conditions, as there will be a retaining wall of some type (either a full retaining wall or as a shorter wall that will be an element of the bridge design). The poor quality soil creates the potential for, among other things, differential settlement of the wall. | This will be a factor in the choice of retaining wall or bridge at this location, as discussed in Risk 1.02. The degree of risk associated with the poor soils can be mitigated by soil improvements and/or foundation design (e.g., a pile/drilled shaft supported retaining wall). |

Explanation of Ratings:
- Degree of Importance:   3 = high            2 = medium            1 = low
- Cost Impact:            3 = $10mm or more   2 = $1 mm to less than $10 mm   1 = less than $1 mm
- Schedule Impact:        3 = 6 months or more   2 = 1 month to less than 6 months   1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 6.01 | Construction | Maintenance of Traffic (MOT) and Sequencing of Construction (SOC) | 3 | 3 | 2 | The breadth of the Project creates major challenges with both MOT and SOC. Among the issues to be addressed will be length of work zones and extent/duration of shoulder closures (which could increase both peak and off-peak congestion). Each of these will impact construction durations and productivity (i.e., cost to the contractor), safety and public relations. The accelerated schedule creates a risk that the MOT/SOC plans will be rushed. | The overall MOT/SOC plans are still in the process of being developed by the project team. At a high level, project management (perhaps at the executive level) should work to balance competing interests (e.g., smaller work zones affecting the contractor's schedule and costs, with longer work zones affecting public relations).<br>Note that the mitigation strategy to address the accelerated project schedule (Risk 9.01) and fixed budget (9.02) are applicable here. |
| 6.02 | Construction | Construction access | 2 | 2 | 2 | Construction access risks and issues are area-dependent, as each project section will have different access needs and traffic impact. The most significant construction access risk for work along the I-64 and I-264 relate to getting trucks safe ingress and egress to the interstate, where there is high speed travel. For arterial streets, access risks include trucks navigating more intersections and smaller turning radiuses. With a fixed budget, costs may be driven up if the decision is made to minimize access points. | Same mitigation strategy for Risk 6.01. |

Explanation of Ratings:

- Degree of Importance: 3 = high 2 = medium 1 = low
- Cost Impact: 3 = $10mm or more 2 = $1 mm to less than $10 mm 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more 2 = 1 month to less than 6 months 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 6.03 | Construction | Existing infrastructure assets | 1 | 1 | 2 | There are a variety of construction activities that will use existing infrastructure, including use of: (a) existing drainage systems; and (b) side roads for truck access. Use of existing drainage systems creates the risk that culverts are in good condition, not leaking, and can be used "as is." While current conditions are being surveyed, this survey is not comprehensive. Use of side roads by trucks with heavy loads could create problems with the roads. Remedying these existing assets could have cost and schedule impacts, and in the case of roads, a public relation impact. This could also challenge VDOT's relationships with the Cities of Norfolk and Virginia Beach, particularly as to who will bear the responsibility of returning existing assets in their pre-construction condition. | Mitigation strategies for this risk include:<br>(a) conducting a more thorough pre-construction assessment (e.g., a CCTV survey) and reaching agreement with Norfolk and Virginia Beach on the conditions established by this assessment;<br>(b) taking this assessment into account in developing an MOT plan;<br>(c) requiring the contractor to take responsibility for returning the assets to pre-construction conditions; and<br>(d) establishing sufficient project contingency to address appropriate repair work. |
| 6.04 | Construction | Night work | 3 | 1 | 1 | It is currently expected that night work will be required, resulting in: (a) higher wage rates to address shift differentials; (b) higher operating costs (e.g., lighting); and (c) lower labor productivity, as one cannot work in as large an area at night. Additionally, productivity in the winter months will be affected by low night-time temperatures and VDOT constraints on asphalt and concrete placement. | This risk can be mitigated by considering these issues in developing the project contingency. Additionally, the construction contract should state clearly that the contractor is obligated to perform night-time work, which will ensure that this requirement is competitively bid and not subject to post-award disputes. |

Explanation of Ratings:

- Degree of Importance: 3 = high 2 = medium 1 = low
- Cost Impact: 3 = $10mm or more 2 = $1 mm to less than $10 mm 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more 2 = 1 month to less than 6 months 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 6.05 | Construction | Maintaining existing ITS during construction | 3 | 1 | 1 | The ITS along the project corridor has been recently upgraded by VDOT (some upgrades are currently under construction), and these upgrades have not been fully integrated into the project's design and construction operations. The ability to effectively integrate the ITS may be affected by: (a) the aggressive project schedule; and (b) difficulty in determining the inventory of upgrades that have been made, partly because of personnel transitions and gaps in knowledge transfer. Because the public relies heavily on the ITS for this corridor, interruption of the ITS may create public relations problems. | The primary mitigation strategy is for the design team to have early meetings with VDOT's O&M team to understand the ITS upgrades. |
| 6.06 | Construction | Coordination with Norfolk and City of Virginia Beach's traffic operations | 3 | 1 | 1 | Construction operations will affect the traffic operations along the arterial network (e.g., detours and traffic pattern changes because of the public's use of alternative routes). Some of these traffic operations will cross city boundaries. The risk is to public relations. | The project team should work closely with each city's traffic operations departments during the design and construction. |
| 6.07 | Construction | Setting beams over traffic | 3 | 1 | 1 | There are two locations that create specific risks. The flyover at Greenwich and Cleveland could be done over live traffic or by diverting traffic away from the construction area. The flyover for Ramp D-7 will likely have to be done over live traffic. These work activities have schedule and public relations risks. | This work should be carefully and thoughtfully planned and managed from the public relations side. |

Explanation of Ratings:

- Degree of Importance: 3 = high; 2 = medium; 1 = low
- Cost Impact: 3 = $10mm or more; 2 = $1 mm to less than $10 mm; 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more; 2 = 1 month to less than 6 months; 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 7.01 | Stakeholder Coordination | Witchduck Phase 2 coordination | 3 | 1 | 1 | The City of Virginia Beach is widening the north side of Witchduck Road north of I-264 (Witchduck Phase 2). While the project is not physically affected by Witchduck Phase 2, the Witchduck interchange will potentially create some MOT issues for both projects. | This risk can be managed by giving focused attention on the MOT around the Witchduck interchange once specific construction schedules for the project and Witchduck Phase 2 are known. |
| 7.02 | Stakeholder Coordination | Interface with localities and public agencies | 2 | 3 | 2 | Both the City of Virginia Beach and Norfolk have major interests in this project, and these interests may affect the project's scope, schedule and construction operations. | Each city should be regularly informed as to the project's status, and project executives should regularly meet to ensure that any major issues are being considered and addressed. |
| 7.03 | Stakeholder Coordination | Interface with private utilities (e.g., communications, power, CCTV) | 3 | 2 | 3 | As discussed in Risks 3.06 and 3.07, the project will involve several private utility companies, some of which are currently known and some of which are not currently known. These interfaces create cost and schedule risks. | The mitigation of this risk is similar to that discussed in Risks 3.06 and 3.07, and focus on having regular communications with these private utilities. |
| 7.04 | Stakeholder Coordination | Future interchange improvements | 1 | 1 | 1 | VDOT is in the process of conducting an overall I-264 corridor study. There is a risk that this study may impact the project's design. This is considered a remote risk, because the I-264 corridor study will be considering this project's design. | The risk of inconsistent results will likely be mitigated because the same consultant (URS) is working on both this project and the I-264 corridor study. |

Explanation of Ratings:

- Degree of Importance: 3 = high; 2 = medium; 1 = low
- Cost Impact: 3 = $10mm or more; 2 = $1 mm to less than $10 mm; 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more; 2 = 1 month to less than 6 months; 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 7.05 | Stakeholder Coordination | HRT coordination | 1 | 3 | 3 | HRT has an interest in this project, particularly because of the work at Curlew Drive. These interests may affect the project's scope, schedule and construction operations.<br>HRT is also likely interested in the design for improvements near Witchduck Road that will include culverts that cross under the former Norfolk Southern railway (currently not in use) as this is the potential future corridor for the light rail extension into Virginia Beach. | The mitigation strategy will be consistent with that described in Risk 7.02. |
| 8.01 | Public Relations | Public perception and support | 2 | 1 | 3 | The public's perception and support for this project will be impacted by several factors during the design and construction process. Specific sensitive areas include: (a) the treatment of the Witchduck bridge; (b) failure of the project to address westbound traffic; and (c) coordination with the City of Virginia Beach and the light rail facility. | A comprehensive public communication plan should be developed to address these issues. |
| 8.02 | Public Relations | Specific acquisitions required for the project | 3 | 2 | 3 | Public perception may be influenced by the takings associated with the project, as discussed in Risk 3.08. | See mitigation strategy for Risks 3.08 and 8.01. |
| 8.03 | Public Relations | Adjacent Land Users | 3 | 1 | 1 | Public perception may be influenced by the following landowners, each of whom has been vocal relative to the project: (a) Top Golf; (b) Jewish Community Center; (c) light rail; and (d) the business park. | See mitigation strategy for Risks 3.08 and 8.01. |

Explanation of Ratings:

- Degree of Importance: 3 = high 2 = medium 1 = low
- Cost Impact: 3 = $10mm or more 2 = $1 mm to less than $10 mm 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more 2 = 1 month to less than 6 months 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 9.01 | Programmatic | Aggressive schedule to meet June 2017 advertisement date | 3 | 3 | 3 | This is considered the biggest risk on the project, as it influences every major element of the project (e.g., ROW acquisition and utility relocation and design development and decisions). | The following mitigation strategies are based on the assumption that the advertisement date cannot be extended and that the delivery process will remain design-bid-build:<br>(a) Use a Tier III Certification process;<br>(b) Phase the construction to be compatible with the Tier III Certification process;<br>(c) Reduce the project's scope;<br>(d) Establish a dedicated internal project team that will devote full time and attention to the project, and add external resources to support this team;<br>(e) Increase the project contingency to recognize that the accelerated schedule may impact project cost;<br>(f) Require the construction contractor to have added responsibility for utility relocations; and<br>(g) Develop a robust project management plan that will integrate the various resources needed to meet the aggressive schedule. |

Explanation of Ratings:

- Degree of Importance: 3 = high; 2 = medium; 1 = low
- Cost Impact: 3 = $10mm or more; 2 = $1 mm to less than $10 mm; 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more; 2 = 1 month to less than 6 months; 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 9.02 | Programmatic | Resource availability given other projects | 3 | 2 | 2 | The ability to obtain adequate resources to design and manage this project is affected by: (a) the project's size and complexity; and (b) the aggressive schedule. This risk is exacerbated by the aggressive schedule discussed in Risk 9.01. | Each department should determine what internal and external resources are needed to meet the schedule, and project executives should determine how to respond to this assessment. |
| 9.03 | Programmatic | Construction cost estimate | 1 | 3 | 3 | The TRNS-PRT estimate is not yet done, and additional design work needs to be done, all of which could affect the estimate. The risk of not having this estimate completed impacts the risks associated with a fixed budget (Risk 9.05). | Estimates are currently being developed. |
| 9.04 | Programmatic | Construction market and inflation | 3 | 3 | 1 | The status of the construction market at the time of advertisement is uncertain. This creates a risk that bids will be higher than anticipated from the TRNS-PRT estimate, which may create challenges with the fixed budget (Risk 9.05). | This risk can be managed by additional contingency. |

Explanation of Ratings:

- Degree of Importance: 3 = high; 2 = medium; 1 = low
- Cost Impact: 3 = $10mm or more; 2 = $1 mm to less than $10 mm; 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more; 2 = 1 month to less than 6 months; 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 9.05 | Programmatic | Fixed budget | 3 | 2 | 3 | It is expected that a budget will be fixed for this project before the start of ROW acquisition and contract advertisement. There are risks that this budget will ultimately be exceeded because, among other things: (a) ROW acquisition may cost more than expected; (b) construction prices may be higher than expected because of the project's inherent risks (e.g., MOT and lower competition); and (c) the project contingency in the budget may be lower than appropriate because of pressures faced by management to meet the fixed budget number. | The mitigation strategy is similar to that for Risk 9.04.<br>Additionally, the project team should consider how to align the scope to this budget. |
| 9.06 | Programmatic | Using a single construction contract | 1 | 1 | 3 | The size, complexity and risk of the project could create procurement risks by reducing competition. This largely comes from: (a) contractors pursuing the project through joint ventures; and (b) smaller contractors not competing as primes because of bonding capacity issues. | On the assumption that the project will be based on a single construction contract, the risk may be mitigated by recognizing these factors into the project's contingency. The risk could be mitigated by dividing the contract into several smaller construction contracts, although this creates further interface risks and project complexity. |

Explanation of Ratings:

- Degree of Importance: 3 = high 2 = medium 1 = low
- Cost Impact: 3 = $10mm or more 2 = $1 mm to less than $10 mm 1 = less than $1 mm
- Schedule Impact: 3 = 6 months or more 2 = 1 month to less than 6 months 1 = less than 1 month

| Risk No. | Risk Category | Risk Description | Probability | Cost Impact | Schedule Impact | Comments/Notes | Mitigation Strategies |
|---|---|---|---|---|---|---|---|
| 9.07 | Programmatic | Federal Oversight | 3 | 2 | 1 | The project is currently being developed on the assumption that there will be typical federal oversight by FHWA. Federal oversight imposes, among other things, certain review and approval requirements throughout the design process. These will have to be accounted for in the cost and schedule of the Project. | If there is a serious consideration of not federalizing the project, this decision should be made by the project's executives quickly. If this occurs, and federal oversight is not used on the project, this could create significant impact to VDOT if it later needs to obtain federal funds. |

Explanation of Ratings:
- Degree of Importance:     3 = high          2 = medium          1 = low
- Cost Impact:              3 = $10mm or more          2 = $1 mm to less than $10 mm          1 = less than $1 mm
- Schedule Impact:          3 = 6 months or more          2 = 1 month to less than 6 months          1 = less than 1 month

## Exhibit 3A:  Risk Impact Chart (Summary Level by Impact Score)

| Risk # | Category | Probability | Cost Impact | Schedule Impact | Impact Score |
|---|---|---|---|---|---|
| 1.01 | Design (Roadway, Bridge, and Structures) | 3 | 3 | 3 | 18 |
| 1.02 | Design (Roadway, Bridge, and Structures) | 2 | 2 | 2 | 8 |
| 1.03 | Design (Roadway, Bridge, and Structures) | 3 | 2 | 1 | 9 |
| 1.04 | Design (Roadway, Bridge, and Structures) | 1 | 1 | 1 | 2 |
| 1.05 | Design (Roadway, Bridge, and Structures) | 1 | 3 | 3 | 6 |
| 1.06 | Design (Roadway, Bridge, and Structures) | 3 | 1 | 1 | 6 |
| 1.07 | Design (Roadway, Bridge, and Structures) | 3 | 1 | 1 | 6 |
| 2.01 | Drainage | 1 | 2 | 3 | 5 |
| 2.02 | Drainage | 3 | 2 | 2 | 12 |
| 3.01 | ROW and Utilities | 3 | 3 | 3 | 18 |
| 3.02 | ROW and Utilities | 3 | 2 | 3 | 15 |
| 3.03 | ROW and Utilities | 3 | 2 | 3 | 15 |
| 3.04 | ROW and Utilities | 2 | 1 | 2 | 6 |
| 3.05 | ROW and Utilities | 2 | 1 | 3 | 8 |
| 3.06 | ROW and Utilities | 2 | 1 | 3 | 8 |
| 3.07 | ROW and Utilities | 2 | 1 | 2 | 6 |
| 3.08 | ROW and Utilities | 3 | 2 | 2 | 12 |
| 4.01 | Environmental | 1 | 3 | 3 | 6 |
| 4.02 | Environmental | 3 | 2 | 2 | 12 |
| 4.03 | Environmental | 3 | 1 | 3 | 12 |
| 5.01 | Geotechnical | 3 | 2 | 1 | 9 |
| 5.02 | Geotechnical | 3 | 2 | 1 | 9 |
| 5.03 | Geotechnical | 3 | 2 | 2 | 12 |
| 6.01 | Construction | 3 | 3 | 2 | 15 |
| 6.02 | Construction | 2 | 2 | 2 | 8 |
| 6.03 | Construction | 1 | 1 | 2 | 3 |
| 6.04 | Construction | 3 | 1 | 1 | 6 |
| 6.05 | Construction | 3 | 1 | 1 | 6 |

| Risk # | Category | Probability | Cost Impact | Schedule Impact | Impact Score |
|---|---|---|---|---|---|
| 6.06 | Construction | 3 | 1 | 1 | 6 |
| 6.07 | Construction | 3 | 1 | 1 | 6 |
| 7.01 | Stakeholder Coordination | 3 | 1 | 1 | 6 |
| 7.02 | Stakeholder Coordination | 2 | 3 | 3 | 12 |
| 7.03 | Stakeholder Coordination | 3 | 2 | 2 | 12 |
| 7.04 | Stakeholder Coordination | 1 | 1 | 1 | 2 |
| 7.05 | Stakeholder Coordination | 1 | 3 | 3 | 6 |
| 8.01 | Public Relations | 2 | 1 | 3 | 8 |
| 8.02 | Public Relations | 3 | 2 | 3 | 15 |
| 8.03 | Public Relations | 3 | 1 | 1 | 6 |
| 9.01 | Programmatic | 3 | 3 | 3 | 18 |
| 9.02 | Programmatic | 3 | 2 | 2 | 12 |
| 9.03 | Programmatic | 1 | 3 | 3 | 6 |
| 9.04 | Programmatic | 3 | 3 | 1 | 12 |
| 9.05 | Programmatic | 3 | 2 | 3 | 15 |
| 9.06 | Programmatic | 1 | 1 | 3 | 4 |
| 9.07 | Programmatic | 3 | 2 | 1 | 9 |

## Exhibit 3B:  Risk Impact Chart (Sequential Based on Risk Number)

| | Category | Risk | Probability | Cost Impact | Schedule Impact | Impact Score |
|---|---|---|---|---|---|---|
| 1.01 | Design (Roadway, Bridge, and Structures) | Ramp D-7 | 3 | 3 | 3 | 18 |
| 3.01 | ROW and Utilities | Need to acquire additional property | 3 | 3 | 3 | 18 |
| 9.01 | Programmatic | Aggressive schedule to meet June 2017 advertisement date | 3 | 3 | 3 | 18 |
| 3.02 | ROW and Utilities | Obtaining approval for a Type III Certification | 3 | 2 | 3 | 15 |
| 3.03 | ROW and Utilities | Ability to manage the ROW and utility relocation process within the times required by the current project schedule | 3 | 2 | 3 | 15 |
| 6.01 | Construction | Maintenance of Traffic ("MOT") and Sequencing of Construction ("SOC") | 3 | 3 | 2 | 15 |
| 8.02 | Public Relations | Specific acquisitions required for the project | 3 | 2 | 3 | 15 |
| 9.05 | Programmatic | Fixed budget | 3 | 2 | 3 | 15 |
| 2.02 | Drainage | Culvert at I-64 and Curlew Drive | 3 | 2 | 2 | 12 |
| 3.08 | ROW and Utilities | Challenges with specific properties | 3 | 2 | 2 | 12 |
| 4.02 | Environmental | Wetland Re-Delineations | 3 | 2 | 2 | 12 |
| 4.03 | Environmental | Ramp D-7 permitting | 3 | 1 | 3 | 12 |
| 5.03 | Geotechnical | Geotechnical conditions south of Curlew Drive | 3 | 2 | 2 | 12 |
| 7.02 | Stakeholder Coordination | Interface with localities and public agencies | 2 | 3 | 3 | 12 |
| 7.03 | Stakeholder Coordination | Interface with private utilities (e.g., communications, power, CCTV) | 3 | 2 | 2 | 12 |
| 9.02 | Programmatic | Resource availability given other projects | 3 | 2 | 2 | 12 |
| 9.04 | Programmatic | Construction market and inflation | 3 | 3 | 1 | 12 |
| 1.03 | Design (Roadway, Bridge, and Structures) | Greenwich Overpass | 3 | 2 | 1 | 9 |

| | Category | Risk | Probability | Cost Impact | Schedule Impact | Impact Score |
|---|---|---|---|---|---|---|
| 5.01 | Geotechnical | Overall soil quality | 3 | 2 | 1 | 9 |
| 5.02 | Geotechnical | Deep foundations | 3 | 2 | 1 | 9 |
| 9.07 | Programmatic | Federal Oversight | 3 | 2 | 1 | 9 |
| 1.02 | Design (Roadway, Bridge, and Structures) | South of Curlew Drive | 2 | 2 | 2 | 8 |
| 3.05 | ROW and Utilities | The effect of weather on the ability of private utility companies to perform their relocations | 2 | 1 | 3 | 8 |
| 3.06 | ROW and Utilities | Dominion Virginia Power ("DVP") | 2 | 1 | 3 | 8 |
| 6.02 | Construction | Construction access | 2 | 2 | 2 | 8 |
| 8.01 | Public Relations | Public perception and support | 2 | 1 | 3 | 8 |
| 1.05 | Design (Roadway, Bridge, and Structures) | Cross-slope of existing mainline | 1 | 3 | 3 | 6 |
| 1.06 | Design (Roadway, Bridge, and Structures) | Accuracy of survey information | 3 | 1 | 1 | 6 |
| 1.07 | Design (Roadway, Bridge, and Structures) | Designing and specifying the ITS | 3 | 1 | 1 | 6 |
| 3.04 | ROW and Utilities | Quality of plan sheets | 2 | 1 | 2 | 6 |
| 3.07 | ROW and Utilities | Private utility company relocations generally | 2 | 1 | 2 | 6 |
| 4.01 | Environmental | Requirement for an Environmental Assessment ("EA") | 1 | 3 | 3 | 6 |
| 6.04 | Construction | Night work | 3 | 1 | 1 | 6 |
| 6.05 | Construction | Maintaining existing ITS during construction | 3 | 1 | 1 | 6 |
| 6.06 | Construction | Coordination with City of Norfolk and City of Virginia Beach's traffic operations | 3 | 1 | 1 | 6 |
| 6.07 | Construction | Setting beams over traffic | 3 | 1 | 1 | 6 |
| 7.01 | Stakeholder Coordination | Witchduck Phase 2 coordination | 3 | 1 | 1 | 6 |

| | Category | Risk | Probability | Cost Impact | Schedule Impact | Impact Score |
|---|---|---|---|---|---|---|
| 7.05 | Stakeholder Coordination | HRT coordination | 1 | 3 | 3 | 6 |
| 8.03 | Public Relations | Adjacent Land Users | 3 | 1 | 1 | 6 |
| 9.03 | Programmatic | Construction cost estimate | 1 | 3 | 3 | 6 |
| 2.01 | Drainage | SWM design may be impacted by new regulations | 1 | 2 | 3 | 5 |
| 9.06 | Programmatic | Using a single construction contract | 1 | 1 | 3 | 4 |
| 6.03 | Construction | Existing infrastructure assets | 1 | 1 | 2 | 3 |
| 1.04 | Design (Roadway, Bridge, and Structures) | Pavement design | 1 | 1 | 1 | 2 |
| 7.04 | Stakeholder Coordination | Future interchange improvements | 1 | 1 | 1 | 2 |



# PROGRAMMATIC AGREEMENT

## BETWEEN THE FEDERAL HIGHWAY ADMINSTRATION, VIRGINIA DIVISION AND THE VIRGINIA DEPARTMENT OF TRANSPORTATION REGARDING THE PROCESSING OF ACTIONS CLASSIFIED AS CATEGORICAL EXCLUSIONS FOR FEDERAL-AID HIGHWAY PROJECTS

**This PROGRAMMATIC AGREEMENT ("Agreement") made and entered into this day of October, 2017, by and between the FEDERAL HIGHWAY ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION ("FHWA") and the VIRGINIA DEPARTMENT OF TRANSPORTATION ("VDOT") hereby provides as follows:**

**WITNESSETH:**

**Whereas,** the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §4321 *et. seq.*, and the Regulations for Implementing the Procedural Provisions of NEPA (40 CFR §1500-1508) direct Federal agencies to consider the environmental impacts of their proposed major Federal actions through the preparation of an environmental assessment (EA) or environmental impact statement (EIS) unless a particular action is categorically excluded;

**Whereas,** FHWA's distribution and spending of Federal funds under the Federal-aid Highway Program and approval of projects pursuant to Title 23 of the U.S. Code are major Federal actions subject to NEPA;

**Whereas,** the Secretary of Transportation has delegated to FHWA the authority to carry out functions of the Secretary under NEPA as they relate to matters within FHWA's primary responsibilities (49 CFR §1.81(a)(5));

**Whereas,** FHWA's NEPA implementing procedures (23 CFR §771) list a number of categorical exclusions (CE) for certain actions that FHWA has determined do not individually or cumulatively have a significant effect on the human environment and therefore do not require the preparation of an EA or EIS (23 CFR §771.117(c)-(d));

**Whereas,** VDOT is a State agency that undertakes transportation projects using Federal funding received under the Federal-aid Highway Program and assists FHWA in fulfilling its obligations under NEPA for projects requiring an FHWA action (23 CFR §771.109);

**Whereas,** Section 1318(d) of the Moving Ahead for Progress in the 21st Century Act (MAP-21), Pub. L. 112-141, 126 Stat. 405 (July 6, 2012), allows FHWA to enter into programmatic agreements with the States that establish efficient administrative procedures for carrying out environmental and other required project reviews, including agreements that allow a State to determine whether a project qualifies for a CE on behalf of FHWA;

**Whereas,** FHWA developed regulations implementing the authorities in Section 1318(d), effective November 6, 2014 (23 CFR §771.117(g));

**Whereas,** as defined in FHWA's *A Practitioner's Guide to FHWA Programmatic Agreements for Categorical Exclusions*, the CE decision is a determination that the proposed project would not individually or cumulatively have a significant environmental impact and the project fits in the category of projects not requiring the preparation of an EA or EIS;

**Whereas,** FHWA's *A Practitioner's Guide to FHWA Programmatic Agreements for Categorical Exclusions* allows for, and describes, a State DOT "determination" (i.e., a State DOT determines on behalf of FHWA that a project qualifies as a CE) and a State DOT "certification" (i.e., a State DOT certifies to FHWA that a project qualifies as a CE and FHWA makes the determination);

**Now, therefore,** FHWA and VDOT enter into this Agreement for the processing of categorical exclusions.

## I.   PARTIES

The Parties to this Agreement are FHWA and VDOT.

## II.   PURPOSE

The purpose of this Agreement is to authorize VDOT to determine on behalf of FHWA whether a project qualifies for a CE, as specifically listed in 23 CFR §771.117(c) or (d) (current CE qualifying projects are listed in Appendix A and B of this Agreement). This Agreement also authorizes VDOT to certify to FHWA that a project, for which VDOT cannot make a CE determination according to the terms of the Agreement, meets the CE criteria in 40 CFR §1508.4 and 23 CFR §771.117(a) and qualifies for a CE as long as there are no unusual circumstances present that would require the preparation of either an environmental assessment (EA) or an environmental impact statement (EIS).

## III.   AUTHORITIES

This Agreement is entered into pursuant to the following authorities:
  A. National Environmental Policy Act, 42 U.S.C. §4321 et seq.
  B. Moving Ahead for Progress in the 21st Century Act, P.L. 112-141, 126 Stat. 405, Sec. 1318(d) (July 6,2012)
  C. Fixing America's Surface Transportation Act, P.L. 114-94, Sec. 1315 (December 4, 2015)
  D. 40 CFR §1500-1508
  E. DOT Order 5610.1C
  F. 23 CFR §771.117

## IV.   RESPONSIBILITIES

  A. VDOT is responsible for:
    1. Ensuring the following process is completed for each project that qualifies for a CE:
      a. For projects established in 23 CFR §771.117(c) (current CE projects are listed in Appendix A) and established in 23 CFR §771.117(d) (current CE projects are listed in Appendix B) that do not exceed the thresholds in Appendix C (i.e., "Programmatic Categorical Exclusions"), VDOT may make a CE determination on behalf of FHWA. VDOT is responsible for defining the project that is the subject of its CE determination and VDOT has discretion on the level of analysis necessary to support its CE determination. VDOT will identify the applicable listed CE, ensure any conditions or constraints are met, verify that unusual circumstances do not apply, address all other environmental requirements, and complete the review with a signature evidencing the determination. No separate review or CE determination by FHWA is required.
      b. VDOT may not make a CE determination for projects listed in 23 CFR §771.117(c) and 23 CFR §771.117(d) that exceed the thresholds in Appendix C. VDOT may certify to FHWA that these projects qualify for a CE. These actions require FHWA's CE determination based on VDOT certification.
      c. VDOT may not make a CE determination for projects not specifically listed as CEs in 23 CFR §771.117(c) and 23 CFR §771.117(d). Instead, if VDOT believes that a project

meets the requirements of a CE under 40 CFR §1508.4 and 23 CFR §771.117(a), VDOT may certify that a project will not result in significant environmental impacts, if VDOT concludes that the project qualifies for a CE and it does not involve unusual circumstances that warrant the preparation of an EA or EIS. VDOT shall submit this certification to FHWA for a CE determination.

2. Consulting with FHWA for projects that involve unusual circumstances (23 CFR §771.117(b)) to determine the appropriate class of action for environmental analysis and documentation. Additional studies may be required prior to making a CE determination.

3. Conducting a quality assurance/control review prior to submitting a completed CE form to FHWA for a determination.

4. Ensuring that a signed Documentation of FHWA Review form documenting an FHWA determination is included in the Comprehensive Environmental Data and Reporting System (CEDAR).

5. Meeting applicable documentation requirements in Section V for VDOT CE determinations and VDOT certifications to FHWA, applicable requirements in Section VI, and applicable quality control/quality assurance, monitoring, and performance requirements in Section VII.

6. Utilizing environmental staff directly employed by VDOT to make CE determinations or certifications submitted to FHWA under this Agreement. VDOT may not delegate its responsibility for CE determinations or certifications to third parties (e.g., consultants, local government staff, and other State agency staff).

B. FHWA is responsible for:

1. Providing timely advice and technical assistance on CEs to VDOT, as requested.

2. Providing timely input and review of certified projects.

3. Reviewing CE certifications and providing a CE determination or comments within seven business days from receipt of the CE certification. FHWA will base its CE determination on the project documentation and certifications prepared by VDOT. FHWA's CE determination will be represented by FHWA's signature on the Documentation of FHWA Review form that will be transmitted to VDOT.

4. Overseeing the implementation of this Agreement in accordance with the provisions in Section VII, including applicable monitoring and performance provisions.

5. Commenting on, or requesting changes to, the CE form, if warranted.

## V. DOCUMENTATION OF VDOT CE DETERMINATIONS AND CERTIFICATIONS

A. For VDOT CE determinations and VDOT CE certifications, VDOT shall ensure that it fulfills the following responsibilities for documenting the project-specific determinations made:

1. For actions listed in 23 CFR §771.117(c) and 23 CFR §771.117(d), VDOT shall identify the applicable action; ensure any conditions are met; verify that unusual circumstances do not apply; address all other environmental requirements; and complete the review with a VDOT signature evidencing the determination or certification.

2. For actions not listed in 23 CFR §771.117(c) and 23 CFR §771.117(d) that VDOT will be certifying, VDOT shall prepare documentation supporting the CE determination and demonstrating no unusual circumstances exist that would make the CE determination inappropriate.

3. VDOT will utilize CEDAR to enhance quality control and review of supporting documentation. CEDAR will be the repository for documentation supporting VDOT determinations and certifications.

4. VDOT will continue to provide FHWA access to CEDAR so that FHWA can review the project documentation as well as gather the information needed to respond to FHWA's Compliance Assessment Program (CAP).

5. When VDOT conducts periodic verification of project files supporting VDOT determinations, FHWA will be extended an invitation to participate in that verification. FHWA reserves the right to independently verify compliance.
6. NEPA Documentation Concurrence Forms for VDOT's CE determinations are not necessary.
7. The Programmatic Categorical Exclusion (PCE) form will be used for VDOT determinations.
8. VDOT will obtain FHWA concurrence to conduct a CE certification using the NEPA Documentation Concurrence Form. The NEPA Documentation Concurrence Form can only be submitted to FHWA after quality control/quality assurance reviews by VDOT.
9. The CE form will be used for all CE certifications.

B. VDOT shall maintain a project record for its CE determinations and CE certifications submitted to FHWA. This record, maintained in CEDAR, should include at a minimum:
   1. Any checklists, forms, or other documents and exhibits that summarize the consideration of project effects and unusual circumstances;
   2. Any stakeholder communication, correspondence, consultation, or public meeting documentation;
   3. The name and title of the person who makes the CE determination and the date of VDOT's determination, or the name and title of the person making the CE certification and the date of FHWA's determination; and
   4. For cases involving re-evaluations, any (required) documented re-evaluation.

C. VDOT will provide any electronic project records maintained by VDOT to FHWA through FHWA's access to CEDAR. VDOT should retain those records, including all letters and comments received from governmental agencies, the public, and others for a period of no less than three (3) years after completion of project construction. This 3-year retention provision does not relieve VDOT of its project or program recordkeeping responsibilities under 2 CFR § 200.333 or any other applicable laws, regulations, or policies.

## VI. CE DETERMINATIONS, CERTIFICATIONS, AND RE-EVALUATIONS

A. VDOT's CE determinations and CEs certifications submitted to FHWA may only be made by VDOT's District Environmental Manager or NEPA Programs Manager. VDOT has discretion on the level of analysis necessary to support VDOT's CE determinations.

B. Except as set forth in Section VI.C, in accordance with 23 CFR §771.129, VDOT shall re-evaluate CE determinations, consult with FHWA, and as necessary, prepare additional documentation to ensure that VDOT CE determinations and CE certifications are still valid. The Right of Way (ROW) Re-evaluation; Plans, Specifications, and Estimates (PS&E) Re-evaluation; and Environmental Certification forms will be used for the re-evaluation of FHWA CE determinations.

C. A ROW Re-evaluation form is not required for a VDOT CE determination, and evidence of adequate review will be documented in CEDAR. A PS&E Re-evaluation form and Environmental Certification form are required for a VDOT CE determination.

## VII. QUALITY CONTROL/QUALITY ASSURANCE, MONITORING & PERFORMANCE

A. VDOT Quality Control/Quality Assurance
   1. VDOT shall carry out regular quality control/quality assurance activities to ensure that its CE determinations and CE certifications are made in accordance with applicable Federal law and regulations and this Agreement.

B. VDOT Performance Monitoring and Reporting
   1. FHWA and VDOT agree to cooperate in monitoring performance under this Agreement and work to assure quality performance.

2. VDOT agrees to summarize its performance under this Agreement to FHWA. VDOT will identify any areas where improvements are needed and the measures VDOT is taking to implement them. VDOT will identify any actions taken by VDOT as part of its quality control efforts under Section VII.A. This performance will be discussed with FHWA during an annual meeting. In the interim, a list of completed VDOT CE determinations will be provided to FHWA on a six-month reporting period basis.

C. FHWA Oversight and Monitoring
   1. Monitoring by FHWA will include consideration of the technical competency and organizational capacity of VDOT, as well as VDOT's performance of its CE processing functions. Performance considerations include, without limitation, the quality and consistency of VDOT's CE determinations and CE certifications; adequacy and capability of VDOT staff and consultants; and the effectiveness of VDOT's administration of its internal CE processes.
   2. FHWA will conduct one or more program reviews as part of its oversight activities during the term of this Agreement. VDOT shall prepare and implement a corrective action plan to address any findings or observations identified in FHWA review. VDOT should draft the corrective action plan within 45 business days of FHWA finalizing its review. The results of that review and corrective actions taken by VDOT shall be considered when this Agreement is considered for renewal.
   3. Nothing in this Agreement prevents FHWA from undertaking other monitoring or oversight actions, including audits, with respect to VDOT's performance. FHWA may require VDOT to perform such other quality assurance activities, including other types of monitoring, as may be reasonably required to ensure compliance with applicable Federal laws and regulations.
   4. VDOT agrees to cooperate with FHWA in all oversight and quality assurance activities.

D. Training
   1. FHWA and VDOT agree that training staff relative to this Agreement is integral to its successful implementation. FHWA and VDOT will collaborate to provide formal and informal training opportunities, the first of which will be conducted within six months from the date of execution of this Agreement.

## VIII.  AMENDMENTS

If the parties agree to amend this Agreement, then FHWA and VDOT may execute an amendment with new signatures and dates of the signatures. The term of the Agreement shall remain unchanged unless otherwise expressly stated in the amended Agreement.

## IX.  TERM, RENEWAL, AND TERMINATION

A. This Agreement shall have a term of five (5) years, effective on the date of the last signature. VDOT shall post and maintain an executed copy of this Agreement on its external website, available to the public.

B. This Agreement is renewable for additional five (5) year terms if VDOT requests renewal and FHWA determines that VDOT has satisfactorily carried out the provisions of this Agreement. In considering any renewal of this Agreement, FHWA will evaluate the effectiveness of the Agreement and its overall impact on the environmental review process.

C. Either party may terminate this Agreement at any time by giving at least 30 days written notice to the other party.

D. Expiration or termination of this Agreement shall mean that VDOT is not able to make CE determinations on FHWA's behalf.

Execution of this Agreement and implementation of its terms by both parties provides evidence that both parties have reviewed this Agreement and agree to the terms and conditions for its implementation. This Agreement is effective upon the date of the last signature below.

John Simkins 10/16/17

Name: John Simkins
Planning and Environment Team Leader
Federal Highway Administration, Virginia Division

Date

Angel N. Deem 10/16/17

Name: Angel N. Deem
Environmental Division Director
Virginia Department of Transportation

Date

**Appendix A: CEs listed in 23 CFR §771.117(c)**

(c) The following actions meet the criteria for CEs in the CEQ regulations (40 CFR §1508.4) and §771.117(a) and normally do not require any further NEPA Approvals by FHWA:

(1) Activities which do not involve or lead directly to construction, such as planning and research activities; grants for training; engineering to define the elements of a proposed action or alternatives so that social, economic, and environmental effects can be assessed; and Federal-aid system revisions which establish classes of highways on the Federal-aid highway system.

(2) Approval of utility installations along or across a transportation facility.

(3) Construction of bicycle and pedestrian lanes, paths, and facilities.

(4) Activities included in the State's highway safety plan under 23 U.S.C. 402.

(5) Transfer of Federal lands pursuant to 23 U.S.C. §107(d) and/or 23 U.S.C. §317 when the land transfer is in support of an action that is not otherwise subject to FHWA review under NEPA.

(6) The installation of noise barriers or alterations to existing publicly owned buildings to provide for noise reduction.

(7) Landscaping.

(8) Installation of fencing, signs, pavement markings, small passenger shelters, traffic signals, and railroad warning devices where no substantial land acquisition or traffic disruption will occur.

(9) The following actions for transportation facilities damaged by an incident resulting in an emergency declared by the Governor of the State and concurred in by the Secretary, or a disaster or emergency declared by the President pursuant to the Robert T. Stafford Act (42 U.S.C. §5121):

(i) Emergency repairs under 23 U.S.C. §125; and

(ii) The repair, reconstruction, restoration, retrofitting, or replacement of any road, highway, bridge, tunnel, or transit facility (such as a ferry dock or bus transfer station), including ancillary transportation facilities (such as pedestrian/bicycle paths and bike lanes), that is in operation or under construction when damaged and the action:

(A) Occurs within the existing right-of-way and in a manner that substantially conforms to the preexisting design, function, and location as the original (which may include upgrades to meet existing codes and standards as well as upgrades warranted to address conditions that have changed since the original construction); and

(B) Is commenced within a 2-year period beginning on the date of the declaration.

(10) Acquisition of scenic easements.

(11) Determination of payback under 23 U.S.C. §156 for property previously acquired with Federal-aid participation.

(12) Improvements to existing rest areas and truck weigh stations.

(13) Ridesharing activities.

(14) Bus and rail car rehabilitation.

(15) Alterations to facilities or vehicles in order to make them accessible for elderly and handicapped persons.

(16) Program administration, technical assistance activities, and operating assistance to transit authorities to continue existing service or increase service to meet routine changes in demand.

(17) The purchase of vehicles by the applicant where the use of these vehicles can be accommodated by existing facilities or by new facilities which themselves are within a CE.

(18) Track and railbed maintenance and improvements when carried out within the existing right-of-way.

(19) Purchase and installation of operating or maintenance equipment to be located within the transit facility and with no significant impacts off the site.

(20) Promulgation of rules, regulations, and directives.

(21) Deployment of electronics, photonics, communications, or information processing used singly or in combination, or as components of a fully integrated system, to improve the efficiency or safety of a surface transportation system or to enhance security or passenger convenience. Examples include, but are not limited to, traffic control and detector devices, lane management systems, electronic payment equipment, automatic vehicle locaters, automated passenger counters, computer-aided dispatching systems, radio communications systems, dynamic message signs, and security equipment including surveillance and detection cameras on roadways and in transit facilities and on buses.

(22) Projects, as defined in 23 U.S.C. §101, that would take place entirely within the existing operational right-of-way. Existing operational right-of-way refers to right-of-way that has been disturbed for an existing transportation facility or is maintained for a transportation purpose. This area includes the features associated with the physical footprint of the transportation facility (including the roadway, bridges, interchanges, culverts, drainage, fixed guideways, mitigation areas, etc.) and other areas maintained for transportation purposes such as clear zone, traffic control signage, landscaping, any rest areas with direct access to a controlled access highway, areas maintained for safety and security of a transportation facility, parking facilities with direct access to an existing transportation facility, transit power substations, transit venting structures, and transit maintenance facilities. Portions of the right-of-way that have not been disturbed or that are not maintained for transportation purposes are not in the existing operational right-of-way.

(23) Federally-funded projects:

(i) That receive less than $5,000,000 (as adjusted annually by the Secretary to reflect any increases in the Consumer Price Index prepared by the Department of Labor, see www.fhwa.dot.gov or www.fta.dot.gov) of Federal funds; or

(ii) With a total estimated cost of not more than $30,000,000 (as adjusted annually by the Secretary to reflect any increases in the Consumer Price Index prepared by the Department of Labor, see www.fhwa.dot.gov or www.fta.dot.gov) and Federal funds comprising less than 15 percent of the total estimated project cost.

(24) Localized geotechnical and other investigation to provide information for preliminary design and for environmental analyses and permitting purposes, such as drilling test bores for soil sampling; archeological investigations for archeology resources assessment or similar survey; and wetland surveys.

(25) Environmental restoration and pollution abatement actions to minimize or mitigate the impacts of any existing transportation facility (including retrofitting and construction of stormwater treatment systems to meet Federal and State requirements under Sections 401 and 402 of the Federal Water Pollution Control Act (33 U.S.C. §1341; 1342)) carried out to address water pollution or environmental degradation.

(26) Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the action meets the constraints in paragraph (e) of this section.

(27) Highway safety or traffic operations improvement projects, including the installation of ramp metering control devices and lighting, if the project meets the constraints in paragraph (e) of this section.

(28) Bridge rehabilitation, reconstruction, or replacement or the construction of grade separation to replace existing at-grade railroad crossings, if the actions meet the constraints in paragraph (e) of this section.

(29) Purchase, construction, replacement, or rehabilitation of ferry vessels (including improvements to ferry vessel safety, navigation, and security systems) that would not require a change in the function of the ferry terminals and can be accommodated by existing facilities or by new facilities which themselves are within a CE.

(30) Rehabilitation or reconstruction of existing ferry facilities that occupy substantially the same geographic footprint, do not result in a change in their functional use, and do not result in a substantial increase in the existing facility's capacity. Example actions include work on pedestrian and vehicle transfer structures and associated utilities, buildings, and terminals.

**Appendix B: CEs listed in 23 CFR §771.117(d)**

(d) Additional actions which meet the criteria for a CE in the CEQ regulations (40 CFR §1508.4) and paragraph (a) of this section may be designated as CEs only after Administration approval unless otherwise authorized under an executed agreement pursuant to paragraph (g) of this section. The applicant shall submit documentation which demonstrates that the specific conditions or criteria for these CEs are satisfied and that significant environmental effects will not result. Examples of such actions include but are not limited to:

(4) Transportation corridor fringe parking facilities.

(5) Construction of new truck weigh stations or rest areas.

(6) Approvals for disposal of excess right-of-way or for joint or limited use of right-of-way, where the proposed use does not have significant adverse impacts.

(7) Approvals for changes in access control.

(8) Construction of new bus storage and maintenance facilities in areas used predominantly for industrial or transportation purposes where such construction is not inconsistent with existing zoning and located on or near a street with adequate capacity to handle anticipated bus and support vehicle traffic.

(9) Rehabilitation or reconstruction of existing rail and bus buildings and ancillary facilities where only minor amounts of additional land are required and there is not a substantial increase in the number of users.

(10) Construction of bus transfer facilities (an open area consisting of passenger shelters, boarding areas, kiosks and related street improvements) when located in a commercial area or other high activity center in which there is adequate street capacity for projected bus traffic.

(11) Construction of rail storage and maintenance facilities in areas used predominantly for industrial or transportation purposes where such construction is not inconsistent with existing zoning and where there is no significant noise impact on the surrounding community.

(12) Acquisition of land for hardship or protective purposes. Hardship and protective buying will be permitted only for a particular parcel or a limited number of parcels. These types of land acquisition qualify for a CE only where the acquisition will not limit the evaluation of alternatives, including shifts in alignment for planned construction projects, which may be required in the NEPA process. No project development on such land may proceed until the NEPA process has been completed.

(i) Hardship acquisition is early acquisition of property by the applicant at the property owner's request to alleviate particular hardship to the owner, in contrast to others, because of an inability to sell his property. This is justified when the property owner can document on the basis of health, safety or financial reasons that remaining in the property poses an undue hardship compared to others.

(ii) Protective acquisition is done to prevent imminent development of a parcel which may be needed for a proposed transportation corridor or site. Documentation must clearly demonstrate that development of the land would preclude future transportation use and that such development is imminent. Advance acquisition is not permitted for the sole purpose of reducing the cost of property for a proposed project.

(13) Actions described in paragraphs (c) (26), (c)(27), and (c)(28) of this section that do not meet the constraints in paragraph (e) of this section.

    (e) Actions described in (c) (26), (c)(27), and (c)(28) of this section may not be processed as CEs under paragraph (c) if they involve:

        (1) An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;

        (2) An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbors Act of 1899;

        (3) A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. §138 or 49 U.S.C. §303 (Section 4(f)) except for actions resulting in de minimis impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;

        (4) Construction of temporary access, or the closure of existing road, bridge, or ramps, that would result in major traffic disruptions;

        (5) Changes in access control;

        (6) A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

## Appendix C: VDOT CE Determination Qualifying Thresholds

If any of the conditions listed below are true, the project ***does not*** qualify for a VDOT CE determination and would require a NEPA approval from FHWA.

1. Involves acquisition of more than minor amounts of temporary or permanent right of way acquisition. Considerations for whether the amount of acquisition qualifies as minor include, but are not limited to, the context and intensity of the impact, the size of the parcel, and the effect on the parcel's function;
2. Involves acquisitions that result in more than limited residential and non-residential displacements, considering the context and intensity of the impact;
3. Results in capacity expansion of a roadway by addition of through lanes;
4. Involves the construction of temporary access, or the closure of an existing road, bridge, or ramps, that would result in major traffic disruptions. Considerations for whether the traffic disruptions qualify as major include, but are not limited to, the context and intensity of the impact, the amount of travel delay, the time during which the facility is closed, the amount of traffic volume utilizing the facility, and the distance of the detour route;
5. Results in a determination of adverse effect on historic properties pursuant to Section 106 of the National Historic Preservation Act (54 U.S.C. §306108);
6. Requires the use of properties protected by Section 4(f) (49 U.S.C. § 303/23 U.S.C. §138) that cannot be documented with an FHWA *de minimis* determination or a programmatic Section 4(f) evaluation signed by FHWA;
7. Requires the acquisition of lands under the protection of Section 6(f) of the Land and Water Conservation Act of 1965 (54 U.S.C. §200305) or other unique areas or special lands that were acquired in fee or easement with federal public-use-money and have deed restrictions or covenants on the property;
8. Requires a U.S. Army Corps of Engineers Section 404 (33 U.S.C. §1344) permit other than a Nationwide or a General Permit;
9. Requires a U.S. Coast Guard bridge permit (33 U.S.C. §401);
10. Requires work that will cause an increase of the flood level by more than one foot within a regulatory floodway of water courses or water bodies, or work affecting the base floodplain (100-year flood) elevations of a water course or lake, pursuant to 23 CFR §650 subpart A;
11. Is defined as a "Type I project" per 23 CFR §772.5 and the VDOT noise manual for purposes of a noise analysis;
12. Is likely to adversely affect federally listed species or designated critical habitat, with the exception of a "may affect, likely to adversely affect" (MALAA) determination for the Northern Long-Eared Bat or Indiana Bat when the project is within the scope of the Section 7 range-wide programmatic consultation for those species;
13. Involves any known or potential hazardous materials issues that represent a substantial liability or require substantial regulatory negotiation to resolve. Sites representing substantial liability would not include minor issues such as low-level petroleum impacts or minimal solid waste;
14. Does not meet the provisions of the "Planning Documents and NEPA Approvals" document. In accordance with 23 CFR §450 and the agreement among FHWA, VDOT, the Federal Transit Administration, and the Virginia Department of Rail and Public Transportation, actions listed in 23 CFR §771.117(c) and 23 CFR §771.117(d) may be grouped;
15. Causes disproportionately high and adverse effects on any minority or low-income populations;
16. Involves consideration of multiple NEPA alternatives under consideration;
17. Is an action listed in 23 CFR §771.115(a); or
18. Involves unusual circumstances, pursuant to 23 CFR §771.117(b).

# Appendix D: VDOT CE Determination Form

(Last Revised: 10/18/2017)

## Programmatic Categorical Exclusion (PCE)

**Project Information**

| | |
|---|---|
| **Project Name:** | **Federal Project#:** |
| **Project Number:** | **Project Type:** |
| **UPC:** | **Charge Number:** |
| **Route Number:** | **Route Type:** |
| **Project Limit--From:** | **To:** |
| **Project Description:** | |
| **Additional Project Description:** | |
| **Purpose and Need:** | |
| **District:** **City/County:** | **Residency:** |

**The subject project meets the criteria for a Programmatic Categorical Exclusion in accordance with:**

_ 23 CFR 771.117

**Description of PCE Category:**

C-XX

UNUSUAL CIRCUMSTANCES (YES/NO):

NO Significant environmental impacts
*Determination:*

NO Substantial controversy on environmental grounds
*Determination:*

NO Significant impact on properties protected by Section 4(f) of the Department of Transportation Act or Section 106 of the National Historic Preservation Act
*Determination:*

NO Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action
*Determination:*

**IMPACTS (YES/NO):**

NO Involves acquisition of more than minor amounts of temporary or permanent right of way acquisition
*Determination:*

NO Involves acquisitions that result in more than limited residential and non-residential displacements, based on the context and intensity of the impact
*Determination:*

NO Results in capacity expansion of a roadway by addition of through lanes
*Determination:*

NO Involves the construction of temporary access, or the closure of an existing road, bridge, or ramps, that would result in major traffic disruptions, based on the context and intensity of the impact
*Determination:*

NO Results in a determination of adverse effect on historic properties pursuant to Section 106 of the National Historic Preservation Act (54 U.S.C. §306108)
*Determination:*

NO Requires the use of properties protected by Section 4(f) (49 U.S.C. § 303/23 U.S.C. § 138) that cannot be documented with an FHWA *de minimis* determination, or a programmatic Section 4(f) evaluation signed by FHWA
*Determination:*

NO Requires the acquisition of lands under the protection of Section 6(f) of the Land and Water Conservation Act of 1965 (54 U.S.C. § 200305) or other unique areas or special lands that were acquired in fee or easement with federal public-use-money and have deed restrictions or covenants on the property
*Determination:*

NO Requires a U.S. Army Corps of Engineers Section 404 (33 U.S.C. § 1344 permit other than a Nationwide or a General Permit
*Determination:*

NO Requires a U.S. Coast Guard bridge permit (33 U.S.C. § 401)
*Determination:*

NO Requires work that will cause an increase of the flood level by more than one foot within a regulatory floodway of water courses or water bodies or work affecting the base floodplain (100-year flood) elevations of a water course or lake, pursuant to 23 CFR §650 subpart A
*Determination:*

NO Is defined as a "Type I project" per 23 CFR §772.5 and the VDOT noise manual for purposes of a noise analysis
*Determination:*

NO Is likely to adversely affect federally listed species or designated critical habitat, with the exception of a "may affect, likely to adversely affect" (MALAA) determination for the Northern Long-Eared Bat or Indiana Bat when the project is within the scope of the Section 7 range-wide programmatic consultation for those species
*Determination:*

NO Involves any known or potential hazardous materials issues that represent a substantial liability or require substantial regulatory negotiation to resolve. Sites representing substantial liability would not include minor issues such as low-level petroleum impacts or minimal solid waste
*Determination:*

NO Does not meet the provisions of the "Planning Documents and NEPA Approvals" document. In accordance with 23 CFR §450 and the FHWA/VDOT/Federal Transit Administration/Virginia Department of Rail and Public Transportation MOA Statewide Transportation Improvement Program (STIP) Procedures MOA, actions listed in 23 CFR §771.117(c) and 23 CFR §771.117(d) may be grouped
*Determination:*

NO Causes disproportionately high and adverse effects on any minority or low-income populations
*Determination:*

NO Involves consideration of multiple NEPA alternatives
*Determination:*

NO Is an action listed in 23 CFR §771.115(a)
*Determination:*

NO Involves unusual circumstances, pursuant to 23 CFR §771.117(b)
*Determination:*

Environmental Manager, CE Determination Date

# Appendix D: VDOT CE Determination Form

(Last Revised: 10/18/2017)

## Programmatic Categorical Exclusion (PCE)

**Project Information**

| | |
|---|---|
| **Project Name:** | **Federal Project#:** |
| **Project Number:** | **Project Type:** |
| **UPC:** | **Charge Number:** |
| **Route Number:** | **Route Type:** |
| **Project Limit--From:** | **To:** |
| **Project Description:** | |
| **Additional Project Description:** | |
| **Purpose and Need:** | |

**District:** **City/County:** **Residency:**

**The subject project meets the criteria for a Programmatic Categorical Exclusion in accordance with:**

_ 23 CFR 771.117

**Description of PCE Category:**

C-XX

UNUSUAL CIRCUMSTANCES (YES/NO):

NO Significant environmental impacts
*Determination:*

NO Substantial controversy on environmental grounds
*Determination:*

NO Significant impact on properties protected by Section 4(f) of the Department of Transportation Act or Section 106 of the National Historic Preservation Act
*Determination:*

NO Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action
*Determination:*

e629cbac80e3d59550a7e90b32058&mc=true&node=pt40.37.1508&rgn=div5#se40.37.1508_14

Link to an amendment published at 85 FR 43374, July 16, 2020.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

Back to Top

### §1508.1 Terminology.

The terminology of this part shall be uniform throughout the Federal Government.

Back to Top

### §1508.2 Act.

*Act* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*) which is also referred to as "NEPA."

Back to Top

### §1508.3 Affecting.

*Affecting* means will or may have an effect on.

Back to Top

### §1508.4 Categorical exclusion.

*Categorical exclusion* means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons

**§1508.4 Categorical exclusion.**

*Categorical exclusion* means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in §1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

Back to Top

**§1508.5 Cooperating agency.**

*Cooperating agency* means any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in §1501.6. A State or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

Back to Top

**§1508.6 Council.**

*Council* means the Council on Environmental Quality established by title II of the Act.

Back to Top

**§1508.7 Cumulative impact.**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what

**§1508.7 Cumulative impact.**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

Back to Top

**§1508.8 Effects.**

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

Back to Top

**§1508.9 Environmental assessment.**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

**§1508.9 Environmental assessment.**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

↥ Back to Top

**§1508.10 Environmental document.**

*Environmental document* includes the documents specified in §1508.9 (environmental assessment), §1508.11 (environmental impact statement), §1508.13 (finding of no significant impact), and §1508.22 (notice of intent).

↥ Back to Top

**§1508.11 Environmental impact statement.**

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

↥ Back to Top

Back to Top

**§1508.11 Environmental impact statement.**

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

Back to Top

**§1508.12 Federal agency.**

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

Back to Top

**§1508.13 Finding of no significant impact.**

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

Back to Top

**§1508.14 Human environment.**

*Human environment* shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

Back to Top

### §1508.14 Human environment.

*Human environment* shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

Back to Top

### §1508.15 Jurisdiction by law.

*Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

Back to Top

### §1508.16 Lead agency.

*Lead agency* means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.

Back to Top

### §1508.17 Legislation.

**§1508.17 Legislation.**

*Legislation* includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. Proposals for legislation include requests for ratification of treaties. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

Back to Top

**§1508.18 Major Federal action.**

*Major Federal action* includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 *et seq.*, with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.;* treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.;* treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

Back to Top

**§1508.19 Matter.**

*Matter* includes for purposes of part 1504:

(a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

Back to Top

**§1508.20 Mitigation.**

*Mitigation* includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

NEPA applies.

Back to Top

**§1508.20 Mitigation.**

*Mitigation* includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

Back to Top

**§1508.21 NEPA process.**

*NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

Back to Top

**§1508.22 Notice of intent.**

*Notice of intent* means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping

### §1508.22 Notice of intent.

*Notice of intent* means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

Back to Top

### §1508.23 Proposal.

*Proposal* exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

Back to Top

### §1508.24 Referring agency.

*Referring agency* means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

Back to Top

*Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequencies together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

Back to Top

**§1508.26 Special expertise.**

*Special expertise* means statutory responsibility, agency mission, or related program experience.

Back to Top

**§1508.27 Significantly.**

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context*. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity*. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of

Back to Top

## §1508.28 Tiering.

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

Back to Top

**§771.117 FHWA categorical exclusions.**

(a) CEs are actions that meet the definition contained in 40 CFR 1508.4, and, based on FHWA's past experience with similar actions, do not involve significant environmental impacts. They are actions that: Do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

(b) Any action that normally would be classified as a CE but could involve unusual circumstances will require the FHWA, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper. Such unusual circumstances include:

(1) Significant environmental impacts;

(2) Substantial controversy on environmental grounds;

(3) Significant impact on properties protected by Section 4(f) requirements or Section 106 of the National Historic Preservation Act; or

(4) Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action.

(c) The following actions meet the criteria for CEs in the CEQ regulations (40 CFR 1508.4) and paragraph (a) of this section and normally do not require any further NEPA approvals by the FHWA:

(1) Activities that do not involve or lead directly to construction, such as planning and research activities; grants for training; engineering to define the elements of a proposed action or alternatives so that social, economic, and environmental effects can be assessed; and Federal-aid system revisions that establish classes of highways on the Federal-aid highway system.

(2) Approval of utility installations along or across a transportation facility.

(3) Construction of bicycle and pedestrian lanes, paths, and facilities.

(4) Activities included in the State's highway safety plan under 23 U.S.C. 402.

(5) Transfer of Federal lands pursuant to 23 U.S.C. 107(d) and/or 23 U.S.C. 317 when the land transfer is in support of an action that is not otherwise subject to FHWA review under NEPA.

(6) The installation of noise barriers or alterations to existing publicly owned buildings to provide for noise reduction.

(7) Landscaping.

(8) Installation of fencing, signs, pavement markings, small passenger shelters, traffic signals, and railroad warning devices where no substantial land acquisition or traffic disruption will occur.

(9) The following actions for transportation facilities damaged by an incident resulting in an emergency declared by the Governor of the State and concurred in by the Secretary, or a disaster or emergency declared by the President pursuant to the Robert T. Stafford Act (42 U.S.C. 5121):

(i) Emergency repairs under 23 U.S.C. 125; and

(ii) The repair, reconstruction, restoration, retrofitting, or replacement of any road, highway, bridge, tunnel, or transit facility (such as a ferry dock or bus transfer station), including ancillary transportation facilities (such as pedestrian/bicycle paths and bike lanes), that is in operation or under construction when damaged and the action:

(A) Occurs within the existing right-of-way and in a manner that substantially conforms to the preexisting design, function, and location as the original (which may include upgrades to meet existing codes and standards as well as upgrades warranted to address conditions that have changed since the original construction); and

(B) Is commenced within a 2-year period beginning on the date of the declaration.

(10) Acquisition of scenic easements.

(11) Determination of payback under 23 U.S.C. 156 for property previously acquired with Federal-aid participation.

(12) Improvements to existing rest areas and truck weigh stations.

(13) Ridesharing activities.

(14) Bus and rail car rehabilitation.

(15) Alterations to facilities or vehicles in order to make them accessible for elderly and handicapped persons.

(16) Program administration, technical assistance activities, and operating assistance to transit authorities to continue existing service or increase service to meet routine changes in demand.

(17) The purchase of vehicles by the applicant where the use of these vehicles can be accommodated by existing facilities or by new facilities that themselves are within a CE.

(18) Track and railbed maintenance and improvements when carried out within the existing right-of-way.

(19) Purchase and installation of operating or maintenance equipment to be located within the transit facility and with no significant impacts off the site.

(20) Promulgation of rules, regulations, and directives.

(21) Deployment of electronics, photonics, communications, or information processing used singly or in combination, or as components of a fully integrated system, to improve the efficiency or safety of a surface transportation system or to enhance security or passenger convenience. Examples include, but are not limited to, traffic control and detector devices, lane management systems, electronic payment equipment, automatic vehicle locaters, automated passenger counters, computer-aided dispatching systems, radio communications systems, dynamic message signs, and security equipment including surveillance and detection cameras on roadways and in transit facilities and on buses.

(22) Projects, as defined in 23 U.S.C. 101, that would take place entirely within the existing operational right-of-way. Existing operational right-of-way means all real property interests acquired for the construction, operation, or mitigation of a project. This area includes the features associated with the physical footprint of the project including but not limited to the roadway, bridges, interchanges, culverts, drainage, clear zone, traffic control signage, landscaping, and any rest areas with direct access to a controlled access highway. This also includes fixed guideways, mitigation areas, areas maintained or used for safety and security of a transportation facility, parking facilities with direct access to an existing transportation facility, transportation power substations, transportation venting structures, and transportation maintenance facilities.

(23) Federally funded projects:

(i) That receive less than $5,000,000 (as adjusted annually by the Secretary to reflect any increases in the Consumer Price Index prepared by the Department of Labor, see *www.fhwa.dot.gov* or *www.fta.dot.gov*) of Federal funds; or

(ii) With a total estimated cost of not more than $30,000,000 (as adjusted annually by the Secretary to reflect any increases in the Consumer Price Index prepared by the Department of Labor, see *www.fhwa.dot.gov* or *www.fta.dot.gov*) and Federal funds comprising less than 15 percent of the total estimated project cost.

(24) Localized geotechnical and other investigation to provide information for preliminary design and for environmental analyses and permitting purposes, such as drilling test bores for soil sampling; archeological investigations for archeology resources assessment or similar survey; and wetland surveys.

(25) Environmental restoration and pollution abatement actions to minimize or mitigate the impacts of any existing transportation facility (including retrofitting and construction of stormwater treatment systems to meet Federal and State requirements under sections 401 and 402 of the Federal Water Pollution Control Act (33 U.S.C. 1341; 1342)) carried out to address water pollution or environmental degradation.

(26) Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the action meets the constraints in paragraph (e) of this section.

(27) Highway safety or traffic operations improvement projects, including the installation of ramp metering control devices and lighting, if the project meets the constraints in paragraph (e) of this section.

(28) Bridge rehabilitation, reconstruction, or replacement or the construction of grade separation to replace existing at-grade railroad crossings, if the actions meet the constraints in paragraph (e) of this section.

(29) Purchase, construction, replacement, or rehabilitation of ferry vessels (including improvements to ferry vessel safety, navigation, and security systems) that would not require a change in the function of the ferry terminals and can be accommodated by existing facilities or by new facilities that themselves are within a CE.

(30) Rehabilitation or reconstruction of existing ferry facilities that occupy substantially the same geographic footprint, do not result in a change in their functional use, and do not result in a substantial increase in the existing facility's capacity. Example actions include work on pedestrian and vehicle transfer structures and associated utilities, buildings, and terminals.

(d) Additional actions that meet the criteria for a CE in the CEQ regulations (40 CFR 1508.4) and paragraph (a) of this section may be designated as CEs only after Administration approval unless otherwise authorized under an executed agreement pursuant to paragraph (g) of this section. The applicant must submit documentation that demonstrates that the specific conditions or criteria for these CEs are satisfied, and that significant environmental effects will not result. Examples of such actions include but are not limited to:

(1)-(3) [Reserved]

(4) Transportation corridor fringe parking facilities.

(5) Construction of new truck weigh stations or rest areas.

(6) Approvals for disposal of excess right-of-way or for joint or limited use of right-of-way, where the proposed use does not have significant adverse impacts.

(7) Approvals for changes in access control.

(8) Construction of new bus storage and maintenance facilities in areas used predominantly for industrial or transportation purposes where such construction is not inconsistent with existing zoning and located on or near a street with adequate capacity to handle anticipated bus and support vehicle traffic.

(9) Rehabilitation or reconstruction of existing rail and bus buildings and ancillary facilities where only minor amounts of additional land are required, and there is not a substantial increase in the number of users.

**§771.117   FHWA categorical exclusions.**

(a) CEs are actions that meet the definition contained in 40 CFR 1508.4, and, based on FHWA's past experience with similar actions, do not involve significant environmental impacts. They are actions that: Do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

(b) Any action that normally would be classified as a CE but could involve unusual circumstances will require the FHWA, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper. Such unusual circumstances include:

(1) Significant environmental impacts;

(2) Substantial controversy on environmental grounds;

(3) Significant impact on properties protected by Section 4(f) requirements or Section 106 of the National Historic Preservation Act; or

(4) Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action.

(c) The following actions meet the criteria for CEs in the CEQ regulations (40 CFR 1508.4) and paragraph (a) of this section and normally do not require any further NEPA approvals by the FHWA:

(1) Activities that do not involve or lead directly to construction, such as planning and research activities; grants for training; engineering to define the elements of a proposed action or alternatives so that social, economic, and environmental effects can be assessed; and Federal-aid system revisions that establish classes of highways on the Federal-aid highway system.

(2) Approval of utility installations along or across a transportation facility.

(3) Construction of bicycle and pedestrian lanes, paths, and facilities.

(4) Activities included in the State's highway safety plan under 23 U.S.C. 402.

(5) Transfer of Federal lands pursuant to 23 U.S.C. 107(d) and/or 23 U.S.C. 317 when the land transfer is in support of an action that is not otherwise subject to FHWA review under NEPA.

(6) The installation of noise barriers or alterations to existing publicly owned buildings to provide for noise reduction.

(7) Landscaping.

(8) Installation of fencing, signs, pavement markings, small passenger shelters, traffic signals, and railroad warning devices where no substantial land acquisition or traffic disruption will occur.

(9) The following actions for transportation facilities damaged by an incident resulting in an emergency declared by the Governor of the State and concurred in by the Secretary, or a disaster or emergency declared by the President pursuant to the Robert T. Stafford Act (42 U.S.C. 5121):

(i) Emergency repairs under 23 U.S.C. 125; and

(ii) The repair, reconstruction, restoration, retrofitting, or replacement of any road, highway, bridge, tunnel, or transit facility (such as a ferry dock or bus transfer station), including ancillary transportation facilities (such as pedestrian/bicycle paths and bike lanes), that is in operation or under construction when damaged and the action:

(A) Occurs within the existing right-of-way and in a manner that substantially conforms to the preexisting design, function, and location as the original (which may include upgrades to meet existing codes and standards as well as upgrades warranted to address conditions that have changed since the original construction); and

(B) Is commenced within a 2-year period beginning on the date of the declaration.

(10) Acquisition of scenic easements.

(11) Determination of payback under 23 U.S.C. 156 for property previously acquired with Federal-aid participation.

(12) Improvements to existing rest areas and truck weigh stations.

(13) Ridesharing activities.

(14) Bus and rail car rehabilitation.

(15) Alterations to facilities or vehicles in order to make them accessible for elderly and handicapped persons.

(16) Program administration, technical assistance activities, and operating assistance to transit authorities to continue existing service or increase service to meet routine changes in demand.

(17) The purchase of vehicles by the applicant where the use of these vehicles can be accommodated by existing facilities or by new facilities that themselves are within a CE.

(18) Track and railbed maintenance and improvements when carried out within the existing right-of-way.

(19) Purchase and installation of operating or maintenance equipment to be located within the transit facility and with no significant impacts off the site.

(20) Promulgation of rules, regulations, and directives.

(21) Deployment of electronics, photonics, communications, or information processing used singly or in combination, or as components of a fully integrated system, to improve the efficiency or safety of a surface transportation system or to enhance security or passenger convenience. Examples include, but are not limited to, traffic control and detector devices, lane management systems, electronic payment equipment, automatic vehicle locaters, automated passenger counters, computer-aided dispatching systems, radio communications systems, dynamic message signs, and security equipment including surveillance and detection cameras on roadways and in transit facilities and on buses.

(22) Projects, as defined in 23 U.S.C. 101, that would take place entirely within the existing operational right-of-way. Existing operational right-of-way means all real property interests acquired for the construction, operation, or mitigation of a project. This area includes the features associated with the physical footprint of the project including but not limited to the roadway, bridges, interchanges, culverts, drainage, clear zone, traffic control signage, landscaping, and any rest areas with direct access to a controlled access highway. This also includes fixed guideways, mitigation areas, areas maintained or used for safety and security of a transportation facility, parking facilities with direct access to an existing transportation facility, transportation power substations, transportation venting structures, and transportation maintenance facilities.

(23) Federally funded projects:

(i) That receive less than $5,000,000 (as adjusted annually by the Secretary to reflect any increases in the Consumer Price Index prepared by the Department of Labor, see *www.fhwa.dot.gov* or *www.fta.dot.gov*) of Federal funds; or

(ii) With a total estimated cost of not more than $30,000,000 (as adjusted annually by the Secretary to reflect any increases in the Consumer Price Index prepared by the Department of Labor, see *www.fhwa.dot.gov* or *www.fta.dot.gov*) and Federal funds comprising less than 15 percent of the total estimated project cost.

(24) Localized geotechnical and other investigation to provide information for preliminary design and for environmental analyses and permitting purposes, such as drilling test bores for soil sampling; archeological investigations for archeology resources assessment or similar survey; and wetland surveys.

(25) Environmental restoration and pollution abatement actions to minimize or mitigate the impacts of any existing transportation facility (including retrofitting and construction of stormwater treatment systems to meet Federal and State requirements under sections 401 and 402 of the Federal Water Pollution Control Act (33 U.S.C. 1341; 1342)) carried out to address water pollution or environmental degradation.

(26) Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the action meets the constraints in paragraph (e) of this section.

(27) Highway safety or traffic operations improvement projects, including the installation of ramp metering control devices and lighting, if the project meets the constraints in paragraph (e) of this section.

(28) Bridge rehabilitation, reconstruction, or replacement or the construction of grade separation to replace existing at-grade railroad crossings, if the actions meet the constraints in paragraph (e) of this section.

(29) Purchase, construction, replacement, or rehabilitation of ferry vessels (including improvements to ferry vessel safety, navigation, and security systems) that would not require a change in the function of the ferry terminals and can be accommodated by existing facilities or by new facilities that themselves are within a CE.

(30) Rehabilitation or reconstruction of existing ferry facilities that occupy substantially the same geographic footprint, do not result in a change in their functional use, and do not result in a substantial increase in the existing facility's capacity. Example actions include work on pedestrian and vehicle transfer structures and associated utilities, buildings, and terminals.

(d) Additional actions that meet the criteria for a CE in the CEQ regulations (40 CFR 1508.4) and paragraph (a) of this section may be designated as CEs only after Administration approval unless otherwise authorized under an executed agreement pursuant to paragraph (g) of this section. The applicant must submit documentation that demonstrates that the specific conditions or criteria for these CEs are satisfied, and that significant environmental effects will not result. Examples of such actions include but are not limited to:

(1)-(3) [Reserved]

(4) Transportation corridor fringe parking facilities.

(5) Construction of new truck weigh stations or rest areas.

(6) Approvals for disposal of excess right-of-way or for joint or limited use of right-of-way, where the proposed use does not have significant adverse impacts.

(7) Approvals for changes in access control.

(8) Construction of new bus storage and maintenance facilities in areas used predominantly for industrial or transportation purposes where such construction is not inconsistent with existing zoning and located on or near a street with adequate capacity to handle anticipated bus and support vehicle traffic.

(9) Rehabilitation or reconstruction of existing rail and bus buildings and ancillary facilities where only minor amounts of additional land are required, and there is not a substantial increase in the number of users.

(10) Construction of bus transfer facilities (an open area consisting of passenger shelters, boarding areas, kiosks and related street improvements) when located in a commercial area or other high activity center in which there is adequate street capacity for projected bus traffic.

(11) Construction of rail storage and maintenance facilities in areas used predominantly for industrial or transportation purposes where such construction is not inconsistent with existing zoning, and where there is no significant noise impact on the surrounding community.

(12) Acquisition of land for hardship or protective purposes. Hardship and protective buying will be permitted only for a particular parcel or a limited number of parcels. These types of land acquisition qualify for a CE only where the acquisition will not limit the evaluation of alternatives, including shifts in alignment for planned construction projects, which may be required in the NEPA process. No project development on such land may proceed until the NEPA process has been completed.

(i) Hardship acquisition is early acquisition of property by the applicant at the property owner's request to alleviate particular hardship to the owner, in contrast to others, because of an inability to sell his property. This is justified when the property owner can document on the basis of health, safety or financial reasons that remaining in the property poses an undue hardship compared to others.

(ii) Protective acquisition is done to prevent imminent development of a parcel that may be needed for a proposed transportation corridor or site. Documentation must clearly demonstrate that development of the land would preclude future transportation use and that such development is imminent. Advance acquisition is not permitted for the sole purpose of reducing the cost of property for a proposed project.

(13) Actions described in paragraphs (c)(26), (c)(27), and (c)(28) of this section that do not meet the constraints in paragraph (e) of this section.

(e) Actions described in (c)(26), (c)(27), and (c)(28) of this section may not be processed as CEs under paragraph (c) if they involve:

(1) An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;

(2) An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899;

(3) A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;

(4) Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;

(5) Changes in access control;

(6) A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

(f) Where a pattern emerges of granting CE status for a particular type of action, the FHWA will initiate rulemaking proposing to add this type of action to the list of categorical exclusions in paragraph (c) or (d) of this section, as appropriate.

(g) FHWA may enter into programmatic agreements with a State to allow a State DOT to make a NEPA CE certification or determination and approval on FHWA's behalf, for CEs specifically listed in paragraphs (c) and (d) of this section and that meet the criteria for a CE under 40 CFR 1508.4, and are identified in the programmatic agreement. Such agreements must be subject to the following conditions:

(1) The agreement must set forth the State DOT's responsibilities for making CE determinations, documenting the determinations, and achieving acceptable quality control and quality assurance;

(2) The agreement may not have a term of more than five years, but may be renewed;

(3) The agreement must provide for FHWA's monitoring of the State DOT's compliance with the terms of the agreement and for the State DOT's execution of any needed corrective action. FHWA must take into account the State DOT's performance when considering renewal of the programmatic CE agreement; and

(4) The agreement must include stipulations for amendment, termination, and public availability of the agreement once it has been executed.

(h) Any action qualifying as a CE under §771.116 or §771.118 may be approved by FHWA when the applicable requirements of those sections have been met. FHWA may consult with FRA or FTA to ensure the CE is applicable to the proposed action.



# Route 264 – Interchange Improvements – 64 WB Ramp to 264 EB

## Initial Financial Plan

December 31, 2015

State Project Numbers: 0264-122-108, P107, R204, C508, B602, B603, B604, B605, B616, D604, D605
UPCs: 57048, 108042

Rte 264 – Interchange Improvements – 64 WB Ramp to 264 EB – Initial Financial Plan
December 31, 2015

## Table of Contents

**1. Project Description ........ 3**
Project Location Map ........ 3
**2. Schedule ........ 4**
Project Schedule Overview (Calendar Year) ........ 5
Project Schedule Overview (Fiscal Year) ........ 5
**3. Project Cost ........ 5**
Project Cost by Phase ........ 6
**4. Project Funds ........ 6**
Summary of Project Funding by Source ........ 7
Project Authorization Details as of September 30, 2015 ........ 8
**5. Financing Issues ........ 8**
**6. Cash Flow ........ 8**
Cash Flow Analysis ........ 9
**7. P3 Assessment ........ 9**
**8. Risk and Response Strategies ........ 9**
**9. Annual Update Cycle ........ 10**

2

## 1. PROJECT DESCRIPTION

The proposed I-64/I-264 Ramp Improvement project is one of two adjacent projects which, when completed, will provide approximately 4 miles of interstate improvements from the Twin Bridges in Norfolk to the Witchduck Road interchange in Virginia Beach. The improvements will provide additional capacity, relieve daily congestion, reduce crash rates, and improve safety and traffic operations along the corridor.

The proposed I-64/I-264 improvements include adding a second exit lane on westbound I-64, the widening of the ramp from westbound I-64 to eastbound I-264, and introducing a new two lane Collector-Distributor (C-D) roadway from I-64 to the Newtown Road interchange mostly on the bridge structure. The project also includes a new two-lane flyover ramp from westbound I-64 tying into the existing eastbound I-264. The adjacent I-264/Witchduck Road Interchange & Ramp Improvements project (UPC 17630) includes extending the new C-D roadway from the Newtown Road interchange to the Witchduck Road interchange, reconfiguring the south side of both interchanges to eliminate the weave movements, and constructing an overpass to connect Greenwich Road on the south side of I-264 and Cleveland Street on the north side. Below figures show the project location map and project improvements.

**PROJECT LOCATION MAP**





**PROJECT IMPROVEMENTS**

A Categorical Exclusion (CE) NEPA document was approved by Federal Highway Administration (FHWA) on July 9, 2007. The CE was combined to encompass the adjacent projects. An Interchange Modification Report was approved by FHWA on November 14, 2011. A combined Location and Design Public Hearing was held on July 14, 2011.

The project website has been established and is available at the following link: http://www.virginiadot.org/projects/hamptonroads/i-64-i-264_ramp_and_i-264_to_witchduck_road_project.asp

## 2. SCHEDULE

The I-64/I-264 project is a Design-Bid-Build project. Pre-Advertisement Conference (PAC) meeting was held on November 19, 2015. Identified right of way total take parcels were submitted early and an advanced Notice to Proceed (NTP) for the total take parcels was issued on April 30, 2015. Partial take right of way NTP for the remaining impacted properties was issued on September 3, 2015. Right of way acquisition is currently underway. The project is projected to require a Type III Right of Way

certification as portions of the right of way and utilities relocations will not be cleared prior to the scheduled advertisement date. Construction Advertisement is currently scheduled for April 12, 2016 and construction NTP is expected by September 2016. The Preliminary Contract Time Determination (CTDR) schedule indicates construction duration of approximately three years with the construction completion projected in fall 2019.

**PROJECT SCHEDULE OVERVIEW (CALENDAR YEAR)**

| | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Task | J F M A M J J A S O N D | J F M A M J J A S O N D | J F M A M J J A S O N D | J F M A M J J A S O N D | J F M A M J J A S O N D |
| PE - Design | | | | | |
| RW/Utilities | | | | | |
| Construction | | | | | |

**PROJECT SCHEDULE OVERVIEW (FISCAL YEAR)**

| | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|
| Task | J F M A M J | J A S O N D J F M A M J | J A S O N D J F M A M J | J A S O N D J F M A M J | J A S O N D J F M A M J | J A S O N D |
| PE - Design | | | | | | |
| RW/Utilities | | | | | | |
| Construction | | | | | | |

## 3. PROJECT COST

**Narrative of Project Cost**

The current total project estimate is $157,142,416. The project will be completed as a Design-Bid-Build project. The estimates, as well as current expenditures for Preliminary Engineering (PE), Right of Way (RW) and Construction (CN) costs are summarized in the table below. The project currently has active PE and RW phases. A portion of PE and all of RW phase will be funded by Hampton Roads Transportation Accountability Commission (HRTAC) Hampton Roads Transportation Fund (HRTF). These expenditures are summarized under a "child" UPC 108042 in the table below. On December 16, 2015 HRTAC signed a resolution to fund the CN phase of the project for $137,023,653. Work to execute a Standard Project Agreement between VDOT and HRTAC is currently underway. Until the agreement is executed, the CN estimate is shown under UPC 57048. PE and RW expenditures as of December 22, 2015 are $5,869,219.

**PROJECT COST BY PHASE**

| UPC | Phase | Estimate | Current Expenditures | Balance to Complete |
|---|---|---|---|---|
| 57048 | PE | $ 5,047,700 | $ 5,047,700 | $ - |
| | RW | $ - | $ - | $ - |
| | CN | $ 137,023,653 | $ - | $ 137,023,653 |
| | **SUBTOTAL** | **$ 142,071,353** | **$ 5,047,700** | **$ 137,023,653** |
| 108042 | PE | $ 3,500,000 | $ 716,463 | $ 2,783,537 |
| | RW | $ 11,571,063 | $ 105,056 | $ 11,466,007 |
| | CN | $ - | $ - | $ - |
| | **SUBTOTAL** | **$ 15,071,063** | **$ 821,519** | **$ 14,249,544** |
| 57048 + 108042 | PE | $ 8,547,700 | $ 5,764,163 | $ 2,783,537 |
| | RW | $ 11,571,063 | $ 105,056 | $ 11,466,007 |
| | CN | $ 137,023,653 | $ - | $ 137,023,653 |
| | **TOTAL** | **$ 157,142,416** | **$ 5,869,219** | **$ 151,273,197** |

**Cost Estimating Methodology**

The preliminary engineering estimate includes field investigation costs for survey, geotechnical data collection, traffic counts, environmental support, and professional engineering design services to develop design plans and construction documents. Preliminary engineering estimate also includes right of way and utility charges prior to right of way notice to proceed.

The right of way phase estimate includes the actual cost of right of way and easements acquisition, miscellaneous fees associated with real estate closings as part of the project and oversight of the right of way acquisition, payment, and condemnation process. The right of way phase also includes utility design and public utility relocation fees.

The project construction cost estimate was developed through VDOT's TrnsPort estimate program and includes all roadway, bridge, drainage, traffic, maintenance of traffic, lighting, traffic control devices, traffic management systems, landscape and other items. The latest TrnsPort estimate was based on the revised Pre-Advertisement Conference (PAC) plans and updated December 31, 2015. The estimate includes 12% for Construction Engineering and Inspection (CEI) and 10% contingency.

## 4. PROJECT FUNDS

The project is funded by multiple funding sources, including Hampton Roads Transportation Funds (HRTF). Federal funds include Interstate Maintenance (IM) and Federal NHS. State funds include the match for the federal funds as well as Priority Transportation Funds (PTF). On April 16, 2015, Hampton Roads Transportation Accountability Commission (HRTAC) executed an Interim Project Agreement for Funding and Administration with VDOT which authorized $15,071,063 of funding in support of

this project. On December 16, 2015, HRTAC signed a resolution to fund the CN phase of the project for $137,023,653. Work to execute a Standard Project Agreement between VDOT and HRTAC is currently underway. The proposed contract assumes that HRTAC would fund costs out of the HRTF on a "pay as you go" basis. That approach is consistent with the initial funding plan approved by HRTAC. The TIP Amendment will be presented at the Transportation Technical Advisory Committee (TTAC) meeting on January 16, 2016 and the Hampton Roads Transportation Planning Organization (HRTPO) meeting on January 21, 2016 for approval.

Additionally, HRTPO has submitted an application through the House Bill 2 (HB2) prioritization process to help fund this project with statewide high priority grant funding. If this project is selected by the Commonwealth Transportation Board to receive the HB2 high priority grant funds, the amount of HRTAC funds that are currently allocated to the project will be reduced.

The table on the following page summarizes the current funding allocated to this project by fund source and year without the proposed $137,023,653 discussed above.

**SUMMARY OF PROJECT FUNDING BY SOURCE**

| | Funding Source | Previous | 2017 | TOTAL |
|---|---|---|---|---|
| UPC 57048 / 108042 | Interstate Maintenance | $ 676 | $ - | $ 676 |
| | National Highway System | $ 3,237,559 | $ - | $ 3,237,559 |
| | **Federal Subtotal** | **$ 3,238,235** | **$ -** | **$ 3,238,235** |
| | State Match | $ 809,465 | $ - | $ 809,465 |
| | Priority Transportation Funds | $ 1,000,000 | | $ 1,000,000 |
| | **State Subtotal** | **$ 1,809,465** | **$ -** | **$ 1,809,465** |
| | HRTAC * | $11,765,045 | $ 3,306,018 | $15,071,063 |
| | **Other Subtotal** | **$11,765,045** | **$ -** | **$11,765,045** |
| | **TOTAL** | **$16,812,745** | **$ 3,306,018** | **$20,118,763** |

* $15,071,063 in allocations is shown in the FY16 SYIP.
HRTAC funding is under UPC 108042.

**Federal Fund Sources and Special Funding Techniques**

The HRTPO has included all phases of this project in its Long Range Transportation Plan. The PE and RW phases of this project are included in HRTPO's TIP as well as the Commonwealth's FFY15-18 STIP.

Preliminary engineering associated with this project was authorized by the Federal Highway Administration (FHWA) on February 1, 2001 under federal project number 264-6(098). The authorization includes federal funds totaling $5,321,729. Detailed information concerning federal fund sources and special funding techniques associated with the project authorization is provided below.

**PROJECT AUTHORIZATION DETAILS AS OF SEPTEMBER 30, 2015**

| Federal Project Number 2546098<br>UPC 57048<br>PE | | | |
|---|---|---|---|
| **Program Code** | **Cost** | **Federal Funds Obligated** | **AC Funds** |
| 0420 | $1,142,071 | $1,027,864 | $0 |
| 0440 | $752 | $676 | $0 |
| 3150 | $2,319,529 | $1,855,623 | $0 |
| H050 | $1,796,958 | $1,437,566 | $0 |
| Q050 | $1,000,000 | $1,000,000 | $0 |
| **Total** | **$6,259,310**[1] | **$5,321,729** | **$0** |
| [1] Agreement under review for modification based on current estimate | | | |

## 5. FINANCING ISSUES

On December 16, 2015 HRTAC signed a resolution to fund the CN phase of the project for $137,023,653. Work to execute a Standard Project Agreement between VDOT and HRTAC is currently underway. No financing issues are anticipated at this time.

## 6. CASH FLOW

I-64/I-264 Ramp Improvement project annual cash expenditures are based on the project schedule developed by VDOT and the design team. The below table summarizes the cash flow analysis for the project and it will be updated annually as expenditures are incurred. It shows the comparison of previously expended and projected expenditures by fiscal year by phase against the total annual allocations.

**CASH FLOW ANALYSIS***

| Expenditures | | Thru FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | TOTAL |
|---|---|---|---|---|---|---|---|
| 57048 | PE | $ 5,047,700 | $ - | $ - | $ - | $ - | $ 5,047,700 |
| | Right of Way | $ - | $ - | $ - | $ - | $ - | $ - |
| | Construction | $ - | $ 22,402,977 | $ 64,831,612 | $ 41,680,228 | $ 8,108,836 | $ 137,023,653 |
| 108042 | PE | $ 3,500,000 | $ - | $ - | $ - | $ - | $ 3,500,000 |
| | Right of Way | $ 8,265,045 | $ 3,306,018 | $ - | $ - | $ - | $ 11,571,063 |
| | Construction | $ - | $ - | $ - | $ - | $ - | $ - |
| Cumulative Expenditures | | $ 16,812,745 | $ 42,521,740 | $ 107,353,352 | $ 149,033,580 | $ 157,142,416 | $ 157,142,416 |
| Total Annual Allocations | | $ 16,812,745 | $ 25,708,995 | $ 64,831,612 | $ 41,680,228 | $ 8,108,836 | $ 157,142,416 |
| Cumulative Allocations | | $ 16,812,745 | $ 42,521,740 | $ 107,353,352 | $ 149,033,580 | $ 157,142,416 | $ 157,142,416 |
| Cash Flow per Year | | $ - | $ - | $ - | $ - | $ - | |

*Note: This cash flow analysis includes the additional $137,023,653 of HRTAC funds that will be discussed at the TTAC meeting on January 16, 2016 and the HRTPO meeting on January 21, 2016 for approval.

## 7. P3 ASSESSMENT

Alternate Project Delivery Office reviewed the project and determined that the project is not a good candidate for a Design-Build procurement or a P3 delivery.

## 8. RISK AND RESPONSE STRATEGIES

The Virginia Department of Transportation (VDOT) conducted a one-day facilitated risk workshop for the I-64/264 Interchange project on Monday, November 17, 2014. The workshop was held at the VDOT Hampton Roads District office in Suffolk, Virginia. Michael Loulakis (President, Capital Project Strategies, LLC) facilitated the workshop, which was attended by 28 individuals from VDOT, Hampton Roads Transportation Accountability Commission (HRTAC), the Federal Highway Administration (FHWA), and project consultants.

The workshop participants identified a total of forty-five (45) individual risks, based on the assumption that the project would be delivered through a Design-Bid-Build process. Participants found the following six (6) project risks to be the most significant:

- Ramp D-7 construction
- Potential need to acquire additional property
- ROW acquisition and utilities relocation schedule
- Maintenance of Traffic (MOT) and sequencing of construction (SOC)
- Aggressive schedule to meet construction advertisement date
- Project's fixed budget

Of the above risks, the most significant to project delivery was considered to be the aggressive schedule to meet the advertisement date.

Each of the above risks has a high level of complexity and the potential, if not continually addressed and mitigated throughout the project development, to have a major impact on the project's cost and/or schedule (i.e., both the pre-advertisement schedule and the post-award schedule). Importantly, several risks are highly dependent upon and influenced by other risks, with the most notable being: (a) the aggressive schedule to meet the advertisement date; and (b) the project's fixed budget. These two risks were perceived to impact resource allocation, quality of work, post-award risk of change orders, and a variety of other issues.

On December 16, 2015 HRTAC signed a resolution to fund the construction phase of the project. Work to execute a Standard Project Agreement between VDOT and HRTAC is currently underway. In addition HRTPO requested HB2 funding for the construction phase of the project.

## 9. ANNUAL UPDATE CYCLE

The submission date of the Initial Financial Plan is December 31, 2015. The first annual update will be submitted by December 31, 2016 and will be based on a "data as of" date of September 30, 2016. Future annual updates will be submitted by December 31 of that year, with a "data as of" date of September 30 of that year.



THE BACK OF THIS CHECK CONTAINS A SECURITY MARK — DO NOT ACCEPT WITHOUT HOLDING AT AN ANGLE TO VERIFY BUILDING BELOW IS PRESENT.
THE FACE OF THIS DOCUMENT HAS A MULTI-COLORED BACKGROUND AND MULTIPLE SECURITY FEATURES

Commonwealth of Virginia

VA Dept of Transportation

Pay Only $******1500*00

75290993

CHECK NUMBER 20352367

05/05/2016

PAY THIS AMOUNT $******1500*00

Void After One Year

Pay To The Order Of BROCK FARMS REALTY INC
CO VDOT RW DIV
1750 NORTH MAIN STREET
SUFFOLK VA 23434

68-198/531 WELLS FARGO BANK, N.A.

Manju Ganeriwala
Treasurer of Virginia

3986888933

PAYEE SIGN ON LINE ABOVE IN INK
IF ENDORSEMENT IS MADE BY (X) IT MUST BE WITNESSED BY TWO PERSONS

Hold at an angle to verify this building is in multiple locations on the back of this check.



PAYEE SIGN ON LINE ABOVE IN INK
IF ENDORSEMENT IS MADE BY (X) IT MUST BE WITNESSED BY TWO PERSONS.
THE BACK OF THIS CHECK CONTAINS A SECURITY MARK — DO NOT ACCEPT WITHOUT HOLDING AT AN ANGLE TO VERIFY BUILDING BELOW IS PRESENT
THE FACE OF THIS DOCUMENT HAS A MULTI-COLORED BACKGROUND AND MULTIPLE SECURITY FEATURES
Commonwealth of Virginia
Pay Only $******8500*00
75229896
CHECK NUMBER
20323793
VA Dept of Transportation
04/21/2016
PAY THIS AMOUNT
$******8500*00
Void After One Year
Pay To The Order Of
BROCK FARMS REALTY INC
CO VDOT RW DIV
1750 NORTH MAIN STREET
SUFFOLK VA 23434
WELLS FARGO BANK, N.A.
Treasurer of Virginia

# Pembroke Title

520 W. 21st St. #G2-229

Norfolk, VA 23517

Phone (757) 627-4700 ~ Fax (757) 627-0229 ~ Cell (757) 409-7614

## Title Report

| | |
|---|---|
| **Dated:** | June 21, 2018 |
| **Our Case#** | 18-1344 |
| **Owners:** | Paul R. Davis, Jr. & Patricia Ann Davis |
| **Address:** | 120 Kidd Boulevard, Norfolk, VA |
| **Prepared for:** | Paul Richard Davis |
| **Effective Date:** | June 20, 2018, at 8:00 am |

Per your request, we researched the indices of the Clerk's Office of the Circuit Court for the City of Norfolk, Virginia, insofar as the correct legal description, and report our title examination follows:

**Legal Description:**

All that certain lot, piece or parcel of land, with the buildings and improvements thereon, situate, lying and being in the City of Norfolk, Virginia, and known, numbered and designated as Lot Three (3), in Block A of Section 1, as shown on that certain plat entitled, "Subdivision of Part of McGinnis Tract, River Forrest Shores, Princess Anne County, Virginia", made by Phillip D. Freeman, C.E., dated June, 1952, which said plat is duly recorded in the Clerk's Office of the Circuit Court of the City of Virginia Beach, Virginia, in Map Book 32, at page 6, reference to which is hereby made for a more particular description thereof; and the riparian and other rights in and to the property extending beyond Lot 3 into the center of Mill Creek, as described in the Deed of Benjamin T. Backus, et ux, to the McGinnis Industrial Center, Incorporated, dated May 20, 1949 and duly recorded in the aforesaid Clerk's Office in Deed Book 263, at page 459.

RE: 120 Kidd Boulevard, Norfolk, VA

It being the same property conveyed unto Paul R. Davis, Jr. and Patricia Ann Davis, husband and wife, as tenants by the entirety with rights of survivorship, by Deed of Gift dated September 12, 1997 from Paul R. Davis, Jr. and Patricia Ann Davis, Ruth E. Browder and Charles L. Browder, Jr., Eva D. Dozier and Gordon H. Dozier, recorded September 16, 1977, as Instrument # 970017479.

It further being the same property conveyed unto Ruth E. Davis (with life estate), Paul R. Davis, Jr., Ruth E. Browder and Eva D. Dozier, by Deed of Gift dated September 5, 1966, from Ruth E. Davis, widow, recorded September 12, 1966 as Instrument # 9600152346.

It further being the same property conveyed unto Paul R. Davis and Ruth E. Davis, husband and wife, by Deed dated June 24, 1957 from William R. Pefley and Dorothy L. Pefley, recorded in Deed Book 501 page 396. The said Paul R. Davis, Sr. department this life June 23, 1986, and the property descended by operation of law to Ruth E. Davis.

It further being the same property conveyed unto William R. Pefley by Deed dated June 26, 1956 from Hugo E. Sellger and A. Edna Sellger, recorded July 6, 1956 in Deed Book 459 page 490.

It further being part of the property conveyed unto Hugo E. Sellger and A. Edna Sellger by Deed dated December 17, 1954 from McGinnis Industrial Center, Incorporated, recorded April 20, 1955 in Deed Book 400, page 57; Deed of Correction, dated October 1, 1956, to correct legal description as to land between lots and water, recorded October 5, 1956 in Deed Book 471 page 477.

NOTE: The Norfolk Assessor and Treasurer's records erroneously reflect ownership of the land between Lot 3 and center of Mill Creek as Brock Farms Realty, Inc. The Virginia Beach Commissioner of Revenue no longer has historical "cards" reflecting notes of ownership. The subdivision plat, MB 32 p. 6, makes no mention as to land between lots and water.

**REAL ESTATE ASSESSMENT / TAX INFO:**

Assessment:
Land: $60,000.00
Improvements $96,100.00
Total $156,100.00

Annual Real Estate Taxes: $1,795.16 ($ 448.79p/q)

RE: 120 Kidd Boulevard, Norfolk, VA

**Objections to title:**

1. Any lien or right to a lien, for services, labor or material imposed by law and not shown by the public record.
2. Any supplemental or special assessments on new construction not presently disclosed by the public records which may become due and owing on the insured premises.
3. Rights or claims of parties in possession not shown by the public records.
4. Encroachments, overlaps boundary line disputes, or other matters which would be disclosed by an accurate survey or inspection of the premises.
5. Taxes or special assessments which are not shown as existing liens by the public records.
6. Any deed of trust or other lien created by or resulting from the actions of the insured.
7. Covenants, conditions and restrictions, if any, appearing in the public records.
8. Any lease, grant, exception or reservation of minerals or mineral rights appearing in the public records.
9. Chain of title prior to December 17, 1954.

This report conveys no warranty or insurance of any kind whatsoever and does not obligate the issuer to issue title insurance.

PEMBROKE TITLE

By: [signature]

315

VIRGINIA:

In the Clerk's Office of the Corporation Court of the City of Norfolk, on the 17th day of June 1966 at 3:30 P M.

This Deed was this day received and upon certificate of acknowledgment, thereto annexed, admitted to record.

TESTE: W. L. PRIEUR, Jr., Clerk

By [signature] D.C.

Delivered to

5396

**This Deed,** Made this 10th day of April, 19 64, by and between Paul R. Davis, Sr. and Ruth E. Davis, his wife

hereinafter designated as Grantor (even though more than one), and the COMMONWEALTH OF VIRGINIA, Grantee:

**Witnesseth;** In consideration of the sum of $ 20.00 paid by the grantee to the grantor, receipt of which is hereby acknowledged, the said grantor hereby grants and conveys unto said grantee in fee simple, with general warranty, the land located in Magisterial District, in the City of Norfolk County, and described as follows:

Being as shown on Sheet 501-7 of the plans to be used for Route 64, State Highway Project 0064-122-103, R/W 201, and lying on the west (right) side of the centerline of proposed Route 64, and adjacent to the south property line of Eugenia W. Copes from the lands of Eugenia W. Copes opposite approximate Station 656+12 to the lands of the landowner opposite approximate Station 656+50 and containing 0.016 acre, more or less, land.

Following is the metes and bounds description of the subject property. Beginning at a point said point being 188.16 on the right of and at right angles to Station 656+26.09 (Centerline proposed Route 64) said point being 553.98' south of existing south right of way line of Curlew Drive. From the point thus established and running N 3° 48' 19" W an approximate distance of 17'; thence in a southeasterly direction a distance of approximately 56' to a point; said point being mean low water mark of Mill Creek. Thence in a southerly direction along the mean low water mark of Mill Creek, a distance of approximately 10' to a point; thence running N 63° 29' 06" W, a distance of approximately 47' to the point of beginning, and being a part of the same land acquired by the grantor from William R. Pefley and Dorothy E. Pefley by deed dated June 24, 1957, and recorded in Deed Book 459, Page 490, in the office of the Clerk of the Corporation Court of the City of Norfolk.

For a more particular description of the land herein conveyed, reference is made to photo copy of said Sheet 501-7, showing outlined in RED the land conveyed in fee simple, which photo copy is hereto attached as a part of this conveyance and recorded simultaneously herewith in the State Highway Plat Book.

State Hwy Plat Book No. 4 Page 274

The said grantor covenants that he is seized of the land in fee simple herein conveyed; that he has the right to convey the said land to the grantee; that he has done no act to encumber the said land; that the grantee shall have quiet possession of the land, free from all encumbrances, and that he will execute such further assurances of the said land as may be requisite.

The said grantor covenants and agrees for himself, his heirs, successors and assigns, that the consideration hereinabove mentioned and paid to him shall be in lieu of any and all claims to compensation for land, and for damages, if any, to the remaining lands of the grantor which may result by reason of the use to which the grantee will put the land to be conveyed, including such drainage facilities as may be necessary.

WITNESS the following signatures and seals:

Paul R. Davis Sr. (SEAL)

Ruth E. Davis (SEAL)

STATE OF VIRGINIA,
City of Norfolk, To-wit:

I, Rose M. Hipple, a Notary Public in and for the City aforesaid, in the State of Virginia, do certify that Paul R. Davis, Sr. and Ruth E. Davis whose names are signed to the foregoing writing, bearing date on the 10th day of April, 1964, have each acknowledged the same before me in my City aforesaid.

My term of office expires February 5, 1968

Given under my hand this 15th day of June 1966

Rose M. Hipple
Notary Public.

VIRGINIA:

In the Clerk's Office of the Corporation Court of the City of Norfolk, on the 17th day of June 1966 at 3:40 P.M.

This Deed with Certificate was this day received and upon certificate of acknowledgment, thereto annexed, admitted to record.

TESTE: W. L. PRIEUR, Jr., Clerk

By Wilma R. Price D.C.

Delivered to A. S. Mattox, Dept. of Highways 6-20-66

I hereby certify that the Note described in this deed WAS produced before me duly cancelled, this 12th day of April, 1978. ATTEST: ... D.C.

The debt herein secured having been fully paid and satisfied the lien of this deed of trust is hereby released, this 12th day of April, 1978. Assignee & Holder of the debt ... ATTEST: ... D.C.

5397

THIS DEED OF TRUST, Made this 16 day of June, 1966, between LEO E. SHALHOUP and JEWELL D. SHALHOUP, husband and wife, parties of the first part, hereinafter called "Grantors" (whether singular or plural), and Frederick T. Stant, Jr., a resident of the City of Norfolk, Virginia, and Jack B. Stokes, a resident of the City of Norfolk, Virginia, Trustees, parties of the second part, hereinafter called "Trustee" (whether singular or plural), either of whom may act alone.

WITNESSETH: That the grantors do grant and convey with General Warranty unto the said Trustee the following property, to-wit:

All that certain lot, piece or parcel of land, together with the buildings and improvements thereon, situate, lying and being in the City of Norfolk, Virginia, being known, numbered and designated as Lot 11, in Block 4, on that certain plat entitled "Subdivision of Bel-Air, Section 3", which said plat is duly recorded in the Clerk's Office of the Circuit Court of Virginia Beach (formerly Princess Anne County), Virginia, in Map Book 36, at page 31.

It being the same property conveyed to the parties of the first part by deed of William E. Thomas and Betty J. Thomas, husband and wife, dated June 28, 1961, and duly recorded in the Clerk's Office of the Corporation Court of the City of Norfolk, Virginia in Deed Book 869 at page 651.

Together with all buildings, improvements, fixtures, or appurtenances now or hereafter erected thereon, including all apparatus, equipment, fixtures, or articles, whether in single units or centrally controlled, used to supply heat, gas, air conditioning, water, light, power, refrigeration, ventilation or other services, and also together with any screens, window shades, storm doors and windows, screen doors, awnings, stoves and water heaters (all of which are declared to be a part of said real estate whether physically attached thereto or not).

IN TRUST TO SECURE to the holder or holders thereof, without preference, the payment of the principal sum of FOUR THOUSAND THREE HUNDRED NINETY FIVE and 60/100 ---------- Dollars ($ 4,395.60 ), ~~with interest thereon at the rate of per centum~~ evidenced by one negotiable promissory note of even date herewith



COPY TESTE:
GEORGE E. SCHAEFER, CLERK
NORFOLK CIRCUIT COURT
BY
Nakia Ward, Deputy Clerk
Authorized to sign on behalf
of George E. Schaefer
Date: 10/20/20

L1-7, 9+10+

McGINNIS INDUSTRIAL CENTER, INCORPORATED

to

HUGO E. SELLGER, et ux
A. EDNA SELLGER, et vir
with rights of survivorship

DEED OF CORRECTION

8474

THIS DEED OF CORRECTION, Made this the 1st day of October, 1956, between McGINNIS INDUSTRIAL CENTER, INCORPORATED, a corporation duly organized and existing under and by virtue of the laws of the State of Virginia, party of the first part, and HUGO E. SELLGER and A. EDNA SELLGER, husband and wife, parties of the second part.

W I T N E S S E T H :

THAT WHEREAS, by deed dated December 17, 1954, and duly of record in the Clerk's Office of the Circuit Court of Princess Anne County, Virginia, in Deed Book 400, at Page 57, the said party of the first part did grant and convey unto the parties of the second part certain lots, pieces or parcels of land in Kempsville Magisterial District, Princess Anne County, Virginia, as shown on the plat entitled "Subdivision of part of McGinnis Tract, River Forrest Shores, Princess Anne County, Virginia", the said lots therein conveyed being specifically designated in said deed; and

WHEREAS, it was the intention of the parties that the said deed should convey to the said parties of the second part all riparian rights appertaining to said lots, but such intention was not specifically set forth in said deed, and the parties hereto now desire to correct said deed of December 17, 1954.

also, See pg. 2

NOW, THEREFORE, in consideration of the premises and of ONE ($1.00) DOLLAR, cash in hand paid by the parties of the second part, to the party of the first part, the receipt whereof is hereby acknowledged, the said McGINNIS INDUSTRIAL CENTER, INCORPORATED, a Virginia corporation, party of the first part, doth grant and convey unto HUGO E. SELLGER and A. EDNA SELLGER, husband and wife, as tenants by the entireties with the right of survivorship, as at common law, parties of the second part, all the right, title, and interest of the said party of the first part in and to all riparian rights appertaining to the following described property, to-wit:

All those certain lots, pieces or parcels of land, situated in the County of Princess Anne, Virginia, Kempsville Magisterial District, known and numbered as Lots One (1) through Seven (7), both inclusive, and Lots Nine (9) and Ten (10), Lots Twenty-five (25) through Twenty-seven (27), both indusive, Lots Thirty-four (34) and Thirty-five (35), Thirty-eight (38), Forty-three (43), Forty-four (44), Forty-six (46) through Forty-nine (49), both inclusive, and Parcel "R", all of which are in Block A of Section 1, and Lots Two (2), Five (5) through Nine (9), both inclusive, in Block J of Section 1, as shown on the plat of "Subdivision of part of McGinnis Tract, River Forrest Shores, Princess Anne County, Virginia", made by Philip D. Freeman, C.E., dated June, 1952, which plat is duly of record in the Clerk's Office of the Circuit Court of Princess Anne County, Virginia, in Map Book 32, at Page 6; reference to said plat is hereby made for a more particular description of the said property; together with all the interest, if any, of the above grantor in and to the land, if any, between the aforesaid lots and the high water mark of the water upon which the aforesaid lots front.

IN WITNESS WHEREOF, McGINNIS INDUSTRIAL CENTER, INCORPORATED, has caused this instrument to be executed in its corporate name by its officers duly authorized and its corporate seal to be hereunto duly affixed and attested by its Secretary, all the day, month and year first hereinabove written:

McGINNIS INDUSTRIAL CENTER, INCORPORATED

By [signature]
Vice-President

ATTEST:

[signature] Mary B. Martin
Secretary

STATE OF VIRGINIA,

CITY OF NORFOLK, to-wit:

I, Donna P. Smith, a Notary Public in and for the City of Norfolk, in the State of Virginia, do certify that HUGO E. SELIGER and MARY B. MARTIN, Vice-President and Secretary, respectively, of McGINNIS INDUSTRIAL CENTER, INCORPORATED, whose names as such are signed to the writing above, bearing date the 1st day of October, 1956, have acknowledged the same before me, in my City and State aforesaid.

My commission expires April 17, 1960.

GIVEN under my hand this the 4th day of October, 1956.

[signature]
Notary Public

VIRGINIA: In the Clerk's Office of the Circuit Court of Princess Anne County, on the 5th day of October 1956 at 9:15 P.M., this Deed was received and upon the certificate of acknowledgment thereto annexed, admitted to record.

TESTE: JOHN V. FENTRESS, Clerk

By Mary E. Cooper D.C.

Kellam & Kellam attys
10-12-56

15236

BK 2833 PG 0344

No Tax

THIS DEED OF GIFT, made this 5th day of September, 1996, by and between Ruth E. DAVIS, widow, GRANTOR; and Ruth E. DAVIS (Life Estate), and Paul R. DAVIS, JR., Ruth E. BROWDER, and Eva D. DOZIER, (Remainder), GRANTEES, whose address is 3472 Bessie Street, Norfolk, Virginia 23513.

WITNESSETH: That for and in consideration of the mutual love and affection the party of the first part holds for the parties of the second part, the said party of the first part does hereby grant and convey with General Warranty and English Covenants of Title, unto the said parties of the second part, subject to an Estate for Life reserved to Ruth E. Davis, the Grantor, in and to the following described property, to-wit:

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon, situate, lying and being in the City of Norfolk, Virginia, and known, numbered and designated as Lot Three (3), in Block A of Section 1, as shown on that certain plat entitled "Subdivision of Part of McGinnis Tract, River Forrest Shores, Princess Anne County, Virginia" made by Philip D. Freeman, C.E., dated June, 1952, which said plat is duly recorded in the Clerk's Office of the Circuit Court of the City of Virginia Beach, Virginia, in Map Book 32, at page 6, reference to which is hereby made for a more particular description thereon; and the riparian and other rights in and to the property extending beyond Lot 3 unto the center of Mill Creek, as described in the deed of Benjamin T. Backus et ux., to the McGinnis Industrial Center, Incorporated, dated May 20, 1949, and duly recorded in the aforesaid Clerk's Office in Deed Book 263, at page 459.

IT BEING the same property conveyed to Paul R. Davis and Ruth E. Davis, husband and wife, by deed of William R. Pefley, et ux., dated June 24, 1957, and duly recorded in the aforesaid Clerk's Office in Deed Book 501, at page 396. The said Paul R. Davis, Sr. departed this life on June 23, 1986, and the property descended by operation of law to Ruth E. Davis.

PENDER & COWARD
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
VIRGINIA BEACH, VIRGINIA



This conveyance is made expressly subject to the conditions, restrictions, conveyances and easements of record, if any, constituting constructive notice.

Pursuant to Section 58.1-811 of the Code of Virginia of 1950, as amended, this instrument is a Deed of Gift and this is to certify that no consideration has passed between the parties and as such this instrument is not subject to taxation.

WITNESS THE FOLLOWING signature and seal:

Ruth E. Davis (SEAL)
Ruth E. Davis

STATE OF VIRGINIA

CITY OF VIRGINIA BEACH, to-wit:

I, the undersigned authority, a Notary Public in and for the City and State aforesaid, do hereby certify Ruth E. Davis, widow, whose name is signed to the foregoing Deed of Gift bearing date on the 5th day of September, 1996, have acknowledged the same before me in my City and State.

GIVEN under my hand ~~this~~ 6th day of September, 1996.

[signature]
Notary Public

My Commission Expires: 11-30 99

PENDER & COWARD
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
VIRGINIA BEACH, VIRGINIA

DELIVERED TO:
[signature]

INSTRUMENT #960015236
RECORDED IN THE CLERK'S OFFICE OF
NORFOLK ON
SEPTEMBER 12, 1996 AT 10:00AM
ALBERT TEICH, JR., CLERK

BY: [signature] DEPUTY CLERK

BK 2942 PG 0353

17479

No Tax

THIS DEED OF GIFT, made this 12th day of September, 1997, by and between Paul R. DAVIS, JR. and Patricia Ann DAVIS, his wife; Ruth E. BROWDER and Charles L. BROWDER, JR., her husband; and Eva D. DOZIER and Gordon H. DOZIER, her husband, GRANTORS, parties of the first part; and Paul R. DAVIS, JR. and Patricia Ann DAVIS, husband and wife, GRANTEES, parties of the second part whose address is 3472 Bessie Street, Norfolk, Virginia 23513.

WITNESSETH: That for and in consideration of the mutual love and affection the parties of the first part hold for the parties of the second part, the said parties of the first part do hereby grant and convey with General Warranty and English Covenants of Title unto the said parties of the second part, as tenants by the entireties with the right of survivorship as at common law, the following described property, to-wit:

ALL THAT certain lot, piece or parcel of land, with the buildings and improvements thereon, situate, lying and being in the City of Norfolk, Virginia, and known, numbered and designated as Lot Three (3), in Block A of Section 1, as shown on that certain plat entitled "Subdivision of Part of McGinnis Tract, River Forrest Shores, Princess Anne County, Virginia", made by Philip D. Freeman, C.E., dated June, 1952, which said plat is duly recorded in the Clerk's Office of the Circuit Court of the City of Virginia Beach, Virginia, in Map Book 32, at page 6, reference to which is hereby made for a more particular description thereof; and the riparian and other rights in and to the property extending beyond Lot 3 unto the center of Mill Creek, as described in the deed of Benjamin T. Backus, et ux. to the McGinnis Industrial Center, Incorporated, dated May 20, 1949, and duly recorded in the aforesaid Clerk's Office in Deed Book 263, at page 459.

PENDER & COWARD
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
VIRGINIA BEACH,
VIRGINIA

IT BEING the same property conveyed to Paul R. Davis, Jr., Ruth E. Browder and Eva D. Dozier by deed of Ruth E. Davis, widow, dated September 5, 1996, and duly recorded in the Clerk's Office of the Circuit Court of the City of Norfolk, Virginia, in Deed Book 2833, at page 344.

This conveyance is made expressly subject to the conditions, restrictions, conveyances and easements of record, if any, constituting constructive notice.

Pursuant to Section 58.1-811 of the Code of Virginia of 1950, as amended, this instrument is a Deed of Gift and this is to certify that no consideration has passed between the parties and as such this instrument is not subject to taxation:

WITNESS THE FOLLOWING signature and seal:

(SEAL)
Paul R. Davis, Jr.

(SEAL)
Patricia Ann Davis

(SEAL)
Ruth E. Browder

(SEAL)
Charles L. Browder, Jr.

(SEAL)
Eva D. Dozier

(SEAL)
Gordon H. Dozier

PENDER & COWARD
PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
VIRGINIA BEACH, VIRGINIA

BK 2942 PG 0355

STATE OF VIRGINIA

CITY OF VIRGINIA BEACH, to-wit:

I, the undersigned authority, a Notary Public in and for the City and State aforesaid, do hereby certify that Paul R. Davis, Jr. and Patricia Ann Davis, his wife, whose names are signed to the foregoing Deed of Gift bearing date on the 12th day of September, 1997, have acknowledged the same before me in my City and State.

GIVEN under my hand this 12th day of September, 1997.

Notary Public

My Commission Expires: 4/30/99

STATE OF VIRGINIA

CITY OF VIRGINIA BEACH, to-wit:

I, the undersigned authority, a Notary Public in and for the City and State aforesaid, do hereby certify that Ruth E. Browder and Charles L. Browder, Jr., her husband, whose names are signed to the foregoing Deed of Gift bearing date on the 12th day of September, 1997, have acknowledged the same before me in my City and State.

GIVEN under my hand and this 12th day of September, 1997.

Notary Public

My Commission Expires: 4/30/99

PENDER & COWARD
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
VIRGINIA BEACH, VIRGINIA

BK 2942 PG 0356

STATE OF Virginia

CITY/COUNTY OF Va Beach, to-wit:

I, the undersigned authority, a Notary Public in and for the City/County and State aforesaid, do hereby certify that Eva D. Dozier and Gordon H. Dozier, her husband, whose names are signed to the foregoing Deed of Gift bearing date on the 12th day of September, 1997, have acknowledged the same before me in my City and State.

GIVEN under my hand this 13th day of September, 1997.

[signature]
Notary Public

My Commission Expires: 8/31/99

DELIVERED TO:
Pender & Coward

INSTRUMENT #970017479
RECORDED IN THE CLERK'S OFFICE OF
NORFOLK ON
SEPTEMBER 16, 1997 AT 03:59PM
ALBERT TEICH, JR., CLERK
BY [signature] DEPUTY CLERK

ENDER & COWARD
OFESSIONAL CORPORATION
TTORNEYS AT LAW
VIRGINIA BEACH,
VIRGINIA



DENNIS BAILEY & ASSOCIATES
Real Estate Appraisers
228 NORTH DONNAWOOD DRIVE
SUITE 103
VIRGINIA BEACH, VA 23452
(757) 498-9280 • FAX: (757) 498-9774

# APPRAISAL REPORT

FOR: Chartway Federal Credit Union
RE: Davis, Paul R. & Patricia A.

May 13, 1999

GENTLEMEN:

AS REQUESTED (I-WE) HAVE PERSONALLY INSPECTED THE PROPERTY DESCRIBED AS:

120 Kidd Boulevard
Norfolk, Virginia 23502

THE PURPOSE OF THIS APPRAISAL IS TO ESTIMATE THE MARKET VALUE OF THIS PROPERTY AS OF May 10, 1999 IT IS MY OPINION THAT THE MARKET VALUE AS OF THE AFOREMENTIONED DATE IS:

$ 84,000.00

THE PROPERTY WAS APPRAISED AS A WHOLE, OWNED IN FEE SIMPLE AND UNENCUMBERED, SUBJECT TO THE CONTINGENT AND LIMITING CONDITIONS OUTLINED HEREIN.

[Seal: Commonwealth of Virginia, John E. Pitts, Certified Residential Real Estate Appraiser]

JOHN E. PITTS
Certified Residential Appraiser

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrance of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**

120 Kidd Boulevard, Norfolk, VA 23502

Commonwealth of Virginia — John E. Pitts — 4001 002575 — Certified Residential Real Estate

| **APPRAISER:** | **SUPERVISORY APPRAISER** (only if required): |
|---|---|
| Signature: [signature] | Signature: |
| Name: John E. Pitts | Name: |
| Date Signed: May 13, 1999 | Date Signed: |
| State Certification #: 4001 002575 | State Certification #: |
| or State License #: | or State License #: |
| State: VA | State: |
| Expiration Date of Certification or License: 03/31/2000 | Expiration Date of Certification or License: |

☐ Did ☐ Did Not Inspect Property

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. The separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing *or sales concessions** granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustments should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. The separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed

Borrower/Client:    Davis, Paul R. Jr. and Patricia A.
Property Address:   120 Kidd Boulevard
City/State/Zip:     Norfolk, Virginia 23502
Lender:             Chartway FCU

The subject property is located in river Forest, an established area in the city of Norfolk. The neighborhood is primarily residential with a few small commercial properties located along the main thoroughfares. These commercial properties do not appear to have any adverse marketing effects on the subject property nor it's neighborhood. Essential services are nearby and the major traffic arteries lead to regional employment centers.

The subject property is a 3 bedroom, 2.0 bath, 1-story house constructed on a crawl foundation. The exterior is siding. The property has storm windows and storm doors, covered porch, deck, 3 sheds, and ceiling fans.

All comparable properties used are current sales located in the subject's neighborhood. Adjustments were made for gross living area, construction, and amenities. The comparables used are the most suitable found and deemed to be good indicators of value.

All comparable dates used in this appraisal report are closed dates. Fencing was not considered in this appraisal due to the insignificant impact it has on buying decisions and the difficulty of establishing ownership of the comparable properties fencing.

Site information was taken from city records and is believed to be accurate.

This appraisal was prepared for those Parties, and/or their assigns named as the lender/client in the URAR and is for their sole and exclusive use. This appraisal was prepared in accordance with the Uniform Standard of Professional Appraisal Practice. A Statement of Limiting Conditions and Appraiser's Certification has been provided with this appraisal and should be given the same consideration as the remainder of this report.

John T. Schropp has significantly contributed to the development of this appraisal. He assisted in gathering pertinent information necessary to prepare the report, entered the property and thoroughly researched comparable sales data for use in the market analysis.

COST APPROACH

| ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS | | | |
|---|---|---|---|
| Dwelling 1,268 Sq Ft @ $ 48.87 | = $ 61,967 | estimated remaining economic life of the property | 45 yrs |
| Sq Ft @ $ | = | | |
| appl,deck,porch,3sheds | = 7,500 | | |
| Garage/Carport Sq Ft @ $ | = | see sketch | |
| Total Estimated Cost New | = $ 69,467 | | |
| Less Physical Functional External | | THIS HOUSE MEETS HUD MINIMUM | |
| Depreciation 11490 | = $ 11,490 | REQUIREMENTS. | |
| Depreciated Value of Improvements | = $ 57,977 | | |
| "As-is" Value of Site Improvements | = $ 4,000 | COST DATA OBTAINED FROM MARSHALL | |
| INDICATED VALUE BY COST APPROACH | = $ 85,977 | AND SWIFT VALUATION SERVICE. | |

SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 120 Kidd Boulevard | 5836 Sellger Drive | | 5944 McGinnis Circle | | 120 Kid Boulevard | |
| Proximity to Subject | | 1 block | | 3 blocks | | same block | |
| Sales Price | $ n/a | | $ 88,000 | | $ 89,900 | | $ 84,000 |
| Price/Gross Liv. Area | $ 0 | $ 78.01 | | $ 62.17 | | $ 61.05 | |
| Data and/or Verification Sources | Pys. Insp. | Tax records & MLS | | Tax records & MLS | | Tax records & MLS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | CLOSED VA | | CLOSED FHA | | CLOSED VA | |
| Date of Sale/Time | | 3/17/99 | | 11/11/98 | | 12/4/98 | |
| Location | River Fst | River Fst | | River Fst | | River Fst | |
| Leasehold/Fee Simple | Fee | Fee | | Fee | | Fee | |
| Site | 80x160/avg | 90x125/avg | | 80a125/avg | | 82x125/avg | |
| View | average | average | | average | | average | |
| Design and Appeal | ranch/avg | ranch/avg | | ranch/avg | | ranch/avg | |
| Quality of Construction | sid/crawl | brick/crawl | -2500 | brick/crawl | -2500 | sid/crawl | |
| Age | 44 | 44 | | 45 | | 44 | |
| Condition | average | average | | average | | average | |
| Above Grade Room Count (Total Bdrms Baths) | 7 3 2.0 | 6 3 1.0 | +1000 | 6 4 1.0 | +1000 | 7 3 2.0 | |
| Gross Living Area | 1268 Sq. Ft. | 1128 Sq. Ft. | +1680 | 1446 Sq. Ft. | -2136 | 1376 Sq. Ft. | -1296 |
| Basement & Finished Rooms Below Grade | none | none | | none | | none | |
| Functional Utility | typical | typical | | typical | | typical | |
| Heating/Cooling | FHA/CAC | FHA/CAC | | BB/CAC | | FHA/CAC | |
| Energy Efficient Items | sw/sd | sw/sd | | sw/sd | | sw/sd | |
| Garage/Carport | converted | none | | det. 2car | -2500 | c.port | -500 |
| Porch, Patio, Deck, | deck/3sheds | shed | | porch | | deck/shed | |
| Fireplace(s), etc. | pch/FP | fireplace | +1000 | fireplace | +1000 | none | +2000 |
| Fence, Pool, etc. | | | | | | | |
| Net Adj. (total) | | [X] + [ ] - | $ 1,180 | [ ] + [X] - | $ 5,136 | [X] + [ ] - | $ 204 |
| Adjusted Sales Price of Comparable | | | $ 89,180 | | $ 84,764 | | $ 84,204 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): All comparables are located within the subject neighborhood. Adjustments were made for gross living area, construction and amenities. Comparable 3 appears most similar to the subject and was given the highest weight factor.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | 9/16/97 Gift city record | none city records | none city records | none city records |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: To the appraiser's knowledge there have been no prior sales of the subject property nor the comparables within the last year

INDICATED VALUE BY SALES COMPARISON APPROACH $ 84,000

INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ 750 /Mo. x Gross Rent Multiplier n/a = $

This appraisal is made [x] "as is" [ ] subject to the repairs, alterations, inspections, or conditions listed below [ ] subject to completion per plans and specifications.

Conditions of Appraisal: The appraiser assumes that the heating/cooling and electrical systems are in good working order.

The Market Data and Cost Approach are considered in the final est

in the City of Norfolk. Properties are a mix of ranch and 2 story houses of average construction and are compatible in architectural design. It is near schools, shopping and major traffic arteries. Regional employment centers are easily accessible.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.

A typical seller is willing to pay a portion of the buyers discount points & CC in this area, thus, sales prices are not influenced by the type of loan. Marketing time is average and supply and demand appear to be in balance. No adverse neighborhood conditions were noted. THIS APPRAISAL IS A SUMMARY REPORT AS DEFINED BY THE BOARD OF THE APPRAISAL FOUNDATION AND COMPLIES WITH USPAP.

**PUD**

**Project Information for PUDs** (If applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)? [ ] Yes [ ] No

Approximate total number of units in the subject project ______ . Approximate total number of units for sale in the subject project ______

Describe common elements and recreational facilities: not located in a PUD

**SITE**

Dimensions 80 x 160 x 80 x 160

Site area 12800 sf +/- Corner Lot [ ] Yes [X] No

Specific zoning classification and description R6 Residential

Zoning Compliance [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [ ] No zoning

Highest & best use as improved: [X] Present use [ ] Other use (explain)

| Topography | level |
|---|---|
| Size | typical for area |
| Shape | rectangular |
| Drainage | appears adequate |
| View | average |
| Landscaping | typical |
| Driveway Surface | concrete |
| Apparent easements | normal utilities |
| FEMA Special Flood Hazard Area | [ ] Yes [X] No |
| FEMA Zone | C |
| Map Date | 4/17/84 |
| FEMA Map No. | 510104-0004D |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private |
|---|---|---|---|---|---|---|
| Electricity | X | | Street | asphalt | X | |
| Gas | | | Curb/gutter | yes | X | |
| Water | X | | Sidewalk | yes | X | |
| Sanitary sewer | X | | Street lights | yes | X | |
| Storm sewer | X | | Alley | no | | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): none

Equal

**DESCRIPTION OF IMPROVEMENTS**

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | block | Slab | no | Area Sq. Ft. | n/a | Roof | |
| No. of Stories | 1 | Exterior Walls | vinyl | Crawl Space | yes | % Finished | n/a | Ceiling | avg X |
| Type (Det./Att.) | detach | Roof Surface | comp | Basement | none | Ceiling | n/a | Walls | avg X |
| Design (Style) | ranch | Gutters & Dwnspts. | yes/yes | Sump Pump | no | Walls | n/a | Floor | |
| Existing/Proposed | exist | Window Type | dh | Dampness | NoneNoted | Floor | n/a | None | |
| Age (Yrs.) | 44 | Storm/Screens | yes/yes | Settlement | NoneNoted | Outside Entry | n/a | Unknown | |
| Effective Age (Yrs.) | 17-21 | Manufactured House | no | Infestation | NoneNoted | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | |
| Level 1 | | 1 | 1 | 1 | | 1 | | 3 | 2.0 | | utl. | 1268 |
| Level 2 | | | | | | | | | | | | |

Finished area **above** grade contains: 7 Rooms; 3 Bedroom(s); 2.0 Bath(s); 1268 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | # of cars |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | cptvin/avg | Type | FHA | Refrigerator | | None | | Fireplace(s) # | | None | |
| Walls | wallbd/avg | Fuel | oil | Range/Oven | X | Stairs | | Patio | | Garage | |
| Trim/Finish | wood/avg | Condition | avg | Disposal | | Drop Stair | | Deck | X | Attached | |
| Bath Floor | vinyl/avg | COOLING | | Dishwasher | X | Scuttle | X | Porch | X | Detached | |
| Bath Wainscot | ceramic/avg | Central | CAC | Fan/Hood | X | Floor | | Fence | X | Built-In | |
| Doors | wood/avg | Other | | Microwave | | Heated | | Pool | | Carport | |
| | | Condition | avg | Washer/Dryer | | Finished | | 3 sheds | X | Driveway | 1car |

**COMMENTS**

Additional features (special energy efficient items, etc.): Storm windows, storm doors, deck, 3 sheds, and ceiling fans.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.: No functional or external depreciation noted. Normal wear and tear noted. Subject has an above ground oil tank with no leaks noted.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: none noted

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. kidd120

## SUBJECT

Property Address 120 Kidd Boulevard | City Norfolk | State VA | Zip Code 23502

Legal Description Lot 3, Block A, River Forest Shores | County n/a

Assessor's Parcel No. 10820700 1 | Tax Year 98/99 | R.E. Taxes $ 1085.28 | Special Assessments $ none

Borrower Davis, Paul R.Jr & | Current Owner Patricia A./same | Occupant: [X] Owner [ ] Tenant [ ] Vacant

Property rights appraised [X] Fee Simple [ ] Leasehold | Project Type [ ] PUD [ ] Condominium (HUD/VA only) | HOA$ n/a /Mo.

Neighborhood or Project Name River Forest | Map Reference 11-D12 | Census Tract 0069.02

Sale Price $ n/a | Date of Sale n/a | Description and $ amount of loan charges/concessions to be paid by seller n/a

Lender/Client Chartway, Fed. C. U. | Address 160 Newtown Road Virginia Beach, VA 23462

Appraiser John E. Pitts | Address 228 N Donnawood Dr.,Ste 103, Va Beach 23452

## NEIGHBORHOOD

| | | | |
|---|---|---|---|
| Location | [ ] Urban | [X] Suburban | [ ] Rural |
| Built up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% |
| Growth Rate | [ ] Rapid | [X] Stable | [ ] Slow |
| Property values | [ ] Increasing | [X] Stable | [ ] Declining |
| Demand/supply | [ ] Shortage | [X] In balance | [ ] Over supply |
| Marketing time | [X] Under 3 mos. | [ ] 3-6 mos. | [ ] Over 6 mos. |

| Predominant occupancy | | Single family housing PRICE $ (000) | | AGE (yrs) |
|---|---|---|---|---|
| [X] Owner | 90 | 70 | Low | 25 |
| [X] Tenant | 5 | 95 | High | 60 |
| [X] Vacant (0-5%) | | | Predominant | |
| [ ] Vacant (Over 5%) | | 90 | | 45 |

| Present land use % | |
|---|---|
| One family | 90 |
| 2-4 family | |
| Multi-family | |
| Commercial | 5 |
| (vac ) | 5 |

Land use change: [X] Not likely [ ] Likely [ ] In process To:

**Note: Race and the racial composition of the neighborhood are not appraisal factors.**

Neighborhood boundaries and characteristics: Interstate I264 to north, Interstate I64 to east, Elizabeth River to south and west.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): The subject property is located in River forest, an established neighborhood in the city of Norfolk. Properties are a mix of ranch and 2 story houses of average construction and are compatible in architectural design. It is near schools, shopping and major traffic arteries. Regional employment centers are easily accessible.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): A typical seller is willing to pay a portion of the buyers discount points & CC in this area, thus, sales prices are not influenced by the type of loan. Marketing time is average and supply and demand appear to be in balance. No adverse neighborhood conditions were noted. THIS APPRAISAL IS A SUMMARY REPORT AS DEFINED BY THE BOARD OF THE APPRAISAL FOUNDATION AND COMPLIES WITH USPAP.

## PUD

**Project Information for PUDs** (If applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)? [ ] Yes [ ] No

Approximate total number of units in the subject project . Approximate total number of units for sale in the subject project

Describe common elements and recreational facilities: not located in a PUD

## SITE

Dimensions 80 x 160 x 80 x 160 | Topography level

Site area 12800 sf +/- | Corner Lot [ ] Yes [X] No | Size typical for area

Specific zoning classification and description R6 Residential | Shape rectangular

Zoning Compliance [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [ ] No zoning | Drainage appears adequate

Highest & best use as improved: [X] Present use [ ] Other use (explain) | View average

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private |
|---|---|---|---|---|---|---|
| Electricity | [X] | | Street | asphalt | [X] | [ ] |
| Gas | [ ] | | Curb/gutter | yes | [X] | [ ] |
| Water | [X] | | Sidewalk | yes | [X] | [ ] |
| Sanitary sewer | [X] | | Street lights | yes | [X] | [ ] |
| Storm sewer | [X] | | Alley | no | [ ] | [ ] |

Landscaping typical

Driveway Surface concrete

Apparent easements normal utilities

FEMA Special Flood Hazard Area [ ] Yes [X] No

FEMA Zone C | Map Date 4/17/84

FEMA Map No. 510104-0004D

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): none Equal

## DESCRIPTION OF IMPROVEMENTS

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | | |
|---|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | block | Slab | no | Area Sq. Ft. | n/a | Roof | | |
| No. of Stories | 1 | Exterior Walls | vinyl | Crawl Space | yes | % Finished | n/a | Ceiling | avg | X |
| Type (Det./Att.) | detach | Roof Surface | comp | Basement | none | Ceiling | n/a | Walls | avg | X |
| Design (Style) | ranch | Gutters & Dwnspts. | yes/yes | Sump Pump | no | Walls | n/a | Floor | | |
| Existing/Proposed | exist | Window Type | dh | Dampness | NoneNoted | Floor | n/a | None | | |
| Age (Yrs.) | 44 | Storm/Screens | yes/yes | Settlement | NoneNoted | Outside Entry | n/a | Unknown | | |
| Effective Age (Yrs.) | 17-21 | Manufactured House | no | Infestation | NoneNoted | | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | |
| Level 1 | | 1 | 1 | 1 | | 1 | | 3 | 2.0 | | utl. | 1268 |
| Level 2 | | | | | | | | | | | | |

Finished area **above** grade contains: 7 Rooms; 3 Bedroom(s); 2.0 Bath(s); 1268 Square Feet of Gross Living Area

INTERIOR Materials/Condition | HEATING | KITCHEN EQUIP. | ATTIC | AMENITIES | CAR STORAGE



LEE S ROOD PC P. 02
PAGE 02

THIS IS TO CERTIFY THAT I ON JUNE 2, 1999 SURVEYED THE PROPERTY SHOWN ON THIS PLAT AND THAT THE TITLE LINES AND THE WALLS OF THE BUILDINGS ARE SHOWN ON THIS PLAT. THE BUILDINGS STAND STRICTLY WITHIN THE TITLE LINES AND THERE ARE NO ENCROACHMENTS OF OTHER BUILDINGS ON THE PROPERTY EXCEPT AS SHOWN.
SIGNED :
COMMONWEALTH OF VIRGINIA
ARTHUR L. ROOD
No. 1543
6/12/99
LAND SURVEYOR
Approx. Edge Of Marsh @ Time Of Survey
200' N.T.S.
150' N.T.S.
S30°42'40"W 80.00'
Nail Found
Pin Found
0.9'
0.8'
Fr. Shed 10.2'x10.2'
Fr. Shed 12.2'x12.2'
Unlabeled Line As Scaled From Recorded Plat
160.00'
160.00'
ZONE "A4"
3
2
4
ZONE "B"
Approx. Flood Zone Line As Scaled From F.I.R.M.
CURLEW DRIVE
Wood Deck
0.4'
38.4'
7.4'
15.8'
24.4'
1 Sty. Fr. #120
20.4'
37.7'
4'
16.4'
12.7'
0.4'
S59°17'20"E
N59°17'20"W
ZONE "C"
36.3'
Conc.
R=10'
Pin Found
Pin Found
406.31'
N30°42'40"E 80.00'
KIDD BOULEVARD

Physical Survey
Of
LOT 3, BLOCK A, RIVER FORREST SHORES
Norfolk, Virginia
For
PAUL R. DAVIS, JR. & PATRICIA ANN DAVIS

BUILDING ELEVATION INFORMATION

FLOOR ELEVATION AT FRONT ENTR. = 12.29 GARAGE FLOOR ELEV. = N/A LOWEST GRADE ADJACENT TO BLDG. = 10.2

NOTES :

1) THIS SURVEY WAS PERFORMED WITHOUT THE BENEFIT OF A TITLE REPORT AND MAY NOT SHOW ANY / ALL EASEMENTS OR RESTRICTIONS THAT MAY AFFECT SAID PROPERTY AS SHOWN.

2) LEE S. ROOD, P.C. IS NOT A PARTY IN DETERMINING THE REQUIREMENTS FOR ...

LEE S. ROOD, P.C.
Land Surveyors

NOTE:
AS SHOWN ON THE FLOOD INSURANCE RATE MAP, THIS PROPERTY APPEARS TO FALL IN :



Physical Survey
Of
LOT 3, BLOCK A, RIVER FORREST SHORES
Norfolk, Virginia
For
PAUL R. DAVIS, JR. & PATRICIA ANN DAVIS

BUILDING ELEVATION INFORMATION

FLOOR ELEVATION AT FRONT ENTR. = 12.29  GARAGE FLOOR ELEV. = N/A  LOWEST GRADE ADJACENT TO BLDG. = 10.2

NOTES :

1) THIS SURVEY WAS PERFORMED WITHOUT THE BENEFIT OF A TITLE REPORT AND MAY NOT SHOW ANY / ALL EASEMENTS OR RESTRICTIONS THAT MAY AFFECT SAID PROPERTY AS SHOWN.

2) LEE S. ROOD, P.C. IS NOT A PARTY IN DETERMINING THE REQUIREMENTS FOR FLOOD INSURANCE ON THE PROPERTY SHOWN HEREON. THIS SURVEY DOES NOT IMPLY THAT THIS PROPERTY WILL OR WILL NOT BE SUBJECT TO FLOODING. FOR FURTHER INFORMATION, CONTACT THE LOCAL COMMUNITY FLOOD OFFICIAL.

3) ELEVATIONS SHOWN HEREON REFER TO N.G.V.D. OF 1929.

LEE S. ROOD, P.C.
Land Surveyors
5737 BARTEE STREET
NORFOLK, VIRGINIA 23502
Ph. (757) 466-1111

NOTE:
AS SHOWN ON THE FLOOD INSURANCE RATE MAP, THIS PROPERTY APPEARS TO FALL IN :
FLOOD ZONE (S) "A4" "B" "C"
COMMUNITY NO. 510104
PANEL NO. 4D DATED: 4/17/84
BASE FLOOD ELEVATION = 8.5

SCALE: 1"=30'  DATE: 6/2/99  REFERENCE: NORFOLK M.B.32, PG.5,6  F.B. T-39 Pg. 35A

51,091-99  F.B.745, PG.57

(757) 816-3043

File No. 69649288

**APPRAISAL OF**

**LOCATED AT:**

120 KIDD BLVD
NORFOLK, VA 23502-5214

**FOR:**

Wells Fargo Bank, N.A. - 0161950
Des Moines
IA 50309

**BORROWER:**

DAVIS PAUL R and PATRICIA

**AS OF:**

April 12, 2015

**BY:**

James Michael Sexton

FORLIS@msn.com

Wells Fargo Bank, N.A. - 0161950
Des Moines
IA 50309

File Number: 69849288

In accordance with your request, I have appraised the real property at:

120 KIDD BLVD
NORFOLK, VA 23502-5214

The purpose of this appraisal is to develop an opinion of the market value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the market value of the property as of April 12, 2015 is:

$132,000
One Hundred Thirty-Two Thousand Dollars

The attached report contains the description, analysis and supportive data for the conclusions, final opinion of value, descriptive photographs, limiting conditions and appropriate certifications.

James Michael Sexton

# Uniform Residential Appraisal Report

File No. 69649288

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

Property Address 120 KIDD BLVD City NORFOLK State VA Zip Code 23502-5214

Borrower DAVIS PAUL R and PATRICIA Owner of Public Record DAVIS PAUL R and PATRICIA County Norfolk City

Legal Description 3 Blk A River Forrest Shores

Assessor's Parcel # 10820700 Tax Year 2014 R.E. Taxes $ 1,708

Neighborhood Name River Forest Shores Map Reference N/A Census Tract 0069.02

Occupant [X] Owner [ ] Tenant [ ] Vacant Special Assessments $ 0 [ ] PUD HOA $ 0 [ ] per year [ ] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [X] Refinance Transaction [ ] Other (describe)

Lender/Client Wells Fargo Bank, N.A. - 0161950 Address Des Moines, IA 50309

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s). Data sources include: REIN/MLS/Tax Records. Per MLS/Tax Records the subject property has not been sold or listed in the past year.

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ Date of Contract Is the property seller the owner of public record? [ ] Yes [ ] No Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | | One-Unit Housing Trends | | | | One-Unit Housing | | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban | [X] Suburban | [ ] Rural | Property Values | [ ] Increasing | [X] Stable | [ ] Declining | PRICE $(000) | | AGE (yrs) | One-Unit | 75 % |
| Built-Up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | Demand/Supply | [ ] Shortage | [X] In Balance | [ ] Over Supply | 110 | Low | 1 | 2-4 Unit | 2.5 % |
| Growth | [ ] Rapid | [X] Stable | [ ] Slow | Marketing Time | [ ] Under 3 mths | [X] 3-6 mths | [ ] Over 6 mths | 230 | High | 70 | Multi-Family | 2.5 % |
| | | | | | | | | 160 | Pred. | 60 | Commercial | 10 % |
| | | | | | | | | | | | Other Vacant | 10 % |

Neighborhood Boundaries The subject is bound by Rt. 264 to the North, Elizabeth River to the South, Rt. 64 to the East, and Rt. 13 to the West.

Neighborhood Description The subject is located in an established residential area within close proximity to schools, shopping, houses of worship and other expected suburban amenities. Major commuter routes nearby provide access to most points in the metropolitan area including employment centers. The neighborhood exhibits average maintenance patterns and marketability.

Market Conditions (including support for the above conclusions) See Attached Addendum

**SITE**

Dimensions 80 x 320 Area 25600 sf Shape Regular View N;Wtr;

Specific Zoning Classification R-6 Zoning Description Single Family Residence

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe. See Attached Addendum

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | [ ] | Water | [X] | [ ] | Street Pavement | [X] | [ ] |
| Gas | [X] | [ ] | Sanitary Sewer | [X] | [ ] | Alley None | [ ] | [ ] |

FEMA Special Flood Hazard Area [ ] Yes [X] No FEMA Flood Zone X FEMA Map # 5101040180F FEMA Map Date 09/02/2009

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe. The appraiser did not check the land records for recorded easements, as these types of documents are not readily available. The appraiser has reported only apparent easements, encroachments, and other apparent adverse conditions for the purpose of this appraisal. The appraiser also recommends a qualified professional (surveyor and/or EPA consultant) for a complete and accurate description of any factors that may have been unforeseen at the time of inspection.

**IMPROVEMENTS**

| GENERAL DESCRIPTION | FOUNDATION | EXTERIOR DESCRIPTION materials/condition | INTERIOR materials/condition |
|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [ ] Concrete Slab [X] Crawl Space | Foundation Walls Cinderblock/Avg. | Floors Carpet/Vin./Avg. |
| # of Stories 1 | [ ] Full Basement [ ] Partial Basement | Exterior Walls Vinyl/Avg. | Walls Drywall/Avg. |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | Basement Area 0 sq.ft. | Roof Surface Asph.Shingle/Avg. | Trim/Finish Wood/Avg. |
| [X] Existing [ ] Proposed [ ] Under Const. | Basement Finish 0 % | Gutters & Downspouts None | Bath Floor Vinyl/Avg. |
| Design (Style) Ranch | [ ] Outside Entry/Exit [ ] Sump Pump | Window Type Metal/Avg. | Bath Wainscot Fiberglass/Avg. |
| Year Built 1955 | Evidence of [ ] Infestation | Storm Sash/Insulated None | Car Storage [ ] None |
| Effective Age (Yrs) 15 | [ ] Dampness [ ] Settlement | Screens Metal/Avg. | [X] Driveway # of Cars 2 |
| Attic [ ] None | Heating [X] FWA [ ] HWBB [ ] Radiant | Amenities [ ] WoodStove(s) # 0 | Driveway Surface Paved |
| [ ] Drop Stair [ ] Stairs | [ ] Other Fuel Gas | [ ] Fireplace(s) # 0 [ ] Fence None | [ ] Garage # of Cars 0 |
| [ ] Floor [X] Scuttle | Cooling [X] Central Air Conditioning | [X] Patio/Deck Deck [X] Porch Covered | [ ] Carport # of Cars 0 |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | [ ] Pool None [X] Other 2 Sheds | [ ] Att. [ ] Det. [ ] Built-in |

Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [ ] Disposal [X] Microwave [X] Washer/Dryer [ ] Other (describe)

Finished area above grade contains: 7 Rooms 3 Bedrooms 2.0 Bath(s) 1,217 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). Typical features for the neighborhood and the area.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). C3;No updates in the prior 15 years; All of the utilities were turned on, and in proper working condition at the time of the inspection (including the testing for hot water). The garage of the subject property appeared to have been converted prior to the effective date of this appraisal. The work was performed in a workmanlike manner, however, it would not be easily converted back into a garage. The converted space did have HVAC tied in from the main system, therefore, the appraiser did include it in the overall GLA for the purpose of this appraisal. <Continued in addendum>

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe. Lead based paint hazards "could" exist in any home built before January 1, 1978. Correction is required to all defective painted surfaces if they exist. The appraiser is unaware if lead based paint exists, however, the warning was noted due to the age of the subject property. A lead based paint inspection is recommended.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe.

LOT SIZE - [illegible] - USED IN THIS APPRAISAL
ACTUAL = [illegible] SF

# Uniform Residential Appraisal Report

File No. 69649288

There are 4 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 139,900 to $ 210,000 .
There are 8 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 115,000 to $ 217,500 .

**SALES COMPARISON APPROACH**

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 120 KIDD BLVD NORFOLK, VA 23502-5214 | 148 Kidd Boulevard Norfolk, VA 23502 | | 5921 Jerry Road Norfolk, VA 23502 | | 300 Pefley Drive Norfolk, VA 23502 | |
| Proximity to Subject | | 0.11 miles SW | | 0.27 miles NW | | 0.54 miles SW | |
| Sale Price | $ | | $ 141,500 | | $ 130,000 | | $ 140,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 93.77 sq. ft. | | $ 112.85 sq. ft. | | $ 109.63 sq. ft. | |
| Data Source(s) | | MLS REIN #1434199;DOM 25 | | MLS REIN #1410560;DOM 105 | | MLS REIN #1421565;DOM 31 | |
| Verification Source(s) | | Tax ID#36280100 | | Tax ID#08835900 | | Tax ID#14785700 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth Cash;0 | | ArmLth Conv;0 | | ArmLth Cash;0 | |
| Date of Sale/Time | | s09/14;c08/14 | | s07/14;c06/14 | | s06/14;c06/14 | |
| Location | N;WtrFr; | N;WtrFr; | | N;Res; | 5,000 | N;WtrFr; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 25600 sf | 15682 sf | 0 | 10454 sf | 0 | 13939 sf | 0 |
| View | N;Wtr; | N;Wtr; | | N;Res; | 0 | B;Wtr; | -5,000 |
| Design (Style) | DT1;Ranch | DT1;Ranch | | DT1;Ranch | | DT1;Ranch | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 60 | 59 | 0 | 60 | | 55 | 0 |
| Condition | C3 | C4 | 5,000 | C3 | | C2 | -5,000 |
| Above Grade Room Count (Total / Bdrms / Baths) | 7 / 3 / 2.0 | 6 / 3 / 1.1 | 2,000 | 7 / 3 / 1.0 | 4,000 | 6 / 3 / 1.0 | 4,000 |
| Gross Living Area | 1,217 sq. ft. | 1,509 sq. ft. | -8,760 | 1,152 sq. ft. | 1,950 | 1,277 sq. ft. | -1,800 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FWA/Gas/C/Air | FWA/Oil/C/Air | 0 | FWA/Oil/C/Air | 0 | FWA/Gas/C/Air | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2dw | 1ga2gd2dw | -12,000 | 2dw | | 2dw | |
| Porch/Patio/Deck | Porch/Deck | Porch/Patio | 1,500 | Porch | 2,500 | Porch/Deck | |
| Fireplaces | 0 F/P | 1 F/P | -500 | 0 F/P | | 1 F/P | -500 |
| Fence/Shed/Pool | 2 Sheds | Fence/Pool | -8,000 | Fence/Shed | -1,000 | Fence | -1,000 |
| Misc. Upgrades | Typical | Typical | | Typical | | Kitchen Updated | -5,000 |
| Net Adjustment (Total) | | ☐+ ☒- | $ 20,760 | ☒+ ☐- | $ 12,450 | ☐+ ☒- | $ 14,300 |
| Adjusted Sale Price of Comparables | | Net Adj. -14.7% Gross Adj. 26.7% | $ 120,740 | Net Adj. 9.6% Gross Adj. 11.1% | $ 142,450 | Net Adj. -10.2% Gross Adj. 15.9% | $ 125,700 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) REIN/MLS
My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) REIN/MLS

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | 07/28/2014 | | 06/23/2014 |
| Price of Prior Sale/Transfer | | $172,651 | | $0 |
| Data Source(s) | Tax Records/REIN | Tax Records/REIN | Tax Records/REIN | Tax Records/REIN |
| Effective Date of Data Source(s) | 04/11/2015 | 04/11/2015 | 04/11/2015 | 04/11/2015 |

Analysis of prior sale or transfer history of the subject property and comparable sales Per public record no sale or transfer of subject within the last 3 years, per MLS no listing of subject within the last 3 years. Comparable #1 had a prior transfer on 07/28/2014, for $172,651. The prior transaction was a foreclosure in which the Veteran's Administration took possession of the property, and the most recent sale was an arm's length transaction, which led to the decrease that is reflected in this appraisal, and is now in line with the subject's current market value. Comparable #3 was transferred on 06/23/2014 with a Gift Deed, for an undisclosed nominal amout as recorded in document # 12381. Comparable #6 was sold on 01/06/2015 for $139,091 in a Foreclosure Deed.

Summary of Sales Comparison Approach. Sales recited are from subject's area and are in acceptable proximity to the subject. They are the most recent and most comparable found. No adjustment was warranted for sales/financing as all types of financing are readily available. Age adjustments are not warranted as all comparables and the subject have been built around the same time frame or have recently been renovated. GLA has been adjusted for based on extracted market data. Variances in amenities have been adjusted for based on the opinion of the appraiser due to lack of comparable sales information for paired sales analysis. All value affecting dissimilarities were adjusted according to market reaction. Secondary market standards for net and gross adjustment percentages were met. The indicated range of values brackets the value of the subject. 0=No adjustment could be supported.

Indicated Value by Sales Comparison Approach $ 132,000

**RECONCILIATION**

Indicated Value by: Sales Comparison Approach $ 132,000 Cost Approach (if developed) $ 133,800 Income Approach (if developed) $ 0

Market actions of buyers and sellers are best analyzed by the Sales Comparison Approach. That approach is given greatest weight in the reconciliation.

This appraisal is made ☒ "as is," ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: None. Some photographs may be reproduced on MLS listings.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 132,000 as of 04/12/2015 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005 UAD Version 9/2011 Produced using ACI software, 800.234.8727 www.aciweb.com Page 2 of 6 Fannie Mae Form 1004 March 2005 1004_05UAD 07222014

First Choice Appraisal Co.

# Uniform Residential Appraisal Report

File No. 69649288

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 120 KIDD BLVD NORFOLK, VA 23502-5214 | 104 Effie Avenue Norfolk, VA 23502 | | 329 Pefley Drive Norfolk, VA 23502 | | 235 Pefley Drive Norfolk, VA 23502 | |
| Proximity to Subject | | 0.06 miles NW | | 0.63 miles SW | | 0.56 miles SW | |
| Sale Price | $ | | $ 140,000 | | $ 139,900 | | $ 139,900 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 116.67 sq. ft. | | $ 107.20 sq. ft. | | $ 127.30 sq. ft. | |
| Data Source(s) | | MLS REIN #1331845;DOM 284 | | MLS REIN #1512991;DOM 17 | | MLS REIN #1507409;DOM 22 | |
| Verification Source(s) | | Tax ID#03976900 | | Tax ID#43375500 | | Tax ID#32298700 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth VA;0 | | Listing ;0 | | Listing ;0 | |
| Date of Sale/Time | | s06/14;c05/14 | | Active | | Active | |
| Location | N;WtrFr; | N;Res; | 5,000 | N;WtrFr; | | N;Res; | 5,000 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 25600 sf | 10454 sf | 0 | 32670 sf | 0 | 10890 sf | 0 |
| View | N;Wtr; | N;Res; | 0 | N;Wtr; | | N;Res; | 0 |
| Design (Style) | DT1;Ranch | DT1;Ranch | | DT1;Ranch | | DT1;Ranch | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 60 | 60 | | 52 | 0 | 57 | 0 |
| Condition | C3 | C3 | | C3 | | C2 | -5,000 |
| Above Grade Room Count (Total / Bdrms / Baths) | 7 / 3 / 2.0 | 7 / 3 / 1.0 | 3,000 | 6 / 3 / 2.0 | 0 | 6 / 2 / 2.0 | 0 |
| Gross Living Area | 1,217 sq. ft. | 1,200 sq. ft. | 510 | 1,305 sq. ft. | -2,640 | 1,099 sq. ft. | 3,540 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FWA/Gas/C/Air | BB/Radnt/C/Air | 0 | BB/Radnt/C/Air | 0 | FWA/Gas/C/Air | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2dw | 1ga2dw | -5,500 | 1ga2dw | -5,500 | 1ga2dw | -5,500 |
| Porch/Patio/Deck | Porch/Deck | Porch | 2,500 | Porch/Patio | 1,500 | Porch | 2,500 |
| Fireplaces | 0 F/P | 0 F/P | | 1 F/P | -500 | 1 F/P | -500 |
| Fence/Shed/Pool | 2 Sheds | Shed | 0 | None | 0 | None | 0 |
| Misc. Upgrades | Typical | Typical | | Typical | | Kitchen/Baths | -5,000 |
| Net Adjustment (Total) | | [X] + [ ] - | $ 5,510 | [ ] + [X] - | $ 7,140 | [ ] + [X] - | $ 4,960 |
| Adjusted Sale Price of Comparables | | Net Adj. 3.9% Gross Adj. 11.8% | $ 145,510 | Net Adj. -5.1% Gross Adj. 7.2% | $ 132,760 | Net Adj. -3.5% Gross Adj. 19.3% | $ 134,940 |

| ITEM | SUBJECT | COMPARABLE SALE NO. 4 | COMPARABLE SALE NO. 5 | COMPARABLE SALE NO. 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | 01/06/2015 |
| Price of Prior Sale/Transfer | | | | $139,091 |
| Data Source(s) | Tax Records/REIN | Tax Records/REIN | Tax Records/REIN | Tax Records/REIN |
| Effective Date of Data Source(s) | 04/11/2015 | 04/11/2015 | 04/11/2015 | 04/11/2015 |

Summary of Sales Comparison Approach Active listings have been provided to further support the final reconciliation of value.

SALES COMPARISON APPROACH



S30°42'40"W
80.00'
Nail Found
Pin Found
Fr. Shed 10.2'x10.2'
0.8'
0.9'
Unlabeled Line As Scaled From Recorded Plat
Fr. Shed 12.2'x12.2'
160.00'
160.00'
ZONE "A4"
3
2
4
ZONE "B"
Approx. Flood Zone Line As Scaled From F.I.R.M.
Wood Deck
CURLEW DRIVE
S59°17'20"E
N59°17'20"W
38.4'
24.4'
1 Sty. Fr. #120
15.8'
20.4'
37.7'
12.7'
16.4'
ZONE "C"
36.3'
Conc.
R=10'
Pin Found
406.31'
N30°42'40"E
80.00'
Pin Found
KIDD BOULEVARD
Physical Survey Of
LOT 3, BLOCK A, RIVER FORREST SHORES
Norfolk, Virginia
For
PAUL R. DAVIS, JR. & PATRICIA ANN DAVIS
BUILDING ELEVATION INFORMATION
FLOOR ELEVATION AT FRONT ENTR. = 12.29
GARAGE FLOOR ELEV. = N/A
LOWEST GRADE ADJACENT TO BLDG. = 10.2
NOTES :
1) THIS SURVEY WAS PERFORMED WITHOUT THE BENEFIT OF A TITLE REPORT AND MAY NOT SHOW ANY / ALL EASEMENTS OR RESTRICTIONS THAT MAY AFFECT SAID PROPERTY AS SHOWN.
2) LEE S. ROOD, P.C. IS NOT A PARTY IN DETERMINING THE REQUIREMENTS FOR FLOOD INSURANCE ON THE PROPERTY SHOWN HEREON. THIS SURVEY DOES NOT IMPLY THAT THIS PROPERTY WILL OR WILL NOT BE SUBJECT TO FLOODING. FOR FURTHER INFORMATION, CONTACT THE LOCAL COMMUNITY FLOOD OFFICIAL.
3) ELEVATIONS SHOWN HEREON REFER TO N.G.V.D. OF 1929.
LEE S. ROOD, P.C.
Land Surveyors
5737 BARTEE STREET
NORFOLK, VIRGINIA 23502
Ph. (757) 466-1111
NOTE:
AS SHOWN ON THE FLOOD INSURANCE RATE MAP, THIS PROPERTY APPEARS TO FALL IN :
FLOOD ZONE (S) "A4" "B" "C"
COMMUNITY NO. 510104
PANEL NO. 4D DATED: 4/17/84
BASE FLOOD ELEVATION = 8.5
SCALE: 1"=30'
DATE: 6/2/99
REFERENCE: NORFOLK M.B.32, PG.5,6
F.B. T-39 Pg. 35A
51,091-99
F.B.745, PG.57



Physical Survey Of

LOT 3, BLOCK A, RIVER FORREST SHORES
Norfolk, Virginia
For
PAUL R. DAVIS, JR. & PATRICIA ANN DAVIS

BUILDING ELEVATION INFORMATION

FLOOR ELEVATION AT FRONT ENTR. = 12.29 GARAGE FLOOR ELEV. = N/A LOWEST GRADE ADJACENT TO BLDG. = 10.2

NOTES :

1) THIS SURVEY WAS PERFORMED WITHOUT THE BENEFIT OF A TITLE REPORT AND MAY NOT SHOW ANY / ALL EASEMENTS OR RESTRICTIONS THAT MAY AFFECT SAID PROPERTY AS SHOWN.

2) LEE S. ROOD, P.C. IS NOT A PARTY IN DETERMINING THE REQUIREMENTS ...

LEE S. ROOD, P.C.
Land Surveyors

NOTE:
AS SHOWN ON THE FLOOD INSURANCE RATE MAP, THIS PROPERTY APPEARS TO FALL IN :

*ROBERT J. BELL & ASSOC., INC*
*REAL ESTATE APPRAISERS*

File No. 120KIDD

No AMC
*PrimeLending, A Plains Capital Company*
18111 PRESTON RD
DALLAS, TX 75252

File Number:   120KIDD

In accordance with your request, I have appraised the real property at:

120 KIDD BLVD
NORFOLK, VA 23502

The purpose of this appraisal is to develop an opinion of the market value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the market value of the property as of   July 8, 2015                    is:

$185,000
One Hundred Eighty-Five Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions, final opinion of value, descriptive photographs, limiting conditions and appropriate certifications.

ROBERT JEFFREY BELL
#4001004048
APPRAISER

# Uniform Residential Appraisal Report

File No. 120KIDD

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

Property Address 120 KIDD BLVD | City NORFOLK | State VA | Zip Code 23502
Borrower PAUL & PATRICIA DAVIS | Owner of Public Record PAUL & PATRICIA DAVIS | County NORFOLK CITY
Legal Description 3 BLK A RIVER FORREST SHORES
Assessor's Parcel # 10820700 | Tax Year 2014 | R.E. Taxes $ 1,709
Neighborhood Name RIVER FORREST SHORES | Map Reference 221-H6 | Census Tract 0069.02
Occupant [X] Owner [ ] Tenant [ ] Vacant | Special Assessments $ 0 | [ ] PUD HOA $ 0 [ ] per year [ ] per month
Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)
Assignment Type [ ] Purchase Transaction [X] Refinance Transaction [ ] Other (describe)
Lender/Client PrimeLending, A Plains Capital Company | Address 18111 PRESTON RD, STE 900, DALLAS, TX 75252
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No
Report data source(s) used, offering price(s), and date(s). REINMLS

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ | Date of Contract | Is the property seller the owner of public record? [ ] Yes [ ] No Data Source(s)
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | | One-Unit Housing Trends | | | | One-Unit Housing | | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban | [X] Suburban | [ ] Rural | Property Values | [ ] Increasing | [X] Stable | [ ] Declining | PRICE | | AGE | One-Unit | 70% |
| Built-Up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | Demand/Supply | [ ] Shortage | [X] In Balance | [ ] Over Supply | $(000) | | (yrs) | 2-4 Unit | % |
| Growth | [ ] Rapid | [X] Stable | [ ] Slow | Marketing Time | [ ] Under 3 mths | [X] 3-6 mths | [ ] Over 6 mths | 90 | Low | 5 | Multi-Family | % |
| | | | | | | | | 650 | High | 80 | Commercial | 30% |
| | | | | | | | | 200 | Pred. | 40 | Other | % |

Neighborhood Boundaries LOCATED TO THE NORTH OF THE ELIZABETH RIVER, SOUTH OF HIGHWAY 264, WEST OF HIGHWAY 64, AND EAST OF MILITARY HIGHWAY.
Neighborhood Description See Attached Addendum

Market Conditions (including support for the above conclusions) See Attached Addendum

**SITE**

Dimensions 80 X 160 | Area 12800 sf | Shape RECTANGULAR | View N;Wtr;
Specific Zoning Classification R-6 | Zoning Description SF RESIDENTIAL
Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)
Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | [ ] | Water | [X] | [ ] | Street ASPHALT | [X] | [ ] |
| Gas | [X] | [ ] | Sanitary Sewer | [X] | [ ] | Alley NONE | [ ] | [ ] |

FEMA Special Flood Hazard Area [ ] Yes [X] No | FEMA Flood Zone X | FEMA Map # 5101040180F | FEMA Map Date 09/02/2009
Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe.
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe. Any easement on the site is for utility and/or drainage purposes. There were no known adverse easements or conditions noted. Subject is within close proximity to the light rail transit line and its railroad tracks however there's no measurable impact on value or marketability. The subject has deeded access to a creek which is tidal water and leads to the elizabeth river. The subject also backs to Interstate 64 however there is no measureable impact on value or marketability

**IMPROVEMENTS**

| GENERAL DESCRIPTION | FOUNDATION | EXTERIOR DESCRIPTION materials/condition | INTERIOR materials/condition |
|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [ ] Concrete Slab [X] Crawl Space | Foundation Walls MASONRY BLK/AVG | Floors HDWD,CPT/AVG |
| # of Stories 1 | [ ] Full Basement [ ] Partial Basement | Exterior Walls VINYL/AVG | Walls PLASTER/AVG |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | Basement Area 0 sq. ft. | Roof Surface ARCH SHINGLE/GD | Trim/Finish WOOD/AVG |
| [X] Existing [ ] Proposed [ ] Under Const. | Basement Finish 0 % | Gutters & Downspouts ALUMINUM/AVG | Bath Floor TILE,VNL/AVG |
| Design (Style) RANCH | [ ] Outside Entry/Exit [ ] Sump Pump | Window Type WD DBL HUNG/AVG | Bath Wainscot FBGLS,TILE/AVG |
| Year Built 1955 | Evidence of [ ] Infestation | Storm Sash/Insulated STORMS/AVG | Car Storage [ ] None |
| Effective Age (Yrs) 20 | [ ] Dampness [ ] Settlement | Screens FBGLASS/AVG | [X] Driveway # of Cars 2 |
| Attic [ ] None | Heating [X] FWA [ ] HWBB [ ] Radiant | Amenities [ ] WoodStove(s) # 0 | Driveway Surface CONCRETE |
| [ ] Drop Stair [ ] Stairs | [ ] Other Fuel GAS | [ ] Fireplace(s) # 0 [ ] Fence None | [ ] Garage # of Cars 0 |
| [ ] Floor [X] Scuttle | Cooling [X] Central Air Conditioning | [X] Patio/Deck deck [ ] Porch None | [ ] Carport # of Cars 0 |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | [ ] Pool None [ ] Other None | [ ] Att. [ ] Det. [ ] Built-in |

Appliances [ ] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [ ] Microwave [ ] Washer/Dryer [X] Other (describe) FAN/HOOD
Finished area above grade contains: 7 Rooms 3 Bedrooms 2.0 Bath(s) 1,208 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.). STORM WINDOWS AND DOORS

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). C4;No updates in the prior 15 years; The subject property was built prior to 1978. Residential structures built prior to 1978 may contain lead-based paint. Appraiser is not responsible for testing to determine if the paint surfaces in the subject property are indeed lead-based.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe. ALL UTILITIES APPEARED TO BE IN WORKING ORDER AT THE TIME OF INSPECTION

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe.

# Uniform Residential Appraisal Report

File No. 120KIDD

There are 4 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 160,000 to $ 270,000 .

There are 6 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 130,000 to $ 270,000 .

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 120 KIDD BLVD NORFOLK, VA 23502 | 148 KIDD BLVD NORFOLK, VA 23502 | | 5913 BRINDA AVE NORFOLK, VA 23502 | | 5921 JERRY RD NORFOLK, VA 23502 | |
| Proximity to Subject | | 0.11 miles SW | | 0.27 miles SW | | 0.28 miles NW | |
| Sale Price | $ | | $ 270,000 | | $ 195,000 | | $ 130,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 154.29 sq. ft. | | $ 115.25 sq. ft. | | $ 112.85 sq. ft. | |
| Data Source(s) | | REINMLS #1512919;DOM 12 | | REINMLS #1446877;DOM 169 | | REINMLS #1410560;DOM 105 | |
| Verification Source(s) | | ASSESSOR REC;EXTERIOR INSP | | ASSESSOR REC;EXTERIOR INSP | | ASSESSOR REC;EXTERIOR INSP | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth FHA;0 | | ArmLth VA;0 | | ArmLth Conv;0 | |
| Date of Sale/Time | | s04/15;c04/15 | | s05/15;c04/15 | | s07/14;c06/14 | |
| Location | N;Res; | N;Res; | | N;Res;. | | N;Res; | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 12800 sf | 14305 sf | 0 | 9877 sf | 0 | 10565 sf | 0 |
| View | N;Wtr; | N;Wtr; | | N;Res; | 20,000 | N;Res; | 20,000 |
| Design (Style) | DT1;RANCH | DT1;RANCH | | DT1;RANCH | | DT1;RANCH | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Actual Age | 60 | 59 | 0 | 60 | | 60 | |
| Condition | C4 | C3 | -30,000 | C4 | | C4 | |
| Above Grade Room Count (Total / Bdrms / Baths) | 7 / 3 / 2.0 | 8 / 4 / 2.1 | -1,500 | 6 / 3 / 2.0 | 0 | 7 / 3 / 1.0 | 3,000 |
| Gross Living Area 30 | 1,208 sq. ft. | 1,750 sq. ft. | -16,260 | 1,692 sq. ft. | -14,520 | 1,152 sq. ft. | 1,680 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FWA C/Air | FWA C/Air | | FWA C/Air | | FWA C/Air | |
| Energy Efficient Items | STORM WD/DRS | INSUL WD/DRS | 0 | INSUL WD/DRS | 0 | INSUL WD/DRS | 0 |
| Garage/Carport | 2dw | 2gd2dw | -15,000 | 2gd2dw | -15,000 | 2dw | |
| Porch/Patio/Deck | Deck | Patio | 0 | NONE | 1,000 | NONE | 1,000 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | [ ] + [X] - | $ 62,760 | [ ] + [X] - | $ 8,520 | [X] + [ ] - | $ 25,680 |
| Adjusted Sale Price of Comparables | | Net Adj. -23.2%% Gross Adj. 23.2% % | $ 207,240 | Net Adj. -4.4% % Gross Adj. 25.9% % | $ 186,480 | Net Adj. 19.8% % Gross Adj. 19.8% % | $ 155,680 |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) MLS/COURT RECORDS

My research [X] did [ ] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) MLS/COURT RECORDS

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | 09/17/2014 | | |
| Price of Prior Sale/Transfer | | $141,500 | | |
| Data Source(s) | CITY RECORDS | CITY RECORDS | CITY RECORDS | CITY RECORDS |
| Effective Date of Data Source(s) | 07/08/2015 | 07/08/2015 | 07/08/2015 | 07/08/2015 |

Analysis of prior sale or transfer history of the subject property and comparable sales THE SUBJECT IS NOT ON THE MARKET & HAS NOT TRANSFERRED WITHIN THE PAST 36 MONTHS. NO PERSONAL PROPERTY WAS INCLUDED IN THE FINAL VALUE ESTIMATE. THE INFORMATION REPORTED FOR THE PREVIOUS SALES HISTORY OF THE SUBJECT(AND COMPARABLES, IF APPLICABLE) INCLUDES A THREE YEAR HISTORY. COMP 1 'S PREVIOUS SALE WAS A FORECLOSURE (WHICH ARE NOT TYPICAL OF THE MARKET AREA).

Summary of Sales Comparison Approach. THE SALES USED ARE THE MOST RELIABLE IN TERMS OF LOCATION, UTILITY, DESIGN, AND QUALITY OF CONSTRUCTION. SEE ATTACHED ADDENDA FOR ADDITIONAL COMMENTS. THE USE OF SALES OVER 6 MONTHS WAS UNAVOIDABLE DUE TO THE LACK OF RECENT COMPARABLE SALES. MOST WEIGHT IS GIVEN TO COMPS 1 AND 2 AS THEY ARE 3 BEDROOM SALES. COMPS 1 AND 4 REQUIRED VERY LARGE CONDITION ADJUSTMENTS FOR HAVING RENOVATED KITCHENS, BATHS, FLOORING, HVAC, ETC

Indicated Value by Sales Comparison Approach $ 185,000

Indicated Value by: Sales Comparison Approach $ 185,000 Cost Approach (if developed) $ 187,300 Income Approach (if developed) $ 0

THE SALES COMPARISON APPROACH IS GIVEN THE MOST WEIGHT AS THERE IS AMPLE MARKET DATA AVAILABLE FOR ANALYSIS. THE MARKET VALUE OF THE SUBJECT IS ESTIMATED TO BE IN THE MID-RANGE OF ADJUSTED VALUES. THE COST APPROACH IS NOT PROVIDED.INSUFFICIENT RENTAL DATA AVAILABLE FOR USE IN THE INCOME APPROACH.

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: NO PERSONAL PROPERTY INCLUDED IN FINAL VALUE ESTIMATE.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 185,000 as of 07/08/2015 , which is the date of inspection and the effective date of this appraisal.

# Uniform Residential Appraisal Report

File No. 120KIDD

SALES COMPARISON APPROACH

| FEATURE | SUBJECT | | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|---|
| Address | 120 KIDD BLVD NORFOLK, VA 23502 | | 124 KIDD BLVD NORFOLK, VA 23502 | | | | | |
| Proximity to Subject | | | 0.02 miles SW | | | | | |
| Sale Price | $ | | | $ 270,000 | | $ | | $ |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | | $ 111.52 sq. ft. | | $ 0.00 sq. ft. | | $ 0.00 sq. ft. | |
| Data Source(s) | | | REINMLS #1523814;DOM 45 | | | | | |
| Verification Source(s) | | | ASSESSOR REC;EXTERIOR INSP | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | | Listing ;0 | | | | | |
| Date of Sale/Time | | | Active | -13,500 | | | | |
| Location | N;Res; | | N;Res; | | | | | |
| Leasehold/Fee Simple | FEE SIMPLE | | FEE SIMPLE | | | | | |
| Site | 12800 sf | | 12621 sf | 0 | | | | |
| View | N;Wtr; | | N;Wtr; | | | | | |
| Design (Style) | DT1;RANCH | | DT2;CAPE COD | 0 | | | | |
| Quality of Construction | Q4 | | Q4 | | | | | |
| Actual Age | 60 | | 76 | 0 | | | | |
| Condition | C4 | | C3 | -30,000 | | | | |
| Above Grade Room Count (Total / Bdrms. / Baths) | 7 / 3 / 2.0 | | 8 / 5 / 2.1 | -1,500 | | | | |
| Gross Living Area | 30 1,208 sq. ft. | | 2,421 sq. ft. | -36,400 | sq. ft. | | sq. ft. | |
| Basement & Finished Rooms Below Grade | 0sf | | 0sf | | | | | |
| Functional Utility | AVERAGE | | AVERAGE | | | | | |
| Heating/Cooling | FWA C/Air | | FWA C/Air | | | | | |
| Energy Efficient Items | STORM WD/DRS | | INSUL WD/DRS | 0 | | | | |
| Garage/Carport | 2dw | | 2dw | | | | | |
| Porch/Patio/Deck | Deck | | Inground Pool | -5,000 | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Net Adjustment (Total) | | | ☐ + ☒ - | $ 86,400 | ☐ + ☐ - | $ | ☐ + ☐ - | $ |
| Adjusted Sale Price of Comparables | | | Net Adj. -32.0%% Gross Adj. 32.0% % | $ 183,600 | Net Adj. % Gross Adj. % | $ | Net Adj. % Gross Adj. % | $ |

| ITEM | SUBJECT | COMPARABLE SALE NO. 4 | COMPARABLE SALE NO. 5 | COMPARABLE SALE NO. 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | CITY RECORDS | CITY RECORDS | | |
| Effective Date of Data Source(s) | 07/08/2015 | 07/08/2015 | | |

Summary of Sales Comparison Approach COMP 4 IS AN ACTIVE LISTING AND IS ADJUSTED DOWN BASED ON THE LIST TO SALES PRICE RATIOS IN THE NEIGHBORHOOD. COMP 4 IS USED AS IT IS LOCATED NEXT DOOR TO THE SUBJECT

# Statement of Credit Denial, Termination or Change

DAVIS
Loan #: 2107000862

Date: AUGUST 14, 2015

Applicant's Name:
PAUL RUFUS DAVIS JR

Applicant's Address: 120 KIDD BLVD
NORFOLK, VA 23502

Description of Account, Transaction, or Requested Credit:
MORTGAGE APPLICATION

Description of Action Taken:
Thank you for your recent application for credit. Your request for a loan was carefully considered, and we regret that we are unable to approve your application at this time for the following reason(s):

Part I - Principal Reason(s) for Credit Denial, Termination, or Other Action Taken Concerning Credit

*This section must be completed in all instances.*

_____ Credit application incomplete
_____ Insufficient number of credit references provided
_____ Unacceptable type of credit references provided
_____ Unable to verify credit references
_____ Temporary or irregular employment
_____ Unable to verify employment
_____ Length of employment
_____ Income insufficient for amount of credit requested
_____ Excessive obligations in relation to income
_____ Unable to verify income
_____ Length of residence
_____ Temporary residence
_____ Unable to verify residence
_____ No credit file
_____ Limited credit experience
_____ Poor credit performance with us
_____ Delinquent past or present credit obligations with others
_____ Collection action or judgment
_____ Garnishment or attachment
_____ Foreclosure or repossession
_____ Bankruptcy
_____ Number of recent inquiries on credit bureau report

15858.104



2107000862

__X__ Value or type of collateral not sufficient
______ Other, specify: ______________________

Part II - Disclosure of Use of Information Obtained From an Outside Source

This section should be completed if the credit decision was based in whole or in part on information that has been obtained from an outside source.

☐ Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons why we have denied credit to you. You also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

Name:

Address:

Toll-Free Telephone Number:

We also obtained your credit score from this consumer reporting agency and used it in making our credit decision. Your credit score is a number that reflects the information in your consumer report. Your credit score can change, depending on how the information in your consumer report changes.

Your credit score:

Date:

Scores range from a low of to a high of

Key factors that adversely affected your credit score:

If you have any questions regarding your credit score, you should contact Experian at:

Address: P. O. Box 2002, Allen, TX 75013

Toll-free Telephone number: 1-888-397-3742

☐ Our credit decision was based in whole or in part on information obtained from an affiliate or from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request, no later than 60 days after you receive this notice, for disclosure of the nature of this information.

# Notice of Action Taken and Statement of Reasons

**Applicant Name and Address**
Paul R Davis, Jr

120 KIDD BLVD, NORFOLK, VA 23502

**Today's Date**
April 17, 2015

**Description of Account, Transaction or Requested Credit**
Conventional mortgage

**Property Address**
120 KIDD BLVD, NORFOLK, VA 23502

We have carefully considered the credit application and sincerely regret that we are unable to approve the application at this time for the reason(s) indicated below. The decisions reflected below apply to applicant listed above unless otherwise noted.

- Value or type of collateral not sufficient

If you have any questions regarding this notice, you should contact:

**Creditor's Name:** Wells Fargo Bank, N.A.
**Phone:** 800-258-6649
**Creditor's Address:** 800 WALNUT ST, 9TH FLOOR, DES MOINES, IA 50309-3605

Our credit decision was based in whole or in part on information obtained from an affiliate or from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request to us, no later than 60 days after you receive this notice, for disclosure of the nature of this information.

Thank you for considering us for your financing needs. Although we cannot be of service to you right now, you have our promise of immediate attention any time you choose to call on us for future assistance.

Notice: The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is:

Bureau of Consumer Financial Protection
1700 G Street NW
Washington, DC 20006



## Statement of Credit Denial, Termination or Change

DAVIS
Loan #: 2107000862

Date: AUGUST 14, 2015

Applicant's Name:
PATRICIA ANN DAVIS

Applicant's Address: 120 KIDD BLVD
NORFOLK, VA 23502

Description of Account, Transaction, or Requested Credit:
MORTGAGE APPLICATION

Description of Action Taken:
Thank you for your recent application for credit. Your request for a loan was carefully considered, and we regret that we are unable to approve your application at this time for the following reason(s):

Part I - Principal Reason(s) for Credit Denial, Termination, or Other Action Taken Concerning Credit

*This section must be completed in all instances.*

______ Credit application incomplete
______ Insufficient number of credit references provided
______ Unacceptable type of credit references provided
______ Unable to verify credit references
______ Temporary or irregular employment
______ Unable to verify employment
______ Length of employment
______ Income insufficient for amount of credit requested
______ Excessive obligations in relation to income
______ Unable to verify income
______ Length of residence
______ Temporary residence
______ Unable to verify residence
______ No credit file
______ Limited credit experience
______ Poor credit performance with us
______ Delinquent past or present credit obligations with others
______ Collection action or judgment
______ Garnishment or attachment
______ Foreclosure or repossession
______ Bankruptcy
______ Number of recent inquiries on credit bureau report

15858.104



# Statement of Credit Denial, Termination or Change

DAVIS
Loan #: 2107000862

Date: AUGUST 14, 2015

Applicant's Name:
PATRICIA ANN DAVIS

Applicant's Address: 120 KIDD BLVD
NORFOLK, VA 23502

Description of Account, Transaction, or Requested Credit:
MORTGAGE APPLICATION

Description of Action Taken:
Thank you for your recent application for credit. Your request for a loan was carefully considered, and we regret that we are unable to approve your application at this time for the following reason(s):

Part I - Principal Reason(s) for Credit Denial, Termination, or Other Action Taken Concerning Credit

*This section must be completed in all instances.*

_____ Credit application incomplete
_____ Insufficient number of credit references provided
_____ Unacceptable type of credit references provided
_____ Unable to verify credit references
_____ Temporary or irregular employment
_____ Unable to verify employment
_____ Length of employment
_____ Income insufficient for amount of credit requested
_____ Excessive obligations in relation to income
_____ Unable to verify income
_____ Length of residence
_____ Temporary residence
_____ Unable to verify residence
_____ No credit file
_____ Limited credit experience
_____ Poor credit performance with us
_____ Delinquent past or present credit obligations with others
_____ Collection action or judgment
_____ Garnishment or attachment
_____ Foreclosure or repossession
_____ Bankruptcy
_____ Number of recent inquiries on credit bureau report

15858.104



2107000862

__x__ Value or type of collateral not sufficient
_____ Other, specify: ____________________

Part II - Disclosure of Use of Information Obtained From an Outside Source

This section should be completed if the credit decision was based in whole or in part on information that has been obtained from an outside source.

☐ Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons why we have denied credit to you. You also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

Name:

Address:

Toll-Free Telephone Number:

We also obtained your credit score from this consumer reporting agency and used it in making our credit decision. Your credit score is a number that reflects the information in your consumer report. Your credit score can change, depending on how the information in your consumer report changes.

Your credit score:

Date:

Scores range from a low of to a high of

Key factors that adversely affected your credit score:

If you have any questions regarding your credit score, you should contact TransUnion Consumer Disclosure Center at:

Address: P.O. Box 1000, Chester, PA 19022

Toll-free Telephone number: 1-800-916-8800

☐ Our credit decision was based in whole or in part on information obtained from an affiliate or from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request, no later than 60 days after you receive this notice, for disclosure of the nature of this information.

2107000862

*If you have any questions regarding this notice, you should contact:*

Creditor's name: PRIMELENDING, A PLAINSCAPITAL COMPANY

Creditor's address: 704 QUINCE ORCHARD ROAD #230, GAITHERSBURG, MD 20878

Creditor's telephone number: (888) 812-2711

Notice: The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the FEDERAL RESERVE CONSUMER HELP CENTER, PO BOX 1200, MINNEAPOLIS, MN 55480.



DENNIS BAILEY & ASSOCIATES
Real Estate Appraisers
228 NORTH DONNAWOOD DRIVE
SUITE 103
VIRGINIA BEACH, VA 23452
(757) 498-9280 • FAX: (757) 498-9774

# APPRAISAL REPORT

FOR: Chartway Federal Credit Union
RE: Davis, Paul R. & Patricia A.

May 13, 1999

GENTLEMEN:

AS REQUESTED (I-WE) HAVE PERSONALLY INSPECTED THE PROPERTY DESCRIBED AS:

120 Kidd Boulevard
Norfolk, Virginia 23502

THE PURPOSE OF THIS APPRAISAL IS TO ESTIMATE THE MARKET VALUE OF THIS PROPERTY AS OF May 10, 1999 IT IS MY OPINION THAT THE MARKET VALUE AS OF THE AFOREMENTIONED DATE IS:

$ 84,000.00

THE PROPERTY WAS APPRAISED AS A WHOLE, OWNED IN FEE SIMPLE AND UNENCUMBERED, SUBJECT TO THE CONTINGENT AND LIMITING CONDITIONS OUTLINED HEREIN.

COMMONWEALTH OF VIRGINIA
JOHN E. PITTS
No. 4001 002...
Certified Residential
Real Estate
Appraiser

JOHN E. PITTS
Certified Residential Appraiser

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. kidd120

**SUBJECT**

Property Address 120 Kidd Boulevard City Norfolk State VA Zip Code 23502
Legal Description Lot 3, Block A, River Forest Shores County n/a
Assessor's Parcel No. 10820700 1 Tax Year 98/99 R.E. Taxes $ 1085.28 Special Assessments $ none
Borrower Davis, Paul R.Jr & Current Owner Patricia A./same Occupant: [X] Owner [ ] Tenant [ ] Vacant
Property rights appraised [X] Fee Simple [ ] Leasehold Project Type [ ] PUD [ ] Condominium (HUD/VA only) HOA$ n/a /Mo.
Neighborhood or Project Name River Forest Map Reference 11-D12 Census Tract 0069.02
Sale Price $ n/a Date of Sale n/a Description and $ amount of loan charges/concessions to be paid by seller n/a
Lender/Client Chartway, Fed. C. U. Address 160 Newtown Road Virginia Beach, VA 23462
Appraiser John E. Pitts Address 228 N Donnawood Dr.,Ste 103, Va Beach 23452

**NEIGHBORHOOD**

| | | | | Predominant occupancy | Single family housing PRICE $ (000) | AGE (yrs) | Present land use % | | Land use change |
|---|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban | [X] Suburban | [ ] Rural | | | | One family | 90 | [X] Not likely [ ] Likely |
| Built up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | [X] Owner 90 | 70 Low | 25 | 2-4 family | | [ ] In process |
| Growth Rate | [ ] Rapid | [X] Stable | [ ] Slow | [X] Tenant 5 | 95 High | 60 | Multi-family | | To: |
| Property values | [ ] Increasing | [X] Stable | [ ] Declining | [X] Vacant (0-5%) | Predominant | | Commercial | 5 | |
| Demand/supply | [ ] Shortage | [X] In balance | [ ] Over supply | [ ] Vacant (Over 5%) | 90 | 45 | (vac ) | 5 | |
| Marketing time | [X] Under 3 mos. | [ ] 3-6 mos. | [ ] Over 6 mos. | | | | | | |

**Note: Race and the racial composition of the neighborhood are not appraisal factors.**

Neighborhood boundaries and characteristics: Interstate I264 to north, Interstate I64 to east, Elizabeth River to south and west.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): The subject property is located in River forest, an established neighborhood in the city of Norfolk. Properties are a mix of ranch and 2 story houses of average construction and are compatible in architectural design. It is near schools, shopping and major traffic arteries. Regional employment centers are easily accessible.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): A typical seller is willing to pay a portion of the buyers discount points & CC in this area, thus, sales prices are not influenced by the type of loan. Marketing time is average and supply and demand appear to be in balance. No adverse neighborhood conditions were noted. THIS APPRAISAL IS A SUMMARY REPORT AS DEFINED BY THE BOARD OF THE APPRAISAL FOUNDATION AND COMPLIES WITH USPAP.

**PUD**

**Project Information for PUDs** (If applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)? [ ] Yes [ ] No
Approximate total number of units in the subject project . Approximate total number of units for sale in the subject project
Describe common elements and recreational facilities: not located in a PUD

**SITE**

Dimensions 80 x 160 x 80 x 160 Topography level
Site area 12800 sf +/- Corner Lot [ ] Yes [X] No Size typical for area
Specific zoning classification and description R6 Residential Shape rectangular
Zoning Compliance [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [ ] No zoning Drainage appears adequate
Highest & best use as improved: [X] Present use [ ] Other use (explain) View average

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private |
|---|---|---|---|---|---|---|
| Electricity | [X] | | Street | asphalt | [X] | [ ] |
| Gas | [ ] | | Curb/gutter | yes | [X] | [ ] |
| Water | [X] | | Sidewalk | yes | [X] | [ ] |
| Sanitary sewer | [X] | | Street lights | yes | [X] | [ ] |
| Storm sewer | [X] | | Alley | no | [ ] | [ ] |

Landscaping typical
Driveway Surface concrete
Apparent easements normal utilities
FEMA Special Flood Hazard Area [ ] Yes [X] No
FEMA Zone C Map Date 4/17/84
FEMA Map No. 510104-0004D

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): none Equal

**DESCRIPTION OF IMPROVEMENTS**

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | block | Slab | no | Area Sq. Ft. | n/a | Roof | |
| No. of Stories | 1 | Exterior Walls | vinyl | Crawl Space | yes | % Finished | n/a | Ceiling avg | X |
| Type (Det./Att.) | detach | Roof Surface | comp | Basement | none | Ceiling | n/a | Walls avg | X |
| Design (Style) | ranch | Gutters & Dwnspts. | yes/yes | Sump Pump | no | Walls | n/a | Floor | |
| Existing/Proposed | exist | Window Type | dh | Dampness | NoneNoted | Floor | n/a | None | |
| Age (Yrs.) | 44 | Storm/Screens | yes/yes | Settlement | NoneNoted | Outside Entry | n/a | Unknown | |
| Effective Age (Yrs.) | 17-21 | Manufactured House | no | Infestation | NoneNoted | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | |
| Level 1 | | 1 | 1 | 1 | | 1 | | 3 | 2.0 | | utl. | 1268 |
| Level 2 | | | | | | | | | | | | |

Finished area **above** grade contains: 7 Rooms: 3 Bedroom(s): 2.0 Bath(s): 1268 Square Feet of Gross Living Area

INTERIOR Materials/Condition HEATING KITCHEN EQUIP. ATTIC AMENITIES CAR STORAGE

**NEIGHBORHOOD**

The subject property is located in River forest, an established neighborhood in which properties are a mix of ranch and 2 story houses of average construction and are compatible in architectural design. It is near schools, shopping and major traffic arteries. Regional employment centers are easily accessible.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): A typical seller is willing to pay a portion of the buyers discount points & CC in this area, thus, sales prices are not influenced by the type of loan. Marketing time is average and supply and demand appear to be in balance. No adverse neighborhood conditions were noted. THIS APPRAISAL IS A SUMMARY REPORT AS DEFINED BY THE BOARD OF THE APPRAISAL FOUNDATION AND COMPLIES WITH USPAP.

**PUD**

**Project Information for PUDs** (If applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)? [ ] Yes [ ] No

Approximate total number of units in the subject project ____ . Approximate total number of units for sale in the subject project ____

Describe common elements and recreational facilities: not located in a PUD

**SITE**

| | |
|---|---|
| Dimensions | 80 x 160 x 80 x 160 |
| Site area | 12800 sf +/- |
| Corner Lot | [ ] Yes [X] No |
| Specific zoning classification and description | R6 Residential |
| Zoning Compliance | [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [ ] No zoning |
| Highest & best use as improved: | [X] Present use [ ] Other use (explain) |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private |
|---|---|---|---|---|---|---|
| Electricity | X | | Street | asphalt | X | |
| Gas | | | Curb/gutter | yes | X | |
| Water | X | | Sidewalk | yes | X | |
| Sanitary sewer | X | | Street lights | yes | X | |
| Storm sewer | X | | Alley | no | | |

| | |
|---|---|
| Topography | level |
| Size | typical for area |
| Shape | rectangular |
| Drainage | appears adequate |
| View | average |
| Landscaping | typical |
| Driveway Surface | concrete |
| Apparent easements | normal utilities |
| FEMA Special Flood Hazard Area | [ ] Yes [X] No |
| FEMA Zone | C |
| Map Date | 4/17/84 |
| FEMA Map No. | 510104-0004D |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): none Equal

**DESCRIPTION OF IMPROVEMENTS**

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | block | Slab | no | Area Sq. Ft. | n/a | Roof | |
| No. of Stories | 1 | Exterior Walls | vinyl | Crawl Space | yes | % Finished | n/a | Ceiling | avg X |
| Type (Det./Att.) | detach | Roof Surface | comp | Basement | none | Ceiling | n/a | Walls | avg X |
| Design (Style) | ranch | Gutters & Dwnspts. | yes/yes | Sump Pump | no | Walls | n/a | Floor | |
| Existing/Proposed | exist | Window Type | dh | Dampness | NoneNoted | Floor | n/a | None | |
| Age (Yrs.) | 44 | Storm/Screens | yes/yes | Settlement | NoneNoted | Outside Entry | n/a | Unknown | |
| Effective Age (Yrs.) | 17-21 | Manufactured House | no | Infestation | NoneNoted | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | |
| Level 1 | | 1 | 1 | 1 | | 1 | | 3 | 2.0 | | utl. | 1268 |
| Level 2 | | | | | | | | | | | | |

Finished area **above** grade contains: 7 Rooms; 3 Bedroom(s); 2.0 Bath(s); 1268 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | cptvin/avg | Type | FHA | Refrigerator | | None | | Fireplace(s) # | | None | |
| Walls | wallbd/avg | Fuel | oil | Range/Oven | X | Stairs | | Patio | | Garage | # of cars |
| Trim/Finish | wood/avg | Condition | avg | Disposal | | Drop Stair | | Deck | X | Attached | |
| Bath Floor | vinyl/avg | COOLING | | Dishwasher | X | Scuttle | X | Porch | X | Detached | |
| Bath Wainscot | ceramic/avg | Central | CAC | Fan/Hood | X | Floor | | Fence | X | Built-In | |
| Doors | wood/avg | Other | | Microwave | | Heated | | Pool | | Carport | |
| | | Condition | avg | Washer/Dryer | | Finished | | 3 sheds | X | Driveway | 1car |

**COMMENTS**

Additional features (special energy efficient items, etc.): Storm windows, storm doors, deck, 3 sheds, and ceiling fans.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.: No functional or external depreciation noted. Normal wear and tear noted. Subject has an above ground oil tank with no leaks noted.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: none noted

COST APPROACH

| | | |
|---|---|---|
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS | | |
| Dwelling 1,268 Sq. Ft @ $ 48.87 | = $ | 61,967 |
| Sq. Ft @ $ | = | |
| appl,deck,porch,3sheds | = | 7,500 |
| Garage/Carport Sq. Ft @ $ | = | |
| Total Estimated Cost New | = $ | 69,467 |
| Less Physical Functional External Depreciation 11490 | = $ | 11,490 |
| Depreciated Value of Improvements | = $ | 57,977 |
| "As-is" Value of Site Improvements | = $ | 4,000 |
| **INDICATED VALUE BY COST APPROACH** | = $ | 85,977 |

Estimated remaining economic life: 45 yrs

see sketch

THIS HOUSE MEETS HUD MINIMUM REQUIREMENTS.

COST DATA OBTAINED FROM MARSHALL AND SWIFT VALUATION SERVICE.

SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 120 Kidd Boulevard | 5836 Sellger Drive | | 5944 McGinnis Circle | | 120 Kidd Boulevard | |
| Proximity to Subject | | 1 block | | 3 blocks | | same block | |
| Sales Price | $ n/a | | $ 88,000 | | $ 89,900 | | $ 84,000 |
| Price/Gross Liv. Area | $ 0 | $ 78.01 | | $ 62.17 | | $ 61.05 | |
| Data and/or Verification Sources | Pys. Insp. | Tax records & MLS | | Tax records & MLS | | Tax records & MLS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | CLOSED VA | | CLOSED FHA | | CLOSED VA | |
| Date of Sale/Time | | 3/17/99 | | 11/11/98 | | 12/4/98 | |
| Location | River Fst | River Fst | | River Fst | | River Fst | |
| Leasehold/Fee Simple | Fee | Fee | | Fee | | Fee | |
| Site | 80x160/avg | 90x125/avg | | 80a125/avg | | 82x125/avg | |
| View | average | average | | average | | average | |
| Design and Appeal | ranch/avg | ranch/avg | | ranch/avg | | ranch/avg | |
| Quality of Construction | sid/crawl | brick/crawl | -2500 | brick/crawl | -2500 | sid/crawl | |
| Age | 44 | 44 | | 45 | | 44 | |
| Condition | average | average | | average | | average | |
| Above Grade Room Count (Total Bdrms Baths) | 7 3 2.0 | 6 3 1.0 | +1000 | 6 4 1.0 | +1000 | 7 3 2.0 | |
| Gross Living Area | 1268 Sq. Ft. | 1128 Sq. Ft. | +1680 | 1446 Sq. Ft. | -2136 | 1376 Sq. Ft. | -1296 |
| Basement & Finished Rooms Below Grade | none | none | | none | | none | |
| Functional Utility | typical | typical | | typical | | typical | |
| Heating/Cooling | FHA/CAC | FHA/CAC | | BB/CAC | | FHA/CAC | |
| Energy Efficient Items | sw/sd | sw/sd | | sw/sd | | sw/sd | |
| Garage/Carport | converted | none | | det. 2car | -2500 | c.port | -500 |
| Porch, Patio, Deck, Fireplace(s), etc. | deck/3sheds pch/FP | shed fireplace | +1000 | porch fireplace | +1000 | deck/shed none | +2000 |
| Fence, Pool, etc. | | | | | | | |
| Net Adj. (total) | | [X] + [ ] - | $ 1,180 | [ ] + [X] - | $ 5,136 | [X] + [ ] - | $ 204 |
| Adjusted Sales Price of Comparable | | | $ 89,180 | | $ 84,764 | | $ 84,204 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): All comparables are located within the subject neighborhood. Adjustments were made for gross living area, construction and amenities. Comparable 3 appears most similar to the subject and was given the highest weight factor.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | 9/16/97 Gift city record | none city records | none city records | none city records |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: To the appraiser's knowledge there have been no prior sales of the subject property nor the comparables within the last year

**INDICATED VALUE BY SALES COMPARISON APPROACH** $ 84,000

**INDICATED VALUE BY INCOME APPROACH** (If Applicable) Estimated Market Rent $ 750 /Mo. x Gross Rent Multiplier n/a = $

This appraisal is made [X] "as is" [ ] subject to the repairs, alterations, inspections, or conditions listed below [ ] subject to completion per plans and specifications.

Conditions of Appraisal: The appraiser assumes that the heating/cooling and electrical systems are in good working order.

The Market Data and Cost Approach are considered in the final est

Borrower/Client: Davis. Paul R. Jr.. and Patricia A.
Property Address: 120 Kidd Boulevard
City/State/Zip: Norfolk, Virginia 23502
Lender: Chartway FCU

The subject property is located in river Forest, an established area in the city of Norfolk. The neighborhood is primarily residential with a few small commercial properties located along the main thoroughfares. These commercial properties do not appear to have any adverse marketing effects on the subject property nor it's neighborhood. Essential services are nearby and the major traffic arteries lead to regional employment centers.

The subject property is a 3 bedroom, 2.0 bath, 1-story house constructed on a crawl foundation. The exterior is siding. The property has storm windows and storm doors, covered porch, deck, 3 sheds, and ceiling fans.

All comparable properties used are current sales located in the subject's neighborhood. Adjustments were made for gross living area, construction, and amenities. The comparables used are the most suitable found and deemed to be good indicators of value.

All comparable dates used in this appraisal report are closed dates. Fencing was not considered in this appraisal due to the insignificant impact it has on buying decisions and the difficulty of establishing ownership of the comparable properties fencing.

Site information was taken from city records and is believed to be accurate.

This appraisal was prepared for those Parties, and/or their assigns named as the lender/client in the URAR and is for their sole and exclusive use. This appraisal was prepared in accordance with the Uniform Standard of Professional Appraisal Practice. A Statement of Limiting Conditions and Appraiser's Certification has been provided with this appraisal and should be given the same consideration as the remainder of this report.

John T. Schropp has significantly contributed to the development of this appraisal. He assisted in gathering pertinent information necessary to prepare the report, entered the property and thoroughly researched comparable sales data for use in the market analysis.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustments should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. The separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. The separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrance of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**

120 Kidd Boulevard, Norfolk, VA 23502

COMMONWEALTH OF VIRGINIA
JOHN E. PITTS
4001 002575
Certified Residential
Real Estate
Appraiser

**APPRAISER:**

Signature: [signature]
Name: John E. Pitts
Date Signed: May 13, 1999
State Certification #: 4001 002575
or State License #:
State: VA
Expiration Date of Certification or License: 03/31/2000

**SUPERVISORY APPRAISER** (only if required):

Signature:
Name:
Date Signed:
State Certification #:
or State License #:
State:
Expiration Date of Certification or License:

☐ Did ☐ Did Not Inspect Property

# Statement of Credit Denial, Termination or Change

DAVIS
Loan #: 2107000862

Date: AUGUST 14, 2015

Applicant's Name:
PAUL RUFUS DAVIS JR

Applicant's Address: 120 KIDD BLVD
NORFOLK, VA 23502

Description of Account, Transaction, or Requested Credit:
MORTGAGE APPLICATION

Description of Action Taken:
Thank you for your recent application for credit. Your request for a loan was carefully considered, and we regret that we are unable to approve your application at this time for the following reason(s):

Part I - Principal Reason(s) for Credit Denial, Termination, or Other Action Taken Concerning Credit

*This section must be completed in all instances.*

______ Credit application incomplete
______ Insufficient number of credit references provided
______ Unacceptable type of credit references provided
______ Unable to verify credit references
______ Temporary or irregular employment
______ Unable to verify employment
______ Length of employment
______ Income insufficient for amount of credit requested
______ Excessive obligations in relation to income
______ Unable to verify income
______ Length of residence
______ Temporary residence
______ Unable to verify residence
______ No credit file
______ Limited credit experience
______ Poor credit performance with us
______ Delinquent past or present credit obligations with others
______ Collection action or judgment
______ Garnishment or attachment
______ Foreclosure or repossession
______ Bankruptcy
______ Number of recent inquiries on credit bureau report

15858.104



2107000862

__X__ Value or type of collateral not sufficient
_____ Other, specify: ____________________

Part II - Disclosure of Use of Information Obtained From an Outside Source

This section should be completed if the credit decision was based in whole or in part on information that has been obtained from an outside source.

☐ Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons why we have denied credit to you. You also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

Name:

Address:

Toll-Free Telephone Number:

We also obtained your credit score from this consumer reporting agency and used it in making our credit decision. Your credit score is a number that reflects the information in your consumer report. Your credit score can change, depending on how the information in your consumer report changes.

Your credit score:

Date:

Scores range from a low of to a high of

Key factors that adversely affected your credit score:

If you have any questions regarding your credit score, you should contact Experian at:

Address: P. O. Box 2002, Allen, TX 75013

Toll-free Telephone number: 1-888-397-3742

☐ Our credit decision was based in whole or in part on information obtained from an affiliate or from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request, no later than 60 days after you receive this notice, for disclosure of the nature of this information.

## Statement of Credit Denial, Termination or Change

DAVIS
Loan #: 2107000862

Date: AUGUST 14, 2015

Applicant's Name:
PATRICIA ANN DAVIS

Applicant's Address: 120 KIDD BLVD
NORFOLK, VA 23502

Description of Account, Transaction, or Requested Credit:
MORTGAGE APPLICATION

Description of Action Taken:
Thank you for your recent application for credit. Your request for a loan was carefully considered, and we regret that we are unable to approve your application at this time for the following reason(s):

Part I - Principal Reason(s) for Credit Denial, Termination, or Other Action Taken Concerning Credit

*This section must be completed in all instances.*

______ Credit application incomplete
______ Insufficient number of credit references provided
______ Unacceptable type of credit references provided
______ Unable to verify credit references
______ Temporary or irregular employment
______ Unable to verify employment
______ Length of employment
______ Income insufficient for amount of credit requested
______ Excessive obligations in relation to income
______ Unable to verify income
______ Length of residence
______ Temporary residence
______ Unable to verify residence
______ No credit file
______ Limited credit experience
______ Poor credit performance with us
______ Delinquent past or present credit obligations with others
______ Collection action or judgment
______ Garnishment or attachment
______ Foreclosure or repossession
______ Bankruptcy
______ Number of recent inquiries on credit bureau report



2107000862

__x__ Value or type of collateral not sufficient
_____ Other, specify: ____________________

Part II - Disclosure of Use of Information Obtained From an Outside Source

This section should be completed if the credit decision was based in whole or in part on information that has been obtained from an outside source.

☐ Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons why we have denied credit to you. You also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

Name:

Address:

Toll-Free Telephone Number:

We also obtained your credit score from this consumer reporting agency and used it in making our credit decision. Your credit score is a number that reflects the information in your consumer report. Your credit score can change, depending on how the information in your consumer report changes.

Your credit score:

Date:

Scores range from a low of to a high of

Key factors that adversely affected your credit score:

If you have any questions regarding your credit score, you should contact TransUnion Consumer Disclosure Center at:

Address: P.O. Box 1000, Chester, PA 19022

Toll-free Telephone number: 1-800-916-8800

☐ Our credit decision was based in whole or in part on information obtained from an affiliate or from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request, no later than 60 days after you receive this notice, for disclosure of the nature of this information.

2107000862

*If you have any questions regarding this notice, you should contact:*

Creditor's name: PRIMELENDING, A PLAINSCAPITAL COMPANY

Creditor's address: 704 QUINCE ORCHARD ROAD #230, GAITHERSBURG, MD 20878

Creditor's telephone number: (888) 812-2711

Notice: The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the FEDERAL RESERVE CONSUMER HELP CENTER, PO BOX 1200, MINNEAPOLIS, MN 55480.

*ROBERT J. BELL & ASSOC., INC*
*REAL ESTATE APPRAISERS*

File No. 120KIDD

No AMC
*PrimeLending, A Plains Capital Company*
18111 PRESTON RD
DALLAS. TX 75252

File Number: 120KIDD

In accordance with your request, I have appraised the real property at:

120 KIDD BLVD
NORFOLK. VA 23502

The purpose of this appraisal is to develop an opinion of the market value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the market value of the property as of July 8, 2015 is:

$185,000
One Hundred Eighty-Five Thousand Dollars

The attached report contains the description, analysis and supportive data for the conclusions, final opinion of value, descriptive photographs, limiting conditions and appropriate certifications.

ROBERT JEFFREY BELL
#4001004048
APPRAISER

# Uniform Residential Appraisal Report

File No. 120KIDD

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

Property Address 120 KIDD BLVD | City NORFOLK | State VA | Zip Code 23502

Borrower PAUL & PATRICIA DAVIS | Owner of Public Record PAUL & PATRICIA DAVIS | County NORFOLK CITY

Legal Description 3 BLK A RIVER FORREST SHORES

Assessor's Parcel # 10820700 | Tax Year 2014 | R.E. Taxes $ 1,709

Neighborhood Name RIVER FORREST SHORES | Map Reference 221-H6 | Census Tract 0069.02

Occupant [X] Owner [ ] Tenant [ ] Vacant | Special Assessments $ 0 | [ ] PUD HOA $ 0 [ ] per year [ ] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [X] Refinance Transaction [ ] Other (describe)

Lender/Client PrimeLending, A Plains Capital Company | Address 18111 PRESTON RD, STE 900, DALLAS, TX 75252

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s). REINMLS

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ | Date of Contract | Is the property seller the owner of public record? [ ] Yes [ ] No Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | | One-Unit Housing Trends | | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban | [X] Suburban | [ ] Rural | Property Values | [ ] Increasing | [X] Stable | [ ] Declining | PRICE $(000) | AGE (yrs) | One-Unit | 70% |
| Built-Up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | Demand/Supply | [ ] Shortage | [X] In Balance | [ ] Over Supply | 90 Low | 5 | 2-4 Unit | % |
| Growth | [ ] Rapid | [X] Stable | [ ] Slow | Marketing Time | [ ] Under 3 mths | [X] 3-6 mths | [ ] Over 6 mths | 650 High | 80 | Multi-Family | % |
| | | | | | | | | 200 Pred. | 40 | Commercial | 30% |
| | | | | | | | | | | Other | % |

Neighborhood Boundaries LOCATED TO THE NORTH OF THE ELIZABETH RIVER, SOUTH OF HIGHWAY 264, WEST OF HIGHWAY 64, AND EAST OF MILITARY HIGHWAY.

Neighborhood Description See Attached Addendum

Market Conditions (including support for the above conclusions) See Attached Addendum

**SITE**

Dimensions 80 X 160 | Area 12800 sf | Shape RECTANGULAR | View N;Wtr;

Specific Zoning Classification R-6 | Zoning Description SF RESIDENTIAL

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | [ ] | Water | [X] | [ ] | Street ASPHALT | [X] | [ ] |
| Gas | [X] | [ ] | Sanitary Sewer | [X] | [ ] | Alley NONE | [ ] | [ ] |

FEMA Special Flood Hazard Area [ ] Yes [X] No | FEMA Flood Zone X | FEMA Map # 5101040180F | FEMA Map Date 09/02/2009

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe. Any easement on the site is for utility and/or drainage purposes. There were no known adverse easements or conditions noted. Subject is within close proximity to the light rail transit line and its railroad tracks however there's no measurable impact on value or marketability. The subject has deeded access to a creek which is tidal water and leads to the elizabeth river. The subject also backs to Interstate 64 however there is no measureable impact on value or marketability.

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | | [ ] Concrete Slab [X] Crawl Space | | Foundation Walls | MASONRY BLK/AVG | Floors | HDWD,CPT/AVG |
| # of Stories 1 | | [ ] Full Basement [ ] Partial Basement | | Exterior Walls | VINYL/AVG | Walls | PLASTER/AVG |
| Type [X] Det. [ ] Att. [ ] S-Det/End Unit | | Basement Area | 0 sq. ft. | Roof Surface | ARCH SHINGLE/GD | Trim/Finish | WOOD/AVG |
| [X] Existing [ ] Proposed [ ] Under Const. | | Basement Finish | 0 % | Gutters & Downspouts | ALUMINUM/AVG | Bath Floor | TILE,VNL/AVG |
| Design (Style) RANCH | | [ ] Outside Entry/Exit [ ] Sump Pump | | Window Type | WD DBL HUNG/AVG | Bath Wainscot | FBGLS,TILE/AVG |
| Year Built 1955 | | Evidence of [ ] Infestation | | Storm Sash/Insulated | STORMS/AVG | Car Storage | [ ] None |
| Effective Age (Yrs) 20 | | [ ] Dampness [ ] Settlement | | Screens | FBGLASS/AVG | [X] Driveway | # of Cars 2 |
| Attic | [ ] None | Heating [X] FWA [ ] HWBB [ ] Radiant | | Amenities | [ ] WoodStove(s)# 0 | Driveway Surface | CONCRETE |
| [ ] Drop Stair | [ ] Stairs | [ ] Other | Fuel GAS | [ ] Fireplace(s) # 0 | [ ] Fence None | [ ] Garage | # of Cars 0 |
| [ ] Floor | [X] Scuttle | Cooling [X] Central Air Conditioning | | [X] Patio/Deck deck | [ ] Porch None | [ ] Carport | # of Cars 0 |
| [ ] Finished | [ ] Heated | [ ] Individual | [ ] Other | [ ] Pool None | [ ] Other None | [ ] Att. [ ] Det. | [ ] Built-in |

Appliances [ ] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [ ] Microwave [ ] Washer/Dryer [X] Other (describe) FAN/HOOD

Finished area above grade contains: 7 Rooms | 3 Bedrooms | 2.0 Bath(s) | 1,208 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). STORM WINDOWS AND DOORS

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). C4;No updates in the prior 15 years; The subject property was built prior to 1978. Residential structures built prior to 1978 may contain lead-based paint. Appraiser is not responsible for testing to determine if the paint surfaces in the subject property are indeed lead-based.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe. ALL UTILITIES APPEARED TO BE IN WORKING ORDER AT THE TIME OF INSPECTION

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe.

# Uniform Residential Appraisal Report

File No. 120KIDD

There are 4 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 160,000 to $ 270,000 .

There are 6 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 130,000 to $ 270,000 .

SALES COMPARISON APPROACH

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 120 KIDD BLVD NORFOLK, VA 23502 | 148 KIDD BLVD NORFOLK, VA 23502 | | 5913 BRINDA AVE NORFOLK, VA 23502 | | 5921 JERRY RD NORFOLK, VA 23502 | |
| Proximity to Subject | | 0.11 miles SW | | 0.27 miles SW | | 0.28 miles NW | |
| Sale Price | $ | | $ 270,000 | | $ 195,000 | | $ 130,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 154.29 sq. ft. | | $ 115.25 sq. ft. | | $ 112.85 sq. ft. | |
| Data Source(s) | | REINMLS #1512919;DOM 12 | | REINMLS #1446877;DOM 169 | | REINMLS #1410560;DOM 105 | |
| Verification Source(s) | | ASSESSOR REC;EXTERIOR INSP | | ASSESSOR REC;EXTERIOR INSP | | ASSESSOR REC;EXTERIOR INSP | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth FHA;0 | | ArmLth VA;0 | | ArmLth Conv;0 | |
| Date of Sale/Time | | s04/15;c04/15 | | s05/15;c04/15 | | s07/14;c06/14 | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 12800 sf | 14305 sf | 0 | 9877 sf | 0 | 10565 sf | 0 |
| View | N;Wtr; | N;Wtr; | | N;Res; | 20,000 | N;Res; | 20,000 |
| Design (Style) | DT1;RANCH | DT1;RANCH | | DT1;RANCH | | DT1;RANCH | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Actual Age | 60 | 59 | 0 | 60 | | 60 | |
| Condition | C4 | C3 | -30,000 | C4 | | C4 | |
| Above Grade Room Count (Total / Bdrms. / Baths) | 7 / 3 / 2.0 | 8 / 4 / 2.1 | -1,500 | 6 / 3 / 2.0 | 0 | 7 / 3 / 1.0 | 3,000 |
| Gross Living Area 30 | 1,208 sq. ft. | 1,750 sq. ft. | -16,260 | 1,692 sq. ft. | -14,520 | 1,152 sq. ft. | 1,680 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FWA C/Air | FWA C/Air | | FWA C/Air | | FWA C/Air | |
| Energy Efficient Items | STORM WD/DRS | INSUL WD/DRS | 0 | INSUL WD/DRS | 0 | INSUL WD/DRS | 0 |
| Garage/Carport | 2dw | 2gd2dw | -15,000 | 2gd2dw | -15,000 | 2dw | |
| Porch/Patio/Deck | Deck | Patio | 0 | NONE | 1,000 | NONE | 1,000 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | [ ] + [X] - | $ 62,760 | [ ] + [X] - | $ 8,520 | [X] + [ ] - | $ 25,680 |
| Adjusted Sale Price of Comparables | | Net Adj. -23.2% % Gross Adj. 23.2% % | $ 207,240 | Net Adj. -4.4% % Gross Adj. 25.9% % | $ 186,480 | Net Adj. 19.8% % Gross Adj. 19.8% % | $ 155,680 |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data source(s) MLS/COURT RECORDS

My research [X] did [ ] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data source(s) MLS/COURT RECORDS

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | 09/17/2014 | | |
| Price of Prior Sale/Transfer | | $141,500 | | |
| Data Source(s) | CITY RECORDS | CITY RECORDS | CITY RECORDS | CITY RECORDS |
| Effective Date of Data Source(s) | 07/08/2015 | 07/08/2015 | 07/08/2015 | 07/08/2015 |

Analysis of prior sale or transfer history of the subject property and comparable sales THE SUBJECT IS NOT ON THE MARKET & HAS NOT TRANSFERRED WITHIN THE PAST 36 MONTHS. NO PERSONAL PROPERTY WAS INCLUDED IN THE FINAL VALUE ESTIMATE. THE INFORMATION REPORTED FOR THE PREVIOUS SALES HISTORY OF THE SUBJECT(AND COMPARABLES, IF APPLICABLE) INCLUDES A THREE YEAR HISTORY. COMP 1 'S PREVIOUS SALE WAS A FORECLOSURE (WHICH ARE NOT TYPICAL OF THE MARKET AREA).

Summary of Sales Comparison Approach. THE SALES USED ARE THE MOST RELIABLE IN TERMS OF LOCATION, UTILITY, DESIGN, AND QUALITY OF CONSTRUCTION. SEE ATTACHED ADDENDA FOR ADDITIONAL COMMENTS. THE USE OF SALES OVER 6 MONTHS WAS UNAVOIDABLE DUE TO THE LACK OF RECENT COMPARABLE SALES. MOST WEIGHT IS GIVEN TO COMPS 1 AND 2 AS THEY ARE 3 BEDROOM SALES. COMPS 1 AND 4 REQUIRED VERY LARGE CONDITION ADJUSTMENTS FOR HAVING RENOVATED KITCHENS, BATHS, FLOORING, HVAC, ETC

Indicated Value by Sales Comparison Approach $ 185,000

RECONCILIATION

Indicated Value by: Sales Comparison Approach $ 185,000 Cost Approach (if developed) $ 187,300 Income Approach (if developed) $ 0

THE SALES COMPARISON APPROACH IS GIVEN THE MOST WEIGHT AS THERE IS AMPLE MARKET DATA AVAILABLE FOR ANALYSIS. THE MARKET VALUE OF THE SUBJECT IS ESTIMATED TO BE IN THE MID-RANGE OF ADJUSTED VALUES. THE COST APPROACH IS NOT PROVIDED.INSUFFICIENT RENTAL DATA AVAILABLE FOR USE IN THE INCOME APPROACH.

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: NO PERSONAL PROPERTY INCLUDED IN FINAL VALUE ESTIMATE.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 185,000 as of 07/08/2015 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005 UAD Version 9/2011 Produced using ACI software, 800.234.8727 www.aciweb.com Page 2 of 6 Fannie Mae Form 1004 March 2005 1004_05UAD 07222014

ROBERT J. BELL & ASSOC., INC.

# Uniform Residential Appraisal Report

File No. 120KIDD

SALES COMPARISON APPROACH

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 120 KIDD BLVD NORFOLK, VA 23502 | 124 KIDD BLVD NORFOLK, VA 23502 | | | | | |
| Proximity to Subject | | 0.02 miles SW | | | | | |
| Sale Price | $ | | $ 270,000 | | $ | | $ |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 111.52 sq. ft. | | $ 0.00 sq. ft. | | $ 0.00 sq. ft. | |
| Data Source(s) | | REINMLS #1523814;DOM 45 | | | | | |
| Verification Source(s) | | ASSESSOR REC;EXTERIOR INSP | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | Listing ;0 | | | | | |
| Date of Sale/Time | | Active | -13,500 | | | | |
| Location | N;Res; | N;Res; | | | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | | | | |
| Site | 12800 sf | 12621 sf | 0 | | | | |
| View | N;Wtr; | N;Wtr; | | | | | |
| Design (Style) | DT1;RANCH | DT2;CAPE COD | 0 | | | | |
| Quality of Construction | Q4 | Q4 | | | | | |
| Actual Age | 60 | 76 | 0 | | | | |
| Condition | C4 | C3 | -30,000 | | | | |
| Above Grade Room Count (Total / Bdrms / Baths) | 7 / 3 / 2.0 | 8 / 5 / 2.1 | -1,500 | | | | |
| Gross Living Area 30 | 1,208 sq. ft. | 2,421 sq. ft. | -36,400 | sq. ft. | | sq. ft. | |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | | | | |
| Functional Utility | AVERAGE | AVERAGE | | | | | |
| Heating/Cooling | FWA C/Air | FWA C/Air | | | | | |
| Energy Efficient Items | STORM WD/DRS | INSUL WD/DRS | 0 | | | | |
| Garage/Carport | 2dw | 2dw | | | | | |
| Porch/Patio/Deck | Deck | Inground Pool | -5,000 | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | [ ] + [X] - | $ 86,400 | [ ] + [ ] - | $ | [ ] + [ ] - | $ |
| Adjusted Sale Price of Comparables | | Net Adj. -32.0%% Gross Adj. 32.0% % | $ 183,600 | Net Adj. % Gross Adj. % | $ | Net Adj. % Gross Adj. % | $ |

| ITEM | SUBJECT | COMPARABLE SALE NO. 4 | COMPARABLE SALE NO. 5 | COMPARABLE SALE NO. 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | CITY RECORDS | CITY RECORDS | | |
| Effective Date of Data Source(s) | 07/08/2015 | 07/08/2015 | | |

Summary of Sales Comparison Approach COMP 4 IS AN ACTIVE LISTING AND IS ADJUSTED DOWN BASED ON THE LIST TO SALES PRICE RATIOS IN THE NEIGHBORHOOD. COMP 4 IS USED AS IT IS LOCATED NEXT DOOR TO THE SUBJECT

1st CHOICE APPRAISAL
(757) 816-3043

File No. 69649288

**APPRAISAL OF**

**LOCATED AT:**

120 KIDD BLVD
NORFOLK, VA 23502-5214

**FOR:**

Wells Fargo Bank, N.A. - 0161950
Des Moines
IA 50309

**BORROWER:**

DAVIS PAUL R and PATRICIA

**AS OF:**

April 12, 2015

**BY:**

James Michael Sexton

FORLIS@msn.com

Wells Fargo Bank, N.A. - 0161950
Des Moines
IA 50309

File Number: 69649288

In accordance with your request, I have appraised the real property at:

120 KIDD BLVD
NORFOLK, VA 23502-5214

The purpose of this appraisal is to develop an opinion of the market value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the market value of the property as of April 12, 2015 is:

$132,000
One Hundred Thirty-Two Thousand Dollars

The attached report contains the description, analysis and supportive data for the conclusions, final opinion of value, descriptive photographs, limiting conditions and appropriate certifications.

James Michael Sexton

# Uniform Residential Appraisal Report

File No. 120KIDD

SALES COMPARISON APPROACH

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 120 KIDD BLVD NORFOLK, VA 23502 | 124 KIDD BLVD NORFOLK, VA 23502 | | | | | |
| Proximity to Subject | | 0.02 miles SW | | | | | |
| Sale Price | $ | | $ 270,000 | | $ | | $ |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 111.52 sq. ft. | | $ 0.00 sq. ft. | | $ 0.00 sq. ft. | |
| Data Source(s) | | REINMLS #1523814;DOM 45 | | | | | |
| Verification Source(s) | | ASSESSOR REC;EXTERIOR INSP | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | Listing ;0 | | | | | |
| Date of Sale/Time | | Active | -13,500 | | | | |
| Location | N;Res; | N;Res; | | | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | | | | |
| Site | 12800 sf | 12621 sf | 0 | | | | |
| View | N;Wtr; | N;Wtr; | | | | | |
| Design (Style) | DT1;RANCH | DT2;CAPE COD | 0 | | | | |
| Quality of Construction | Q4 | Q4 | | | | | |
| Actual Age | 60 | 76 | 0 | | | | |
| Condition | C4 | C3 | -30,000 | | | | |
| Above Grade Room Count (Total / Bdrms / Baths) | 7 / 3 / 2.0 | 8 / 5 / 2.1 | -1,500 | Total / Bdrms / Baths | | Total / Bdrms / Baths | |
| Gross Living Area 30 | 1,208 sq. ft. | 2,421 sq. ft. | -36,400 | sq. ft. | | sq. ft. | |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | | | | |
| Functional Utility | AVERAGE | AVERAGE | | | | | |
| Heating/Cooling | FWA C/Air | FWA C/Air | | | | | |
| Energy Efficient Items | STORM WD/DRS | INSUL WD/DRS | 0 | | | | |
| Garage/Carport | 2dw | 2dw | | | | | |
| Porch/Patio/Deck | Deck | Inground Pool | -5,000 | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ 86,400 | ☐ + ☐ - | $ | ☐ + ☐ - | $ |
| Adjusted Sale Price of Comparables | | Net Adj. -32.0% Gross Adj. 32.0% | $ 183,600 | Net Adj. % Gross Adj. % | $ | Net Adj. % Gross Adj. % | $ |

| ITEM | SUBJECT | COMPARABLE SALE NO. 4 | COMPARABLE SALE NO. 5 | COMPARABLE SALE NO. 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | CITY RECORDS | CITY RECORDS | | |
| Effective Date of Data Source(s) | 07/08/2015 | 07/08/2015 | | |

Summary of Sales Comparison Approach COMP 4 IS AN ACTIVE LISTING AND IS ADJUSTED DOWN BASED ON THE LIST TO SALES PRICE RATIOS IN THE NEIGHBORHOOD. COMP 4 IS USED AS IT IS LOCATED NEXT DOOR TO THE SUBJECT

# Uniform Residential Appraisal Report

File No. 69649288

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

Property Address 120 KIDD BLVD | City NORFOLK | State VA | Zip Code 23502-5214
Borrower DAVIS PAUL R and PATRICIA | Owner of Public Record DAVIS PAUL R and PATRICIA | County Norfolk City
Legal Description 3 Blk A River Forrest Shores
Assessor's Parcel # 10820700 | Tax Year 2014 | R.E. Taxes $ 1,708
Neighborhood Name River Forest Shores | Map Reference N/A | Census Tract 0069.02
Occupant [X] Owner [ ] Tenant [ ] Vacant | Special Assessments $ 0 | [ ] PUD | HOA $ 0 [ ] per year [ ] per month
Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)
Assignment Type [ ] Purchase Transaction [X] Refinance Transaction [ ] Other (describe)
Lender/Client Wells Fargo Bank, N.A. - 0161950 | Address Des Moines, IA 50309
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No
Report data source(s) used, offering price(s), and date(s). Data sources include: REIN/MLS/Tax Records. Per MLS/Tax Records the subject property has not been sold or listed in the past year.

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ | Date of Contract | Is the property seller the owner of public record? [ ] Yes [ ] No | Data Source(s)
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | | One-Unit Housing Trends | | | | One-Unit Housing | | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban | [X] Suburban | [ ] Rural | Property Values | [ ] Increasing | [X] Stable | [ ] Declining | PRICE $(000) | | AGE (yrs) | One-Unit | 75 % |
| Built-Up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | Demand/Supply | [ ] Shortage | [X] In Balance | [ ] Over Supply | 110 | Low | 1 | 2-4 Unit | 2.5 % |
| Growth | [ ] Rapid | [X] Stable | [ ] Slow | Marketing Time | [ ] Under 3 mths | [X] 3-6 mths | [ ] Over 6 mths | 230 | High | 70 | Multi-Family | 2.5 % |
| | | | | | | | | 160 | Pred. | 60 | Commercial | 10 % |
| | | | | | | | | | | | Other Vacant | 10 % |

Neighborhood Boundaries The subject is bound by Rt. 264 to the North, Elizabeth River to the South, Rt. 64 to the East, and Rt. 13 to the West.
Neighborhood Description The subject is located in an established residential area within close proximity to schools, shopping, houses of worship and other expected suburban amenities. Major commuter routes nearby provide access to most points in the metropolitan area including employment centers. The neighborhood exhibits average maintenance patterns and marketability.
Market Conditions (including support for the above conclusions) See Attached Addendum

**SITE**

Dimensions 80 x 320 | Area 25600 sf | Shape Regular | View N;Wtr;
Specific Zoning Classification R-6 | Zoning Description Single Family Residence
Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)
Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe. See Attached Addendum

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | [ ] | Water | [X] | [ ] | Street Pavement | [X] | [ ] |
| Gas | [X] | [ ] | Sanitary Sewer | [X] | [ ] | Alley None | [ ] | [ ] |

FEMA Special Flood Hazard Area [ ] Yes [X] No | FEMA Flood Zone X | FEMA Map # 5101040180F | FEMA Map Date 09/02/2009
Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe.
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe. The appraiser did not check the land records for recorded easements, as these types of documents are not readily available. The appraiser has reported only apparent easements, encroachments, and other apparent adverse conditions for the purpose of this appraisal. The appraiser also recommends a qualified professional (surveyor and/or EPA consultant) for a complete and accurate description of any factors that may have been unforeseen at the time of inspection.

**IMPROVEMENTS**

| GENERAL DESCRIPTION | | FOUNDATION | | EXTERIOR DESCRIPTION materials/condition | | INTERIOR materials/condition | |
|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | | [ ] Concrete Slab [X] Crawl Space | | Foundation Walls | Cinderblock/Avg. | Floors | Carpet/Vin./Avg. |
| # of Stories 1 | | [ ] Full Basement [ ] Partial Basement | | Exterior Walls | Vinyl/Avg. | Walls | Drywall/Avg. |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | | Basement Area | 0 sq. ft. | Roof Surface | Asph.Shingle/Avg. | Trim/Finish | Wood/Avg. |
| [X] Existing [ ] Proposed [ ] Under Const. | | Basement Finish | 0 % | Gutters & Downspouts | None | Bath Floor | Vinyl/Avg. |
| Design (Style) Ranch | | [ ] Outside Entry/Exit [ ] Sump Pump | | Window Type | Metal/Avg. | Bath Wainscot | Fiberglass/Avg. |
| Year Built 1955 | | Evidence of [ ] Infestation | | Storm Sash/Insulated | None | Car Storage [ ] None | |
| Effective Age (Yrs) 15 | | [ ] Dampness [ ] Settlement | | Screens | Metal/Avg. | [X] Driveway # of Cars 2 | |
| Attic | [ ] None | Heating [X] FWA [ ] HWBB [ ] Radiant | | Amenities | [ ] WoodStove(s) # 0 | Driveway Surface Paved | |
| [ ] Drop Stair | [ ] Stairs | [ ] Other Fuel Gas | | [ ] Fireplace(s) # 0 | [ ] Fence None | [ ] Garage # of Cars 0 | |
| [ ] Floor | [X] Scuttle | Cooling [X] Central Air Conditioning | | [X] Patio/Deck Deck | [X] Porch Covered | [ ] Carport # of Cars 0 | |
| [ ] Finished | [ ] Heated | [ ] Individual [ ] Other | | [ ] Pool None | [X] Other 2 Sheds | [ ] Att. [ ] Det. [ ] Built-in | |

Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [ ] Disposal [X] Microwave [X] Washer/Dryer [ ] Other (describe)
Finished area above grade contains: 7 Rooms | 3 Bedrooms | 2.0 Bath(s) | 1,217 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.). Typical features for the neighborhood and the area.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). C3;No updates in the prior 15 years; All of the utilities were turned on, and in proper working condition at the time of the inspection (including the testing for hot water). The garage of the subject property appeared to have been converted prior to the effective date of this appraisal. The work was performed in a workmanlike manner, however, it would not be easily converted back into a garage. The converted space did have HVAC tied in from the main system, therefore, the appraiser did include it in the overall GLA for the purpose of this appraisal. <Continued in addendum>

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe. Lead based paint hazards "could" exist in any home built before January 1, 1978. Correction is required to all defective painted surfaces if they exist. The appraiser is unaware if lead based paint exists, however, the warning was noted due to the age of the subject property. A lead based paint inspection is recommended.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe.

LOT SIZE - 80'x320' - USED IN THIS APPRAISAL
ACTUAL = 80'x468' ≈ 57440SF

# Uniform Residential Appraisal Report

File No. 69649288

There are 4 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 139,900 to $ 210,000 .
There are 8 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 115,000 to $ 217,500 .

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 120 KIDD BLVD NORFOLK, VA 23502-5214 | 148 Kidd Boulevard Norfolk, VA 23502 | | 5921 Jerry Road Norfolk, VA 23502 | | 300 Pefley Drive Norfolk, VA 23502 | |
| Proximity to Subject | | 0.11 miles SW | | 0.27 miles NW | | 0.54 miles SW | |
| Sale Price | $ | | $ 141,500 | | $ 130,000 | | $ 140,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 93.77 sq. ft. | | $ 112.85 sq. ft. | | $ 109.63 sq. ft. | |
| Data Source(s) | | MLS REIN #1434199;DOM 25 | | MLS REIN #1410560;DOM 105 | | MLS REIN #1421565;DOM 31 | |
| Verification Source(s) | | Tax ID#36280100 | | Tax ID#08835900 | | Tax ID#14785700 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth Cash;0 | | ArmLth Conv;0 | | ArmLth Cash;0 | |
| Date of Sale/Time | | s09/14;c08/14 | | s07/14;c06/14 | | s06/14;c06/14 | |
| Location | N;WtrFr; | N;WtrFr; | | N;Res; | 5,000 | N;WtrFr; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 25600 sf | 15682 sf | 0 | 10454 sf | 0 | 13939 sf | 0 |
| View | N;Wtr; | N;Wtr; | | N;Res; | 0 | B;Wtr; | -5,000 |
| Design (Style) | DT1;Ranch | DT1;Ranch | | DT1;Ranch | | DT1;Ranch | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 60 | 59 | 0 | 60 | | 55 | 0 |
| Condition | C3 | C4 | 5,000 | C3 | | C2 | -5,000 |
| Above Grade Room Count (Total / Bdrms / Baths) | 7 / 3 / 2.0 | 6 / 3 / 1.1 | 2,000 | 7 / 3 / 1.0 | 4,000 | 6 / 3 / 1.0 | 4,000 |
| Gross Living Area | 1,217 sq. ft. | 1,509 sq. ft. | -8,760 | 1,152 sq. ft. | 1,950 | 1,277 sq. ft. | -1,800 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FWA/Gas/C/Air | FWA/Oil/C/Air | 0 | FWA/Oil/C/Air | 0 | FWA/Gas/C/Air | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2dw | 1ga2gd2dw | -12,000 | 2dw | | 2dw | |
| Porch/Patio/Deck | Porch/Deck | Porch/Patio | 1,500 | Porch | 2,500 | Porch/Deck | |
| Fireplaces | 0 F/P | 1 F/P | -500 | 0 F/P | | 1 F/P | -500 |
| Fence/Shed/Pool | 2 Sheds | Fence/Pool | -8,000 | Fence/Shed | -1,000 | Fence | -1,000 |
| Misc. Upgrades | Typical | Typical | | Typical | | Kitchen Updated | -5,000 |
| Net Adjustment (Total) | | [ ] + [X] - | $ 20,760 | [X] + [ ] - | $ 12,450 | [ ] + [X] - | $ 14,300 |
| Adjusted Sale Price of Comparables | | Net Adj. -14.7% Gross Adj. 26.7% | $ 120,740 | Net Adj. 9.6% Gross Adj. 11.1% | $ 142,450 | Net Adj. -10.2% Gross Adj. 15.9% | $ 125,700 |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) REIN/MLS
My research [X] did [ ] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) REIN/MLS

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | 07/28/2014 | | 06/23/2014 |
| Price of Prior Sale/Transfer | | $172,651 | | $0 |
| Data Source(s) | Tax Records/REIN | Tax Records/REIN | Tax Records/REIN | Tax Records/REIN |
| Effective Date of Data Source(s) | 04/11/2015 | 04/11/2015 | 04/11/2015 | 04/11/2015 |

Analysis of prior sale or transfer history of the subject property and comparable sales Per public record no sale or transfer of subject within the last 3 years, per MLS no listing of subject within the last 3 years. Comparable #1 had a prior transfer on 07/28/2014, for $172,651. The prior transaction was a foreclosure in which the Veteran's Administration took possession of the property, and the most recent sale was an arm's length transaction, which led to the decrease that is reflected in this appraisal, and is now in line with the subject's current market value. Comparable #3 was transferred on 06/23/2014 with a Gift Deed, for an undisclosed nominal amout as recorded in document # 12381. Comparable #6 was sold on 01/06/2015 for $139,091 in a Foreclosure Deed.

Summary of Sales Comparison Approach. Sales recited are from subject's area and are in acceptable proximity to the subject. They are the most recent and most comparable found. No adjustment was warranted for sales/financing as all types of financing are readily available. Age adjustments are not warranted as all comparables and the subject have been built around the same time frame or have recently been renovated. GLA has been adjusted for based on extracted market data. Variances in amenities have been adjusted for based on the opinion of the appraiser due to lack of comparable sales information for paired sales analysis. All value affecting dissimilarities were adjusted according to market reaction. Secondary market standards for net and gross adjustment percentages were met. The indicated range of values brackets the value of the subject. 0=No adjustment could be supported.

Indicated Value by Sales Comparison Approach $ 132,000

Indicated Value by: Sales Comparison Approach $ 132,000 Cost Approach (if developed) $ 133,800 Income Approach (if developed) $ 0

Market actions of buyers and sellers are best analyzed by the Sales Comparison Approach. That approach is given greatest weight in the reconciliation.

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: None. Some photographs may be reproduced on MLS listings.

**Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 132,000 as of 04/12/2015 , which is the date of inspection and the effective date of this appraisal.**

Freddie Mac Form 70 March 2005 UAD Version 9/2011 Produced using ACI software, 800.234.8727 www.aciweb.com Page 2 of 6 Fannie Mae Form 1004 March 2005 1004_05UAD 07222014

First Choice Appraisal Co.

# Notice of Action Taken and Statement of Reasons

**Applicant Name and Address**
Paul R Davis, Jr

120 KIDD BLVD, NORFOLK, VA 23502

**Today's Date**
April 17, 2015

**Description of Account, Transaction or Requested Credit**
Conventional mortgage

**Property Address**
120 KIDD BLVD, NORFOLK, VA 23502

We have carefully considered the credit application and sincerely regret that we are unable to approve the application at this time for the reason(s) indicated below. The decisions reflected below apply to applicant listed above unless otherwise noted.

- Value or type of collateral not sufficient

If you have any questions regarding this notice, you should contact:

**Creditor's Name:** Wells Fargo Bank, N.A.
**Phone:** 800-258-6649
**Creditor's Address:** 800 WALNUT ST, 9TH FLOOR, DES MOINES, IA 50309-3605

Our credit decision was based in whole or in part on information obtained from an affiliate or from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request to us, no later than 60 days after you receive this notice, for disclosure of the nature of this information.

Thank you for considering us for your financing needs. Although we cannot be of service to you right now, you have our promise of immediate attention any time you choose to call on us for future assistance.

Notice: The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is:

Bureau of Consumer Financial Protection
1700 G Street NW
Washington, DC 20006



# Notice of Action Taken and Statement of Reasons

**Applicant Name and Address**
Patricia Ann Davis

120 KIDD BLVD, NORFOLK, VA 23502

**Today's Date**
April 17, 2015

**Description of Account, Transaction or Requested Credit**
Conventional mortgage

**Property Address**
120 KIDD BLVD, NORFOLK, VA 23502

We have carefully considered the credit application and sincerely regret that we are unable to approve the application at this time for the reason(s) indicated below. The decisions reflected below apply to applicant listed above unless otherwise noted.

- Value or type of collateral not sufficient

If you have any questions regarding this notice, you should contact:

**Creditor's Name:** Wells Fargo Bank, N.A.
**Phone:** 800-258-6649
**Creditor's Address:** 800 WALNUT ST, 9TH FLOOR, DES MOINES, IA 50309-3605

Our credit decision was based in whole or in part on information obtained from an affiliate or from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request to us, no later than 60 days after you receive this notice, for disclosure of the nature of this information.

Thank you for considering us for your financing needs. Although we cannot be of service to you right now, you have our promise of immediate attention any time you choose to call on us for future assistance.

Notice: The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is:

Bureau of Consumer Financial Protection
1700 G Street NW
Washington, DC 20006

*440225415201*



S30°42'40"W 80.00'
Nail Found
Pin Found
Fr. Shed 10.2'x10.2'
Fr. Shed 12.2'x12.2'
Unlabeled Line As Scaled From Recorded Plat
160.00'
ZONE "A4"
3
2
4
ZONE "B"
Approx. Flood Zone Line As Scaled From F.I.R.M.
Wood Deck
38.4'
1 Sty. Fr. #120
15.8'
37.7'
12.7'
16.4'
20.4'
24.4'
S59°17'20"E
N59°17'20"W
ZONE "C"
Conc.
36.3'
CURLEW DRIVE
R=10'
406.31'
Pin Found
N30°42'40"E 80.00'
KIDD BOULEVARD
Physical Survey Of
LOT 3, BLOCK A, RIVER FORREST SHORES
Norfolk, Virginia
For
PAUL R. DAVIS, JR. & PATRICIA ANN DAVIS
BUILDING ELEVATION INFORMATION
FLOOR ELEVATION AT FRONT ENTR. = 12.29
GARAGE FLOOR ELEV. = N/A
LOWEST GRADE ADJACENT TO BLDG. = 10.2
NOTES :
1) THIS SURVEY WAS PERFORMED WITHOUT THE BENEFIT OF A TITLE REPORT AND MAY NOT SHOW ANY / ALL EASEMENTS OR RESTRICTIONS THAT MAY AFFECT SAID PROPERTY AS SHOWN.
2) LEE S. ROOD, P.C. IS NOT A PARTY IN DETERMINING THE REQUIREMENTS FOR FLOOD INSURANCE ON THE PROPERTY SHOWN HEREON. THIS SURVEY DOES NOT IMPLY THAT THIS PROPERTY WILL OR WILL NOT BE SUBJECT TO FLOODING. FOR FURTHER INFORMATION, CONTACT THE LOCAL COMMUNITY FLOOD OFFICIAL.
3) ELEVATIONS SHOWN HEREON REFER TO N.G.V.D. OF 1929.
LEE S. ROOD, P.C.
Land Surveyors
5737 BARTEE STREET
NORFOLK, VIRGINIA 23502
Ph. (757) 466-1111
NOTE:
AS SHOWN ON THE FLOOD INSURANCE RATE MAP, THIS PROPERTY APPEARS TO FALL IN :
FLOOD ZONE (S) "A4" "B" "C"
COMMUNITY NO. 510104
PANEL NO. 4D DATED: 4/17/84
BASE FLOOD ELEVATION = 8.5
SCALE: 1"=30'
DATE: 6/2/99
REFERENCE: NORFOLK M.B.32, PG.5,6
F.B. T-39 Pg. 35A
51.091-99
F.B.745, PG.57

THIS IS TO CERTIFY THAT I ON JUNE 2, 1999 SURVEYED THE PROPERTY SHOWN ON THIS PLAT AND THAT THE TITLE LINES AND THE WALLS OF THE BUILDINGS ARE SHOWN ON THIS PLAT. THE BUILDINGS STAND STRICTLY WITHIN THE TITLE LINES AND THERE ARE NO ENCROACHMENTS OF OTHER BUILDINGS ON THE PROPERTY EXCEPT AS SHOWN.

SIGNED :

COMMONWEALTH OF VIRGINIA
ARTHUR L. ROOD
No 1543
6/2/99
LAND SURVEYOR

Approx. Edge Of Marsh @ Time Of Survey

200' N.T.S.
150' N.T.S.
S30°42'40"W 80.00'
Nail Found
Pin Found
0.9'
0.8'
Fr. Shed 10.2'x10.2'
Unlabeled Line As Scaled From Recorded Plat
160.00'
Fr. Shed 12.2'x12.2'
ZONE "A4"
3
160.00'
4
2
Approx. Flood Zone Line As Scaled From F.I.R.M.
ZONE "B"
Wood Deck
0.4'
S59°17'20"E
38.4'
24.4'
1 Sty. Fr. #120
7.4'
15.8'
20.4'
37.7'
12.7'
4'
16.4'
0.4'
N59°17'20"W
ZONE "C"
36.3'
Conc.
CURLEW DRIVE
R=10'
Pin Found
406.31'
N30°42'40"E 80.00'
Pin Found

KIDD BOULEVARD

Physical Survey
Of
LOT 3, BLOCK A, RIVER FORREST SHORES
Norfolk, Virginia
For
PAUL R. DAVIS, JR. & PATRICIA ANN DAVIS

**BUILDING ELEVATION INFORMATION**

FLOOR ELEVATION AT FRONT ENTR. = 12.29 GARAGE FLOOR ELEV. = N/A LOWEST GRADE ADJACENT TO BLDG. = 10.2

**NOTES :**

1) THIS SURVEY WAS PERFORMED WITHOUT THE BENEFIT OF A TITLE REPORT AND MAY NOT SHOW ANY / ALL EASEMENTS OR RESTRICTIONS THAT MAY AFFECT SAID PROPERTY AS SHOWN.

2) LEE S. ROOD, P.C. IS NOT A PARTY IN DETERMINING THE REQUIREMENTS FOR FLOOD ...

LEE S. ROOD, P.C.
Land Surveyors

**NOTE:**
AS SHOWN ON THE FLOOD INSURANCE RATE MAP, THIS PROPERTY APPEARS TO FALL IN ...



INTERSTATE DIVIDED - FLAT

NOTE:
These plans, Project 0064-122-103 R/W 201 are to be used for Right-of-Way purposes only.

For Construction, see plans, Project 0064-122-103-C-501 marked "For Construction Only"

LIMITED ACCESS HIGHWAY By resolution of Highway Commission dated Oct. 4, 1956

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2 | VA. | 64 | [illegible] | 64 | 0064-122-103-R/W201 | 501-1 | 26 |

COMMONWEALTH OF VIRGINIA
DEPARTMENT OF HIGHWAYS

# PLAN AND PROFILE OF PROPOSED
# STATE HIGHWAY

## CITY OF NORFOLK

FROM 0.180 MI. SOUTH OF RTE. 58 (VIRGINIA BEACH BLVD.)
TO 0.396 MI. SOUTH OF NORFOLK SOUTHERN RAILWAY
(INTERCHANGE RTES. 64 AND 264)

## INDEX OF SHEETS

| SHEET NO. | |
|---|---|
| 501-1 | TITLE SHEET |
| 501-1A | COMPOSITE LAYOUT, INTERCHANGE "C" & "D" |
| 501-2A, 2B, 2C, 2D, 2E | TYPICAL SECTION SHEETS |
| 501-3 | PLAN - RTE. 64 ROADWAYS, STA. 597+00 TO STA. 612+00 |
| 501-4 | PLAN - RTE. 64 ROADWAYS, STA. 612+00 TO STA. [illegible]+00 |
| 501-5, 5A | PLAN - RTE. 64 ROADWAYS, STA. 625+00 TO STA. 635+00 |
| 501-6, 6A | PLAN - RTE. 64 ROADWAYS, STA. 635+00 TO STA. 647+50 |
| 501-7 | PLAN - RTE. 64 ROADWAYS, STA. 647+50 TO STA. 659+96 |
| 501-8 | PLAN - RTE. 64 ROADWAYS, STA. 659+96 TO STA. 671+00 |
| 501-9 | PLAN - RTE. 264 ROADWAYS, STA. [illegible]+00 TO STA. 323+00 E.B.L., STA. 313+02 TO STA. 323+50 W.B.L. |
| 501-10 | PLAN - RTE. 264 ROADWAYS, STA. 340+50 TO STA. 330+00 |
| 501-11 | PLAN - COMPOSITE LAYOUT RTE. 64 INTERCHANGE "D" |
| 501-12, 13, 14, 15 | PROFILES - RTE. 64 ROADWAYS, CURLEW DR. & EDISON AVE. |
| 501-16, 17 | PROFILES - RTE. 264 E.B.L. |
| 501-18, 19 | PROFILES - ROADWAY "A", HARGROVE ST. & RONALD RD. |
| 501-20, 21 | PROFILES - RTE. 264 W.B.L. |
| 501-22, 23 | PROFILES - ROADWAY "B", CHAMBERS ST., YODER AVE. & BARTEE TURNAROUND |
| 501-24, 25, 26, 27, 28, 29 | PROFILES - RAMPS D-1, D-2, D-3, D-4, D-5, D-6, D-7, D-8, D-9 |

NOTE: This project is to be constructed in accordance with the Virginia Department of Highways Road & Bridge Specifications dated April 1, 1958 and Road Design and Standards dated November 1, 1953, revised November 1, 1958 and including all subsequent revisions.
All curves are to be superelevated in accordance with the General Notes and as shown on the plans. Standard TC-2 does not apply unless so noted on the plans.

## CONVENTIONAL SIGNS

| | |
|---|---|
| STATE LINE | LAND OR MONUMENT |
| COUNTY LINE | |
| CITY, TOWN OR VILLAGE | CULVERTS |
| RIGHT OF WAY LINE | DROP INLET |
| FENCE LINE | TROLLEY POLES |
| | POWER POLES |
| | TELEPHONE OR TELEGRAPH POLES |
| TRAVEL WAY | |
| GUARD RAIL | |
| RETAINING WALL | |
| RAILROADS | GROUND ELEVATION |
| BASE OR SURVEY LINE | GRADE ELEVATION |

| STATE PROJ. NOS. | CONTRACT NO. | SECTION | FEDERAL AID PROJECT NOS. | EQUALITIES FEET | LENGTH FEET | LENGTH MILES | LENGTH FEET | LENGTH MILES | TYPE PROJECT | DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 0064-122-103 | | R/W-201 | [illegible] | NONE | [illegible] | [illegible] | | | R/W | FROM: 0.180 MI. SOUTH OF VIRGINIA BEACH BLVD. TO: 0.396 MI. SOUTH OF NORFOLK SOUTHERN RAILWAY (R/W) |
| | | C-501 | | NONE | [illegible] | [illegible] | | | CST | FROM: 0.0[illegible] MI. SOUTH OF VIRGINIA BEACH BLVD. TO: 0.396 MI. SOUTH OF NORFOLK SOUTHERN RAILWAY (CONST.) |

NOTE: Length based on ℄ Med. & E.B.L. ℄

| PLANS REVISED | | | |
|---|---|---|---|
| SHEET NO. | DATE | SHEET NO. | DATE |
| [illegible] | [illegible] | [illegible] | [illegible] |

RECOMMENDED FOR APPROVAL FOR RIGHT OF WAY ACQUISITION

| | |
|---|---|
| [illegible] DATE | [signature] |
| [illegible] DATE | [signature] |
| 6-28-63 DATE | [signature] |
| [illegible] DATE | [signature] |
| [illegible] DATE | [signature] |

APPROVED FOR RIGHT OF WAY ACQUISITION

| | |
|---|---|
| 6/[illegible]/63 DATE | [signature] |

CONSULTING ENGINEERS - LUBLIN McGAUGHY & ASSOCIATES - NORFOLK, VIRGINIA

A10140

A 1 0 1 4 0 0 0 2

LIMITED ACCESS HIGHWAY By resolution of Highway Commission dated OCT. 4, 1956

| PUB. ROAD REGION | STATE | FEDERAL AID ROUTE | FEDERAL AID PROJECT | STATE ROUTE | STATE PROJECT | SHEET NO. | TOTAL SHEETS |
|---|---|---|---|---|---|---|---|
| 2 | VA. | 64 | I-64-3(22)? | 64 | 0064-122-103-R/W 201 | 501-1A | 36 |

REVISED 7-20-66 5-25-67 2-25-64

# COMPOSITE LAYOUT - INTERCHANGES "C" & "D"

SCALE 0 300' 600'

10140

26-

(2)

1A



LIMITED ACCESS HIGHWAY
TYPICAL SECTION NO. 1
INTERSTATE NO. 64
EAST BOUND LANE
WEST BOUND LANE
TYPICAL SECTION NO. 2
INTERSTATE NO. 64
TYPICAL SECTION NO. 3
INTERSTATE NO. 64
EAST BOUND LANE
WEST BOUND LANE

LIMITED ACCESS HIGHWAY
VA.
TYPICAL SECTION NO. 4
INTERSTATE NO. 264
ROADWAY 'A'
EAST BOUND LANE
TYPICAL SECTION NO. 5
INTERSTATE NO. 264
ROADWAY 'A'
EAST BOUND LANE
DETAIL 'E'
RAMP D-4
EAST BOUND LANE
DETAIL 'F'
SECTIONS THRU APPROACH - END TREATMENT
INTERSTATE NO. 264
DETAIL 'A'
CURBED RIBBED CONCRETE PAVEMENT
DETAIL 'B'
CURBED PAVED SHOULDER
DETAIL 'C'
SECTION THRU RIBBED CONCRETE PAVEMENT
DETAIL 'D'
SECTION THRU DECELERATION, ACCELERATION, WEAVING LANES AND TAPERS
26-7
110140



LIMITED ACCESS HIGHWAY
Commission dated OCT. 4, 1956
STATE VA.
FEDERAL AID
I-64-5(22)255
0064-122-105-R/W 201
501. 2C
36
TYPICAL SECTION NO. 6
INTERSTATE NO. 264
Sta. 316+00.00 to Sta. 323+12.50 W.B.L.
ROADWAY "B"
WEST BOUND LANE
TYPICAL SECTION NO. 7
INTERSTATE NO. 264
ROADWAY "B"
WEST BOUND LANE
See Typical Section No 4
TYPICAL SECTION NO. 8
INTERSTATE NO. 264
ROADWAY "B"
WEST BOUND LANE
See Typical Section No 4
DETAIL "G"
DETAIL H
SECTIONS THRU APPROACH - END TREATMENT
INTERSTATE NO. 264
Median
Shoulder
Paved
Profile Grade Line
Ditch
Prop R/W Line
4' Rounding
A10140







LIMITED ACCESS HIGHWAY
OCT. 4, 1956
1-20-66
2
VA.
64
I-64-1(28)256
64
0064-122-106. R/W 201
501. 20
36
TYPICAL SECTION NO. 9
RAMPS - HIGH SIDE LEFT OF TRAFFIC
Use when superelevation rate is over 0.05 ft/ft
TYPICAL SECTION NO. 11
RAMPS - HIGH SIDE RIGHT OF TRAFFIC
Use when superelevation rate is over 0.05 ft/ft.
TYPICAL SECTION NO. 10
RAMPS - HIGH SIDE LEFT OF TRAFFIC
Use when superelevation rate is 0.05 ft/ft or less
TYPICAL SECTION NO. 12
RAMPS - HIGH SIDE RIGHT OF TRAFFIC
Use when superelevation rate is 0.05 ft/ft or less
TYPICAL FILL SECTION
TYPICAL CUT SECTION
RAMP D-4 & D-1
NOTE: See Detail 'X' for Ramp D-4 Shoulder treatment when superelevation rate is over 0.05 ft/ft.
TYPICAL SECTION NO. 13
RAMP D-4
At exit from East Bound Lane use Main Line details for Ribbed concrete pavement, widening, and curbed paved Shoulder.
DETAIL 'X'
RAMP D-4
Use when superelevation rate is over 0.05 ft/ft.
A10140
26-7-1
20

A10140002

LIMITED ACCESS HIGHWAY
TYPICAL SECTION NO. 14 STREET RELOCATIONS
TYPICAL SECTION NO. 15 CURLEW DRIVE
RAMP D-2 EXIT NOSE DETAIL
CONNECTION FOR STREET INTERSECTIONS
PRIVATE ENTRANCE
CURB & GUTTER
PLAIN CURB
TYPICAL EXIT RAMP NOSE DETAIL
TYPICAL ENTRANCE RAMP NOSE DETAIL
CITY OF NORFOLK
A10140

A 1 0 1 4 0 0 0 8

POSTED

RIGHT OF WAY DATA SHEET

| PARCEL NO. | GRANTOR | INSTRUMENT | DATE | DEED BOOK | DEED PAGE | PLAT BOOK | PLAT PAGE | SHEET NO. | FEE | PERM. EASMT. | TEMP. EASMT. | UTIL. EASMT. | LIMITED ACCESS | A.A.G. | COND. FILED | COND. END | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

A 1 0 1 4 0 0 0 9

POSTED

RIGHT OF WAY DATA SHEET

| RIGHT OF WAY SHEET | |
|---|---|
| ROUTE: 44 | PROJECT: 0064-122-103-RW201 |
| COUNTY: | |
| COMPILED BY: R. O. Collins | DATE: 5-9-66 |
| REVISED BY: | DATE: |
| REVISED BY: | DATE: |
| REVISED BY: | DATE: |

| PARCEL NO. | GRANTOR | INSTRUMENT | DATE | DEED BOOK | DEED PAGE | PLAT BOOK | PLAT PAGE | SHEET NO. | FEE | PERM. ESMT. | TEMP. ESMT. | UTIL. ESMT. | LIMITED ACCESS | A.A.C. | COND. HELD | COND. PAID | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Seawell, Hattie A. Estate | DEED | 3-2-64 | 1090 | 576 | 5 | 46 | | X | | | | | | | | |
| | Pine, Louise B. Et Al | Certificate of Deposit | 6-8-64 | 980 | 173 | | | 7 | X | | | | | | 9-30-65 | 7-28-66 | |
| | Harwood, Charles A. and Harwood, Ozelle J. | Deed | 3-6-64 | 977 | 201 | | | 7 | X | | | | | | | | |
| | Seawell, Harry A. and Seawell, J. M. | DEED | 3-3-64 | 1095 | 576 | 5 | 46 | | X | | | | | | | | |
| | Seawell, Harry A. Estate | DEED | | | | | | 9 | X | | | | | | | | |
| | Glenrock, Alpin League Corporation | Deed | 4-15-64 | 981 | 43 | | | 9 | X | | | | | | | | |
| | Princess Anne and Norfolk Land Company Incorporated | Deed | 5-28-64 | 986 | 334 | | | 9 | X | | | | | | | | |
| | Seawell, William A. | Deed | 5-7-64 | 980 | 124 | | | 7 | X | | | | | | | | |
| | Dozier, Nelson E. | Deed | 4-10-64 | 984 | 491 | | | 9 | X | | | | X | | | | |
| | Price, J. Ella | Deed | 4-24-64 | 981 | 472 | | | 9 | X | | | | | | | | |
| | Hatfield, Joseph H. Sr. | Deed | 9-19-64 | 1011 | 611 | | | 9 | X | | | | | | | | |
| | Albertson, Thelma H. | Deed | 3-20-64 | 967 | 116 | | | 9 | X | | | | X | | | | |
| | North, Marcellus D. Sr. | Deed | 4-3-64 | 983 | 204 | | | 9 | X | | | | X | | | | |
| | Princess Anne and Norfolk Land Company Incorporated | Deed | 5-28-64 | 986 | 278 | | | 9 | X | | | | | | | | |
| | Hassell, Thelma G. | Deed | 3-10-64 | 981 | 41 | | | 7 | X | | | | X | | | | |
| | Not Used | | | | | | | | X | | | | | | | | |
| | Lovelace, Lucy T. | Deed | 9-14-64 | 1008 | 232 | | | 10 | X | | | | | | | | |
| | OWNER UNKNOWN | | | | | | | | | | | | | | | | PENDING |
| | Watson, Evia E. | Deed | 6-15-64 | 993 | 126 | | | 9 | X | | | | | | | | |
| | Ewell, Lucille C. Jones | Deed | 4-8-64 | 982 | 383 | | | 9 | X | | | | | | | | |
| | Wilson, Charles T. | Deed | 4-9-64 | 981 | 371 | | | 7 | X | | | | X | | | | |
| | Fowler, Austin S. and Fowler, Elizabeth Sykes | Deed | 4-24-64 | 983 | 137 | | | 9 | X | | | | X | | | | |
| | Capps, Eugenia W. | Deed | 4-10-64 | 993 | 480 | | | 7 | X | | | | | | | | |
| | Davis, Paul R. Sr. | DEED | 4-10-64 | 1097 | 139 | 4 | 274 | 7 | X | | | | | | | | |

| PLAN NO. | PROJECT | SHEET | SHEET NO. |
|---|---|---|---|
| A10140 | 0064-122-103RW201 | (9) | 2RW |

LIMITED ACCESS HIGHWAY
VA.
600
605
610
A.G. BACKUS
VIRGINIA BEACH BLVD.
HOGGARD ROAD
BARRY-ROBINSON HOME FOR BOYS
Total taking Area - 28.148 Ac.
VIRGINIA DEPARTMENT OF HIGHWAYS
WEST BOUND LANE
EAST BOUND LANE
Limits of Grading
Prop. Fence
NORFOLK DRIVE-IN THEATRES, INC.
SCALE
A10140
26-7-1

LIMITED ACCESS HIGHWAY
CURVE DATA
615
620
625
BARRY-ROBINSON HOME FOR BOYS
WEST BOUND LANE
EAST BOUND LANE
RAMP D-4
RAMP D-1
YODER AVE
ALDRIDGE ST
BENTON ST
FINNEY ST
SEE SHEET NO. 5
A10140

A 1 0 1 4 0 0 1 2

LIMITED ACCESS HIGHWAY
EAST BOUND LANE RTE 64
YODER AVE
RAMP D-1
RAMP D-2
ROADWAY "B"
WEST BOUND LANE
LUCAS AVE
CURVE DATA
JOHN J. SULLIVAN &
ALBERTINE E. SULLIVAN
330
325
630
635
SEE SHEET NO. 9
SCALE

CHAMBERS ST.
LUCAS AVE.
EAST BOUND LANE RTE. 264
ROADWAY "A"
HARGROVE AVE.
RAMP D-9
RAMP D-2
RAMP D-8
EAST BOUND LANE RTE. 64
ADDERLEY ST.
ROLLESTON ROAD
RONALD ROAD
BEACON HOLDING CORP.
JOHN H. WOLFORD
LUCY E. WOLFORD
WILLIAM GLOVER
HELEN M. GLOVER
SEE SHEET NO. 5
SEE SHEET NO. 7
635
640
645
330
LIMITED ACCESS HIGHWAY
A10140

LIMITED ACCESS HIGHWAY
VA.
SEE SHEET NO. 10
SEE SHEET NO. 8
635
640
645
340
335
CURVE DATA - RAMP D-7
RAMP D-6
RAMP D-7
EAST BOUND LANE RTE 364
WEST BOUND LANE
DONALD ROAD
BEACON HOLDING CORP
CARRIE S.
R.E. TOWNSEND
T.A. WEAVER & MALINDA W. WEAVER
Marsh
SCALE

A 1 0 1 4 0 0 1 5

CURLEW DRIVE
CURLEW DRIVE
CURLEW DRIVE
CURLEW DRIVE
FARMVILLE AVE.
EAST BOUND LANE
WEST BOUND LANE
NEWARK AVE.
EDISON AVE.
IVOR AVE.
KIDD BLVD.
FARMVILLE AVE.
DORIS BACKUS BROCK, ET ALS
THELMA HASSELL
SEE SHEET NO 6
SEE SHEET NO 6A
SEE SHEET NO 5
650
655
LIMITED ACCESS HIGHWAY
VA.
CURVE DATA
A10140

LIMITED ACCESS HIGHWAY
660
665
670
WEST BOUND LANE
EAST BOUND LANE
Prop. Fence
Fee R/W
Limits of Grading
Marsh
Woods
DORIS BACKUS BROCK ETALS
SCALE
A10140

BARTEE ST.
CHAMBERS ST.
WEST BOUND LANE
ROADWAY "B"
EAST BOUND LANE
ROADWAY "A"
RAMP D-9
HARGROVE AVE.
GLENROCK ROAD
HICKS AVE.
HONAKER AVE.
ADDERLEY STREET
CURVE DATA
LIMITED ACCESS HIGHWAY
A10140
315
320

A 1 0 1 4 0 0 1 8

LIMITED ACCESS HIGHWAY
VA.
350
345
CURVE DATA
KEMPSVILLE
ROAD
RONALD
NORMAN BERLIN
EDWARD MARSHALL
R.E. TOWNSEND
CLARENCE H. BLAKEMORE ET AL
BARRY - ROBINSON HOME FOR BOYS
RAMP D-5
ROADWAY
WEST BOUND LANE
ROAD
EAST BOUND LANE
REVISED
SEE SHEET NO. 84
SCALE
A10140

LIMITED ACCESS HIGHWAY
VA.
BEGIN PROJECT 0064-122-103-C-501
WEST BOUND LANE
ROUTE 64
EAST BOUND LANE
KEMPSVILLE ROAD
ROUTE 264
RAMP D-1
RAMP D-2
RAMP D-3
RAMP D-4
RAMP D-5
RAMP D-6
RAMP D-7
RAMP D-8
RAMP D-9
YODER AVE.
BARTEE ST.
GLENROCK ROAD
HARGROVE ST.
ROLLESTON ROAD
CURLEW DRIVE
NORFOLK & SOUTHERN R.R.
KIDD BLVD.
END PROJECT 0064-122-103-C-501
PLAN - COMPOSITE LAYOUT ROUTE 64 INTERCHANGE "D"
SCALE

A10140 020

ROUTE 64 E.B.L. - W.B.L.
Profile Grade Line - E.B.L. W.B.L.
Existing Ground Line - E.B.L.
Existing Ground Line - W.B.L.
Profile Grade Line - E.B.L.
Profile Grade Line - W.B.L.
VA.
A10140

A10140 022

ROUTE 64 E.B.L. - W.B.L.
A10140



ROUTE 64 E.B.L. + W.B.L.
CURLEW DRIVE
EDISON AVENUE EXTENSION
A-10140

A10140 024

LIMITED ACCESS HIGHWAY
VA.
Transition
Normal Section
Profile Grade Line
Existing Ground Line
ROUTE 264 - E.B.L.
ROUTE 264 - W.B.L.
A10140

















A10140 029

A10140 027
LIMITED ACCESS HIGHWAY
VA.
Transition
Normal Section
Profile Grade Line
Existing Ground Line
ROUTE 264 - ROADWAY "A"
A10140

A10140 028

LIMITED ACCESS HIGHWAY
VA.
Transition:
Profile Grade Line
RONALD ROAD
A10140

A10140 029

LIMITED ACCESS HIGHWAY
Profile Grade Line
ROUTE 664 - ROADWAY "B"
Existing Ground Line - Roadway "B"
ROUTE 664 - ROADWAY "B"
A10140

A10140 032

LIMITED ACCESS HIGHWAY
CHAMBERS ST.
BROADWAY

A10140 034

LIMITED ACCESS HIGHWAY
VA.
Profile Grade Line
Existing Ground Line
RAMP D-1
RAMP D-2
RAMP D-1
RAMP D-2 0+00 TO 11+00



A10140

A1 0140 037
LIMITED ACCESS HIGHWAY
VA.
Profile Grade Line
Transition
Normal Section
Normal Section Width
RAMP D-8
RAMP D-9

A10140 038

LIMITED ACCESS HIGHWAY
VA.
Profile Grade Line
RAMP D-6
Scale: 1" = 50' Hor. 1" = 5' Vert.
RAMP D-7
Scale: 1" = 50' Hor. 1" = 5' Vert.
Existing Ground Line - Ramp D-7
Existing Ground Line - Ramp D-6
Transition
Normal Section
Channel Change
A10140





#REF001 #LEV001 #REF002 #LEV002 #REF003 #LEV003 #REF004 #LEV004 #REF005 #LEV005 #REF006 #LEV006

LIMITED ACCESS HIGHWAY — By Resolution of Commonwealth Transportation Board dated October 15, 2014

| STATE | FEDERAL AID PROJECT | ROUTE | STATE PROJECT | SHEET NO. |
|---|---|---|---|---|
| VA. | NH-264-6( ) (SEE TABULATION BELOW FOR SECTION NUMBERS) | 264 | (FO) 0264-122-108 (SEE TABULATION BELOW FOR SECTION NUMBERS) | 1 |

FOR INDEX OF SHEETS SEE SHEET 1B

THIS PROJECT WAS DEVELOPED UTILIZING THE DEPARTMENT'S ENGINEERING DESIGN PACKAGE (GEOPAK). GEOPAK Computer Identification No. 57048

PORTIONS OF THESE PLANS CONTAIN CRITICAL INFRASTRUCTURE INFORMATION (CII). UNAUTHORIZED RELEASE OR REPRODUCTION OF THESE DOCUMENTS MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

# COMMONWEALTH OF VIRGINIA
## DEPARTMENT OF TRANSPORTATION

FHWA 534 DATA 4A104

# PLAN AND PROFILE OF PROPOSED
# STATE HIGHWAY

## CITY OF NORFOLK
## RTE 264 - INTERCHANGE IMPROVEMENTS - 64 WB RAMP TO 264 EB
## FROM: 0.757 MILE SOUTH OF CURLEW DRIVE
## TO: 0.832 MILE EAST OF WBL I-64

| FUNCTIONAL CLASSIFICATION AND TRAFFIC DATA | |
|---|---|
| URBAN INTERSTATE - DIVIDED - FLAT - 70 MPH MIN. DES. SPEED | |
| ** I-64 WBL | Fr: 0.757 MILE SOUTH OF CURLEW DRIVE To: 0.832 MILE EAST OF WBL I-64 |
| AAWDT (2015) | 75,076 |
| AAWDT (2035) | 181,000 |
| DHV | 15,840 |
| D (%) (design hour) | 60 |
| T (%) (design hour) | 2 |
| V (MPH) | * |
| DESIGN VEHICLE | WB-67 |

* SEE PLAN AND PROFILE SHEETS FOR HORIZONTAL AND VERTICAL CURVE DESIGN SPEED.
** SEE INDEX OF SHEETS FOR FUNCTIONAL CLASSIFICATION OF OTHER ROADWAYS

SCALE 0 800 1600

THIS PROJECT IS GRANDFATHERED UNDER THE PROVISIONS OF SECTION 9VAC25-780-48 OF THE VSMP REGULATIONS ADOPTED SEPTEMBER 15,2011 AND UTILIZES THE TECHNICAL CRITERIA OF PART IIC (9VAC25-870-093 ET.SEQ) FOR DETERMINING ITS POST DEVELOPMENT STORMWATER MANAGEMENT DESIGN.

CONVENTIONAL SIGNS

STATE LINE; COUNTY LINE; CITY, TOWN OR VILLAGE; RIGHT OF WAY LINE; FENCE LINE; UNFENCED PROPERTY LINE; FENCED PROPERTY LINE; WATER LINE; SANITARY SEWER LINE; GAS LINE; ELECTRIC UNDERGROUND CABLE; TRAVELED WAY; GUARD RAIL; RETAINING WALL; RAILROADS; BASE OR SURVEY LINE

LEVEE OR EMBANKMENT; BRIDGES; CULVERTS; DROP INLET; POWER POLES; TELEPHONE OR TELEGRAPH POLES; TELEPHONE OR TELEGRAPH LINES; HEDGE; TREES; HEAVY WOODS; GROUND ELEVATION; GRADE ELEVATION

| DESCRIPTION REFERENCE |
|---|
| Intersection of WBL Interstate 64 And Edge of Pavement EBL Curlew Drive Sta.138+81.78 I-64 WBL Constr.B |

| DESCRIPTION REFERENCE |
|---|
| Intersection of EB CD Interstate 264 Interstate 64 WB Sta.18+41.13 I-264 EB CD Constr.B |

END PE-107 STA.62+35.55
END RW-204 STA.45+28.76
END C-508 STA.46+00.00

City of Norfolk Population 242,803 (2010 Census) — Project Lengths are based on Multiple Baselines

| STATE PROJECT NO. | SECTION | FEDERAL AID PROJECT NO. | TYPE CODE | UPC NO. | EQUALITIES FEET | LENGTH INCLUDING BRIDGE(S) FEET | LENGTH INCLUDING BRIDGE(S) MILES | LENGTH EXCLUDING BRIDGE(S) FEET | LENGTH EXCLUDING BRIDGE(S) MILES | BRIDGE PROJECT NO. | TYPE PROJECT | DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0264 - 122 - 108 | PE - 107 | NH-264-6(098) | | 57048 109042 | | 17,885.12 | 3.387 | 12,696.27 | 2.404 | | Prel. Engr. | Fr: 0.757 M. S. Curlew Drive To: 0.832 M. E. WBL I-64 |
| | RW - 204 | | | 57048 109042 | | 16,153.28 | 3.059 | 10,964.43 | 2.076 | | Right of Way | Fr: 0.703 M. S. Curlew Drive To: 0.609 M. E. WBL I-64 |
| | C - 508 | | 1000 | 57048 109042 | | 14,578.06 | 2.761 | 9,387.81 | 1.778 | | Construction | Fr: 0.718 M. S. Curlew Drive To: 0.522 M. E. WBL I-64 |
| | B - 602 | | X571 | 57048 | | 2,393.38 | 0.453 | | | 288-27 | Bridge | Ramp D7 Bridge over Curlew Drive and over I-264 EB CD |
| | B - 603 | | X581 | 57048 | | 1,090.50 | 0.207 | | | 288-28 | Bridge | Ramp D7 CD Bridge |
| | B - 604 | | X281 | 57048 | | 198.16 | 0.037 | | | 286-77 | Bridge | Ramp D7 Bridge over Kempsville Road |
| | B - 605 | | X271 | 57048 | | 1,508.21 | 0.286 | | | 288-29 | Bridge | I-264 EB CD Bridge over Kempsville Road |
| | B - 616 | | X271 | 57048 | | 174.00 | 0.032 | | | 182-01C | Bridge | I-264 EBL Bridge over Kempsville Road |
| | D - 604 | | X028 | 57048 | | 24.99 | 0.004 | | | | Box Culvert | Double 8' x 8' Box Culvert Parallel to I-264 EB CD, and under CD Connector, and Loop A |
| | D - 605 | | X028 | 57048 | | | | | | | Box Culvert | Double 7' x 8' Box Culvert Under Church Parking Lot and Ramp D7 CD |

REVISED: 6-16-15, 10-07-15, 10-26-15, 11-20-15, 11-30-15, 12-08-15, 12-16-15, 12-22-15, 12-29-15, 12-30-15

TIER 2 PROJECT

| RECOMMENDED FOR APPROVAL FOR RIGHT OF WAY ACQUISITION | |
|---|---|
| 8/17/15 DATE | Kim Pryor — INFRASTRUCTURE INVESTMENT DIRECTOR |
| 8/28/15 DATE | B.A. Thrasher — STATE LOCATION AND DESIGN ENGINEER |
| 8/31/15 DATE | John W. Lawson — CHIEF FINANCIAL OFFICER |
| 8/31/15 DATE | Mohammad Mirshahi — FOR CHIEF ENGINEER |

| APPROVED FOR RIGHT OF WAY ACQUISITION | |
|---|---|
| 9/1/15 DATE | Richard L. Walton Jr. — CHIEF OF POLICY |

| RECOMMENDED FOR APPROVAL FOR RIGHT OF WAY ACQUISITION | |
|---|---|
| TOTAL TAKE FOR PARCELS: -003- -008- | |
| 4/22/15 DATE | Kim Pryor — INFRASTRUCTURE INVESTMENT DIRECTOR |
| 4/22/15 DATE | B.A. Thrasher — STATE LOCATION AND DESIGN ENGINEER |
| 4/23/15 DATE | John W. Lawson — CHIEF FINANCIAL OFFICER |
| 4/27/15 DATE | Mohammad Mirshahi — FOR CHIEF ENGINEER |

| APPROVED FOR RIGHT OF WAY ACQUISITION | |
|---|---|
| 4/27/15 DATE | Richard L. Walton Jr. — CHIEF OF POLICY |

| RECOMMENDED FOR APPROVAL FOR CONSTRUCTION | |
|---|---|
| 1/18/16 DATE | Kim Pryor — INFRASTRUCTURE INVESTMENT DIRECTOR |
| 3/23/16 DATE | B.A. Thrasher — STATE LOCATION AND DESIGN ENGINEER |
| 3/24/16 DATE | Kendal R. Walus — STATE STRUCTURE AND BRIDGE ENGINEER |
| 3/29/16 DATE | John W. Lawson — CHIEF FINANCIAL OFFICER |

| APPROVED FOR CONSTRUCTION | |
|---|---|
| 3/29/16 DATE | Mohammad Mirshahi — FOR CHIEF ENGINEER |

| APPROVED | |
|---|---|
| DATE | DIVISION ADMINISTRATOR FEDERAL HIGHWAY ADMINISTRATION U.S. DEPARTMENT OF TRANSPORTATION |

THE COMPLETE ELECTRONIC PDF VERSION OF THE PLAN ASSEMBLY AS AWARDED, HAS BEEN SEALED AND SIGNED USING DIGITAL SIGNATURES AND THE OFFICIAL PLAN ASSEMBLY IN ELECTRONIC FORMAT IS STORED IN THE VDOT CENTRAL OFFICE PLAN LIBRARY, INCLUDING ALL SUBSEQUENT REVISIONS. WILL BE THE OFFICIAL CONSTRUCTION PLANS. FOR INFORMATION RELATIVE TO ELECTRONIC FILES AND LAYERED PLANS, SEE THE GENERAL NOTES.

DESIGN FEATURES RELATING TO CONSTRUCTION OR TO REGULATION AND CONTROL OF TRAFFIC MAY BE SUBJECT TO CHANGE AS DEEMED NECESSARY BY THE DEPARTMENT.

THIS PROJECT IS TO BE CONSTRUCTED IN ACCORDANCE WITH THE DEPARTMENT'S 2007 ROAD AND BRIDGE SPECIFICATIONS, 2008 ROAD AND BRIDGE STANDARDS, 2009 MUTCD, 2011 VIRGINIA SUPPLEMENT TO THE MUTCD, 2011 VIRGINIA WORK AREA PROTECTION MANUAL, REVISION 1 (APRIL 2015) AND AS AMENDED BY CONTRACT PROVISIONS AND THE COMPLETE ELECTRONIC PDF VERSION OF THE PLAN ASSEMBLY.

ALL CURVES ARE TO BE SUPERELEVATED, TRANSITIONED AND WIDENED IN ACCORDANCE WITH STANDARD TC-5.11(R), EXCEPT WHERE OTHERWISE NOTED.

THE ORIGINAL APPROVED TITLE SHEET(S), INCLUDING ORIGINAL SIGNATURES, ARE FILED IN THE VDOT CENTRAL OFFICE PLAN LIBRARY. ANY MISUSE OF ELECTRONIC FILES, INCLUDING SCANNED SIGNATURES, IS ILLEGAL AND ENFORCED TO THE FULL EXTENT OF THE LAW.

PROJECT MANAGER Sam) Jo Hofheimer, P.E. (757) 494-5486, Hampton Roads District
SURVEYED BY, DATE Woolpert, Inc. (757) 399-6882, Danny Williams, L.S. (757) 925-2656, Hampton Roads District
DESIGN BY AECOM (757) 499-4224
SUBSURFACE UTILITY BY, DATE Rice Associates, Inc. (757) 306-4260 June 2015

Copyright 2016, Commonwealth of Virginia

9:33:51 AM

PROJECT 0264-122-108 SHEET NO. 1

1/28/2019
8:06 AM

LIMITED ACCESS HIGHWAY By Resolution of Highway Commission dated December 12, 1963

LIMITED ACCESS HIGHWAY By Resolution of Commonwealth Transportation Board dated October 15, 2014

PROJECT MANAGER Sabel Jo Hoffelmac, P.E. (757) 494-5495, Hampton Roads District
SURVEYED BY, DATE Woolpert, Inc. (757) 399-6892, Doug Williams, L.S. (757) 925-2656, Hampton Roads District
DESIGN BY AECOM (757) 499-4224
SUBSURFACE UTILITY BY, DATE Bloa Associates, Inc. (757) 306-4200 June 2015

| REVISED | | STATE | ROUTE | PROJECT | SHEET NO. |
|---|---|---|---|---|---|
| 08-03-2016<br>10-14-2016<br>10-26-2016<br>6-12-2017<br>8-24-2017<br>1-26-2018 | 10-05-2015<br>11-05-2015<br>11-20-2015<br>12-18-2015<br>06-08-2016<br>07-06-2016 | VA. | 264 | 0264-122-108, RW-204<br>C-508 | 1C |

DESIGN FEATURES RELATING TO CONSTRUCTION OR TO REGULATION AND CONTROL OF TRAFFIC MAY BE SUBJECT TO CHANGE AS DEEMED NECESSARY BY THE DEPARTMENT

City/County: Norfolk

UPC No.: 57048

# PRELIMINARY
# RIGHT OF WAY DATA SHEET

| PARCEL NO. | LANDOWNER | RW SHEET NO. | AREA: TOTAL | FEE TAKING | | PRESCRIPTIVE R/W | | FEE REMAINDER | | EASEMENTS: PERMANENT | | UTILITY | | TEMPORARY | | TEMPORARY (ENTRANCES) | | PROFFERS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | ACRES ~~OR SQUARE FEET~~ | ~~ACRES OR~~ SQ. FEET | ~~HECTARES/~~ OR SQ. METERS | ~~ACRES OR~~ SQ. FEET | ~~HECTARES/~~ OR SQ. METERS | ~~ACRES OR~~ SQ. FEET | ~~HECTARES/~~ OR SQ. METERS | ~~ACRES OR~~ SQ. FEET | ~~HECTARES/~~ OR SQ. METERS | ~~ACRES OR~~ SQ. FEET | ~~HECTARES/~~ OR SQ. METERS | ~~ACRES OR~~ SQ. FEET | ~~HECTARES/~~ OR SQ. METERS | ~~ACRES OR~~ SQ. FEET | ~~HECTARES/~~ OR SQ. METERS | YES / NO |
| 001 | TRUSTEES OF GLAD TIDINGS CHURCH OF THE CITY OF NORFOLK | 3,4 | 10.000 | 54,423 | | | | 381,177 | | 417 | | | | 113,105 | | | | |
| 002 | SENTARA LIFE CARE CORPORATION (FORMERLY ALLIANCE LIFE CARE CORPORATION) | 4,5 | 12.011 | | | | | | | | | | | 12,924 | | | | |
| 003 | BRYAN L. EASON & CARLGENTA JORDAN | 5 | 0.346 | 257 | | | | 14,815 | | | | | | 1,337 | | | | |
| ~~004~~ | | | | | | | | | | | | | | | | | | |
| 005 | CITY OF NORFOLK | 5 | No Recorded Acreage | 2,382 | | | | | | 2,556 | | 9,906 | | 13,742 | | | | |
| 006<br>~~007, 009, 010, 011, 012, 013~~<br>~~023, 024, 025, 026, 027, 028~~ | BUSH CONSTRUCTION CORPORATION & W H H TRICE & CO (As Their Interest May Appear) " " " " | 6, 7, 7D SEE 6RW(2) | 7.243 | 315,514 | | | | TOTAL TAKE | | | | | | | | | | |
| ~~008~~ | | | | | | | | | | | | | | | | | | |
| 014 | CLARENCE H. BLACKMORE (And Others, As Their Interest May Appear) | 7 | | 12,787 | | | | | | | | | | 5,367 | | | | |
| 015 | LUCY B. HILL | 7 | | 4,688 | | | | | | | | | | 1,075 | | | | |
| 016<br>~~017-022~~ | TRUSTEES OF FIRST BAPTIST CHURCH OF NORFOLK | 7, 8 | | 5,244 | | | | | | 38,068 | | 5,267 | | 48,034 | | | | |
| 018 | HEIRS & DEVISEES of A. A. MASTERS | 8 | 0.110 | | | | | | | 3,587 | | | | | | | | |
| 019 | TRUSTEES OF FIRST BAPTIST CHURCH OF NORFOLK | 8, 8E, 8N | 10.190 | 2,920 | | | | 440,956 | | 35,547 | | | | 48,562 | | | | |
| 020 | NMA HOLDCO, LLC, A DELAWARE LIMITED LIABILITY COMPANY (As To The Portion Of Parcel 3-1 Shown On Map Book 62, Page 34 As Parcel 3) AND NEWTOWN MOTEL ASSOCIATES ONE, L.L.C., A VIRGINIA LIMITED LIABILITY COMPANY (As To The Portion Of Parcel 3-1 Shown On Map Book 62, Page 34 As Parcel 2) | 8E | 3.249 | 799 | | | | 140,727 | | 2,305 | | | | 5,967 | | | | |
| ~~021~~ | | | | | | | | | | | | | | | | | | |
| ~~029, 030~~ | | | | | | | | | | | | | | | | | | |
| 031 | BROCK FARMS REALTY, INC. | 3 | | | | | | | | 93 | | 1,719 | | | | | | |
| 032 | THE GREGORY REVOCABLE LIVING TRUST | 5 | | | | | | | | | | 402 | | | | | | |
| ~~033~~ | | | | | | | | | | | | | | | | | | |
| 034 | BROCK FARMS REALTY INC | 5 | | | | | | | | 1,610 | | | | | | | | |
| 035 | BUSH CONSTRUCTION CORPORATION, A VIRGINIA CORPORATION, AND W H H TRICE & CO, A VIRGINIA CORPORATION; OR THE HEIRS, SUCCESSORS AND ASSIGNS OF R E TOWNSEND, ALSO KNOWN AS ROBERT EASTON TOWNSEND, As Their Respective Interest May Appear | 6 | No Recorded Acreage | 1,884 | | | | | | | | | | | | | | |
| 036 | TRANSPORTATION DISTRICT COMMISSION OF HAMPTON ROADS | 6 | | | | | | | | 1,323 | | | | | | | | |
| 037 | TRUSTEES OF THE JAMES BARRY-ROBINSON HOME FOR BOYS | 8 | | | | | | | | | | 1,310 | | | | | | |
| 101 | TRUSTEES OF GLAD TIDINGS CHURCH OF THE CITY OF NORFOLK | 4 | 10.000 | | | | | N / A | | | | | | 2,265 | | | | |
| 105 | CITY OF NORFOLK, ET ALS | 5 | No Recorded Acreage | 1,113 | | | | | | | | | | 1,424 | | | | |
| 116 | TRUSTEES OF FIRST BAPTIST CHURCH OF NORFOLK; or LUCY T. LOVELACE, if she be living, or her heirs, successors or assigns, if she be dead; or persons unknown, as their interests may appear | 8(1) | No Recorded Acreage | | | 2,733 | | | | | | | | | | | | |
| 118 | HEIRS & DEVISEES of A. A. MASTERS | 8(1) | No Recorded Acreage | | | 2,633 | | | | | | | | | | | | |
| 119 | TRUSTEES OF FIRST BAPTIST CHURCH OF NORFOLK | 8, 8E, 8N | 10.190 | | | | | | | | | | | 85,360 | | | | |
| 120 | FBCN OFFICE HOLDINGS, LLC | 8N | 2.644 | | | | | | | | | | | 15,219 | | | | |
| 218 | HEIRS & DEVISEES of A. A. MASTERS | 8 | 0.110 | | | | | | | 601 | | | | | | | | |

| PROJECT | SHEET NO. |
|---|---|
| 0264-122-108 | 1C |

LIMITED ACCESS HIGHWAY — By Resolution of Highway Commission dated December 12, 1963

LIMITED ACCESS HIGHWAY — By Resolution of Commonwealth Transportation Board dated October 15, 2014

| REVISED | STATE | ROUTE | STATE PROJECT | SHEET NO. |
|---|---|---|---|---|
| 10-5-15<br>8-3-16<br>10-26-16<br>2-03-17<br>6-12-17<br>4-20-18 | VA. | 264 | 0264-122-108, RW-204 ; C-508 : | 1B |

DESIGN FEATURES RELATING TO CONSTRUCTION OR TO REGULATION AND CONTROL OF TRAFFIC MAY BE SUBJECT TO CHANGE AS DEEMED NECESSARY BY THE DEPARTMENT

PROJECT MANAGER Sahil Jo. Hofheimer, P.E. (757) 494-5495, Hampton Roads District
SURVEYED BY, DATE Woolpert, Inc. (757) 399-6862 ; Danny Williams, L.S. (757) 925-2656, Hampton Roads District
DESIGN BY AECOM (757) 499-4224
SUBSURFACE UTILITY BY, DATE Bliss Associates, Inc. (757) 306-4950, June 2015

# INDEX OF SHEETS

| Sheet | Description |
|---|---|
| 1 | TITLE SHEET |
| 1A | PROJECT LOCATION MAP |
| 1B | INDEX OF SHEETS |
| 1C | RIGHT OF WAY DATA SHEET |
| 1D,1D1 | REVISION DATA SHEETS |
| 1E | STREAM FLOW HYDROGRAPH SHEET (NOT REQUIRED) |
| 1F - 1F(3) | ALIGNMENT DATA SHEETS |
| 1G - 1G(6) | SURVEY |
| 1H | UNDERGROUND UTILITY TEST HOLE INFORMATION |
| 1K | T.M.P. GENERAL NOTES |
| 1K(0A) | PROPERTY ACQUISITION & UTILITY RELOCATION AREAS |
| 1K(1) - 1K(1C) | T.M.P. PHASE MAP |
| 1K(1D) | T.M.P. PROJECT LIMIT SIGNING PLAN SHEET |
| 1K(2) - 1K(2A) | T.M.P. ALIGNMENT DATA SHEET |
| 1K(3) | T.M.P. PHASE 1 CONSTRUCTION PHASE NOTES |
| 1K(4) | T.M.P. PHASE 1 TYPICAL SECTIONS |
| 1K(5) - 1K(11) | T.M.P. PHASE 1 |
| 1K(11A) | PROFILE SHEET |
| 1K(12) - 1K(16) | T.M.P. PHASE 1 |
| 1K(17) - 1K(19) | NOT USED |
| 1K(20) | T.M.P. PHASE 2 CONSTRUCTION PHASE NOTES |
| 1K(21) | T.M.P. PHASE 2 TYPICAL SECTIONS |
| 1K(22) - 1K(25) | T.M.P. PHASE 2 |
| 1K(26) - 1K(29) | NOT USED |
| 1K(30) | T.M.P. PHASE 3 CONSTRUCTION PHASE NOTES |
| 1K(31) - 1K(38) | T.M.P. PHASE 3 |
| 1K(39) - 1K(39A) | T.M.P. PHASE 3 DETOUR MAP |
| 1K(40) - 1K(40A) | T.M.P. PHASE 4 CONSTRUCTION PHASE NOTES |
| 1K(41) - 1K(50) | T.M.P. PHASE 4 |
| 1K(52) - 1K(54) | T.M.P. PHASE 5 |
| 1K(55) - 1K(58) | T.M.P. SIGN DETAIL SHEETS |
| 1L(1) - 1L(3) | STORMWATER POLLUTION PREVENTION PLAN |
| 2 | GENERAL NOTES |
| 2A - 2N | TYPICAL SECTIONS |
| 2D(1) - 2D(4) | DRAINAGE SUMMARY SHEETS |
| 2P | EROSION AND SEDIMENT CONTROL SUMMARY |
| 2Q | ROADSIDE DEVELOPMENT |
| 2R(1) - 2R(2) | INCIDENTAL AND PAVEMENT QUANTITIES |
| 2S | GRADING DIAGRAM AND SUMMARY |
| 2T | MAINTENANCE OF TRAFFIC SUMMARY |
| 2U | SIGNING AND PAVEMENT MARKING SUMMARY |
| 2V | DEMOLITION SUMMARY |
| 2W(1) | GORE AREA DETAIL: I-64 WB / RAMP D-7 |
| 2W(2) | GORE AREA DETAIL: RAMP D-7 / D-7 CD |
| 2W(3) | GORE AREA DETAIL: RAMP D-7 / I-264 EB CD |
| 2W(4) | GORE AREA DETAIL: RAMP A / I-264 EB CD |
| 2W(5) | GORE AREA DETAIL: LOOP A / CD CONN |
| 2W(6) | GORE AREA DETAIL: RAMP D-7 / RAMP D-7 CONN |
| 2W(7) - 2W(104) | DETAIL AND INSERTABLE SHEETS (2W(53) NOT INCLUDED) |
| 3 | PLAN SHEET |
| 3A | PROFILE SHEET |
| 3RW | RIGHT OF WAY PLAN SHEET |
| 3B | E & S CONTROL PLAN PHASE I |
| 3C | E & S CONTROL PLAN PHASE II |
| 4 | PLAN SHEET |
| 4A | PROFILE SHEET |
| 4RW | RIGHT OF WAY PLAN SHEET |
| 4B | E & S CONTROL PLAN PHASE I |
| 4C | E & S CONTROL PLAN PHASE II |
| 5 | PLAN SHEET |
| 5A | PROFILE SHEET |
| 5B | PROFILE SHEET |
| 5RW | RIGHT OF WAY PLAN SHEET |
| 5C | E & S CONTROL PLAN PHASE I |
| 5D | E & S CONTROL PLAN PHASE II |
| 6 | PLAN SHEET |
| 6A | PROFILE SHEET |
| 6B | PROFILE SHEET |
| 6RW(1) | RIGHT OF WAY PLAN SHEET |
| 6RW(2) | RIGHT OF WAY PLAN SHEET |
| 6C | E & S CONTROL PLAN PHASE I |
| 6D | E & S CONTROL PLAN PHASE II |
| 6E | PLAN SHEET PIER PROTECTION CURLEW DR |
| 7 | PLAN SHEET |
| 7A | PROFILE SHEET |
| 7B | PROFILE SHEET |
| 7C | PROFILE SHEET |
| 7RW | RIGHT OF WAY PLAN SHEET |
| 7D | PLAN SHEET |
| 7DRW | RIGHT OF WAY PLAN SHEET |
| 7E | E & S CONTROL PLAN PHASE I |
| 7F | E & S CONTROL PLAN PHASE II |
| 8 | PLAN SHEET |
| 8A | PROFILE SHEET |
| 8B | PROFILE SHEET |
| 8RW | RIGHT OF WAY PLAN SHEET |
| 8RW(1) | RIGHT OF WAY PLAN SHEET |
| 8C | E & S CONTROL PLAN PHASE I |
| 8D | E & S CONTROL PLAN PHASE II |
| 8E | PLAN SHEET |
| 8F | PROFILE SHEET |
| 8G | PROFILE SHEET |
| 8H | PROFILE SHEET |
| 8ERW | RIGHT OF WAY PLAN SHEET |
| 8H(1) | E & S CONTROL PLAN PHASE I |
| 8H(2) | E & S CONTROL PLAN PHASE II |
| 8I | PLAN SHEET |
| 8J | PROFILE SHEET |
| 8K | E & S CONTROL PLAN PHASE I |
| 8L | E & S CONTROL PLAN PHASE II |
| 8M | PLAN SHEET PIER PROTECTION KEMPSVILLE RD |
| 8N | PLAN SHEET |
| 8NRW | RIGHT OF WAY PLAN SHEET |
| 8O | E & S CONTROL PLAN PHASE I |
| 8P | E & S CONTROL PLAN PHASE II |
| 9A(1) - 9A(2) | DRAINAGE DESCRIPTIONS |
| 9A(3) | DITCH TYPICALS |
| 9A(4) | ALLOWABLE PIPE TYPE TABLE |
| 9B(1) - 9B(9) | STORM SEWER PROFILES |
| 9C(1) - 9C(5) | BASIN DETAILS |
| 9D(1) - 9D(3) | LANDSCAPING PLANS |
| 9E(1) - 9E(4) | GRADING DETAILS |
| 9F(1) - 9F(11) | CULVERT FOUNDATION DETAILS |
| 10(1)-10(6),10(6a),10(7), 10(8),10(8a),10(9) | ROADWAY SIGNING PLANS |
| 10(8A) | KEMPSVILLE ROAD SIGNING PLANS |
| 11(1) - 11(8) | ROADWAY LIGHTING PLANS |
| 12(1) - 12(8A) | PAVEMENT MARKING PLANS |
| 13(1) - 13(11A) | TRAFFIC MANAGEMENT SYSTEM PLANS |
| 14(1) - 14(6) | SOUND BARRIERS |
| 15(1) - 15(2) | M.S.E. WALL PROFILES |
| 15(3) - 15(4A) | RETAINING WALL "R" PLAN & PROFILES |
| 15(5) - 15(7) | RETAINING WALL DETAILS |
| 16(1) - 16(5) | TIDAL CHANNEL RELOCATION SHEETS |
| 16(5) - 16(8) | TIDAL CHANNEL PLANTING PLAN SHEETS |
| 17(1) - 17(10) | UTILITY RELOCATION PLANS - WATER & SEWER (CITY OF NORFOLK) |
| 18(1) - 18(10) | UTILITY RELOCATION PLANS - SEWER (HRSD) |
| 19(1) - 19(3) | TRAFFIC SIGNAL PLANS |
| X-1 | CROSS SECTION SHEET INDEX |
| X-2 - X-168 | CROSS SECTIONS |

PLAN SET ALSO INCLUDES THE FOLLOWING BRIDGE/STRUCTURE PLANS:

| Sheets | Description |
|---|---|
| 1 - 196 | BRIDGE B-602 (PLAN NO. 288-27) |
| 1 - 58 | BRIDGE B-603 (PLAN NO. 288-28) |
| 1 - 41 | BRIDGE B-604 (PLAN NO. 286-77) |
| 1 - 85 | BRIDGE B-605 (PLAN NO. 288-29) |
| 1 - 23 | BRIDGE B-616 (PLAN NO. 182-0C) |
| 1 - 17 | SOUND WALL STRUCTURE (PLAN NO. 298-54) |

| FUNCTIONAL CLASSIFICATION AND TRAFFIC DATA | |
|---|---|
| URBAN INTERSTATE - DIVIDED - FLAT - 60 MPH MIN.DES.SPEED | |
| I-264 EB CONN. CD | Fr: 0.14 MILE EAST OF KEMPSVILLE ROAD<br>To: 0.03 MILE EAST OF NEWTOWN ROAD |
| AAWDT (2040) | 52,000 |
| AAWDT (2040) | 86,500 |
| DHV | 1,950 |
| D (%) (design hour) | 100 |
| T (%) (design hour) | 2 |
| V (MPH) | * |
| DESIGN VEHICLE | WB-67 |

| FUNCTIONAL CLASSIFICATION AND TRAFFIC DATA | |
|---|---|
| INTERCHANGE RAMP - FLAT - 25 MPH MIN.DES.SPEED | |
| LOOP A | Fr: NEWTOWN ROAD SB<br>To: I-264 EB CD ROAD |
| AAWDT (2040) | 8,450 |
| AAWDT (2040) | 9,000 |
| DHV | 800 |
| D (%) (design hour) | 100 |
| T (%) (design hour) | 2 |
| V (MPH) | * |
| DESIGN VEHICLE | WB-67 |

* SEE PLAN AND PROFILE SHEETS FOR HORIZONTAL AND VERTICAL CURVE DESIGN SPEED.

| FUNCTIONAL CLASSIFICATION AND TRAFFIC DATA | |
|---|---|
| URBAN INTERSTATE - DIVIDED - FLAT - 60 MPH MIN.DES.SPEED | |
| I-264 EB CD | Fr: 0.757 MILE SOUTH OF CURLEW DRIVE<br>To: 0.832 MILE EAST OF WBL I-64 |
| AAWDT (2040) | 32,940 |
| AAWDT (2040) | 43,000 |
| DHV | 4,300 |
| D (%) (design hour) | 100 |
| T (%) (design hour) | 2 |
| V (MPH) | * |
| DESIGN VEHICLE | WB-67 |

| FUNCTIONAL CLASSIFICATION AND TRAFFIC DATA | |
|---|---|
| INTERCHANGE RAMP - FLAT - 50 MPH MIN.DES.SPEED | |
| RAMP D-7 | Fr: I-64 WB<br>To: I-264 EB MAINLINE |
| AAWDT (2040) | N/A |
| AAWDT (2040) | 23,500 |
| DHV | 1,300 |
| D (%) (design hour) | 100 |
| T (%) (design hour) | 3 |
| V (MPH) | * |
| DESIGN VEHICLE | WB-67 |

| FUNCTIONAL CLASSIFICATION AND TRAFFIC DATA | |
|---|---|
| INTERCHANGE RAMP - FLAT - 45 MPH MIN.DES.SPEED | |
| RAMP D7 CD | Fr: I-64 WB<br>To: I-264 EB CD ROAD |
| AAWDT (2040) | 25,927 |
| AAWDT (2040) | 10,500 |
| DHV | 800 |
| D (%) (design hour) | 100 |
| T (%) (design hour) | 3 |
| V (MPH) | * |
| DESIGN VEHICLE | WB-67 |

| FUNCTIONAL CLASSIFICATION AND TRAFFIC DATA | |
|---|---|
| INTERCHANGE RAMP - FLAT - 35 MPH MIN.DES.SPEED | |
| RAMP A NEWTOWN | Fr: I-264 EB CD ROAD<br>To: NEWTOWN ROAD SB |
| AAWDT (2040) | 10,573 |
| AAWDT (2040) | 17,000 |
| DHV | 1,500 |
| D (%) (design hour) | 100 |
| T (%) (design hour) | 2 |
| V (MPH) | * |
| DESIGN VEHICLE | WB-67 |

* SEE PLAN AND PROFILE SHEETS FOR HORIZONTAL AND VERTICAL CURVE DESIGN SPEED.





ALIGNMENT SHEET









LIMITED ACCESS HIGHWAY

LIMITED ACCESS HIGHWAY

| REVISED | STATE | ROUTE | PROJECT | SHEET NO. |
|---|---|---|---|---|
| | VA. | 264 | 0264-122-108, RW-204 C-508 | 1G(6) |

DESIGN FEATURES RELATING TO CONSTRUCTION OR TO REGULATION AND CONTROL OF TRAFFIC MAY BE SUBJECT TO CHANGE AS DEEMED NECESSARY BY THE DEPARTMENT

# HORIZONTAL CONTROL

Detailed Description:
STANDARD METAL DISK STAMPED "134-0155" SET IN CONC. APPROX. 3" BELOW GROUND LEVEL. DISK IS LOCATED ON THE BACK SIDE OF EBL RTE. 264 PARAPET WALL. DISK IS 1.7 MILES EAST ALONG RTE. 264 FROM THE INT. OF RTE. 264 AND NEWTOWN RD.
DISK IS 145.0' NW OF THE NW EDGE OF CONC. BASE FOR EXIT 17A-B OVERHEAD SIGN. 32.5' SE OF A VDOT LIGHT POLE "B-2, AND 3.4' SW OF THE BACK OF PARAPET WALL.

Detailed Description:
STANDARD METAL DISK STAMPED "134-0156 SET IN CONC. APPROX. 3" BELOW GROUND LEVEL. DISK IS LOCATED ON THE BACK SIDE OF EBL RTE. 264 GUARDRAIL AND BETWEEN THE INDEPENDENCE BLVD. ON RAMP AND SAME GUARDRAIL. DISK IS 2.9 MILES EAST ALONG RTE. 264 FROM THE INT. OF RTE. 264 AND NEWTOWN ROINT.
DISK IS 3.0' SOUTH OF THE BACK OF GUARDRAIL. 33.3' NW OF TWO VDOT ELECTRIC BOXES, 31.0' EAST OF ANOTHER VDOT ELECTRIC BOX, AND 99.0' SW OF THE GRASS LINE AND EP OF THE SAID ON RAMP AND RTE. 264 EBL.

Detailed Description:
STANDARD METAL DISK STAMPED "134-0157" SET IN CONC. APPROX. 3" BELOW GROUND LEVEL. DISK IS LOCATED ON THE BACK SIDE OF EBL RTE. 264 PARAPET WALL. DISK IS 3.25 MILES EAST ALONG RTE. 264 FROM THE INT. OF RTE. 264 AND NEWTOWN RD.
DISK IS 3.5' SOUTH OF THE BACK OF PARAPET WALL, 140' WEST OF A VDOT LIGHT POLE, 24.2' NORTH OF A 6.0' CHAINLINK FENCE, 153.0' NE OF THE EAST EDGE OF CONC. BASE FOR OVERHEAD SIGN "750033, AND 12.5' EAST OF A VDOT ELECTRIC BOX.

| PROJECT | SHEET NO. |
|---|---|
| 0264-122-108 | 1G(6) |

LVI654888 Ramp D-T\d57048\Sheets\d570480.3.dgn #REF001 #REF002 #REF003 #REF004 #REF005 #REF006
#DGNLEV #LEV001 #LEV002 #LEV003 #LEV004 #LEV005 #LEV006

LIMITED ACCESS HIGHWAY By Resolution of Highway Commission dated december 17, 1963

LIMITED ACCESS HIGHWAY By Resolution of Commonwealth Transportation Board dated October 15, 2014

| REVISED | STATE | ROUTE | PROJECT | SHEET NO. |
|---|---|---|---|---|
| 10-7-15<br>10-30-15<br>6-8-16<br>8-24-17<br>3-28-18 | VA. | 264 | 0264-122-108, RW-204 : C-508 : | 3 |

DESIGN FEATURES RELATING TO CONSTRUCTION OR TO REGULATION AND CONTROL OF TRAFFIC MAY BE SUBJECT TO CHANGE AS DEEMED NECESSARY BY THE DEPARTMENT

AECOM Virginia Beach, Virginia HYDRAULIC ENGINEER — AECOM Virginia Beach, Virginia ROADWAY ENGINEER

PROJECT MANAGER Sohail Ja. Hoffelmer, P.E. (757) 494-5495, Hampton Roads District
SURVEYED BY, DATE Woolpert, Inc. (757) 399-6882 + Danny Williams, L.S. (757) 925-2656, Hampton Roads District
DESIGN BY AECOM (757) 499-4224
SUBSURFACE UTILITY BY, DATE Bliss Associates, Inc. (252) 306-4260, June, 2015

## Utility Owners:

**Water:**
City of Virginia Beach Public Utilities
Operations Building, 2nd Floor
Virginia Beach, Virginia 23456
Contact: Josie Tatem
Telephone: 757-385-4171

City of Norfolk Utilities
400 Granby Street
Norfolk, Virginia 23501
Contact: Wesley Jones
Telephone: 757-664-6757

Barry Robinson Center (Private Water)
443 Kempsville Road
Norfolk, Virginia 23502
Contact: Len Sandiego
Telephone: 757-455-6170

**Force Main:**
Hampton Roads Sanitation District
1436 Air Rail Avenue
Virginia Beach, Virginia 23462
Contact: Edward Heady
Telephone: 757-460-7021

City of Virginia Beach Public Utilities
Operations Building, 2nd Floor
Virginia Beach, Virginia 23456
Contact: Josie Tatem
Telephone: 757-385-4171

City of Norfolk Utilities
400 Granby Street
Norfolk, Virginia 23501
Contact: Susan Moore
Telephone: 757-664-6701

**Gas:**
Virginia Natural Gas
3719 East Virginia Beach Boulevard
Norfolk, Virginia 23502
Contact: Victoria Mansfield
Telephone: 757-466-5441

**Electric:**
Dominion Virginia Power
7500 West Broad Street
Richmond, Virginia 23294
Contact: Lindsey Holler
Telephone: 804-755-5209

**Telephone / Fiber Optic:**
Verizon
5701 Cleveland Street
Virginia Beach, Virginia 23462
Contact: James Fulton
Telephone: 757-667-5511

Cavalier Telephone
1450 E. Parham Road
Richmond, Virginia 23228
Contact: Megan Shogren
Telephone: 804-422-4264

Level 3 Communications
(Formerly Adelphia / KMC / Telcove)
2600 Eltham Avenue, Suite 103
Norfolk, Virginia 23513
Contact: Rich Eldreth
Telephone: 757-777-7719

City of Virginia Beach Public Schools
Department of Technology
2380 Court Plaza Drive
Virginia Beach, Virginia 23456
Contact: Morty Smith
Telephone: 757-263-1994

KNT
5700 Lake Wright Drive
Norfolk, Virginia 23502
Contact: Junius Joe
Telephone: 757-466-9204

**Cable Television:**
Cox Communications
5200 Cleveland Street
Virginia Beach, Virginia 23462
Contact: Timothy Hayes
Telephone: 757-222-8902

**VDOT Facilities:**
VDOT Electric
1700 N. Main Street
Suffolk, Virginia 23435
Contact: Lonnie Ayers
Telephone: 757-934-5030

VDOT Traffic Management System (TMS)
970 Reon Drive
Virginia Beach, Virginia 23464
Contact: Neil Reed
Telephone: 757-424-9942

**Traffic Control:**
City of Norfolk
Dept. of Traffic Engineering
810 Union Street
Norfolk, Virginia 23510
Contact: Daniel Rydzewski
Telephone: 757-664-7300

City of Virginia Beach
Department of Public Works
3556 Dam Neck Road
Virginia Beach, Virginia 23453
Contact: Darwin Dewey
Telephone: 757-617-1857

**Communication / Signal:**
Norfolk and Southern Railroad
2200 Redgate Avenue
Norfolk, Virginia 23514
Contact: David Swain
Telephone: 757-446-5316

### LEGEND

- (1) DENOTES PROP. R/W & LIMITED ACCESS LINE
- (2) DENOTES PROP. R/W
- (3) DENOTES PROP. PERMANENT DRAINAGE EASEMENT
- (4) DENOTES TEMPORARY CONSTRUCTION EASEMENT
- (5) DENOTES PROP. PERMANENT AERIAL AND MAINTENANCE EASEMENT
- (6) VARIABLE WIDTH PERMANENT STANDARD UTILITY EASEMENT FOR DOMINION VIRGINIA POWER
- (7) VARIABLE WIDTH PERMANENT STANDARD VDOT UTILITY EASEMENT

(001) TRUSTEES OF GLAD TIDINGS CHURCH OF THE CITY OF NORFOLK
D.B. 1298, PG. 172
M.B. 28, PG. 140
10.000 Ac.

(031) BROCK FARMS REALTY, INC.
D.B. 2817, PG. 166
D.B. 2276, PG. 742
No Recorded Acreage

### LEGEND

- DENOTES NEW PAVEMENT
- DENOTES PROPOSED MILLING & OVERLAY
- DENOTES DEMOLITION OF PAVEMENT
- C — Denotes Construction Limits In Cuts
- F — Denotes Construction Limits In Fills
- DENOTES PERMANENT EASEMENTS
- DENOTES TEMPORARY EASEMENTS

12' ST'D. CG-9D REQ'D. TYPE I
SEE DRIVEWAY TABLE
SWM POND *5 E. ACCESS DRIVEWAY ℄

DRIVEWAY TABLE

| | 12' ST'D. CG-9D REQ'D. | | | | | TYPE I CRUSHER RUN AGGR. NO. 25 | | | | | 5' CONC SIDEWALK | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | STATION | OFFSET | STATION | OFFSET | RAD | STATION | OFFSET | STATION | OFFSET | RAD | STATION | OFFSET | STATION | OFFSET |
| SWM POND *5 E.DR ℄ | 10-16.67 (RT) | 14.55' | 10-26.61 | 6.00' | 9' | 10-26.61 | 6.00' | 10-46.03 | 16.71' | 10' | 10-22.40 | 6.52' | 10-22.63 | 11.62' |
| | 10-16.82 (LT) | 14.55' | 10-26.04 | 6.00' | 9' | 10-26.04 | 6.00' | 10-46.03 | 16.71' | 10' | 10-22.90 | 6.48' | 10-22.86 | 11.52' |
| SWM POND *5 S.DR ℄ | 20-18.27 (RT) | 17.40' | 20-26.86 | 6.00' | 10' | 20-26.86 | 6.00' | 20-44.69 | 13.77' | 10' | 20-21.57 | 8.40' | 20-21.96 | 12.52' |
| | 20-16.69 (LT) | 16.70' | 20-26.44 | 6.00' | 10' | 20-26.44 | 6.00' | 20-43.79 | 11.65' | 10' | 20-21.34 | 7.50' | 20-21.48 | 12.25' |

### LEGEND

1. STD. GR-2 REQ'D.
2. STD. GR-2A REQ'D.
3. STD. GR-FOA-2 TYPE I REQ'D.
4. STD. GR-FOA-2 TYPE II REQ'D
5. STD. MB-7D REQ'D.
6. STD. MB-7E REQ'D.
7. STD. MB-7F REQ'D.
8. STD. MC-3B W/ASPHALT CONCRETE CURB BACK-UP MATERIAL

SWM POND *5 ACCESS E.DRIVEWAY BASELINE KEY
- (A) POT 10-00.00
- (B) PI 10-36.03
- (C) POT 10-57.99

SWM POND *5 ACCESS S.DRIVEWAY BASELINE KEY
- (A) POT 20-00.00
- (B) PI 20-39.35
- (C) POT 20-53.63

SCALE 0 50' 100'

| REFERENCES (PROFILES, DETAIL & DRAINAGE DESCRIPTION SHEETS, ETC.) | |
|---|---|
| SURVEY DRAINAGE DESC. | 1G(7-15) |
| I-64 WBL PROFILE | 3A |
| E & S PHASE I | 3B |
| E & S PHASE II | 3C |
| DRAINAGE DESCRIPTIONS | 9A(1) |
| DITCH TYPICALS | 9A(3) |
| BASIN DETAILS | 9C(1) - 9C(4) |
| LIGHTING PLANS | 11(3) |
| SOUND BARRIER | 14(5) |

PROJECT 0264-122-108 SHEET NO. 3

LN\E54055 Ramp D-T\d57049\Sheets\d57048G2.dgn
#CCRLEV

#REF001 #LEV001 #REF002 #LEV002 #REF003 #LEV003 #REF004 #LEV004 #REF005 #LEV005 #REF006 #LEV006

LIMITED ACCESS HIGHWAY By Resolution of Highway Commission dated December 12, 1963

LIMITED ACCESS HIGHWAY By Resolution of Commonwealth Transportation Board dated October 15, 2014

| REVISED | STATE | ROUTE | PROJECT | SHEET NO. |
|---|---|---|---|---|
| | VA. | 264 | 0264-122-108, RW-204 C-508 | 1G(2) |

DESIGN FEATURES RELATING TO CONSTRUCTION OR TO REGULATION AND CONTROL OF TRAFFIC MAY BE SUBJECT TO CHANGE AS DEEMED NECESSARY BY THE DEPARTMENT

PROJECT MANAGER Seid Ja. McFadden, P.E. (757) 494-5496, Hampton Roads District
SURVEYED BY, DATE Woolpert, Inc. (757) 320-6812 , Danny Williams, L.S. (757) 925-2656, Hampton Roads District
DESIGN BY AECOM (757) 499-4224
SUBSURFACE UTILITY BY, DATE Bliss Associates, Inc. (252) 306-4250, June 2015

CONTROL STATION ID. 4006
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 38.618
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
X (EAST) 3,704,238.390
Y (NORTH) 1,058,959.686

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,950,905.450
Y (NORTH) 193,535.328

AZIMUTH TO STATION 4005 IS 58° 52' 59"

UNABLE TO RECOVER MARCH, 2011.

DETAILED DESCRIPTION

STATION IS A PIN & CAP SET FLUSH WITH GROUND LOCATED SOUTH OF MILITARY HIGHWAY OVERPASS OVER I-264. TO REACH STATION FROM I-264 EAST BOUND LANE AT MILITARY HIGHWAY OVERPASS PROCEED ON LOOP TO MILITARY HIGHWAY NORTH BOUND LANE. STATION IS IN GORE AREA BETWEEN NORTH BOUND LANE +/- 4' EAST OF EAST EDGE OF ASPHALT SHOULDER OF LOOP.

CONTROL STATION ID. 4003
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 12.269
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
X (EAST) 3,705,069.278
Y (NORTH) 1,059,201.867

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,953,631.457
Y (NORTH) 194,231.458

AZIMUTH TO STATION 4002 IS 93° 44' 55"

RECOVERED MARCH, 2011. REFERENCES GOOD.

DETAILED DESCRIPTION

STATION IS A PIN & CAP SET FLUSH WITH GROUND LOCATED OFF OF ASPHALT SHOULDER OF I-264 EAST BOUND LANE. TO REACH STATION FROM I-264 EAST BOUND LANE AT MILITARY HIGHWAY OVERPASS PROCEED +/- 0.55 MILES ALONG I-264 EAST BOUND LANE. STATION IS IN CORE AT ON RAMP TO I-64 EAST BOUND LANE +/- 2' SOUTH OF SOUTH EDGE OF ASPHALT SHOULDER.

CONTROL STATION ID. 4000
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 18.021
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,706,306.400
Y (NORTH) 1,059,379.758

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,957,698.247
Y (NORTH) 194,815.091

AZIMUTH TO STATION 134-0153 IS 88° 24' 44"

UNABLE TO RECOVER MARCH, 2011.

DETAILED DESCRIPTION

STATION IS A PK NAIL & CAP SET IN ASPHALT SHOULDER OF I-264 EAST BOUND LANE. TO REACH STATION FROM I-264 EAST BOUND LANE AT I-64 OVERPASS PROCEED +/- 0.55 MILES ALONG I-264 EAST BOUND LANE. STATION IS +/- 2.5' NORTH OF SOUTH EDGE OF ASPHALT SHOULDER.

CONTROL STATION ID. 4005
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 14.428
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
X (EAST) 3,704,527.532
Y (NORTH) 1,059,164.253

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,951,854.077
Y (NORTH) 194,108.086

AZIMUTH TO STATION 4004 IS 78° 44' 08"

RECOVERED MARCH, 2011. REFERENCES GOOD.

DETAILED DESCRIPTION

STATION IS A PIN & CAP SET FLUSH WITH GROUND LOCATED OFF OF ASPHALT SHOULDER OF I-264 EAST BOUND LANE. TO REACH STATION FROM I-264 EAST BOUND LANE AT MILITARY HIGHWAY OVERPASS PROCEED +/- 0.2 MILES ALONG I-264 EAST BOUND LANE. STATION IS +/- 3' SOUTH OF SOUTH EDGE OF ASPHALT SHOULDER.

CONTROL STATION ID. 4002
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 19.262
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
X (EAST) 3,705,325.441
Y (NORTH) 1,059,186.083

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,954,471.884
Y (NORTH) 194,176.393

AZIMUTH TO STATION 4001 IS 74° 24' 16"

UNABLE TO RECOVER MARCH, 2011.

DETAILED DESCRIPTION

STATION IS A PIN & CAP SET FLUSH WITH GROUND LOCATED OFF OF ASPHALT SHOULDER OF I-264 EAST BOUND LANE. TO REACH STATION FROM I-264 EAST BOUND LANE AT MILITARY HIGHWAY OVERPASS PROCEED +/- 0.7 MILES ALONG I-264 EAST BOUND LANE. STATION IS IN GORE AT OFF RAMP FROM I-64 WEST BOUND LANE +/- 5' SOUTH OF SOUTH EDGE OF ASPHALT SHOULDER.

CONTROL STATION ID. 134-0153
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 18.531
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
X (EAST) 3,707,069.434
Y (NORTH) 1,059,401.465

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,960,259.251
Y (NORTH) 194,886.306

AZIMUTH TO STATION 4000 IS 268° 24' 44"

RECOVERED MARCH, 2011. REFERENCES GOOD.

DETAILED DESCRIPTION

STATION IS A STANDARD VDOT DISC SET IN CONC. FLUSH WITH GROUND LOCATED OFF OF ASPHALT SHOULDER OF I-264 EAST BOUND LANE. TO REACH STATION FROM I-264 EAST BOUND LANE AT I-64 OVERPASS PROCEED +/- 1 MILES ALONG I-264 EAST BOUND LANE. STATION IS +/- 3' SOUTH OF SOUTH EDGE OF ASPHALT SHOULDER.

CONTROL STATION ID. 4004
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 12.905
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
X (EAST) 3,704,761.098
Y (NORTH) 1,059,210.784

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,952,620.368
Y (NORTH) 194,260.713

AZIMUTH TO STATION 4003 IS 91° 39' 26"

RECOVERED MARCH, 2011. REFERENCES REVISED.

DETAILED DESCRIPTION

STATION IS A PIN & CAP SET FLUSH WITH GROUND LOCATED OFF OF ASPHALT SHOULDER OF I-264 EAST BOUND LANE. TO REACH STATION FROM I-264 EAST BOUND LANE AT MILITARY HIGHWAY OVERPASS PROCEED +/- 0.4 MILES ALONG I-264 EAST BOUND LANE. STATION IS +/- 4' SOUTH OF SOUTH EDGE OF ASPHALT SHOULDER.

CONTROL STATION ID. 4001
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 22.413
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,805.892
Y (NORTH) 1,059,319.188

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,956,048.164
Y (NORTH) 194,616.370

AZIMUTH TO STATION 4008 IS 73° 04' 29"

RECOVERED MARCH, 2011. REFERENCES GOOD.

DETAILED DESCRIPTION

STATION IS A PIN & CAP SET FLUSH WITH GROUND LOCATED OFF OF ASPHALT SHOULDER OF I-264 EAST BOUND LANE. TO REACH STATION FROM I-264 EAST BOUND LANE AT I-64 OVERPASS PROCEED +/- 0.2 MILES ALONG I-264 EAST BOUND LANE. STATION IS +/- 6.5' SOUTH OF SOUTH EDGE OF ASPHALT SHOULDER.

Note: The Vertical Values for this Project Were Originally Based on NGVD 29 Datum. To Match the Adjoining Project to the East VDOT Converted the Vertical Values in this Survey to NAVD88 Datum Based on an Average Horizontal Position for the Project. In Preparing the Control Sheets for Sealing All the Vertical Values were Recalculated Based on Their Individual Horizontal Positions.

| PROJECT | SHEET NO. |
|---|---|
| 0264-122-108 | 1G(2) |

LNI65408 Ramp D-T\d57040\Sheets\d57048004.dgn
#DGNLEV

#REF001 #LEV001 #REF002 #LEV002 #REF003 #LEV003 #REF004 #LEV004 #REF005 #LEV005 #REF006 #LEV006

LIMITED ACCESS HIGHWAY By Resolution of Highway Commission dated December 12, 1963

LIMITED ACCESS HIGHWAY By Resolution of Commonwealth Transportation Board dated October 15, 2014

| REVISED | STATE | ROUTE | PROJECT | SHEET NO. |
| --- | --- | --- | --- | --- |
| | VA. | 264 | 0264-122-108, RW-204 C-508 | 1G(4) |

DESIGN FEATURES RELATING TO CONSTRUCTION OR TO REGULATION AND CONTROL OF TRAFFIC MAY BE SUBJECT TO CHANGE AS DEEMED NECESSARY BY THE DEPARTMENT

PROJECT MANAGER Scott Jr. Hofheimer, P.E. (757) 494-5496, Hampton Roads District
SURVEYED BY, DATE Woolpert, Inc. (757) 399-6832 ; Darcy Williams, L.S. (757) 925-2656, Hampton Roads District
DESIGN BY AECOM (757) 493-4224
SUBSURFACE UTILITY BY, DATE Bles Associates, Inc. (757) 306-4060, June 2015

CONTROL STATION ID. 103
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 24.418
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,566.646
Y (NORTH) 1,057,695.987

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,955,263.238
Y (NORTH) 189,290.97

AZIMUTH TO STATION 212 IS 176° 21' 27"

RECOVERED MARCH, 2011 UNDER 3" ASPHALT OVERLAY. REFERENCES GOOD.

DETAILED DESCRIPTION

STATION IS A PK NAIL & CAP SET IN ASPHALT SHOULDER OF I-64 WEST BOUND LANE. TO REACH STATION FROM I-64 WEST BOUND LANE AT NORTH END OF BRIDGE OVER THE EASTERN BRANCH OF THE ELIZABETH RIVER PROCEED +/- 108' NORTH TO THE STATION. STATION IS APPROXIMATELY +/- 7' WEST OF EAST EDGE OF ASPHALT SHOULDER.

CONTROL STATION ID. 4008
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 27.002
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,895.572
Y (NORTH) 1,059,346.478

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,956,342.389
Y (NORTH) 194,705.905

AZIMUTH TO STATION 4000 IS 85° 22' 07"

RECOVERED MARCH, 2011, 1' UNDERGROUND. REFERENCES GOOD.

DETAILED DESCRIPTION

STATION IS A PIN & CAP SET FLUSH WITH GROUND LOCATED OFF OF ASPHALT SHOULDER OF I-264 EAST BOUND LANE. TO REACH STATION FROM I-264 EAST BOUND LANE AT I-64 OVERPASS PROCEED +/- 0.3 MILES ALONG I-264 EAST BOUND LANE. STATION IS +/- 3.5' SOUTH OF SOUTH EDGE OF ASPHALT SHOULDER.

CONTROL STATION ID. 212
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 12.248
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,607.669
Y (NORTH) 1,057,051.567

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,955,397.827
Y (NORTH) 187,176.683

AZIMUTH TO STATION 213 IS 175° 55' 24"

RECOVERED MARCH, 2011. REFERENCES REVISED.

DETAILED DESCRIPTION

STATION IS A PIN & CAP SET FLUSH WITH GROUND OF ASPHALT SHOULDER OF I-64 EAST BOUND LANE. TO REACH STATION FROM I-64 EAST BOUND LANE AT SOUTH END OF BRIDGE OVER THE EASTERN BRANCH OF THE ELIZABETH RIVER PROCEED +/- 0.1 MILES ALONG I-64 EAST BOUND LANE. STATION IS APPROXIMATELY +/- 3.5' EAST OF EAST EDGE OF ASPHALT SHOULDER.

CONTROL STATION ID. 106
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 17.658
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,469.754
Y (NORTH) 1,058,601.671

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,954,945.352
Y (NORTH) 192,262.36

AZIMUTH TO STATION 105 IS 173° 53' 53"

RECOVERED MARCH, 2011 UNDER 1" ASPHALT OVERLAY. REFERENCES GOOD.

DETAILED DESCRIPTION

STATION IS A PK NAIL & CAP SET IN ASPHALT SHOULDER OF I-64 WEST BOUND LANE. TO REACH STATION FROM I-64 WEST BOUND LANE AT NORTH END OF BRIDGE OVER THE EASTERN BRANCH OF THE ELIZABETH RIVER PROCEED +/- 0.6 MILES ALONG I-64 WEST BOUND LANE. STATION IS APPROXIMATELY +/- 5' WEST OF EAST EDGE OF ASPHALT SHOULDER.

CONTROL STATION ID. 213
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 14.657
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,636.268
Y (NORTH) 1,056,650.305

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,955,491.656
Y (NORTH) 185,860.209

AZIMUTH TO STATION 212 IS 355° 55' 24"

RECOVERED MARCH, 2011. REFERENCES REVISED.

DETAILED DESCRIPTION

STATION IS A PIN & CAP SET FLUSH WITH GROUND OF ASPHALT SHOULDER OF I-64 EAST BOUND LANE. TO REACH STATION FROM I-64 EAST BOUND LANE AT SOUTH END OF BRIDGE OVER THE EASTERN BRANCH OF THE ELIZABETH RIVER PROCEED +/- 0.35 MILES ALONG I-64 EAST BOUND LANE. STATION IS APPROXIMATELY +/- 3' EAST OF EAST EDGE OF ASPHALT SHOULDER.

Note: The Vertical Values for this Project Were Originally Based on NGVD 29 Datum. To Match the Adjoining Project to the East VDOT Converted the Vertical Values in this Survey to NAVD88 Datum Based on an Average Horizontal Position for the Project. In Preparing the Control Sheets for Sealing All the Vertical Values were Recalculated Based on Their Individual Horizontal Positions.

| | PROJECT | SHEET NO. |
| --- | --- | --- |
| | 0264-122-108 | 1G(4) |

VDOT PM

HORIZONTAL CONTROL

LIMITED ACCESS HIGHWAY

LIMITED ACCESS HIGHWAY

| STATE | ROUTE | PROJECT | SHEET NO. |
|---|---|---|---|
| VA. | 264 | 0264-122-108, RW-204 C-508 | 1G(3) |

DESIGN FEATURES RELATING TO CONSTRUCTION OR TO REGULATION AND CONTROL OF TRAFFIC MAY BE SUBJECT TO CHANGE AS DEEMED NECESSARY BY THE DEPARTMENT

SURVEYED BY, DATE Woolpert, Inc. (757) 339-6802, Danny Williams, L.S. (757) 925-2556, Hampton Roads District
DESIGN BY AECOM (757) 493-4224
SUBSURFACE UTILITY BY, DATE Bias Associates, Inc. (252) 306-4260, June 2015

CONTROL STATION ID. 122-0106
ROUTE I-264 COUNTY/CITY NORFOLK
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 17.89
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,505.018
Y (NORTH) 1,062,130.952

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,955,061.045
Y (NORTH) 203,841.298

AZIMUTH TO STATION 122-0107 IS 176°58'32"

RECOVERED MARCH, 2011. REFERENCES REVISED.

DETAILED DESCRIPTION

STATION IS A STANDARD VDOT DISC SET IN CONCRETE OFF OF ASPHALT SHOULDER OF I-64 WEST BOUND LANE. TO REACH STATION FROM I-64 WEST BOUND LANE AT THE OVERPASS FOR KEMPSVILLE ROAD PROCEED +/- 0.9 MILES ALONG I-64 WEST BOUND LANE. STATION IS APPROXIMATELY +/- 4' EAST OF EAST EDGE OF ASPHALT SHOULDER.

Exit To Northampton Blvd.
SS 100+00.000
Kempsville Road
Survey Trav.
Asphalt Shoulder
I-64 WBL
Conc. Bridge
HOV
I-64 EBL

CONTROL STATION ID. 122-0109
ROUTE I-264 COUNTY/CITY NORFOLK
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 16.97
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,488.826
Y (NORTH) 1,059,990.277

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,955,007.924
Y (NORTH) 196,818.101

AZIMUTH TO STATION 107 IS 182°1'11"

RECOVERED MARCH, 2011. REFERENCES REVISED.

DETAILED DESCRIPTION

STATION IS A STANDARD VDOT DISC SET IN CONCRETE OFF OF ASPHALT SHOULDER OF I-64 WEST BOUND LANE. TO REACH STATION FROM I-64 WEST BOUND LANE AT THE OVERPASS FOR KEMPSVILLE ROAD PROCEED +/- 0.1 MILES ALONG I-64 WEST BOUND LANE. STATION IS APPROXIMATELY +/- 6' EAST OF EAST EDGE OF ASPHALT SHOULDER.

Conc. V-Ditch
PI 170+26.938
I-264
Survey Trav.
Guardrail
Asphalt Shoulder
I-64 WBL
Conc. Bridge
HOV
I-64 EBL

CONTROL STATION ID. 105
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 11.868
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,513.318
Y (NORTH) 1,058,194.166

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,955,088.277
Y (NORTH) 190,925.380

AZIMUTH TO STATION 104 IS 173°50'22"

RECOVERED MARCH, 2011 UNDER 3" ASPHALT OVERLAY. REFERENCES RESET.

DETAILED DESCRIPTION

STATION IS A PK NAIL & CAP SET IN ASPHALT SHOULDER OF I-64 WEST BOUND LANE. TO REACH STATION FROM I-64 WEST BOUND LANE AT NORTH END OF BRIDGE OVER THE EASTERN BRANCH OF THE ELIZABETH RIVER PROCEED +/- 0.3 MILES ALONG I-64 WEST BOUND LANE. STATION IS APPROXIMATELY +/- 4' WEST OF EAST EDGE OF ASPHALT SHOULDER.

6' Chain Link Fence
PI 229+30.528
PK Nail
Guardrail
Asphalt Shoulder
Survey Trav.
I-64 WBL
Jersey Barrier
HOV
Asphalt
Crash Nose
I-64 EBL

CONTROL STATION ID. 122-0107
ROUTE I-264 COUNTY/CITY NORFOLK
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 14.85
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,529.518
Y (NORTH) 1,061,667.237

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,955,141.427
Y (NORTH) 202,319.924

AZIMUTH TO STATION 122-0108 IS 181°23'21"

RECOVERED MARCH, 2011. REFERENCES REVISED.

DETAILED DESCRIPTION

STATION IS A STANDARD VDOT DISC SET IN CONCRETE OFF OF ASPHALT SHOULDER OF I-64 WEST BOUND LANE. TO REACH STATION FROM I-64 WEST BOUND LANE AT THE OVERPASS FOR KEMPSVILLE ROAD PROCEED +/- 0.6 MILES ALONG I-64 WEST BOUND LANE. STATION IS APPROXIMATELY +/- 3' EAST OF EAST EDGE OF ASPHALT SHOULDER.

PI 115+23.494
END GUARD RAIL
LIGHT POLE #642096
Guardrail
Survey Trav.
EDGE ASPH.
I-64 WBL
Asphalt Shoulder
Jersey Barrier
HOV
I-64 EBL

CONTROL STATION ID. 107
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 39.239
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,453.947
Y (NORTH) 1,059,001.204

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,954,893.491
Y (NORTH) 193,573.117

AZIMUTH TO STATION 8020 IS 178°37'51"

RECOVERED MARCH, 2011. REFERENCES GOOD.

DETAILED DESCRIPTION

STATION IS A PK NAIL & CAP SET IN ASPHALT SHOULDER OF I-64 WEST BOUND LANE. TO REACH STATION FROM I-64 WEST BOUND LANE AT NORTH END OF BRIDGE OVER THE EASTERN BRANCH OF THE ELIZABETH RIVER PROCEED +/- 0.8 MILES ALONG I-64 WEST BOUND LANE. STATION IS APPROXIMATELY +/- 4' WEST OF EAST EDGE OF ASPHALT SHOULDER.

PI 202+73.939
Guardrail
I-264 EBL On Ramp
PK Nail
Asphalt Shoulder
Survey Trav.
VDOT Illuminated Span Sign #640219
I-64 WBL
HOV
I-64 EBL

CONTROL STATION ID. 104
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 15.903
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,542.207
Y (NORTH) 1,057,926.522

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,955,183.057
Y (NORTH) 190,047.264

AZIMUTH TO STATION 103 IS 173°56'55"

RECOVERED MARCH, 2011 UNDER 3" ASPHALT OVERLAY. REFERENCES REVISED.

DETAILED DESCRIPTION

STATION IS A PK NAIL & CAP SET IN ASPHALT SHOULDER OF I-64 WEST BOUND LANE. TO REACH STATION FROM I-64 WEST BOUND LANE AT NORTH END OF BRIDGE OVER THE EASTERN BRANCH OF THE ELIZABETH RIVER PROCEED +/- 0.15 MILES ALONG I-64 WEST BOUND LANE. STATION IS APPROXIMATELY +/- 4' WEST OF EAST EDGE OF ASPHALT SHOULDER.

PI 238+13.724
Sound Barrier
Drill Hole In I-Beam
PK Nail
Asphalt Shoulder
Survey Trav.
I-64 WBL
Asphalt
HOV
Jersey Barrier
I-64 EBL

CONTROL STATION ID. 122-0108
ROUTE I-264 COUNTY/CITY NORFOLK
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 37.506
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,502.885
Y (NORTH) 1,060,568.956

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,955,054.047
Y (NORTH) 198,716.648

AZIMUTH TO STATION 122-0109 IS 181°23'31"

RECOVERED MARCH, 2011. REFERENCES GOOD.

DETAILED DESCRIPTION

STATION IS A STANDARD VDOT DISC SET IN CONCRETE OFF OF ASPHALT SHOULDER OF I-64 WEST BOUND LANE. TO REACH STATION FROM I-64 WEST BOUND LANE AT THE OVERPASS FOR VA BEACH BLVD PROCEED +/- 0.1 MILES ALONG I-64 WEST BOUND LANE. STATION IS APPROXIMATELY +/- 4' EAST OF EAST EDGE OF ASPHALT SHOULDER.

Wade Street
Kempsville Road
PI 151+27.831
Va Beach Blvd.
Survey Trav.
Jersey Barrier
Asphalt Shoulder
Conc. Bridge
I-64 WBL
HOV
I-64 EBL

CONTROL STATION ID. 8020
ROUTE I-264 COUNTY/CITY VA BEACH
ESTABLISHED BY WOOLPERT, LLP YEAR 2001
VERTICAL DATUM BASED ON NAVD88 ELEV. 33.442
HORIZONTAL DATUM BASED ON NAD83
Va STATE PLANE COORDINATES
NAD 1983 METRIC VALUES S ZONE
X (EAST) 3,705,459.111
Y (NORTH) 1,058,785.140

Va DEPT. TRANS. PROJECT COORDINATES
X (EAST) 3,954,910.434
Y (NORTH) 192,864.248

AZIMUTH TO STATION 106 IS 176°40'48"

RECOVERED MARCH, 2011 UNDER 3" ASPHALT OVERLAY. REFERENCES REVISED.

DETAILED DESCRIPTION

STATION IS A PK NAIL & CAP SET IN ASPHALT SHOULDER OF I-64 WEST BOUND LANE. TO REACH STATION FROM I-64 WEST BOUND LANE AT NORTH END OF BRIDGE OVER THE EASTERN BRANCH OF THE ELIZABETH RIVER PROCEED +/- 0.7 MILES ALONG I-64 WEST BOUND LANE. STATION IS APPROXIMATELY +/- 2' WEST OF EAST EDGE OF ASPHALT SHOULDER.

Curlew Drive
DRILL HOLE TOP/CURB
PI 209+83.010
Guardrail
Asphalt Shoulder
Survey Trav.
I-64 WBL
Conc. Bridge
HOV
I-64 EBL

Note: The Vertical Values for this Project Were Originally Based on NGVD 29 Datum. To Match the Adjoining Project to the East VDOT Converted the Vertical Values in this Survey to NAVD88 Datum Based on an Average Horizontal Position for the Project. In Preparing the Control Sheets for Seating All the Vertical Values were Recalculated Based on Their Individual Horizontal Positions.

| PROJECT | SHEET NO. |
|---|---|
| 0264-122-108 | 1G(3) |

LIMITED ACCESS HIGHWAY

VA. 164

DESIGN FEATURES RELATING TO CONSTRUCTION OR TO REGULATION AND CONTROL OF TRAFFIC MAY BE SUBJECT TO CHANGE AS DEEMED NECESSARY BY THE DEPARTMENT.

**SURVEY ALIGNMENTS**

| POINT | STATION | BEARING | NORTH (Y) | EAST (X) |
|---|---|---|---|---|

**SURVEY ALIGNMENTS**

| POINT | STATION | BEARING | NORTH (Y) | EAST (X) |
|---|---|---|---|---|

BENCHMARKS

SURVEY ALIGNMENTS

LIMITED ACCESS HIGHWAY — By Resolution of Highway Commission
LIMITED ACCESS HIGHWAY — By Resolution of Commonwealth Transportation Board dated October 15, 2014

| REVISED | STATE | ROUTE | PROJECT | SHEET NO. |
|---|---|---|---|---|
| | VA. | 264 | 0264-122-108, RW-204 C-508 | IG(7) |

DESIGN FEATURES RELATING TO CONSTRUCTION OR TO REGULATION AND CONTROL OF TRAFFIC MAY BE SUBJECT TO CHANGE AS DEEMED NECESSARY BY THE DEPARTMENT

PROJECT MANAGER
SURVEYED BY, DATE
DESIGN BY
SUBSURFACE UTILITY BY, DATE

# SURVEY DATA SHEET

AA1 In Pl. DI, Rim = 16.07
AB1 In Pl. 24" Conc. Pipe, Inv. In = 10.97, Inv. Out = 10.65
AC1 In Pl. DI, Rim = 17.28
AD1 In Pl. 15" Conc. Pipe, Inv. In = 13.24, Inv. Out = 10.98
AE1 In Pl. DI, Rim = 17.67
AF1 In Pl. 24" Conc. Pipe, Inv. In = 10.61, Inv. Out = 10.44
AG1 In Pl. Double DI, Rim (a) = 18.56, Rim (b) = 17.47
AH1 In Pl. 15" Conc. Pipe, Inv. In = 12.78, Inv. Out = 10.49
AI1 In Pl. DI, Rim = 17.05
AJ1 In Pl. DI, Rim = 17.69
AK1 In Pl. 15" Conc. Pipe, Inv. In = 13.27, Inv. Out = 11.70
AL1 In Pl. 24" Conc. Pipe, Inv. In = 10.22, Inv. Out = 10.30
AM1 In Pl. 15" Conc. Pipe, Inv. In = 8.56, Inv. Out = 8.46
AN1 In Pl. 12" Conc. Pipe, Inv. In = 9.71, Inv. Out = 8.56
AO1 In Pl. SSMH, Rim = 10.91
AP1 In Pl. 15" Conc. Pipe, Inv. In = 8.43, Inv. Out = 8.21
AQ1 In Pl. DI, Rim = 10.68
AR1 In Pl. 15" Conc. Pipe, Inv. In = 7.80, Inv. Out = 7.62
AS1 In Pl. 15" Conc. Pipe, Inv. In = 7.80, Inv. Out = 7.98
AT1 In Pl. 12" Conc. Pipe, Inv. In = N/A, Inv. Out = 7.89
AU1 In Pl. SSMH, Rim = 10.95
AV1 In Pl. 12" Conc. Pipe, Inv. In = 8.06, Inv. Out = 7.95
AW1 In Pl. DI, Rim = 10.41
AX1 In Pl. 12" Conc. Pipe, Inv. In = 10.24, Inv. Out = 8.14
AY1 In Pl. 12" Metal / PVC, Inv. In = 10.85, Inv. Out = 10.46
AZ1 In Pl. 12" Metal Pipe, Inv. In = 10.92, Inv. Out = 10.83
BA1 In Pl. 18" Conc. Pipe, Inv. In = 10.04, Inv. Out = 9.86

BB1 In Pl. 18" Conc. Pipe, Inv. In = 5.15, Inv. Out = 5.13
BC1 In Pl. DI, Rim = 9.11
BD1 In Pl. 24" Conc. Pipe, Inv. In = 4.89, Inv. Out = 4.65
BE1 In Pl. SSMH, Rim = 12.45
BF1 In Pl. 24" Conc. Pipe, Inv. In = 4.56, Inv. Out = 4.16
BG1 In Pl. SSMH, Rim = 11.93
BH1 In Pl. 24" Conc. Pipe, Inv. In = 4.13, Inv. Out = 4.03
BI1 In Pl. 15" Conc. Pipe, Inv. In = 8.81, Inv. Out = 8.59
BJ1 In Pl. SSMH, Rim = 11.27
BK1 In Pl. 12" Conc. Pipe, Inv. In = 8.65, Inv. Out = 8.25
BL1 In Pl. 24" Conc. Pipe, Inv. In = 8.41, Inv. Out = 8.32
BM1 In Pl. 12" Conc. Pipe, Inv. In = 8.465, Inv. Out = 8.22
BN1 In Pl. 12" Conc. Pipe, Inv. In = 9.68, Inv. Out = 9.24
BO1 In Pl. 12" Metal Pipe, Inv. In = 9.66, Inv. Out = 9.59
BP1 In Pl. 12" Metal Pipe, Inv. In = 10.61, Inv. Out = 10.47
BQ1 In Pl. 15" Conc. Pipe, Inv. In = 8.66, Inv. Out = 8.39
BR1 In Pl. 10" Conc. Pipe, Inv. In = 10.06, Inv. Out = 10.04
BS1 In Pl. 12" Conc. Pipe, Inv. In = 10.17, Inv. Out = 10.05
BT1 In Pl. DI, Rim = 11.51
BU1 In Pl. 12" Conc. Pipe, Inv. In = 10.08, Inv. Out = 9.94
BV1 In Pl. DI, Rim = 11.46
BW1 In Pl. 15" Conc. Pipe, Inv. In = 9.79, Inv. Out = 9.73
BX1 In Pl. 12" Conc. Pipe, Inv. In = 9.53, Inv. Out = 9.72
BY1 In Pl. DI, Rim = 8.37
BZ1 In Pl. 12" Conc. Pipe, Inv. In = 9.80, Inv. Out = 9.87
CA1 In Pl. 12" Conc. Pipe, Inv. In = 9.96, Inv. Out = 9.92

CB1 In Pl. 12" Metal Pipe, Inv. In = 10.12, Inv. Out = 10.08
CC1 In Pl. 12" Conc. Pipe, Inv. In = 10.02, Inv. Out = 9.88
CD1 In Pl. 12" Conc. Pipe, Inv. In = 10.21, Inv. Out = 9.95
CE1 In Pl. 12" Conc. Pipe, Inv. In = 9.90, Inv. Out = 9.86
CF1 In Pl. 15" Conc. Pipe, Inv. In = 9.96, Inv. Out = 9.68
CG1 In Pl. SSMH, Rim = 8.05
CH1 In Pl. DI, Rim = 7.47, Inv. Out = 3.59
CI1 In Pl. 15" Conc. Pipe
CJ1 In Pl. DI, Rim = 7.47; In Pl. 15" Conc. Pipe, Inv. In = 2.81, Inv. Out = 2.47
CK1 In Pl. 15" Conc. Pipe, Inv. In = 2.70, Inv. Out = 2.59
CL1 In Pl. 15" Conc. Pipe
CM1 In Pl. 24" Conc. Pipe, Inv. In = 2.22, Inv. Out = 1.70
CO1 In Pl. 12" Conc. Pipe, Inv. In = 10.05, Inv. Out = 9.82
CP1 In Pl. 12" Conc. Pipe, Inv. In = 9.99, Inv. Out = 9.82
CQ1 In Pl. 12" Conc. Pipe, Inv. In = 9.50, Inv. Out = 9.44
CR1 In Pl. 12" Conc. Pipe, Inv. In = 9.96, Inv. Out = 9.97
CS1 In Pl. DI, Rim = 16.89
CT1 In Pl. 15" Conc. Pipe, Inv. In = 12.14, Inv. Out = 11.84
CU1 In Pl. Double DI, Rim (a) = 17.84, Rim (b) = 17.23
CV1 In Pl. 15" Conc. Pipe, Inv. In = 11.94, Inv. Out = Inaccessible
CW1 In Pl. DI, Rim = 18.00 (Full Of Debris)
CX1 In Pl. 24" Conc. Pipe, Inv. In = Inaccessible, Inv. Out = 10.26
CY1 In Pl. Double DI, Rim (a) = 18.64, Rim (b) = 17.51 (Full Of Debris)
CZ1 In Pl. Double DI, Rim (a) = 17.57, Rim (b) = 16.46

DA1 In Pl. 24" Conc. Pipe, Inv. In = 12.08, Inv. Out = 10.76
DB1 In Pl. 15" CMP, Inv. In = 7.52, Inv. Out = 7.26
DC1 In Pl. 18" Conc. Pipe, Inv. In = 7.09, Inv. Out = 7.02
DD1 In Pl. DI, Rim = 13.84
DE1 In Pl. 15" Conc. Pipe, Inv. In = 10.23, Inv. Out = 5.87
DF1 In Pl. DI, Rim = 10.84
DG1 In Pl. DI, Rim = 13.54
DH1 In Pl. 15" Conc. Pipe, Inv. In = 8.97, Inv. Out = 8.39
DI1 In Pl. 10" Conc. Pipe, Inv. In = 10.55, Inv. Out = 10.34
DJ1 In Pl. DI, Rim = 13.50
DK1 In Pl. 18" Conc. Pipe, Inv. In = 7.24, Inv. Out = 6.96
DL1 In Pl. SSMH, Rim = 11.83
DM1 In Pl. 18" Conc. Pipe, Inv. In = 6.93, Inv. Out = 6.58
DN1 In Pl. SSMH, Rim = 13.93
DO1 In Pl. 18" Conc. Pipe, Inv. In = 6.53, Inv. Out = 6.11
DP1 In Pl. 15" Conc. Pipe, Inv. In = 6.97, Inv. Out = 6.10
DR1 In Pl. 15" Conc. Pipe, Inv. In = 8.08, Inv. Out = 7.12
DS1 In Pl. DI, Rim = 12.49
DT1 In Pl. 15" Conc. Pipe, Inv. In = 6.92, Inv. Out = 6.00
DU1 In Pl. DI, Rim = 12.35
DV1 In Pl. 15" Conc. Pipe, Inv. In = -5.95, Inv. Out = 4.06
DW1 In Pl. 30" CMP, Inv. In = 6.65, Inv. Out = 6.56
DX1 In Pl. DI, Rim = 9.70
DY1 In Pl. 15" Conc. Pipe, Inv. In = 6.68, Inv. Out = 5.69
DZ1 In Pl. DI, Rim = 10.03
EA1 In Pl. 24" Conc. Pipe, Inv. In = 5.79, Inv. Out = 4.15

EB1 In Pl. DI, Rim = 10.90
EC1 In Pl. 24" Conc. Pipe, Inv. In = 4.00, Inv. Out = 3.95
ED1 In Pl. SSMH, Rim = 12.23
EE1 In Pl. 24" Conc. Pipe, Inv. In = 3.83, Inv. Out = 3.35
EF1 In Pl. 15" Conc. Pipe, Inv. In = 11.63, Inv. Out = 10.14
EG1 In Pl. DI, Rim = 14.48
EH1 In Pl. DI, Rim = 14.58 (Full Of Debris)
EI1 In Pl. 15" Conc. Pipe, Inv. In (upper) = Inaccessible, Inv. In (lower) = Inaccessible, Inv. Out (upper) = 10.18, Inv. Out (lower) = 5.14
EJ1 In Pl. 15" Conc. Pipe, Inv. In = 4.45, Inv. Out = Inaccessible
EK1 In Pl. 72"x84" Box Culvert, Inv. In = 1.94, Inv. Out = 0.11
EL1 In Pl. DI, Rim = 39.45
EM1 In Pl. 15" Conc. Pipe, Inv. In = 35.17, Inv. Out = 35.96
EN1 In Pl. DI, Rim = 39.36
EO1 In Pl. 15" Conc. Pipe, Inv. In = 34.84, Inv. Out = 34.35
EP1 In Pl. DI, Rim = 40.74
EQ1 In Pl. DI, Rim = 35.82
ER1 In Pl. 15" Conc. Pipe, Inv. In = 30.41, Inv. Out = 30.07
ES1 In Pl. DI, Rim = 40.92
ET1 In Pl. 15" Conc. Pipe, Inv. In = 30.03, Inv. Out = 29.77
EU1 In Pl. 15" Conc. Pipe, Inv. In = 29.77, Inv. Out = 29.78

EV1 In Pl. DI, Rim = 36.70
EW1 In Pl. 15" Conc. Pipe w/15" Corr. PVC Extension, Inv. In = 29.76, Inv. Out = 4.62
EX1 In Pl. 24" Conc. Pipe, Inv. In = 6.85, Inv. Out = 5.92
EY1 In Pl. DI, Rim = 10.77
EZ1 In Pl. 15" Conc. Pipe, Inv. In = 7.73, Inv. Out = 7.15
FA1 In Pl. DI, Rim = 10.26
FB1 In Pl. 15" Conc. Pipe, Inv. In = 6.71, Inv. Out = 6.99
FC1 In Pl. DI, Rim = 10.20
FD1 In Pl. 24" Conc. Pipe, Inv. In = 5.39, Inv. Out = 4.91
FE1 In Pl. DI, Rim = 11.03
FF1 In Pl. 15" Conc. Pipe, Inv. In = 7.49, Inv. Out = 7.15
FG1 In Pl. 24" Conc. Pipe, Inv. In = 4.88, Inv. Out = 3.84
FH1 In Pl. DI, Rim = 10.57
FI1 In Pl. 15" Conc. Pipe, Inv. In = 8.04, Inv. Out = 7.29
FJ1 In Pl. DI, Rim = 10.20
FK1 In Pl. 15" Conc. Pipe, Inv. In = 7.26, Inv. Out = 6.84
FL1 In Pl. DI, Rim = 10.13
FM1 In Pl. 15" Conc. Pipe, Inv. In = 6.83, Inv. Out = 6.67
FN1 In Pl. DI, Rim = 39.75
FO1 In Pl. 12" Conc. Pipe, Inv. In = 35.55, Inv. Out = 34.18
FP1 In Pl. DI, Rim = 42.27
FQ1 In Pl. 18" Conc. Pipe, Inv. In = 34.07, Inv. Out = 33.35
FR1 In Pl. DI, Rim = 42.28
FS1 In Pl. 18" Conc. Pipe, Inv. In = 33.34, Inv. Out = 33.34

FT1 In Pl. DI, Rim = 39.54
FU1 In Pl. 18" Conc. Pipe w/24" Corr. PVC Extension, Inv. In = 33.34, Inv. Out = 30.21
FV1 In Pl. 96"x72" Double Box Culvert, Inv. In = -3.22, Inv. Out = -3.30
FW1 In Pl. 96"x72" Double Box Culvert, Inv. In = -3.52, Inv. Out = -3.31
FY1 In Pl. 96"x120" Box Culvert, Inv. In = -3.24, Inv. Out = -3.24
FZ1 In Pl. 96"x120" Box Culvert, Inv. In = -3.25, Inv. Out = -3.29
GA1 In Pl. 15" Conc. Pipe, Inv. In = 7.35, Inv. Out = 7.25
GB1 In Pl. 15" Conc. Pipe, Inv. In = 8.48, Inv. Out = 8.25
GC1 In Pl. 15" Conc. Pipe, Inv. In = 7.97, Inv. Out = 6.59
GD1 In Pl. 12" Conc. Pipe, Inv. In = 10.99, Inv. Out = 10.92
GE1 In Pl. 15" Conc. Pipe, Inv. In = 10.06, Inv. Out = 9.84
GF1 In Pl. 15" Conc. Pipe, Inv. In = 7.83, Inv. Out = 7.78
GG1 In Pl. 15" Conc. Pipe, Inv. In = 8.30, Inv. Out = 8.13
GH1 In Pl. 12" Conc. Pipe, Inv. In = 13.16, Inv. Out = 12.83
GI1 In Pl. DI, Rim = 14.06
GJ1 In Pl. 12" CPP, Inv. In = 11.60, Inv. Out = 11.03
GK1 In Pl. 12" Conc. Pipe, Inv. In = 12.28, Inv. Out = 11.74
GL1 In Pl. DI, Rim = 13.65
GM1 In Pl. 15" Conc. Pipe, Inv. In = 11.60, Inv. Out = 11.03
GN1 In Pl. DI, Rim = 19.21
GO1 In Pl. 18" Conc. Pipe, Inv. In = 14.45, Inv. Out = 13.90
GP1 In Pl. Double DI, Rim (a) = 17.49, Rim (b) = 19.72
GQ1 In Pl. 18" Conc. Pipe, Inv. In = Inaccessible, Inv. Out = 13.92

GR1 In Pl. 18" Conc. Pipe, Inv. In = 13.70, Inv. Out = 13.26
GS1 In Pl. DI, Rim = 19.01
GT1 In Pl. 18" Conc. Pipe, Inv. In = 13.76, Inv. Out = 13.36
GU1 In Pl. 18" Conc. Pipe, Inv. In = 13.26, Inv. Out = 13.32
GV1 In Pl. Double DI, Rim (a) = 19.51, Rim (b) = 17.32
GW1 In Pl. SSMH, Rim = 18.28 (Unsafe Conditions)
GX1 In Pl. 15" Conc. Pipe, Inv. In = Inaccessible, Inv. Out = 10.08
HA1 In Pl. Double DI, Rim (a) = 16.21, Rim (b) = 17.14
HB1 In Pl. 18" Conc. Pipe, Inv. In = 12.04, Inv. Out = 11.63
HC1 In Pl. Double DI, Rim (a) = 17.06, Rim (b) = 16.21
HD1 In Pl. 18" Conc. Pipe, Inv. In = 11.56, Inv. Out = 10.54
HE1 In Pl. Double DI, Rim (a) = 16.05, Rim (b) = 16.38
HF1 In Pl. 24" Conc. Pipe, Inv. In = 9.40, Inv. Out = 9.51
HG1 In Pl. Double DI, Rim (a) = 16.19, Rim (b) = 17.57
HH1 In Pl. DI, Rim = 15.66
HI1 In Pl. 15" Conc. Pipe, Inv. In = 12.06, Inv. Out = 11.93
HJ1 In Pl. DI, Rim = 15.86
HK1 In Pl. 15" Conc. Pipe, Inv. In = 11.91, Inv. Out = 11.53
HL1 In Pl. Double DI, Rim (a) = 16.28, Rim (b) = 15.58
HM1 In Pl. 15" Conc. Pipe, Inv. In = 11.48, Inv. Out = 11.23
HN1 In Pl. Double DI, Rim (a) = 15.55, Rim (b) = 16.33
HO1 In Pl. 18" Conc. Pipe, Inv. In = 10.00, Inv. Out = 9.93
HP1 In Pl. 24" Conc. Pipe, Inv. In = 9.65, Inv. Out = 8.92

HQ1 In Pl. 24" Conc. Pipe, Inv. In = 11.67, Inv. Out = 9.55
HR1 In Pl. Double DI, Rim (a) = 36.65, Rim (b) = 39.21
HS1 In Pl. 15" Conc. Pipe, Inv. In = 30.08, Inv. Out = 29.73
HT1 In Pl. DI, Rim = 39.01
HU1 In Pl. 15" Conc. Pipe, Inv. In = 29.71, Inv. Out = 29.78
HV1 In Pl. DI, Rim = 36.40
HW1 In Pl. 15" Conc. Pipe, Inv. In = 29.65, Inv. Out = 29.04
HX1 In Pl. DI, Rim = 35.84
HY1 In Pl. 18" Conc. Pipe, Inv. In = 28.16, Inv. Out = 12.57
HZ1 In Pl. DI, Rim = 40.34
IA1 In Pl. 15" Conc. Pipe, Inv. In = Inaccessible, Inv. Out = 33.80
IB1 In Pl. DI, Rim = 37.81
IC1 In Pl. 15" Conc. Pipe, Inv. In = 33.61, Inv. Out = 32.00
ID1 In Pl. DI, Rim = 40.13
IE1 In Pl. 15" Conc. Pipe, Inv. In = 31.78, Inv. Out = 30.62
IF1 In Pl. DI, Rim = 37.87
IG1 In Pl. 15" Conc. Pipe, Inv. In = 27.61, Inv. Out = Not Found
IH1 In Pl. DI, Rim = 33.95
II1 In Pl. 15" Conc. Pipe, Inv. In = Inaccessible, Inv. Out = 28.73
IJ1 In Pl. DI, Rim = 32.66
IK1 In Pl. 15" Conc. Pipe, Inv. In = 28.60, Inv. Out = 27.61
IL1 In Pl. DI, Rim = 30.63
IM1 In Pl. 15" Conc. Pipe, Inv. In = 23.31, Inv. Out = 23.14
IN1 In Pl. DI, Rim = 33.94
IO1 In Pl. 15" Conc. Pipe, Inv. In = 23.04, Inv. Out = 12.10

| PROJECT | SHEET NO. |
|---|---|
| 0264-122-108 | IG(7) |